UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 15-22180-SBB |
| HAIMARK LINE, LTD. | ) | |
| EIN:   46-5744608 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**MOTION TO REJECT EXECUTORY CONTRACT
(TIME-CHARTERPARTY AGREEMENT)**

The Debtor, Haimark Line, Ltd. ("Debtor"), by and through its attorneys, Kutner Brinen Garber, P.C., moves the Court pursuant to 11 U.S.C. § 365 and Federal Rules of Bankruptcy Procedure 6006 and 9014 for approval of the rejection of an executory contract entered into by and between Clipper Cruises, Ltd. ("Clipper") and the Debtor, and as grounds therefor, states as follows:

1.      The Debtor filed for relief under Chapter 11 of the Bankruptcy Code on October 30, 2015 ("Petition Date") and remains a Debtor in Possession.

2.      The Debtor owns and operates a cruise line based out of Lakewood, Colorado.

3.      Prior to the Petition Date, the Debtor and Clipper entered into a Time-Charterparty Agreement dated July 22, 2014, and three (3) Addendums thereto, (collectively, the "Agreement") for the Debtor to charter the M/V Sea Voyager, renamed the Saint Laurent, (the "Ship") from Clipper, which is the owner of the Ship.  The shipbroker for the Agreement was FleetPro Ocean, Inc.  A copy of the Agreement is attached hereto as Exhibit A.

4.      The Agreement provides for the Debtor to charter the Ship from Clipper for a period of sixty (60) months, commencing on the day the Ship was delivered to the Debtor, which, pursuant to the Agreement, was originally scheduled to occur on May 3, 2015, and was amended to occur between May 6 and May 10, 2015.  The Ship was actually delivered to the Debtor on May 12, 2015.  In exchange for the use of the Ship, the Debtor is required to pay Clipper daily fees based on the destination of the Ship and the season that the Ship is being used. Pursuant to the Agreement, the Debtor is to pay Clipper the daily fees that accumulated in the previous month on the first day of each month.  The Agreement provides for the daily fees to increase on an annual basis.

5.      The Agreement is executory in nature in that it requires the Debtor, among other things, to make payments to Clipper, and requires Clipper, among other things, to allow the Debtor to use the Ship.

6.      The Debtor seeks Court approval to reject the Agreement.   Rejection of the Agreement will allow the Debtor to reduce its expenses and to negotiate an agreement for a new ship, or negotiate a new agreement for the Ship, on terms that are more favorable to the Debtor. Such actions will greatly assist the Debtor in its reorganization.

7.      The Debtor, in an exercise of its business judgment, has determined that it is in its best interest to reject the Agreement.

8.      Courts generally review the rejection of executory contracts and unexpired leases under the business judgment standard. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1983). A debtor's decision to assume or reject a lease should be approved when the debtor decides, in good faith, that the assumption or rejection would be beneficial to the estate. *In re Minges*, 602 F.2d 38, 43 (2nd Cir. 1979).   Court approval under section 365(a) "should be granted as a matter of course." *In re Summit Land Co.*, 13 B.R. 310, 315 (Bankr. D. Utah 1981).

9.      The Debtor has determined that rejection of the Agreement is in its best interest. Further, rejection of the Agreements is in the best interest of creditors and the estate since it will allow the Debtor to lower its expenses and to negotiate a new agreement on more favorable terms that will assist the Debtor in its reorganization.

10.      The Debtor requests that the Court approve the rejection of the Agreement as of the date of this Motion, November 17, 2015.

WHEREFORE, the Debtor prays that the Court make and enter an Order approving the Debtor's rejection of the Agreement with Clipper *nunc pro tunc* November 17, 2015, and for such further and additional relief as to the Court may appear appropriate.

Dated: November 17, 2015

Respectfully submitted,

By:

Jeffrey S. Brinen #20565
Benjamin H. Shloss, #39276
**KUTNER BRINEN GARBER, P.C.**
1660 Lincoln Street, Suite 1850
Denver, CO 80264
Telephone:  (303) 832-2400
Telecopy: (303) 832-1510
E-Mail: jsb@kutnerlaw.com

2

# TIME-CHARTERPARTY AGREEMENT

*For*

# *M/V SEA VOYAGER*

*Between*

# CLIPPER CRUISES LTD.

*And*

# HAIMARK LINE LTD.

*Dated*

# JULY 22, 2014



**Exhibit A**

| | **BIMCO UNIFORM TIME-CHARTER (AS REVISED 2001)** **CODE NAME: "BALTIME 1939"** |
|---|---|

PART I

| 1. Shipbroker **FleetPro Ocean Inc.** **4770 Biscayne Blvd, PH-A** **Miami, FL 33137** | |
|---|---|
| | 2. Place and date of Charter **Miami - July 22, 2014** |
| 3. Owners/Place of business **Clipper Cruises Ltd.** **Pineapple Grove, Unit 3** **Nassau** **Bahamas** | 4. Charterers/Place of business **Haimark Line Ltd.** **1536 Cole Boulevard, Suite 333** **Lakewood, Colorado 80401** |
| 5. Vessel's Name **Sea Voyager** | 6. GT/NT **4954 / 1486** |
| 7. Class **Lloyd's Register, Bahamas Flag** | 8. Indicated brake horse power (bhp) **N/A** |
| 9. Total tons d. w. (abt.) on summer freeboard | 10. Cubic feet grain/bale capacity **N/A** |
| 11. Permanent bunkers (abt.) **N/A** | 12. Speed capability in knots (abt.) on a consumption in tons (abt.) of **Economical Speed: 10-knots at 12 tons/24 hours, plus 2-4 tons for generators.** |
| 13. Present position **N/A** | 14. Period of hire (Cl. 1) **Sixty (60) months** |
| 15. Port of delivery (Cl. 1) **Portland, Maine** | 16. Time of delivery (Cl. 1) **May 3, 2015** |
| 17. (a) Trade limits (Cl. 2) **Great Lakes, East coast North America, Caribbean, Central America and Panama Canal. Always within IWL - Vessel not to trade to Cuba or North Korea or any other country from time to time subject to US embargo or prohibition.** (b) Cargo exclusions specially agreed | |
| 18. Bunkers on re-delivery (state min. and max. quantity)(Cl. 5) **N/A** | 19. Charter hire (Cl. 6) **See Clause 25** |
| 20. Hire payment (state currency, method and place of payment; also beneficiary and bank account) (Cl. 6) **United States Dollars to be paid monthly in advance via wire transfer (see Clause 25(b))** | |
| 21. Place or range of re-delivery (Cl. 7) **Jacksonville, Florida** | 22. Cancelling date (Cl. 21) **May 10, 2015** |
| 23. Dispute resolution (state 22(A), 22(B) or 22(C); if 22(C) agreed Place of Arbitration must be stated) (Cl. 22) **22(B)** | 24. Brokerage commission and to whom payable (Cl. 24) **1.25% to FleetPro Ocean Inc.** |
| 25. Numbers of additional clauses covering special provisions, if agreed **25 - 37 and Exhibits I-III** | |

*It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I as well as PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict.*

Issued 1909; Amended 1911; 1912; 1920; 1939; 1950; 1974; and 2001

Printed by BIMCO's Idea

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

(continued)                    "BALTIME 1939" (Revised 2001) UNIFORM TIME-CHARTER                    PART I

Signature (Owners)

Signature (Charterers)

This document is a computer generated VOLCOA form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## "BALTIME 1939" Uniform Time-Charter (as revised 2001)

It is agreed between the party mentioned in Box 3 as Owners 1
of the Vessel named in Box 5 of the gross/net tonnage 2
indicated in Box 6, classed as stated in Box 7 ~~and of indicated~~ 3
~~brake horse power (bhp) as stated in Box 8~~, carrying about 4
~~the number of tons deadweight indicated in Box 9~~ on 5
~~summer freeboard inclusive of bunkers, stores and~~ 6
~~provisions, having as per builder's plan a cubic feet grain/~~ 7
~~bale capacity as stated in Box 10~~, exclusive of permanent 8
bunkers, ~~which contain about the number of tons stated in~~ 9
~~Box 11, and fully loaded capable of steaming about the~~ 10
~~number of knots indicated in Box 12 in good weather and~~ 11
~~smooth water on a consumption of about the number of~~ 12
~~tons fuel oil stated in Box 12, now in position as stated in~~ 13
~~Box 13~~ having the further particulars set forth by EXHIBIT I, 14
and the party mentioned as Charterers in Box 4, as 15
follows:

