UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

IN RE:                            )
                                  )   Case No. 15-22180-SBB
HAIMARK LINE, LTD.                )
EIN:  46-5744608                  )   Chapter 11
                                  )
       Debtor.                    )

**EMERGENCY MOTION TO APPROVE AGREEMENT FOR
USE OF CASH COLLATERAL AND ADEQUATE PROTECTION
BETWEEN DEBTOR AND CENTENNIAL BANK**

The Debtor and Debtor in Possession, Haimark Line, Ltd. ("Debtor"), by and through its attorneys, Kutner Brinen Garber, P.C., hereby moves the Court for entry of an Order approving the Agreement for Use of Cash Collateral and Adequate Protection (the "Agreement") entered into by and between the Debtor and Centennial Bank ("Bank") on an interim and final basis, and as grounds therefor respectfully states as follows:

**BACKGROUND**

1.  The Debtor filed its Voluntary Petition pursuant to Chapter 11 of the Bankruptcy Code on October 30, 2015 ("Petition Date"), and remains a debtor in possession.

2.  The Debtor owns and operates a cruise line based out of Lakewood, Colorado. The Debtor is subject to the rules and regulations of the Federal Maritime Commission (the "FMC").

3.  Bank has a perfected first priority security interest in a $2,000,000 certificate of deposit held at Bank (the "CD"), as well as rights of set off against the Debtor's deposit accounts held at Bank as of the Petition Date in the approximate amount of $174,000.00 (the "Deposit Account", and together with the CD, the "Cash Collateral").

4.  Bank is the only creditor with an interest in the Cash Collateral.

5.  The Debtor plans to continue operation of its business. In order to effectuate a successful reorganization, the Debtor needs to use the Cash Collateral.

6.  The FMC requires the Debtor to establish escrow accounts into which certain of its unearned customer deposits and payments are held until such time as those sums are earned. The Debtor maintains escrow accounts at KeyBank (the "KeyBank Escrow Accounts") and at Bank (the

"CB Escrow Accounts" and, collectively with the KeyBank Escrow Accounts, the "Escrow Accounts").

7. The Debtor is currently required to deposit $209,231 into the KeyBank Escrow Accounts (the "Current KeyBank Deposit Requirement"). Additionally, the Debtor is required to deposit $90,000 into the CB Escrow Accounts (together with the Current KeyBank Deposit Requirement, the "Current Deposit Requirement").

8. Further, the Debtor requests the use of the Cash Collateral to fund future deposits requirements, if any, that become due (the "Future Deposit Requirements")

9. The Debtor manages its merchant account through a combination of agreements with Bankers' Bank of the West ("BBOW") and Bank (the "Merchant Account"). When customers request charge-backs against payments through the Merchant Account (the "Charge-backs"), Bank is now funding the Charge-backs directly and accumulating a claim against the Debtor which is secured by the CD and as well as by Bank's right to offset against the Deposit Account consistent with Bankruptcy Code § 506(a).

10. The Debtor desires for the process of the Charge-backs to continue with a minimum of disruption and for refunds to be processed as quickly as possible. This will assist the Debtor in maintaining its relationships with customers and will allow the Debtor and Bank to determine the amount of excess funds at Bank that the Debtor can use for its operations. Further, the Debtor seeks to avoid providing a double refund to customers that will result if funds from the Escrow Accounts are returned to customers that also exercise their Charge-back rights.

11. Both the Debtor and Bank believe that Bank is an over-secured creditor entitled to the rights contained in Bankruptcy Code § 506(b).

### RELIEF REQUESTED

**A.     The Agreement & Approval Thereof**

12. Bank has consented to the Debtor's use of some of the Cash Collateral, but only on the specific terms and conditions set forth in the Agreement.

13. The Debtor and Bank have entered into the Agreement, a copy of which is attached hereto as Exhibit A, to be able to use the Cash Collateral and provide adequate protection to Bank's interest in the Cash Collateral pursuant to the terms and conditions of the Agreement.