1.  **Period/Port of Delivery/Time of Delivery** 16
    The Owners let, and the Charterers hire the Vessel for a 17
    period of the number of calendar months indicated in 18
    Box 14 from the time ~~(not a Sunday or a legal Holiday~~ 19
    ~~unless taken over)~~ the Vessel is delivered and placed at 20
    the disposal of the Charterers between 9 a.m. and 6 21
    p.m., ~~or between 9 a.m. and 2 p.m. if on Saturday~~, at the 22
    port stated in Box 15 in such available berth where she 23
    can safely lie always afloat, as the Charterers may direct, 24
    the Vessel being in every way fitted for ordinary ~~cargo~~ 25
    passenger
    service. The Vessel shall be delivered at the time 26
    indicated in Box 16. 27

2.  **Trade** 28
    The Vessel shall be employed in lawful trades for the 29
    carriage of passengers, their baggage and personal 30
    belongings and lawful merchandise only between safe
    ports
    or places where the Vessel can safely lie always afloat 31
    within the limits stated in Box 17. No live stock nor 32
    injurious, inflammable or dangerous goods (such as 33
    acids, explosives, calcium carbide, ferro silicon, 34
    naphtha, motor spirit, tar, or any of their products) shall 35
    be shipped. 36

3.  ~~Owners' Obligations~~ See Clauses 26 and 27 37
    ~~The Owners shall provide and pay for all provisions and~~ 38
    ~~Wages, for insurance of the Vessel, for all deck and~~ 39
    ~~Engine room stores and maintain her in a thoroughly~~ 40
    ~~efficient state in hull and machinery during service. The~~ 41
    ~~Owners shall provide winchmen from the crew to~~ 42
    ~~operate the Vessel's cargo handling gear, unless the~~ 43
    ~~crew's employment conditions or local union or port~~ 44
    ~~regulations prohibit this, in which case qualified shore~~ 45
    ~~winchmen shall be provided and paid for by the~~ 46
    ~~Charterers.~~ 47

4.  **Charterers' Obligations** 48
    The Charterers shall provide and pay for all fuel oil, lube oil, 49
    port
    charges, pilotages (whether compulsory or not), canal 50
    steersmen, boatage, lights, tug-assistance, consular 51
    charges (except those pertaining to the Master, officers 52
    and crew), canal, dock, water, sewage discharge and 53
    other dues and charges,
    including any foreign general municipality or state taxes, 54
    also all dock, harbour and tonnage dues at the ports of 55
    delivery and re-delivery (unless ~~incurred through cargo~~ 56
    ~~carried before delivery or after re-delivery~~), agencies, 57
    commissions, ~~also shall arrange and pay for loading,~~ 58
    ~~trimming, stowing (including dunnage and shifting~~ 59
    ~~boards, excepting any already on board), unloading,~~ 60
    ~~weighing, tallying and delivery of cargoes, surveys on~~ 61
    ~~hatches~~, meals supplied to officials and men in their 62

service and all other charges and expenses whatsoever 63
including detention and expenses through quarantine 64
(including cost of fumigation and disinfection). ~~All ropes,~~ 65
~~slings and special runners actually used for loading~~ 66
~~and discharging and any special gear, including special~~ 67
~~ropes and chains required by the custom of the port for~~ 68
~~mooring shall be for the Charterers' account. The Vessel~~ 69
~~shall be fitted with winches, derricks, wheels and or-~~ 70
~~dinary runners capable of handling lifts up to 2 tons.~~ 71

5.  **Bunkers** 72
    The Charterers at port of delivery and the Owners at port 73
    of re-delivery shall take over and pay for all fuel oil 74
    remaining in the Vessel's bunkers at invoice ~~current price at~~ 75
    ~~the~~
    ~~respective ports. The Vessel shall be re-delivered with~~ 76
    ~~not less than the number of tons and not exceeding the~~ 77
    ~~number of tons of fuel oil in the Vessel's bunkers stated~~ 78
    ~~in Box 18.~~ 79

6.  **Hire** 80
    The Charterers shall pay as hire the rate stated in Box 81
    19 ~~per 30 days~~ day, commencing in accordance with Clause 82
    1 until her re-delivery to the Owners. 83
    Payment of hire shall be made in cash, in the currency 84
    stated in Box 20, without discount, without any deduction 85
    or set-off whatsoever and free of bank charges ~~every 30~~
    ~~days~~ monthly, in
    advance, and in the manner prescribed in Box 20. In 86
    default of payment the Owners shall have the right of 87
    withdrawing the Vessel from the service of the Charterers, 88
    without notice and without protest and without interference by 89
    any court or any other formality whatsoever and without 90
    prejudice to any claim the Owners may otherwise have 91
    on the Charterers under the Charter. 92

7.  **Re-delivery** 93
    The Vessel shall be re-delivered on the expiration of the 94
    Charter in the same good order as when delivered to 95
    the Charterers (fair wear and tear excepted) at an ice- 96
    free port in the Charterers' option at the place or within 97
    the range stated in Box 21, between 9 a.m. and 6 p.m., 98
    and 9 a.m. and 2 p.m. on Saturday, but the day of re- 99
    delivery shall not be a Sunday or legal Holiday. 100
    The Charterers shall give the Owners not less than ten 101
    days' notice at which port and on about which day the 102
    Vessel will be re-delivered. ~~Should the Vessel be ordered~~ 103
    ~~on a voyage by which the Charter period will be exceeded~~ 104
    ~~the Charterers shall have the use of the Vessel to enable~~ 105
    ~~them to complete the voyage, provided it could be~~ 106
    ~~reasonably calculated that the voyage would allow~~ 107
    ~~redelivery about the time fixed for the termination of the~~ 108
    ~~Charter, but for any time exceeding the termination date~~ 109
    ~~the Charterers shall pay the market rate if higher than~~ 110
    ~~the rate stipulated herein.~~ 111

8.  ~~Cargo~~ Vessel Space 112
    The whole reach and burthen of the Vessel, including 113
    passenger accommodation and facilities,
    lawful deck-capacity shall be at the Charterers' disposal, 114
    reserving proper and sufficient space for the ~~Vessel's~~ 115
    ~~Master, officers, crew.~~ Owners crew, tackle, apparel, 116
    furniture,
    provisions and stores. Passengers however to be 117
    restricted to such parts of the Vessel as are customarily
    used by them.

9.  **Master** 118
    The Master shall prosecute all voyages with the utmost 119
    despatch and shall render customary assistance with 120
    the Vessel's crew. The Master shall be under the orders 121
    of the Charterers as regards employment, agency, or 122

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BALTIME 1939" Uniform Time-Charter (as revised 2001)
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

the Vessel's crew. The Master shall be under the orders of the Charterers as regards employment, agency, or other arrangements. The Master however to be solely responsible (on behalf of the Owners) for the management, handling, safety and navigation of the Vessel. The Charterers shall indemnify the Owners against all consequences or liabilities arising from the Master, officers or Agents signing Bills of Lading or other documents prepared by Charterers or otherwise complying with such orders, as well as from any irregularity in the Vessel's papers or for overcarrying goods passengers. The Owners shall not be responsible for shortage, mixture, marks, nor for Number of pieces or packages, nor for damage to or claims on cargo caused by bad stowage or otherwise. If the Charterers have reason to be dissatisfied with the conduct of the Master or any officer, the Owners, on receiving particulars of the complaint, promptly to investigate the matter, and, if reasonably necessary and practicable, to make a change in the appointments. See also Clause 32.

121
122
123
124
125
126
127
128
129
130
131
132
133
134
135
136

**10. Directions and Logs**
The Charterers shall furnish the Master with all instructions and sailing directions and the Master shall keep full and correct logs accessible to the Charterers or their Agents.