14. Pursuant to the Agreement, and as adequate protection for the use of the Cash Collateral, the Debtor and Bank have generally agreed as follows[1]:

    a. Bank consents to the Debtor's use of the Cash Collateral to fund the Current Deposit Requirement, and, as may be agreed to hereafter, to fund costs associated with the Escrow Accounts and the Future Deposit Requirements. *See* Agreement at ¶¶ 3-5.

    b. Bank is authorized to exercise its right of offset against the Cash Collateral to fund Charge-backs, the payment of fees associated with the Merchant Account and the costs arising in connection with the Agreement. *See* Agreement at ¶ 6.

    c. Funds which are held in the Escrow Accounts and for which Bank has honored Charge-backs shall be disbursed directly to Bank, as may be agreed among Debtor, Bank, KeyBank and the FMC or among Debtor, Bank and the escrow agent of the CB Escrow Accounts, as the case may be. *See* Agreement at ¶ 7.

    d. The Debtor's use of the Merchant Account is suspended, pending subsequent agreement of the parties or Court order. *See* Agreement at ¶ 8.

    e. To the extent that the Debtor's use of the Cash Collateral results in a decrease in the value of the Cash Collateral as of the Petition Date, the Debtor grants to Bank, *nunc pro tunc* to the Petition Date, valid, first priority and automatically perfected post-petition replacement liens and security interests in all property which the Debtor or the estate had as of, or may acquire after, the Petition Date and upon which Bank did not have a perfected lien or security interest (with the exception of any avoiding powers or causes of action possessed by the Debtor's estate under 11 U.S.C. §§ 542-552), subject only to statutory tax liens to the extent provided by applicable non-bankruptcy law. *See* Agreement at ¶ 9.

    f. Bank is granted a super-priority administrative expense claim under § 507(b) of the Bankruptcy Code to the extent that the provision of adequate protection by virtue of the provision of replacement liens and security interests and the funds received by Bank from it exercising its right of setoff are insufficient to

---

[1] A summary of the material terms of the Agreement are included herein. For a full understanding of all the terms and conditions of the Agreement, refer to the text of the Agreement attached hereto as Exhibit A.

3

      compensate for any diminution in the value of Bank's interest in the Cash Collateral measured as of the Petition Date. *See* Agreement at ¶ 10.

g. The Debtor shall be obligated to Bank for all reasonable costs and expenses incurred by Bank in connection with (i) the preparation of the Agreement and related documentation; (ii) the preservation and protection of Bank's rights under the Agreement and under any other such documentation; and (iii) this case, all as is permitted by Bankruptcy Code § 506(b) and Bankruptcy Court Order. *See* Agreement at ¶ 13.

h. The Debtor's right to use the Cash Collateral shall terminate automatically and without action by any person on the earlier of (a) March 31, 2016, which date may be extended by mutual agreement in writing without the need to obtain further Court Order; or (b) the occurrence of one of the following events:

    i. Failure to comply with the Agreement or the order approving the Agreement within five (5) business days after written notice from Bank to the Debtor, or failure to request a hearing before the Court regarding whether a default has indeed occurred within five (5) business days after written notice from Bank to the Debtor;

    ii. Entry of an order under Bankruptcy Code § 1112;

    iii. Entry of an order appointing a Chapter 11 trustee;

    iv. Entry of an order under Bankruptcy Code § 362(d) in favor of any person other than Bank and materially affecting any of the property constituting part or all of the Cash Collateral or materially affecting Bank's liens; and

    v. Entry of an order under Bankruptcy Code § 364 granting any person a lien on any assets of the estate equal to or senior to Bank's liens, without the Bank's express prior written consent or Court Order. *See* Agreement at ¶ 16.

i. Approval of the Agreement shall be requested *nunc pro tunc* to the Petition Date. *See* Agreement at ¶ 20.

j. Bank reserves the right to withdraw its consent to the use of the Cash Collateral in the event that the Court enters an order in connection with the approval of the Agreement which contains any provision to which Bank does not consent. *See* Agreement at ¶ 1.