137
138
139
140
141

**11. Suspension of Hire etc.**
(A) In the event of drydocking or other necessary measures to maintain the efficiency of the Vessel, deficiency of men or Owners' stores, breakdown of machinery, damage to hull or other accident, either hindering or preventing the working of the Vessel and continuing for more than twenty-four consecutive hours, no hire shall be paid in respect of any time lost thereby during the period in which the Vessel is unable to perform the service immediately required. Any hire paid in advance shall be adjusted accordingly.
(B) In the event of the Vessel being driven into port or to anchorage through stress of weather, trading to shallow harbours or to rivers or ports with bars or suffering an accident to her cargo, any detention of the Vessel and/or expenses resulting from such detention shall be for the Charterers' account even if unless such detention and/or expenses, or the cause by reason of which either is incurred, be due to, or be contributed to by, the negligence of the Owners' servants.

142
143
144
145
146
147
148
149
150
151
152
153
154
155
156
157
158
159
160
161

**12. Responsibility and Exemption**
The Owners only shall be responsible for delay in delivery of the Vessel or for delay during the currency of the Charter and for loss or damage to goods onboard, if such delay or loss has been caused by want of due diligence on the part of the Owners or their Manager in making the Vessel seaworthy and fitted for the voyage or any other personal act or omission or default of the Owners or their Manager. The Owners shall not be responsible in any other case nor for damage or delay whatsoever and howsoever caused even if caused by the neglect or default of their servants. The Owners shall not be liable for loss or damage arising or resulting from strikes, lock-outs or stoppage or restraint of labour (including the Master, officers or crew) whether partial or general. The Charterers shall be responsible for loss or damage caused to the Vessel or to the Owners by goods being loaded contrary to the terms of the Charter or by improper or careless bunkering or loading, stowing

162
163
164
165
166
167
168
169
170
171
172
173
174
175
176
177
178
179
180

or discharging of goods or any other improper or negligent act on their part or that of their servants.

181
182

**13. Advances**
The Charterers or their Agents shall advance to the Master, if required, necessary funds for ordinary disbursements for the Vessel's account at any port charging only interest at 6 per cent. p.a., such advances shall be deducted from hire.

183
184
185
186
187
188

**14. Excluded Ports**
The Vessel shall not be ordered to nor bound to enter:
(A) any place where fever or epidemics are prevalent or to which the Master, officers and crew by law are not bound to follow the Vessel;
(B) any ice-bound place or any place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out after having completed loading or discharging. The Vessel shall not be obliged to force ice. If on account of ice the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in and/or damaged, he has liberty to sail to a convenient open place and await the Charterers' fresh instructions. Unforeseen detention through any of above causes shall be for the Charterers' account.

189
190
191
192
193
194
195
196
197
198
199
200
201
202
203
204
205
206

**15. Loss of Vessel**
Should the Vessel be lost or missing, hire shall cease from the date when she was lost. If the date of loss cannot be ascertained half hire shall be paid from the date the Vessel was last reported until the calculated date of arrival at the destination. Any hire paid in advance shall be adjusted accordingly.

207
208
209
210
211
212
213

**16. Overtime**
The Vessel shall work day and night, seven days a week if required. The Charterers shall refund the Owners their outlays for all overtime paid to officers and crew according to the hours and rates stated in the Vessel's articles.

214
215
216
217
218

**17. Lien**
The Owners shall have a lien upon all cargoes and sub-freights belonging to the Time-Charterers and any Bill of Lading freight for all claims under this Charter, and the Charterers shall have a lien on the Vessel for all moneys paid in advance and not earned.

219
220
221
222
223
224

**18. Salvage**
All salvage and assistance to other vessels shall be for the Owners' and the Charterers' equal benefit after deducting the Master's, officers' and crew's proportion and all legal and other expenses including hire paid under the charter for time lost in the salvage, also repairs of damage and fuel oil consumed. The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and to fix its amount.

225
226
227
228
229
230
231
232
233

**19. Sublet**
The Charterers shall have the option of subletting the Vessel, giving due notice to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter.

234
235
236
237
238

**20. War ("Conwartime 1993")**
(A) For the purpose of this Clause, the words:
(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the

239
240
241
242
243

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BALTIME 1939" Uniform Time-Charter (as revised 2001)
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

Vessel, and the Master; and | 244
(ii) "War Risks" shall include any war (whether actual or | 245
threatened), act of war, civil war, hostilities, revolution, | 246
rebellion, civil commotion, warlike operations, the laying | 247
of mines (whether actual or reported), acts of piracy, | 248
acts of terrorists, acts of hostility or malicious damage, | 249
blockades (whether imposed against all vessels or | 250
imposed selectively against vessels of certain flags or | 251
ownership, or against certain cargoes or crews or | 252
otherwise howsoever), by any person, body, terrorist or | 253
political group, or the Government of any state | 254
whatsoever, which, in the reasonable judgement of the | 255
Master and/or the Owners, may be dangerous or are | 256
likely to be or to become dangerous to the Vessel, her | 257
cargo, crew or other persons on board the Vessel. | 258
(B) The Vessel, unless the written consent of the Owners | 259
be first obtained, shall not be ordered to or required to | 260
continue to or through, any port, place, area or zone | 261
(whether of land or sea), or any waterway or canal, where | 262
it appears that the Vessel, her cargo, crew or other | 263
persons on board the Vessel, in the reasonable | 264
judgement of the Master and/or the Owners, may be, or | 265
are likely to be, exposed to War Risks. Should the Vessel | 266
be within any such place as aforesaid, which only | 267
becomes dangerous, or is likely to be or to become | 268
dangerous, after her entry into it, she shall be at liberty | 269
to leave it. | 270
(C) The Vessel shall not be required to load contraband | 271
cargo, or to pass through any blockade, whether such | 272
blockade be imposed on all vessels, or is imposed | 273
selectively in any way whatsoever against vessels of | 274
certain flags or ownership, or against certain cargoes | 275
or crews or otherwise howsoever, or to proceed to an | 276
area where she shall be subject, or is likely to be subject | 277
to a belligerent's right of search and/or confiscation. | 278
(D) (i) The Owners may effect war risks insurance in | 279
respect of the Hull and Machinery of the Vessel and their | 280
other interests (including, but not limited to, loss of | 281
earnings and detention, the crew and their Protection | 282
and Indemnity Risks), and the premiums and/or calls | 283
therefor shall be for their account. | 284
(ii) If the Underwriters of such insurance should require | 285
payment of premiums or calls because, pursuant | 286
to the Charterers' orders, the Vessel is within, or is due | 287
to enter and remain within, any area or areas which are | 288
specified by such Underwriters as being subject to | 289
additional premiums because of War Risks, then such | 290
premiums and/or calls shall be reimbursed by the | 291
Charterers to the Owners at the same time as the next | 292
payment of hire is due. | 293
(E) If the Owners become liable under the terms of | 294
employment to pay to the crew any bonus or additional | 295
wages in respect of sailing into an area which is | 296
dangerous in the manner defined by the said terms, | 297
then such bonus or additional wages shall be re- | 298
imbursed to the Owners by the Charterers at the same | 299
time as the next payment of hire is due. | 300
(F) The Vessel shall have liberty:- | 301
(i) to comply with all orders, directions, recom- | 302
mendations or advice as to departure, arrival, routes, | 303
sailing in convoy, ports of call, stoppages, destinations, | 304
discharge of cargo, delivery, or in any other way | 305
whatsoever, which are given by the Government of the | 306
Nation under whose flag the Vessel sails, or other | 307
Government to whose laws the Owners are subject, or | 308
any other Government, body or group whatsoever acting | 309
with the power to compel compliance with their orders | 310
or directions; | 311