4

15. The adequate protection granted in the Agreement is fair and reasonable under the circumstances.

16. Approval of the Agreement is in the best interest of the Debtor, its creditors and the estate, as it provides the Debtor with a way to remain in compliance with the FMC's rules and regulations and for the Charge-backs to continue with minimum disruption.

17. The Debtor requests that the Court approve the Agreement *nunc pro tunc* October 30, 2015.

**B.  Interim Approval**

18. The Debtor requests Court approval of the Agreement on an interim basis pending a final hearing on approval of the Agreement.

19. There is no party with an interest in the Cash Collateral that will oppose approval of the Agreement since the Bank is the only party with an interest in the Cash Collateral. No creditor will be harmed by the Debtor's use of the Cash Collateral.

20. The FMC is threatening to take actions against the Debtor if the Current Deposit Requirement is not immediately deposited into the Escrow Accounts. The Debtor will not have the necessary funds to make the required deposits if it is not permitted to use the Cash Collateral.

21. It is imperative for the Debtor to remain in compliance with the FMC. In order for the Debtor to operate as a passenger cruise line in the United States, it must be licensed through the FMC. Failure to remain in compliance with the FMC can result in the FMC revoking the Debtor's license.

22. Further, in order for the Debtor to preserve its relationship with its customers, the Debtor requires the Charge-backs to continue with minimum disruption. The Agreement provides a mechanism for the Charge-backs to continue with minimum disruption and for the Debtor to be able to determine the amount of excess funds being held by Bank that can be used for the Debtor's operations.

23. As such, without the immediate use of the Cash Collateral, the Debtor will suffer immediate and irreparable harm. The Debtor will not be able to fund the Current Deposit Requirement, will be at risk of losing its license and/or facing other actions and penalties from the FMC, will damage its relationships with customers, and will severely impair the Debtor's ability to successfully reorganize.

WHEREFORE, the Debtor prays that the Court enter an Order, approving the Agreement with Bank *nunc pro tunc* October 30, 2015, and granting such further and additional relief as to the Court may appear proper.

DATED: November 25, 2015                    Respectfully submitted,

By: _____
Jeffrey S. Brinen #20565
Benjamin H. Shloss, #39276
KUTNER BRINEN GARBER, P.C.
1660 Lincoln Street, Suite 1850
Denver, CO 80264
Telephone: (303) 832-2400
Telecopy: (303) 832-1510
E-Mail: jsb@kutnerlaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on November 25, 2015, I served by **FEDERAL EXPRESS OVERNIGHT or FEDERAL EXPRESS INTERNATIONAL PRIORITY** a copy of **EMERGENCY MOTION TO APPROVE AGREEMENT FOR USE OF CASH COLLATERAL AND ADEQUATE PROTECTION BETWEEN DEBTOR AND CENTENNIAL BANK** in accordance with FED. R. BANKR. P. 2002 and 11 U.S.C. § 342(c) (if applicable) on all interested parties the movant mailed the foregoing to the following addresses:

Alexander & Roberts
53 Summer Street
Keene, NH 03431

Ambassatours Gray Line
3790 MacKintosh Street
Hailfax, NS B3K 5A6
Canada

Barin Haskell
1190 Fairbrook D
Mountain View, CA 94040

Clipper Cruises, Ltd.
Pinnapple Grove, Unit 3
Nassau Bahamas

Conlin
Eva Drafta, CTC, DS, ACC
3270 Washtenaw Ave
Ann Arbor, MI 48104

Empire Stevedoring Co., Ltd.
500 Place D'Armes, Suite 2800
Montreal, QC H2Y 2W2
Canada