(ii) to comply with the order, directions or recom- | 312
mendations of any war risks underwriters who have the | 313
authority to give the same under the terms of the war | 314
risks insurance; | 315
(iii) to comply with the terms of any resolution of the | 316
Security Council of the United Nations, any directives of | 317
the European Community, the effective orders of any | 318
other Supranational body which has the right to issue | 319
and give the same, and with national laws aimed at | 320
enforcing the same to which the Owners are subject, | 321
and to obey the orders and directions of those who are | 322
charged with their enforcement; | 323
(iv) to divert and discharge at any other port any cargo or | 324
part thereof which may render the Vessel liable to | 325
confiscation as a contraband carrier; | 326
(v) to divert and call at any other port to change the crew | 327
or any part thereof or other persons on board the Vessel | 328
when there is reason to believe that they may be subject | 329
to internment, imprisonment or other sanctions. | 330
(G) If in accordance with their rights under the foregoing | 331
provisions of this Clause, the Owners shall refuse to | 332
proceed to the loading or discharging ports, or any one | 333
or more of them, they shall immediately inform the | 334
Charterers. No cargo shall be discharged at any | 335
alternative port without first giving the Charterers notice | 336
of the Owners' intention to do so and requesting them | 337
to nominate a safe port for such discharge. Failing such | 338
nomination by the Charterers within 48 hours of the | 339
receipt of such notice and request, the Owners may | 340
discharge the cargo at any safe port of their own choice. | 341
(H) If in compliance with any of the provisions of sub- | 342
clauses (B) to (G) of this Clause anything is done or not | 343
done, such shall not be deemed a deviation, but shall | 344
be considered as due fulfilment of this Charter. | 345

21. Cancelling | 346
Should the Vessel not be delivered by the date indicated | 347
in Box 22, the Charterers shall have the option of | 348
cancelling. If the Vessel cannot be delivered by the | 349
cancelling date, the Charterers, if required, shall declare | 350
within 48 hours after receiving notice thereof whether | 351
they cancel or will take delivery of the Vessel. | 352

22. Dispute Resolution | 353
*) (A) This Charter shall be governed by and construed in | 354
accordance with English law and any dispute arising | 355
out of or in connection with this Charter shall be referred | 356
to arbitration in London in accordance with the Arbitration | 357
Act 1996 or any statutory modification or re-enactment | 358
thereof save to the extent necessary to give effect to the | 359
provisions of this Clause. | 360
The arbitration shall be conducted in accordance with | 361
the London Maritime Arbitrators Association (LMAA) | 362
Terms current at the time when the arbitration | 363
proceedings are commenced. | 364
The reference shall be to three arbitrators. A party | 365
wishing to refer a dispute to arbitration shall appoint its | 366
arbitrator and send notice of such appointment in writing | 367
to the other party requiring the other party to appoint its | 368
own arbitrator within 14 calendar days of that notice and | 369
stating that it will appoint its arbitrator as sole arbitrator | 370
unless the other party appoints its own arbitrator and | 371
gives notice that it has done so within the 14 days | 372
specified. If the other party does not appoint its own | 373
arbitrator and give notice that it has done so within the | 374
14 days specified, the party referring a dispute to | 375
arbitration may, without the requirement of any further | 376
prior notice to the other party, appoint its arbitrator as | 377
sole arbitrator and shall advise the other party | 378

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## "BALTIME 1939" Uniform Time-Charter (as revised 2001)
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

| | |
|---|---|
| accordingly. The award of a sole arbitrator shall be | 379 |
| binding on both parties as if he had been appointed by | 380 |
| agreement. | 381 |
| Nothing herein shall prevent the parties agreeing in | 382 |
| writing to vary these previsions to provide for the | 383 |
| appointment of a sole arbitrator. | 384 |
| In cases where neither the claim nor any counterclaim | 385 |
| exceeds the sum of US$50,000 (or such other sum as | 386 |
| the parties may agree) the arbitration shall be conducted | 387 |
| in accordance with the LMAA Small Claims Procedure | 388 |
| current at the time when the arbitration proceedings are | 389 |
| commenced. | 390 |
| *) **(B)** This Charter shall be governed by and construed in | 391 |
| accordance with Title 9 of the United States Code and | 392 |
| the Maritime Law of the United States and any dispute | 393 |
| arising out of or in connection with this Contract shall | 394 |
| be referred to three persons at New York, one to be | 395 |
| appointed by each of the parties hereto, and the third by | 396 |
| the two so chosen; their decision or that of any two of | 397 |
| them shall be final, and for the purposes of enforcing | 398 |
| any award, judgement may be entered on an award by | 399 |
| any court of competent jurisdiction. The proceedings | 400 |
| shall be conducted in accordance with the rules of the | 401 |
| Society of Maritime Arbitrators, Inc. | 402 |
| In cases where neither the claim nor any counterclaim | 403 |
| exceeds the sum of US$50,000 (or such other sum as | 404 |
| the parties may agree) the arbitration shall be conducted | 405 |
| in accordance with the Shortened Arbitration Procedure | 406 |
| of the Society of Maritime Arbitrators, Inc. current at the | 407 |
| time when the arbitration proceedings are commenced. | 408 |
| *) **(C)** This Charter shall be governed by and construed in | 409 |
| accordance with the laws of the place mutually agreed | 410 |
| by the parties and any dispute arising out of or in | 411 |
| connection with this Charter shall be referred to | 412 |
| arbitration at a mutually agreed place, subject to the | 413 |
| procedures applicable there. | 414 |
| **(D)** Notwithstanding (A), (B) or (C) above, the parties | 415 |
| may agree at any time to refer to mediation any difference | 416 |
| and/or dispute arising out of or in connection with this | 417 |
| Charter. | 418 |
| In the case of a dispute in respect of which arbitration | 419 |
| has been commenced under (A), (B) or (C) above, the | 420 |
| following shall apply:- | 421 |
| **(i)** Either party may at any time and from time to time | 422 |
| elect to refer the dispute or part of the dispute to | 423 |
| mediation by service on the other party of a written notice | 424 |
| (the "Mediation Notice") calling on the other party to agree | 425 |
| to mediation. | 426 |
| **(ii)** The other party shall thereupon within 14 calendar | 427 |
| days of receipt of the Mediation Notice confirm that they | 428 |
| agree to mediation, in which case the parties shall | 429 |
| thereafter agree a mediator within a further 14 calendar | 430 |
| days, failing which on the application of either party a | 431 |
| mediator will be appointed promptly by the Arbitration | 432 |

| | |
|---|---|
| Tribunal ("the Tribunal") or such person as the Tribunal | 433 |
| may designate for that purpose. The mediation shall | 434 |
| be conducted in such place and in accordance with such | 435 |
| procedure and on such terms as the parties may agree | 436 |
| or, in the event of disagreement, as may be set by the | 437 |
| mediator. | 438 |
| **(iii)** If the other party does not agree to mediate, that fact | 439 |
| may be brought to the attention of the Tribunal and may | 440 |
| be taken into account by the Tribunal when allocating | 441 |
| the costs of the arbitration as between the parties. | 442 |
| **(iv)** The mediation shall not affect the right of either party | 443 |
| to seek such relief or take such steps as it considers | 444 |
| necessary to protect its interest. | 445 |
| **(v)** Either party may advise the Tribunal that they have | 446 |
| agreed to mediation. The arbitration procedure shall | 447 |
| continue during the conduct of the mediation but the | 448 |
| Tribunal may take the mediation timetable into account | 449 |
| when setting the timetable for steps in the arbitration. | 450 |
| **(vi)** Unless otherwise agreed or specified in the | 451 |
| mediation terms, each party shall bear its own costs | 452 |
| incurred in the mediation and the parties shall share | 453 |
| equally the mediator's costs and expenses. | 454 |
| **(vii)** The mediation process shall be without prejudice | 455 |
| and confidential and no information or documents | 456 |
| disclosed during it shall be revealed to the Tribunal | 457 |
| except to the extent that they are disclosable under the | 458 |
| law and procedure governing the arbitration. | 459 |
| *(Note: The parties should be aware that the mediation* | 460 |
| *process may not necessarily interrupt time limits.)* | 461 |
| **(E)** If Box 23 in Part I is appropriately filled in, sub- | 462 |
| clause (A) of this Clause shall apply. Sub-clause (D) | 463 |
| shall apply in all cases. | 464 |
| * *(A), (B) and (C) are alternatives; indicate alternative* | 465 |
| *agreed in Box 23.* | 466 |
| **23. General Average** | 467 |
| General Average shall be settled according to York/ | 468 |
| Antwerp Rules, 1994 and any subsequent modification | 469 |
| thereof. Hire shall not contribute to General Average. | 470 |
| **24. Commission** | 471 |
| The Owners shall pay a commission at the rate stated | 472 |
| in Box 24 to the party mentioned in Box 24 on any hire | 473 |
| paid under the Charter, but in no case less than is | 474 |
| necessary to cover the actual expenses of the Brokers | 475 |
| and a reasonable fee for their work. If the full hire is not | 476 |
| paid owing to breach of Charter by either of the parties | 477 |
| the party liable therefor shall indemnify the Brokers | 478 |
| against their loss of commission. Should the parties | 479 |
| agree to cancel the Charter, the Owners shall indemnify | 480 |
| the Brokers against any loss of commission but in such | 481 |
| case the commission not to exceed the brokerage | 482 |
| on one year's hire. | 483 |

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

ADDITIONAL CLAUSES
to
CHARTERPARTY
dated
July 22, 2014
for
SEA VOYAGER

---

**25.   CHARTER HIRE, PURCHASE OPTION, GUARANTEE, OPERATION**

(a)   The daily rate will vary by destinaton and season.