Fleetpro
4770 Biscayne Blvd, Penthouse A
Miami, FL 33137

Great Adventure Tours
498 Blanchard Drive
Tecumesh, Ontario N8N 2L9
Canada

Greaves Travel
1306 Old Skoki Road
Highland Park, IL 60035

Haimark Ltd.
1536 Cole Blvd, Suite 330
Lakewood, CO 80401

InnerWorkings, Inc.
61 S Hunt Rd
Amesbury, MA 01913

Larry Busching
10718 Gatewood Ave
Silver Spring, MD 20903

Lueftner
Mernardi Center
Amraser 56
6020 Insbruck
Austria

Melvyn Dutton
4019 Narragansett Ave
San Diego, CA 92107

Messena Memorial Hospital
One Hospital Drive
Massena, NY 13662

Navitrans
4336, Boul, St. Martin West
Laval QC H2T 1C3
Canada

Peter Brieger
20 Queen Street W, Ste 3308
Toronto Ontario M5H 3R3
Canada

Richard Anderson
31 Hackberry Lane
Houston, TX 77027

Road Scholar
11 Avenue de Lafayette
Boston, MA 02111

Travelzoo
Dept CH 19569
Palatine, IL 60055-9569

Centennial Bank
116 Lincoln Ave
Breckenridge, CO 80424

Federal Maritime Commission
800 North Capitol Street, N.W
Washington, DC 20573

Key Bank
100 Public Square
Cleveland, OH 44114

Duncan E. Barber, Esq.
4582 S. Ulster St. Pkwy.
Ste. 1650
Denver, CO 80237

John F. Young, Esq.
1700 Lincoln St.
Ste. 4550
Denver, CO 80203

Edward P. Timmins, Esq.
450 E. 17th Ave.
Ste. 210
Denver, CO 80203

Torben Welch, Esq.
1430 Wynkoop St.
Ste. 400
Denver, CO 80202

Daniel J. Morse, Esq.
308 W. 21st St.
Ste. 203
Cheyenne, WY 82001

*s/ Angela R. Upton*
Angela R. Upton

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) |
| HAIMARK LINE LTD. | ) Chapter 11 |
| EIN: | ) |
| | ) Case No. |
| Debtor. | ) |
| | ) |

## AGREEMENT FOR USE OF CASH COLLATERAL AND ADEQUATE PROTECTION

Pursuant to 11 U.S.C. § 363(c)(2), **HAIMARK LINE LTD.**, a Colorado limited liability company, debtor and debtor-in-possession ("**Debtor**"), and **CENTENNIAL BANK** ("**Bank**"), hereby stipulate and agree:

### RECITALS

A. On October 30, 2015 (the "**Petition Date**"), Debtor filed its voluntary petition under Chapter 11 of the United States Bankruptcy Code and has retained possession of its assets as debtor-in-possession under §§ 1107 and 1108 of the Bankruptcy Code. No committees have been formed.

B. Debtor owns and operates a cruise line based out of Lakewood, Colorado. Debtor is subject to the rules and procedures of the Federal Maritime Commission (the "**FMC**").

C. Debtor is in the process of reorganization. In order to do so while in Chapter 11, Debtor must be able to use a portion of the funds held at Bank to meet certain of its obligations, as discussed below. Without use of such funds, Debtor would be unable to achieve its goals in connection with this bankruptcy filing.

D. Bank has a perfected first priority security interest in a $2,000,000 certificate of deposit held at Bank, CD Account No. 2001929 (the "**CD**"), as well as rights of set off against Debtor's deposit accounts held at Bank as of the Petition Date in the approximate amount of $174,000.00 (the "**Deposit Account**", and together with the CD, the "**Cash Collateral**"). In light of Debtor's obligations under Bankruptcy Code § 363(c)(2) and (e), Debtor has requested that Bank consent to the use of Bank's Cash Collateral (as defined in Bankruptcy Code § 363(a)), as contemplated by Bankruptcy Code § 363(c)(2)(A).

E. Bank has indicated its willingness to allow Debtor to use some of the Cash Collateral, but only on the specific terms and conditions set forth in this Agreement.