For Year 1 Charter Hire:

| | |
|---|---|
| USD20,500 per day | For Great Lakes Season |
| USD15,500 per day | For Caribbean and Panama |
| USD12,500 per day | For positioning sailings |

For Year 2 - Charter Hire:

| | |
|---|---|
| USD21,100 per day | For Great Lakes Season |
| USD18,010 per day | For Caribbean and Panama |
| USD12,860 per day | For positioning sailings |

(i)   The above rates to increase by 3% annually after second full year.

(ii)   Positioning days are not to exceed 40 days annually.

(iii)   The Great Lakes season to be a minimum of 160 days per year.

(b)   The Charterers shall pay to the Owners hire at the rate stated in Clause 25(a). Charter hire to be paid on the 1st of the month for the following month.  Charter hire to be paid based on the following wire instructions:

| | |
|---|---|
| Bank Name: | Compass Bank |
| | 15 South 20th Street |
| | Birmingham, AL 35233 |
| SWIFT: | CPASUS44 |
| Account : | 067015724 |
| Beneficiary Name: | Stonegate Bank |
| Beneficiary Address: | 1430 N Federal Highway |
| | Fort Lauderdale, FL 33304 |
| Reference: | For Further Credit to ISP/1024496 |

(c)     The Charterers to have the option to buy the vessel at any given time after twelve months by giving three months notice in writing. The price for the vessel to be USD25 Million cash. The sale to be based on SALESFORM 1993, and based on an "as is – where is" delivery.

Owners have the right to sell the Vessel at any given time throughout the whole period of this Charter. Charterers to be granted a right of first refusal to the Vessel, for the same price and on the same terms and conditions as Owners are prepared to accept from a third party at any time throughout the period of this Charter. Owners to notify Charterers of the receipt of any offer to purchase the Vessel from any third party during the term of this Charter that Owners are prepared to accept, prior to accepting same, and Charters shall have one (1) working day after receipt of such notice to notify Owners that Charterers elect to exercise its right of first refusal and purchase the Vessel on the same terms and conditions as the Owers are prepared to accept from the third party. Irrespective of the aforementioned, Owners have the right to sell the Vessel to a related party, during and throughout the whole Charter Period, without Charterers having the right of first refusal.

(d)     Charterers to provide a USD2,500,000 Letter of Credit based on both parties accepting the final wording of the Letter of Credit as per the draft in EXHIBIT II. Letter of Credit to be arranged in the amount according to the following schedule:

| Within 5 business days of both parties approving the Letter of Credit: | USD   500,000 |
| December 31, 2014: | USD 1,150,000 |
| January 31, 2015: | USD 1,650,000 |
| March 15, 2015: | USD 2,000,000 |
| April 15, 2015: | USD 2,500,000 |

Letter of Credit must be assignable enabling the Owners as beneficiaries under the Letter of Credit to assign all its rights and obligations under the Letter of Credit to a new owner of the Vessel.

Such Letter of Credit to guarantee Charterers' full performance of the Charter Party.  The Letter of Credit to be released by Owners fifteen (15) days after satisfactory redelivery of the Vessel.

(e)     The Charterers shall have the privilege of flying their own house flag and renaming the Vessel, *SAINT LAURENT* and painting the Vessel with their own marking. The Vessel shall be repainted in the Owners' colors before redelivery of the Vessel by the Charterers. The cost and time of painting, maintaining and repainting those changes affected by the Charterers shall be for the Charterers' account.

(f)     The Vessel is currently positioned in the Jacksonville, Florida area, and if the Vessel is not chartered out prior to the delivery in Portland, Maine under this Charter, Charterers will take over the fuel and lube oil inventory at the time of departing the Jacksonville area and thereby covering the fuel and lube oil cost for the positioning voyage from Jacksonville, Florida to Portland, Maine.

## 26.   VESSEL'S CLASS AND CONDITION

(a)     The Vessel to be delivered fully in class with all certificates valid and equipment and systems onboard in good functioning order. The Owners to maintain the Vessel in class and in a thoroughly efficient state, normal wear and tear excepted, and in accordance with applicable industry standards, including (but without limiting the generality of the foregoing) compliance with SOLAS, class and the requirements of all applicable laws.

(b)     Prior to delivery of the Vessel, Owners to upgrade and refurbish the Vessel as per EXHIBIT III.  This work to be done in Owners' time and at Owners' cost.

(c)     The Vessel has been approved by the Charterers.

(d)     The Owners shall provide all necessary and appropriate deck and engine crew (for the avoidence of doubt, this is excluding Medical Officer and/or medical crew), supplies and provisions, and equipment (including all gangways, ramps, pontoons and similar equipment required for the safe embarkation and disembarkation of passengers to and from the Vessel) required, and shall at all times be responsible for the safe and proper mooring, berthing and operation of the Vessel and for the due compliance by the Vessel, her master, officers and crew, with all lawful requirements of port and other local and national authorities.

## 27.   MAINTENANCE

The Owners to maintain the Vessel in class and in a thoroughly efficient state, normal wear and tear excepted, and in accordance with industry standards for cruise vessels.

## 28.   INSURANCE

(a)     The Owners to provide and pay for customary marine and war risks insurance in respect of the Vessel, as well as Protection and Indemnity insurance. Such Protection and Indemnity insurance shall include cover in respect of claims for damages or compensation for loss of life or personal injury or illness to all such onboard personnel and all passengers and for loss or damage to passengers' luggage on the appropriate basis for such personnel in accordance with the rules of the P&I Club. Subject to the approval of the P&I Club, the Owners shall procure that the Charterers and concessionaires are named as co-assured with the Owners, with the P&I Club for **"misdirected arrow"** claims at no additional cost to the Charterers and without any liability of the Charterers to the P&I Club for premiums or calls. The Owners shall, as a condition precedent of this Charter and otherwise upon request from time to time, produce proof of the insurances required under this Clause 28 to the Charterers.

(b)     The Charterers will take out and pay for, and maintain throught the period of this Charter, a seperate Charterers liability insurance, and will procure that their concessionaires take out, and maintain throughout the period of this Charter, in their own names and at their own expense, a separate ENTRY TO COVER Protection And Indemnity risks, in each case with The P&I Club or other Protection and Indemnity

Association acceptable to the Owners and will produce evidence to the Owners that such entries are in place and in force, and that all calls, premiums and other payments necessary to maintain such entries in effect during the period of this Charter have been paid.

The Charterer warrants that all contracts with passengers for cruises within the Cruise Programme shall be made on the basis of the ticket terms approved by the Owners' P&I Club.

(c)     Each of the Charterers or Owners shall be responsible for the deductible on any insurance claim arising out of the act or omission of any person for which such party is responsible.

## 29.     OWNERS' AND CHARTERERS' LIABILITY

(a)     The Charterers shall indemnify, hold harmless and defend the Owners and the Vessel against any damage, liability, suit, claim, penalty, fine, cost or expense whatsoever, including reasonable attorneys fees and cost incurred in defense thereof which arises out of Charterers' negligence or caused by Charterers' breach of this Charter, or results from representations by the Charterers or contracts between the Charterers and the passengers, or which results from the acts, omissions or defaults of the Charterers, or any person acting on behalf of the Charterers, or of passengers.