403057                                    **Exhibit A**

I. **Current Deposit Requirement.**

F. Under applicable FMC rules and regulations, Debtor is required to establish escrow accounts into which certain of its unearned customer deposits and payments are held until such time as those sums are earned. Debtor maintains certain of its escrow accounts at KeyBank (collectively, the "**KeyBank Escrow Accounts**") and others at Bank (the "**CB Escrow Accounts**" and, collectively with the KeyBank Escrow Accounts, the "**Escrow Accounts**"). Under the terms of the applicable escrow agreements, the funds held in the Escrow Accounts are property of the individual passengers until earned by Debtor. If a scheduled cruise is cancelled by Debtor in its entirety or if a customer timely exercises his or her right to cancel a trip, then the escrowed funds for that cruise or passenger trip are returned to the applicable passengers. Combined, the funds in the Escrow Accounts and the Cash Collateral exceed the amount subject to refunds and that excess will be eventually refunded to Debtor.

G. Funds to be held in escrow are reconciled on a weekly basis and remitted to the applicable Escrow Account. This process is monitored by the FMC. Debtor's licensure with the FMC to operate as a passenger cruise line is conditioned on maintaining the Escrow Accounts by remitting the funds as passengers book and pay for trips.

H. The amount of $209,231.00 is currently due to be deposited in the KeyBank Escrow Accounts (the "**Current KeyBank Deposit Requirement**"). The amount of $90,000.00 is currently due to be deposited in the CB Escrow Accounts (the "**Current CB Deposit Requirement**", and together with the Current KeyBank Deposit Requirement, the "**Current Deposit Requirement**")

I. Debtor has requested Bank's consent to use $299,231.00 of Bank's Cash Collateral to fund the Current Deposit Requirement.

J. Debtor has requested that Bank also consent to use of the Cash Collateral to fund future deposit requirements (the "**Future Deposit Requirements**"), if any, that become due.

II. **Charge-Back Offset Right.**

K. Debtor manages its merchant account through a combination of agreements with Bankers' Bank of the West ("**BBOW**") and Bank (the "**Merchant Account**"). This combination of agreements is a routine structure through which Bank manages its credit cards.

L. In the event of charge-backs against payments through the Merchant Account (the "**Charge-backs**"), funds are debited from Debtor's Deposit Account and those funds are then remitted to BBOW.

M. Since the Petition Date, there have been Charge-backs. Initially, $39,081.11 in Charge-backs were funded through the prior arrangement of debiting Debtor's Deposit Account at Bank (the "**Initial Charge-backs Claim**").

403057

2

N. That practice has stopped. Now Bank funds Charge-backs directly and is accumulating a claim against Debtor (the "**Ongoing Charge-back Claims**" and, together with the Initial Charge-backs Claim, the "**Charge-back Claim**").

O. Bank's Charge-back Claim is secured by the CD as well as by Bank's right to offset against the Deposit Account consistent with Bankruptcy Code § 506(a).

P. Debtor desires the Charge-backs to continue with a minimum of disruption to passengers to assist in preserving its business.

### III. Cancelled Cruises.

Q. As a result of an accident pre-petition and ongoing disputes with the owner of the ship chartered by Debtor, Debtor has cancelled a number of cruises. As a result, some customers have exercised their Charge-back rights, thus creating the Initial Charge-backs Claim, and it is anticipated that Charge-backs will continue until the escrowed funds are refunded.

R. Debtor, Bank, KeyBank and the FMC have started the effort to effectuate the refund of escrowed funds. However, that process will take some time to coordinate and implement among these parties, and, accordingly, it is fully anticipated that additional Charge-backs will be processed before the escrowed funds are disbursed.

S. Debtor seeks to avoid a double refund to customers that will result if escrowed funds are refunded to a passenger that has exercised his or her Charge-back rights. Moreover, Debtor wants to process refunds quickly so that it can realize and use the net funds in its operations. Allowing Bank to exercise its offset rights for Charge-backs will facilitate that result.