(b)     The Charterers undertake to indemnify, hold harmless and defend the Owners and the Vessel against all damage to the Vessel and its equipment caused by any act, omission or default of passengers, or any person acting on behalf of the Charterers, as well as against liability for any illegal act by any such persons, including but not limited to smuggling, drug abuse, facilitating stowaways, possession of firearms, explosives or pollution, including reasonable attorneys fees and cost incurred in defense thereof.

(c)     The Owners shall indemnify and hold harmless the Charterers and their successors, assigns, affiliates, servants, agents and employees from and against:

(i)     any claims arising out of the operation of the Vessel by the Owners due to any negligent act or default of the Owners, their servants, agents or employees or attributable to the breach of this Charter by the Owners or resulting from representations by the Owners, including any costs, expenses or disbursements incurred including reasonable attorneys fees and cost incurred in defense thereof by the Charterers in connection with any such claim; and

(ii)     without prejudice to the generality of the foregoing, any claim for damages or compensation for loss of life of or personal injury to or illness of any person in or onboard or going aboard or ashore from the Vessel, including the gangplank, and attributable to the negligence or default of the Owners, their servants, agents or employees.

30. **LIMITATION OF LIABILITIES**

(a)     The Owners of the Vessel shall have the right at all times to avail themselves and have the benefit of any limitation of liability or exemption from liability under applicable law.

(b)     If any action is brought directly against the Owners or any member of the Owners' crew, or any servant, agent or independent contractor of the Owners, or against any person having an interest in the Vessel, such persons shall be entitled to avail themselves of all defenses and limits of liability which the Owners are entitled to invoke under this Charter and provisions of law applicable, as if they were expressly made for their benefit. In entering into this Charter, the Owners do so not only on their own behalf, but also as agent and trustee for all such persons.

31. **FORCE MAJEURE**

Neither the Owners nor the Charterers shall be responsible for any loss, damage, delay or failure in performance under this Charter resulting from acts of God, civil commotion, arrest or restraint by princes, rulers and people, bad weather, closure of ports, quarantine or epidemics or any other event whatsoever which cannot be avoided or guarded against by the exercise of due diligence or the consequences of which as may affect the performance of this Charter Party, cannot be avoided or guarded against by the exercise of due diligence.

32. **OWNERS' AND MASTER'S AUTHORITY**

(a)     During the term of this Charter, the Master shall have the complete control of the Vessel and shall be in charge of all operations relating to the Vessel. The Master shall have complete and unrestricted discretion to act in any way he regards as appropriate, including but not limited to take such action as the Master may consider necessary or desirable to preserve the safety and security of the Vessel or the health, safety or well-being of the passengers, to comply with local and flag state law, to safeguard the environment and to maintain good order and security on the Vessel.

(b)     The Owners or the Master may at their sole discretion and without any liability on their part refuse transportation of, or at any stage, disembark, any person, whether members of the Owners' crew, crew or other staff retained by the Charterers or any concessionaires or passengers or otherwise, who in their judgement endangers the Vessel or himself or herself, is or becomes unfit to travel or jeopardizes the health, safety or well-being of other persons onboard.

(c)     The Owners shall place at the disposal of the Charterers the whole of the Vessel's passenger accommodation. Passengers and the staff of the Charterers onboard the Vessel shall also be permitted the use of the public rooms and those of the Vessel's deck spaces which are normally available for passenger use. Passengers and the Charterers' staff will not be permitted access to any other part of the Vessel without the approval of the Master of the Vessel.

**33.     MANAGERS, ISM, ISPS, ISO 9001/2000 and ISO 14001 CODE**

(a)     The Vessel will be managed during the term of this Charter by FleetPro Ocean Inc., of 4770 Biscayne Boulevard, Penthouse A, Miami, Florida 33137, Florida or such other Managers as the Owners may appoint and the Charterers shall approve (such approval not to be unreasonably withheld).

(b)     The Owners ensure that they or their managers shall apply the management standard of the ISM, ISPS, ISO 9001/2000 and ISO 14001 code in their management of the Vessel. Charterers undertake that Charterers and concessionaires crew shall undergo such training and follow such procedures as Owners may reasonably require to enable/ensure compliance with these codes.

**34.     PERMISSIONS, TAXES AND DUTIES**

Charterers confirm that the Vessel can operate with Bahamian Flag and foreign crew for the planned operation/itinerary. Furthermore, if Charterers change the itinerary resulting in requirements for any local Vessel or Crew permits this will be Charterers' responsibility and costs. If such change of intinerary or operation result in any taxes, VAT or duties for the Vessel, the Crew, spare parts, consumables, etc. this to be for the account of the Charterers.

**35.     TERMINATION FOR CAUSE AND RIGHT TO CURE**

Charterers shall have a five (5) business day cure period after given notice in writing for any Charter Hire payment or other amount due, after which Owners have the right to terminate this Charter and take such other actions as per the rights in this Charter.

For non-monetary issues, neither party shall exercise any right, power or remedy with respect to a default which may be cured (including without limiation the right to terminate this Charter for cause, or any rights Owners may have to draw upon the Letter of Credit provided by Charterers pursuant to Clause 25 (d) unless the party has first delivered written notice to the defaulting party that a default has occurred, reasonably describing the default, and has given the defaulting party right to cure the default as hereinafter provided. Following delivery of notice of the default, the defaulting party shall have thirty (30) days to cure such default, or longer if the default cannot be cured with such thirty (30) day period and the defaulting party has commenced and continued vigorous efforts to cure such default.

**36.     NOTICES**

All notices and communications to be in writing sent by prepaid first class post or by courier, or telefax, except to the extend such notices or communications are required under this Agreement to be sent by certified mail, return receipt requested and shall be deemed received when telefaxed or the return receipt is signed for:

(a)    To the Owners:

   Clipper Cruises Ltd.
   c/o Sunstone Ships Inc.
   Attention: Niels-Erik Lund
   4770 Biscayne Boulevard, PH-B
   Miami, Florida 33137
   Telephone: +1 (305) 400-8055
   Telefax: +1 (305) 573-5177
   E-mail: nlund@sunstoneships.com

(b)    To the Charterers:

   Haimark Line Ltd.
   Attention: Marcus Leskovar
   1536 Cole Boulevard, Suite 333
   Lakewood, CO 80401
   E-mail: marcus@haimarktravel.com

## 37.    MISCELLANEOUS

(a)    Clause headings are for ease of reference only and shall not affect construction.

(b)    Nothing in this Charter shall be construed as a demise of the Vessel to the Charterers.

(c)    This Charter contains the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior negotiations, proposals, statement of intent and other representations or warranties with respect to such subject matter.

(d)    If there is any conflict between any of the provisions of these Additional Clauses 25 to 37 (including Exhibits I-III) inclusive on the one hand and any provision of Part 1 and Part 2 on the other hand, the provisions of these Additional Clauses 25 to 37 inclusive shall prevail.

(e)    Save as expressly provided herein, a person who is not a party of the Charter may not enforce, or otherwise have the benefit of any provision of this Charter under the Contracts (Right of Third Parties) Act 1999, but this provision does not affect any right or remedy of a third party, which exists or is available apart from that Act.

   AS WITNESS the hands of the duly authorized representatives of the Owners and the Charterers the day and year first herein written.

For and on behalf of
**CLIPPER CRUISES LTD.**

Niels-Erik Lund
ATTORNEY-IN-FACT

For and on behalf
**HAIMARK LINE LTD.**

Marcus Leskovar
MANAGING PARTNER

**EXHIBIT 1**
**CHARTERPARTY**
*SEA VOYAGER*

July 2014

**GENERAL INFORMATION**
1. NAME OF VESSEL:         *SEA VOYAGER*
2. EX. NAMES:              Clipper Voyager, Cape May Light I
3. TYPE OF VESSEL:         Passenger
4. MANAGERS:               FleetPro Ocean, Inc.
5. CALL SIGN:              C6YZ8
   IMO NUMBER:             9213129
6. PORT OF REGISTRY:       Nassau, Bahamas
7. YEAR BUILT:             2001
8. YARD BUILT:             Atlantic Marine, Jacksonville, Florida
9. CLASSIFICATION:         Lloyd's Register
10. SOLAS:                 Built to SOLAS 2000.