T. Given Bank's Cash Collateral and the escrowed funds, both Debtor and Bank believe that Bank is an over-secured creditor entitled to the rights contained in Bankruptcy Code § 506(b).

U. Debtor desires to enter into this Agreement for the purpose of providing adequate protection to Bank's interest in the Cash Collateral.

### AGREEMENT

IN CONSIDERATION OF the foregoing Recitals and the mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Bank and Debtor hereby stipulate and agree as follows:

1. Bank consents to Debtor's use of the Cash Collateral, but only on the terms set forth herein. Bank reserves the right to withdraw its consent to such use in the event that the Bankruptcy Court enters an order in connection with the approval or attempted approval of this Agreement which contains any provision to which Bank does not consent.

2. For so long as Debtor remains in compliance with the terms of this Agreement, and the order approving this Agreement (which order shall be acceptable to Bank in its sole discretion), Debtor shall be authorized and entitled to use the Cash Collateral as specified herein.

3. Bank consents to Debtor's funding the Current Deposit Requirement from the Cash Collateral.

4. As may be agreed hereafter, Bank consents to Debtor's use of the Cash Collateral to fund costs associated with the Escrow Agreements.

5. As may be agreed hereafter, Bank consents to Debtor's use of the Cash Collateral to fund Future Deposit Requirements.

6. Bank is authorized to exercise its right of offset against the Cash Collateral to fund Charge-backs, the payment of fees associated with the Merchant Account and the costs arising in connection with this Agreement.

7. Funds which are held in the Escrow Accounts and for which Bank has honored Charge-backs shall be disbursed directly to Bank, as may be agreed among Debtor, Bank, KeyBank and the FMC or among Debtor, Bank and the escrow agent of the CB Escrow Accounts, as the case may be.

8. Debtor's use of the Merchant Account is suspended, pending subsequent agreement of the parties or Court order.

9. In accordance with Bankruptcy Code § 361(2), Debtor hereby grants, assigns and pledges to Bank, *nunc pro tunc* to the Petition Date, valid, first priority and automatically perfected post-petition replacement liens and security interests in all property which the Debtor or its estate had as of, or may acquire after, the Petition Date and upon which Bank did not have a perfected lien or security interest (the "**Replacement Collateral**") (with the exception of any avoiding powers or causes of action possessed by the Debtor's estate under 11 U.S.C. §§ 542-552), subject only to statutory tax liens to the extent provided by applicable non-bankruptcy law, in the amount and only to the extent that Debtor's actual post-petition use of the Cash Collateral results in a decrease in the value of the Cash Collateral measured as of the Petition Date. The liens and security interests granted hereunder as adequate protection shall be automatically valid, perfected and enforceable against the Replacement Collateral as of the Petition Date and thereafter without further filing or recording of any document or instrument or the taking of any further action, including but not limited to the filing of UCC Financing Statements or control agreements. Notwithstanding anything contained herein to the contrary, the replacement liens and other rights granted under this Agreement are to adequately protect Bank's interest in pre-petition Cash Collateral against any diminution in the value of Bank's interest therein measured as of the Petition Date arising from Debtor's post-petition use of the Cash Collateral. The liens granted herein are provided only to the extent that Debtor's post-petition use of the Cash Collateral results in a decrease in the value of Bank's interest in such property measured as of the Petition Date. The Replacement Collateral expressly include any funds held in the Escrow Accounts and to which Debtor becomes entitled.