**SPEED AND CONSUMPTION**
1. IN PORT:                4 ton/day
2. MANEUVERING SPEED:      6 kn = 6 ton/day +  5 ton/day
3. ECONOMICAL SPEED:       12 kn = 5 ton/day + 12 ton/day
4. FULL SPEED:             14 kn = 5 ton/day + 16 ton/day

**TANK CAPACITY**
1. MGO:                    248.70 m3
2. FRESHWATER:             255.44 m3
3. BALLAST WATER:          218.40 m3

**PASSENGER CABINS**

|                    | CABINS | BEDS |
|--------------------|--------|------|
| OUTSIDE 2 BED:     | 101    | 202  |
| INSIDE 2 BED:      | 9      | 18   |
| TOTAL:             | 110    | 220  |

Cabins 321 & 340 are handicap accessible

**PUBLIC ROOMS AND FACILITIES**

| AREA                     | SEATS |
|--------------------------|-------|
| Fog Cutters Pub          | 42    |
| Harbor Lights Lounge     | 132   |
| The Rosecliff Restaurant | 132   |
| Lighthouse Keepers Bar   | 60    |
| Gift Shop                |       |
| Pursers Office           |       |
| Passenger Launderette    |       |
| Crew Launderette         |       |
| Main Laundry             |       |
| Crew Mess                |       |

**MAIN DIMENSIONS**
1. LENGTH OVERALL:         286.3 ft
2. BREADTH:                50.0 ft
3. DRAUGHT (MAX.):         13.5 ft
4. GT:                     4954 ton
5. NT:                     1486 ton

**LIFE SAVING EQUIPMENT**
1. TOTAL CAPACITY:         294 Persons
2. LIFEBOATS:              4
3. LIFERAFTS:              6

**CREW CABINS**

|                          | CABINS | BEDS |
|--------------------------|--------|------|
| 1 BED WITH FACILITIES:   | 7      | 7    |
| 2 BED WITH FACILITIES:   | 36     | 72   |
| TOTAL:                   | 43     | 79   |

**TECHNICAL INFORMATION**
**EQUIPMENT**                    **DETAILS**
MAIN-ENGINES                     2 x Caterpillar 3516 B
                                 Serial #: 9AN00178, 9AN00179
                                 2 x 2000 HP, 1491 KW, 1800 RPM
                                 2 x Caterpillar 3516 B
                                 Serial #: 8KN00378, 8KN00379
                                 2 x 2549 HP, 1901 KW, 1800 RPM
AUXILIARY-ENGINES:               2 x 2261 KVA, 1825 KW, 2993 A
   GENERATORS:                   440 V, 60 Hz, 3 phase
PROPELLERS:                      2 x Schottel five blades
                                 2 x 1212 R.L. Building No. 14434
BOWTHRUSTER:                     1 x Schottel 480 VAC, 3 ph, 738.6 KW
AIR-CONDITIONING:                Fully airconditioned
ELEVATORS:                       Passenger: 1
                                 Food: 1

**EXHIBIT II**
**CHARTERPARTY AGREEMENT**
**SEA VOYAGER**


**LETTER OF CREDIT**

EXHIBIT III

**M/V SEA VOYAGER**

**REFURBISHMENT SUMMARY**

| ITEM | DESCRIPTION | AMOUNT | COST | TOTAL |
|---|---|---|---|---|
| **1** | **Vessel Exterior** | | | |
| | | | | |
| 1.1 | Gangway System: easy exit from ship to tenders for southern hemisphere intineraries. | 2 | 7,500.00 | 15,000.00 |
| 1.2 | Hull painting | 1 | 40,000.00 | 40,000.00 |
| 1.3 | Install carpet in 4 outdoor public areas. | 1200 | 83.34 | 100,008.00 |
| | | | | |
| **2** | **Observation Deck** | | | |
| | | | | |
| 2.1 | New lounge furniture: | | | |
| | Lounge Chairs | 100 | 200.00 | 20,000.00 |
| | Tables with umbrella and chairs | 10 | 800.00 | 8,000.00 |
| | Tables with chairs aft | 30 | 500.00 | 15,000.00 |
| | Construct roofing with awning aft of funnel | 1 | 35,000.00 | 35,000.00 |
| | Install lighting | 1 | 8,000.00 | 8,000.00 |
| 2.2 | Camouflage Sewer Stack by building a square louver type box over the mushroom fan | 1 | 3,000.00 | 3,000.00 |
| 2.3 | Lighthouse Keeper's Bar: | | | |
| | Convert to Lighthouse Keeper's Café offering breakfast and lunch options in an outdoor dining enviroment (Need approx. 50 (2/4 tops) café style furniture | 1 | 150,000.00 | 150,000.00 |
| | | | | |
| **3** | **Vessel Interior** | | | |
| | | | | |
| 3.1 | **Public Areas** | | | |
| | New carpeting throughout (need to loose the dated style on-board) | | | |
| | Restaurant | 300 | 65.00 | 19,500.00 |
| | Lounge | 300 | 65.00 | 19,500.00 |
| | Pub | 150 | 65.00 | 9,750.00 |
| | Gift Shop | 30 | 65.00 | 1,950.00 |
| | Purser Office | 30 | 65.00 | 1,950.00 |
| | Stairs and Hallways | 300 | 65.00 | 19,500.00 |
| 3.2 | Update public restrooms, tile, cabinetry, lighting | 2 | 5,000.00 | 10,000.00 |
| 3.3 | New elevator interior | 1 | 4,000.00 | 4,000.00 |
| 3.4 | New lighting | 1 | 8,000.00 | 8,000.00 |
| 3.5 | Additional furnishings in lobby areas | 1 | 12,000.00 | 12,000.00 |
| | | | | |
| **4** | **Staterooms** | | | |
| | | | | |
| 4.1 | Wall coverings | 110 | 1,200.00 | 132,000.00 |
| 4.2 | Mattresses/Bedding | 220 | 600.00 | 132,000.00 |
| 4.3 | Lighting | 110 | 400.00 | 44,000.00 |
| 4.4 | Draperies/Blinds | 110 | 900.00 | 99,000.00 |
| 4.5 | Carpeting | 110 | 1,000.00 | 110,000.00 |
| 4.6 | Refinish Cabinetry | 110 | 325.00 | 35,750.00 |
| 4.7 | New LCD Televisions | 110 | 600.00 | 66,000.00 |
| 4.8 | Minibars added to AA & Owner's Suites | 24 | 1,000.00 | 24,000.00 |
| 4.9 | Wood trim around windows/doors | 110 | 700.00 | 77,000.00 |
| 4.10 | New towel bars in bath | 110 | 100.00 | 11,000.00 |
| 4.11 | Make-up mirrors | 110 | 300.00 | 33,000.00 |

7/22/2014

EXHIBIT III
M/V SEA VOYAGER
REFURBISHMENT SUMMARY

| | | | | |
|---|---|---|---|---|
| 4.12 | Mini-safes | 110 | 250.00 | 27,500.00 |
| 4.13 | New towel rack ( wall mounted ) with storage | 110 | 600.00 | 66,000.00 |
| 4.14 | New Shower Curtains | 110 | 30.00 | 3,300.00 |
| 4.15 | 400 Series cabins to receive additional storage | 22 | 1,600.00 | 35,200.00 |
| 4.16 | Direct Dial Telephone System | 1 | 25,000.00 | 25,000.00 |
| 4.17 | Take ironing board out of storage cabinet and widen hanger space | 110 | 200.00 | 22,000.00 |
| 4.18 | Install new shower doors in the suites and renew handsink | 2 | 1,200.00 | 2,400.00 |
| | | | | |
| 5 | **Dining Room** | | | |
| | | | | |
| 5.1 | Increase capacity from 140 (Current) to 190 | | | |
| | Upholster all existing chairs | | | |
| | Additional chairs | 1 | 150,000.00 | 150,000.00 |
| | Wall paper entire room | | | |
| | Renew curtains and drapery | | | |
| | Remove both Coffee Staions and add Banquette style seating | | | |
| 5.2 | Changing tables from 4-tops to 6-tops | | | |
| 5.3 | Add Banquette seating where wine storage and center column is located | | | |
| 5.4 | Entry area for wine storage | | | · |
| | | | | |
| 6 | **Lounge** | | | |
| | | | | |
| 6.1 | Increase capacity from 150 to 190 via Banquettes/sofas | | | |
| | Upholster all existing chairs | | | |
| | Additional chairs | 1 | 120,000.00 | 120,000.00 |
| | Wall paper entire room | | | |
| 6.2 | Renew curtains and drapery | | | |
| | Install PA/Screens for lectures/port talks, etc. as one unit | 1 | 25,000.00 | 25,000.00 |
| | | | | |
| | Reserve | | | 259,692.00 |
| | | | | |
| | **GRAND TOTAL** | | | **2,000,000.00** |