403057

4

10. Bank shall be entitled to and is hereby granted a super-priority administrative expense claim under § 507(b) of the Bankruptcy Code to the extent that the provision of adequate protection by virtue of the provision of replacement liens and security interests and the funds receieved by Bank from it exercising its right of setoff are insufficient to compensate for any diminution in the value of Bank's interest in the Cash Collateral measured as of the Petition Date. The super-priority administrative claim shall at all times be senior to the rights of all other creditors (except any creditor who under applicable non-bankruptcy law has a senior perfected lien in the Cash Collateral as of the Petition Date), Debtor, or any trustee in this or any subsequent proceeding under the United States Bankruptcy Code irrespective of and notwithstanding the provisions of § 726(b) of the United States Bankruptcy Code. The replacement liens and security interests of Bank and the proceeds thereof in Replacement Collateral granted to Bank pursuant to this Agreement and any super-priority administrative expense claim awarded or afforded to Bank hereunder shall be subordinate and subject to the fees owed pursuant to 28 U.S.C. § 1930(a)(6). No priority claims or costs of administration in this case or any conversion of these proceedings pursuant to § 1112 of the Bankruptcy Code, or any other proceeding related hereto, shall be prior to or on a parity with Bank's claims against Debtor arising from the aforementioned use of the Cash Collateral. Notwithstanding Bank's super-priority administrative expense claim, Bank shall not be entitled to recover any administrative expense payments made by Debtor in the ordinary course of business or pursuant to court order.

11. Debtor shall execute any and all documents Bank reasonably requests concerning the transaction specified herein, including but not limited to notes, security agreements, and financing statements.

12. Bank shall be given at least 10 days' prior written notice and an opportunity for a hearing prior to the granting to any other person or entity of any lien or security interest in any property in which Bank possesses a security interest which is senior or equal to the liens of Bank. In the event any such equal or senior security interest or lien is granted to any such other person or entity in the same collateral subject to Bank's liens, the proceeds of any loan or extension of credit secured by any such senior or equal security interest or lien shall be applied first in payment to Bank in reduction of indebtedness and obligations owing by Debtor to Bank, unless otherwise ordered by the Court.

13. Debtor shall be obligated to Bank for all reasonable costs and expenses (including, without limitation, attorneys' fees and outside accounting fees) incurred by Bank in connection with (i) the preparation of this Agreement and related documentation; (ii) the preservation and protection of Bank's rights hereunder and under any other such documentation; and (iii) this case, all as is permitted by Bankruptcy Code § 506(b) and the Order approving this Agreement.

14. Debtor shall timely provide to Bank all periodic reports and information, including but not limited to reports regarding Cash Collateral, financial statements, evidence of insurance, debtor-in-possession reports, and all other information reasonably requested by Bank.

15. In the event any other person or entity hereafter seeks an order from the United States Bankruptcy Court pursuant to §§ 361, 362, 363, 364, or 365 of the Bankruptcy Code, Bank shall be given notice thereof and Bank shall have an opportunity to be heard prior to the entry of any such order.

16. Debtor's right to use Cash Collateral shall terminate automatically and without action by any person on the earlier of (a) March 31, 2016, which date may be extended by mutual agreement of Bank and Debtor in writing without the need to obtain further Court Order; or (b) the occurrence of one of the following events:

    a. Failure to comply with this Agreement or the order approving and authorizing this Agreement, which failure to comply shall remain uncured for five (5) business days after written notice from Bank to Debtor with a copy to the United States Trustee and any committee appointed herein, including the failure to pay in accordance with § 7 hereof;

    b. Entry of an order under Bankruptcy Code § 1112, including conversion of this case to a case under Chapter 7 or dismissal of this case;

    c. Entry of an order under Bankruptcy Code § 1104, appointing a Chapter 11 trustee in this case, provided that Bank may in writing elect to continue this Agreement following appointment of a Chapter 11 trustee;

    d. Entry of an order under Bankruptcy Code § 362(d) in favor of any person other than Bank and materially affecting any of the property constituting part or all of the Cash Collateral or materially affecting Bank's liens; and

    e. Entry of an order under Bankruptcy Code § 364 granting any person a lien on any assets of the estate equal to or senior to Bank's liens, without Bank's express prior written consent or Court Order.

    f. Upon the occurrence of a default as set forth hereinabove, Bank shall provide notice of such default to Debtor and any Committee. Debtor shall have a period of five (5) business days from mailing of the notice of such default to cure or request a hearing before the Court to determine whether a default has indeed occurred. If Debtor does not request a hearing or cure the asserted default within the stated five (5) business days, Debtor's right under this Agreement to use the Cash Collateral subject to Bank's security interest shall terminate (unless Debtor has otherwise obtained an Order authorizing use of Cash Collateral).