ADDENDUM NO. 1

To

CHARTER PARTY AGREEMENT (the Agreement)

For

M/V SEA VOYAGER (the Vessel)

Between

CLIPPER CRUISES LTD. (The Owner)

And

HAIMARK LINE LTD. (The Charterer)

Dated

JULY 22 2014

The following has hereby been agreed between the parties:

1) As per Section 26(b) of the Charterparty Agreement, the Owner will pay USD 2 million for such vessel upgrades and refurbishment as outlined in EXHIBIT III in the Agreement (the "Upgrades").

2) It has been further agreed that an additional amount, not to exceed USD 1.5 million and to be agreed to by Owner and Charterers (the "Additional Upgrades Cost"), will be necessary to facilitate and complete the needed Upgrades. Owner and Charterers shall each be responsible and liable for one-half of the Additional Upgrades Costs as set forth below. Owner shall initially pay the full amount of all Additional Upgrade Costs to have the Upgrades performed, including directly to the contractors performing the Upgrades. The Additional Upgrades Costs shall otherwise be paid and accounted for between the parties as follows:

   a. The Owner will pay 50% of the Additional Upgrades Costs (up to USD 750,000) by providing to Charterers a credit against the Charter hire in the amount of such 50%, such credit to be applied to and from the first passenger cruise (same not to commence later than May 12th 2015) and to successive cruises thereafter until the credit is exhausted.

   b. The Charterer will pay an increase in the rate of the daily Charter hire calculated based on the total amount of the Additional Upgrades Costs amortized over 4 years and commencing January 1 2016

3) The initially planned cruise scheduled to commence May 3rd 2015 will be moved to the end of the 5 year charter making the "initial cruise a shakedown cruise". The Charterer will schedule the first passenger cruise no later than May 12th 2015. During the first "shakedown cruise" commencing May 3rd 2015 there shall be no daily hire due.

4) Durables (ie stemware, china, etc) to be for the account of the Owner and cost of same to be approved by the Owner

5)   If the Owner is being offered charters on the sister vessel M/V SEA DISCOVERER lasting
      longer than May 2017 a first refusal will be given to the Charterer (Haimark Line Ltd.)

      For shorter employment no such first refusal to apply

      If the Owner is being offered a sale opportunity which the Owner would accept
      The Charterer will be given first refusal.

      A reply to any of the above scenarios should be given by the Charterer to the Owner
      within 24 hours of receiving same.

6)   All other terms of the Agreement remain unchanged, other than logically amended
      based on the above revised terms.

Agreed to this **03**rd day of **February 2015.**

For and on behalf of                              For and on behalf of
**CLIPPER CRUISES LTD**                      **HAIMARK LINE LTD**

NIELS G. JENSEN                              MARCUS LESKOVAR
DIRECTOR                                     MANAGING PARTNER

ADDENDUM NO. 2

To

TIME CHARTER AGREEMENT

For

M.V. SEA VOYAGER

Between

CLIPPER CRUISES LTD ("Owners")

And

Denmark Line Ltd ("Charterers")

Dated

May 22, 2014

hereinafter the "Time Charter"

The following has hereby been agreed between the Owners and Charterers:

1. **Clause 25 (b)** – the account details to where charterhire under the Time Charter shall be paid by wire transfer to the Owners to be changed to the following account details:

| | |
|---|---|
| Bank | Danske Bank |
| | Holmens Kanal 2 |
| | 1092 Copenhagen |
| | Denmark |
| | |
| ACCOUNT NO. | 3230-3458-0210 6 |
| IBAN | DK12 3000 12 34042168 |
| SWIFT | DABADKKK |
| BENEFICIARY | CLIPPER CRUISES LTD |

All other terms of the Time Charter remain unchanged and other than expressly amended based on the Addendum shall apply.

Agreed to on this 20 March 2, 15

For and on behalf of                    For and on behalf of
Clipper Cruises Ltd                     Denmark Line Ltd

ADDENDUM NO. 3
to
TIME CHARTER AGREEMENT
for
*M/V SEA VOYAGER*
(RENAMED SAINT LAURENT) ("Vessel")
between
CLIPPER CRUISES LTD. ("Owners")
and
HAIMARK LINE LTD. ("Charterers")
dated
JULY 22, 2014
(Hereinafter the "Time Charter")

The following amendments to the Time Charter have hereby been agreed between the parties:

1.    Box 15: Port of Delivery  - To be changed to:

      "Latitude Portland, Maine"

      After delivery the vessel to sail immediately straight to Montreal.

2.    Box 16: Time of Delivery - To be changed to:

      "Between May 6 and May 10, 2015"

3.    Box 22: Cancelling Date - To be changed to:

      "Thursday May 14, 2015"

      It is the intention that the Vessel is ready for passenger services on May 12, 2015 in Montreal.

4.    In the event the Vessel is not ready for passenger boarding in Montreal on May 12, 2015, at 2100 hours, local time, Charterers have the right, at Charterers cost, to provide passengers with overnight hotel accommodations and in such case the Vessel will be off-hire for a 24-hour period.

      In the unlikely event that the vessel is further delayed, and not available for passengers by May 13, 2015, at 1900 hours local time, then the Vessel will be off-hire for an additional 24-hour period.

5.    The itinerary to be revised so that upon leaving Montreal the vessel will go full service speed with a scheduled arrival in the first US port of call, Clayton, New York, at approximately 1200 the following day. This in order to facilitate USCG's inspections on said date and the following day when the vessel will remain in Clayton all day.

May 6, 2015
Page 1.

On the date of this Addendum, the Owner will provide Charterers with a letter from FleetPro, where they explain what USCG has stated they need to inspect.

In the unlikely event that the Vessel will not pass USCG's inspection within 36 hours after arrival in Clayton, New York, then the Vessel will be off-hire until USCG compliance has been achieved. Should the delay be more than 3 days, the Charterer has the right to cancel that cruise and any charter hire, which has been paid for that cruise to be refunded by Owner, and the Vessel to stay off-hire until USCG compliance has been obtained and until commencement of the next scheduled cruise.

6.  During the afternoon on the day of arrival in Clayton, the passengers to be off the Vessel on sight-seeing tours or other arranged activity, and such tours to be for Owners account.

7.  In case of delays in commencement of the cruise on May 12th, or any off-hire during the cruise, then Charterers will have the right to claim against Owner any refunds or settlements they will have made with their clients and for other damages incurred. Such claim to be presented to Owners, who will claim it against FleetPro. Owners will do their best in collecting this claim, and the amount collected for such claim to be paid to Charterers. Charterers have been made aware that FleetPro's maximum liability is USD100,000.00. Notwithstanding the foregoing, Charterers recovery on its claim shall not be limited to the amount paid by or recovered from FleetPro, and Charterers may seek recovery from Owner of any amount of Charterers' claim not paid by or recovered from FleetPro.

8.  Charterer has the right to have an independent surveyor inspect the Vessel upon arrival in Montreal to verify and document the condition of the Vessel and the refurbishment.

9.  All other terms of the Agreement remain unchanged, other than logically amended based on the above revised terms.

Agreed to and dated this 6th day of May 2015

For and on behalf of the Owners
**CLIPPER CRUISES LTD.**

For and on behalf of the Charterers
**HAIMARK LINE LTD.**


By:   Niels-Erik Lund
Its:   Attorney-in-fact

By:   Marcus Leskovar
Its:   Managing Partner

May 6, 2015
Page 2.