17. Nothing contained herein shall preclude Bank or Debtor from making appropriate requests of this Court for such other or further relief as shall from time to time be necessary for adequate protection of Bank's interest, including its security interests in the Cash Collateral and Replacement Collateral. Bank's agreement to the provisions herein shall not constitute an admission by Bank that Debtor should continue operation of its business or that there is a reasonable likelihood of Debtor's successful reorganization. The automatic stay provided by § 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed vacated or modified as necessary to implement the provisions of this Agreement, but this provision shall not mean nor

be interpreted to mean that Bank shall be entitled to foreclose on the Cash Collateral or Replacement Collateral without first obtaining an order under Bankruptcy Code § 362(d) with an opportunity for Debtor and any Committee to respond.

18. This Agreement shall be binding upon and inure to the benefit of Bank, Debtor, and any Committee and their respective successors and assigns, including any trustee subsequently appointed in this case or any conversion of this case under the United States Bankruptcy Code to Chapter 7.

19. Debtor shall give notice and an opportunity for hearing to all creditors and parties in interest entitled to notice in accordance with Bankruptcy Rule 4001(d) of the execution of this Agreement and Motion seeking approval thereof.

20. Debtor shall seek approval of this Agreement and authorization to enter and perform the terms hereof. Debtor shall seek approval *nunc pro tunc* to the Petition Date.

21. This Agreement may be executed in any number of counterparts, and may be executed in original or facsimile transmission signatures. All such counterparts, taken together, shall constitute a single agreement.

22. This Agreement shall be governed by Colorado law except to the extent otherwise governed by Bankruptcy law

23. Any notice or report required to be sent or furnished under this Agreement shall be in writing and either via email or transmitted by United States Mail, first-class postage prepaid, addressed as follows:

    a. If to Debtor:

Haimark Line, Ltd.
ATTN: Marcus Leskover
1536 Cole Boulevard, Suite 330
Lakewood, CO 80401
Email:

With a copy to:

Jeff Brinen, Esq.
Kutner Brinen Garber, P.C.
1660 Lincoln Street, Suite 1850
Denver, Colorado 80264
Email: jsb@kutnerlaw.com

403057

7

b. If to Bank:

Centennial Bank
116 Lincoln Ave.
ATTN: Kenneth Trausch
P.O. Box 6520
Breckenridge, Colorado 80424
Email: ktrausch@centennialbanking.com

With a copy to:

Duncan Barber, Esq.
Bieging Shapiro & Barber LLP
4582 S. Ulster Street Parkway, Suite 1650
Denver, CO 80237
Email: dbarber@bsblawyers.com

DATED this 25th day of November, 2014.

Accepted and Agreed:

HAIMARK LINE LTD.

By:_____
Name: Marcus Leskover
Title: Managing Partner

CENTENNIAL BANK

By:_____
Name: Kenneth Trausch
Title: Market President

403057

8

b. If to Bank:

Centennial Bank
116 Lincoln Ave.
ATTN: Kenneth Trausch
P.O. Box 6520
Breckenridge, Colorado 80424
Email: ktrausch@centennialbanking.com

With a copy to:

Duncan Barber, Esq.
Bieging Shapiro & Barber LLP
4582 S. Ulster Street Parkway, Suite 1650
Denver, CO 80237
Email: dbarber@bsblawyers.com

DATED this 25th day of November, 2014.

Accepted and Agreed:

| HAIMARK LINE LTD. | CENTENNIAL BANK |
|---|---|
| By: _____ | By: _____ |
| Name: Marcus Leskover | Name: Kenneth Trausch |
| Title: Managing Partner | Title: Market President |

403057

8