## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | Case No. 15-22180-JGR |
| HAIMARK LINE, LTD., *et al.* | Chapter 11 |
| Debtor. | |

### CENTENNIAL BANK'S OBJECTION TO ADEQUACY OF DISCLOSURE STATEMENT

Centennial Bank ("**Centennial**"), by and through its counsel, Holland & Hart LLP, hereby objects to the adequacy of the Disclosure Statement filed by the Debtor herein on December 20, 2016, Docket No. 344, (the "**Disclosure Statement**") as follows:

### BACKGROUND

1.      On October 30, 2015 (the "**Petition Date**"), the Debtor filed its voluntary petition under Chapter 11 of the United States Bankruptcy Code and has retained possession of its assets as debtor-in-possession under §§ 1007 and 1108 of the Bankruptcy Code.  No committees have been formed.

2.      Centennial has a perfected first priority security interest in a certificate of deposit held at Centennial, CD Account No. 2001929, (the "**CD**"), as well as rights of set off against the Debtor's deposit held at Centennial.

3.      As of the Petition Date, the CD balance was $2,004,827.  The Debtor managed its merchant account through a combination of agreements with Bankers' Bank of the West and Centennial, and pursuant to an agreement with Centennial, customer charge-backs processed by Centennial were reimbursed from the CD.  The remaining balance on the CD is approximately $960,000.

4.     On December 3, 2015, the Debtor and Centennial entered into an Amended Agreement for the Use of Cash Collateral and Adequate Protection, a copy of which is attached hereto as *Exhibit A*, in which the Debtor acknowledged that Centennial was an over-secured creditor entitled to the rights contained in 11 U.S.C. § 506(b) and in which Centennial consented to allow the Debtor to use the funds in the CD to meet its obligations for customer charge-backs and to fund certain escrow deposit accounts as required by Federal Maritime Commission regulation (the "**Cash Collateral Agreement**"), Docket No. 67.

5.     The Cash Collateral Agreement was approved pursuant to 11 U.S.C. §363(c)(2)(A) by an Order dated January 13, 2016, Docket No. 132.

6.     Pursuant to the Cash Collateral Agreement, Centennial was authorized to exercise its right of offset against the CD to fund charge-backs, the payment of fees associated with the Debtor's Merchant Account, and costs arising in connection with the Cash Collateral Agreement. *See* Cash Collateral Agreement at ¶6.  Further, the Debtor was obligated to Centennial for all reasonable costs and expenses incurred in connection with the preparation of the Cash Collateral Agreement, the preservation of Centennial's rights thereunder, and the bankruptcy case, all as permitted by Section 506(b) of the Bankruptcy Code. *Id.* at ¶13.

7.     Further, the Debtor agreed to timely provide to Centennial periodic reports and information, financial statements, and all other information reasonably requested by Centennial. *Id.* at ¶ 14.

8.     On October 6, 2016, certain creditors of Haimark, Ltd., an affiliate of the Debtor, filed an involuntary petition for relief against Haimark, Ltd. under Chapter 7 of the Bankruptcy Code, commencing Case No. 16-19885-JGR.

9.       Shortly thereafter, the petitioning creditors commenced discovery to investigate the financial affairs of Haimark, Ltd. and its relationship with the Debtor.  In particular, on December 8, 2016, counsel for the petitioning creditors conducted depositions of Mr. Marcus Leskovar, the former managing partner and Chief Operating Officer of Haimark, Ltd., and Ms. Sarah Lamond, the accountant for Haimark, Ltd., the Debtor and certain affiliated companies. Attached hereto as *Exhibit B* are the deposition transcripts from those depositions.

10.      Mr. Leskovar and Ms. Lamond each testified that the funds of Haimark, Ltd. and the Debtor were commingled, that the Debtor had no separate employees, and that the Haimark entities were operated as one business. Mr. Leskovar and Ms. Lamond further testified that Haimark, Ltd. was the operating entity for the business, funded the CD, and provided virtually all of the monies which financed the Debtors.  Counsel for Centennial attended those depositions.

11.      Based on the testimony provided, Centennial believes that there  may be alter ego, piercing, fraudulent transfer or other claims against the Debtor which may be asserted by the Chapter 7 Trustee for Haimark, Ltd. and/or creditors of its estate against the Debtor.  Counsel for Centennial has conferred with counsel for the Haimark, Ltd. Chapter 7 Trustee, and on December 20, 2016, counsel for the Trustee formally notified Centennial that funds held in accounts and certificates of deposit under the name of Haimark Line, Ltd. are the property of Haimark, Ltd and demanded an accounting and surrender of such funds.  *See Exhibit C* attached hereto.

12.      Thereafter, pursuant to paragraph 14 of the Cash Collateral Agreement, Centennial requested that the Debtor provide its books and records so that Centennial might examine the sources and uses of the funds in its possession and the intercompany accounting

between Haimark, Ltd and the Debtor.  However, to date, the Debtors have refused to provide their books and records and not allowed Centennial to inspect those books and records.

13.     On January 13, 2017, the Haimark, Ltd. Trustee filed a number of Motions for Orders Authorizing Rule 2004 Examinations on various entities involved in the Debtor's operations.  Those Motions alleged that Haimark, Ltd. was the operating company for the Debtor and other related companies and that money was routinely comingled between the entities. Further discovery concerning those allegations is underway.

14.     Centennial Bank is also a creditor of Haimark, Ltd.

## THE DISCLOSURE IS INADEQUATE

### Legal Standard

15.     Under Section 1125(b) of the Bankruptcy Code, a disclosure statement must provide "adequate information" in order to be approved.  See 11 U.S.C. § 1125(b).  "Adequate information" means "information of a kind, and in sufficient detail, as far as reasonably practical in light of the nature and history of the debtor and the condition of the debtor's books and records…that would enable a hypothetical investor of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a*). See also, Krystal Cadillac-Oldsmobile GMC Truck, v. General Motors Corp.*, 337 F.3d 314, 322 (3d Cir. 2003) (stating that preparing and filing a disclosure statement is the pivotal concept in reorganization of a chapter 11 debtor).

16.     "Adequate information" includes all relevant information which pertains to the success or failure of the proposals in the plan of reorganization, as well as the timing and amount of distributions to creditors under the plan.  *See*, *e.g.*, *In re Stanley Hotel, Inc.*, 13 B.R. 926, 929 (D. Colo. 1981); *In re Scioto Valley Mortgage Co.*, 88 B.R. 168, 170 (S.D. Ohio 1988). Moreover, a plan proponent "should be biased toward more disclosure than less" and should "make full, candid, and complete disclosure."  *In re Michelson*, 141 B.R. 715, 720 (E.D. Cal.

4

1992).  As stated by one court, "[t]he importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by creditors and the court.  Given this reliance, the Debtor's obligation to provide sufficient information to satisfy the Code standard of 'adequate information' cannot be overemphasized."  *In re Oneida Motor Freight, Inc.*, 848 F.2d 414, 417 (3d Cir. 1988), *cert. denied,* 488 U.S. 967 (1988).

17.     The Debtor must prove that the Disclosure Statement provides "adequate information" and should be approved.  *See In re Roedemeier*, 374 B.R. 264, 267 (D. Kan. 2007) ("[T]he Debtor ha[s] the burden to prove [its] disclosure statement should be approved…."). *See also, In re Metrocraft Pub. Serv., Inc.*, 39 B.R. 567 (N.D. Ga. 1984).[1]

18.     Fundamentally, the Disclosure Statement does not contain sufficient information to comply with the standard mandated by § 1125.  As is more fully discussed below, the Disclosure Statement omits important information concerning potential claims by the Chapter 7

---

[1]  In *Metrocraft*, the court listed the following nineteen factors as pertinent to an analysis of the adequacy of a disclosure statement: "(1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectibility of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the chapter 11 plan; (15) projected realizable value from recovery of preferential or otherwise voidable transfers; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a nonbankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates."  39 B.R. at 568; *accord In re Jeppson*, 66 B.R. 269, 292 (D. Utah 1986).  Courts in other cases have set forth similar "laundry lists" of factors relevant to an analysis of a disclosure statement under 11 U.S.C. § 1125(a).  *See e.g. Ferretti*, 128 B.R. at 18-19; *In re Cardinal Congregate 1*, 121 B.R. 760, 765 (S.D. Ohio 1990); *In re Scioto Valley Mort. Co.*, 88 B.R. 168.

Trustee for the Haimark, Ltd estate and inaccurately describes the Centennial Bank claim and the status of the CD.

### Disclosure Statement Objections

19.     Most importantly, the Disclosure Statement is devoid of any disclosure regarding the allegations of alter ego, piercing, comingling, fraudulent transfer, and corporate looting being investigated by the Haimark, Ltd. Trustee.

20.     While the Disclosure Statement references the $800,000 intercompany balance owing from the Debtor to Haimark, Ltd. as reflected on the Debtor's Schedules, that claim is dismissed in a conclusory fashion with a statement that the CLO has not located records supporting this claim.  *See* Disclosure Statement at 9.  But the Debtor is apparently unable to produce its books and records, so this statement is unsupported at best.  Further, the testimony of the Debtor's former accountant supports the existence of a significant intercompany payable.

21.     Such claims could have a material effect on the Debtor's assets and proposed plan of liquidation, both with respect to timing and amounts available to pay creditors.  If, for example, it is determined that the Debtor is the alter ego of Haimark, Ltd. or that it is the transferee of a fraudulent transfer from that entity, the amounts available to pay creditors will not be as projected.

22.     More specifically, given these issues, the Debtor's statement that it anticipates distributions equal to 40-60% of the allowed general unsecured claims is misleading.  *See* Disclosure Statement at page 13.  The significant Haimark, Ltd.  claims against the Debtor must be disclosed and fully explained.

23.     The Disclosure Statement should also explain the Debtor's relationships with the other Haimark entities, the transactions between them, and whether such transactions are susceptible of recovery.  *See* 7 COLLIER ON BANKRUPTCY ¶ 1125.02[2] (Alan N. Resnick &

Henry J. Sommer eds., 16th ed.) ("[A]t a minimum, the disclosure statement should contain…transactions with insiders….") (citing *In re Malek*, 35 B.R. 443, 443-44 (Bankr. E.D. Mich. 1983); *see also In re S.E.T. Income Properties, III*, 83 B.R. 791, 792 (Bankr. N.D. Okla. 1988) (same); *In re Cardinal Congregate I*, 121 B.R. 760, 767 (Bankr. S.D. Ohio 1990) (finding inadequate discussion of claims of various affiliates of the debtor for loans made and services provided to the debtor and requiring detailed disclosure of information on nature of insider claims and the plan's treatment of these claims).

24.     In addition, the description of Centennial Bank's claim on pages 3 and 13 of the Disclosure Statement is incorrect and improperly limits  its claim.

25.     As explained above, pursuant to paragraphs 6 and 13 of the Cash Collateral Agreement, Centennial retains a right of offset against the CD not only to fund charge-backs, but also for the reasonable fees and costs arising in connection with the Cash Collateral Agreement, the preservation of Centennial Bank's rights thereunder, and the bankruptcy case in general.

26.     The description of the Class 2 Centennial Secured Claim for "processing charge-backs and/or for attorneys' fees associated therewith" should be amended to accurately reflect Centennial Bank's rights under the Cash Collateral Agreement.

27.     Similarly, the discussion of the Centennial Bank CD and Charge-Back rights on pages 7-8 of the Disclosure Statement is misleading.  Centennial has not refused to release the CD, but has requested the Debtor to produce books and records which would refute allegations of comingling and the Haimark, Ltd. Trustee's demand for the turnover of the CD.

28.     To date, the Debtor has not produced the Debtor's books and records, notwithstanding its obligation to do so under paragraph 14 of the Cash Collateral Agreement.

29.     Further, in light of the Haimark, Ltd. Trustee's demand that the CD be turned over to him, Centennial Bank has sought to maintain the status quo until the Trustee's investigation is completed.

WHEREFORE, Centennial Bank respectfully requests the Court to deny the Debtors' request to approve the Disclosure Statement.

Dated:   January 27, 2017                    Respectfully submitted,

*/s/Risa Lynn Wolf-Smith*
Risa Lynn Wolf-Smith, #15835
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Post Office Box 8749
Denver, Colorado  80201-8749
Tel:  (303) 295-8011
Fax:  (303) 295-8261
Email:  rwolf@hollandhart.com
*Attorneys for CENTENNIAL BANK AND TRUST*

### CERTIFICATE OF SERVICE

I certify that on January 27, 2017, I served a copy of the foregoing document to the following by

☒      U.S. Mail, postage prepaid
☐      Hand Delivery
☐      Fax

| | | |
|---|---|---|
| Steven E. Abelman<br>410 Seventeenth St., 22nd floor<br>Denver, CO 80202 | Duncan E. Barber<br>4582 S. Ulster St. Pkwy., Ste.<br>1650<br>Denver, CO 80237 | Ethan Birnberg<br>600 17th St., Ste. 1800 South<br>Denver, CO 80202 |
| Kevin C. Driscoll, Jr.<br>1 North Wacker Dr., Ste. 4400<br>Chicago, IL 60606 | Daniel Glasser<br>2000 S. Colorado Blvd.<br>Tower I, Suite 7500<br>Denver, CO 80222 | Samuel M. Kidder<br>410 17th St., Ste. 2200<br>Denver, CO 80202 |
| Daniel J. Morse<br>308 W. 21st St., Ste. 203<br>Cheyenne, WY 82001 | Steven T Mulligan<br>1099 18th St., Ste. 2150<br>Denver, CO 80202 | Paul W. Rodney<br>370 17th St., Ste. 4400<br>Denver, CO 80202 |
| John C. Smiley<br>600 17th St., Ste. 1800-S<br>Denver, CO 80202 | Edward P. Timmins<br>450 E. 17th Ave., Ste. 210<br>Denver, CO 80203 | Torben Welch<br>1430 Wynkoop St., Ste. 400<br>Denver, CO 80202 |
| John F. Young<br>1700 Lincoln St., Ste. 4550<br>Denver, CO 80203 | John C. Smiley<br>600 17th St., Suite 1800 South<br>Denver, Colorado 80202 | |

/s/*Lela Lopez Velasquez*
Lela Lopez Velasquez
Holland & Hart LLP

9505375_1

# EXHIBIT A

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| HAIMARK LINE, LTD. | ) | |
| | ) | Case No. 15-22180 SBB |
| Debtors. | ) | |
| | ) | |

### NOTICE OF FILING AMENDED AGREEMENT FOR USE OF CASH COLLATERAL AND ADEQUATE PROTECTION

PLEASE TAKE NOTICE that attached hereto as Exhibit A is the executed version of the Amended Agreement for Use of Cash Collateral and Adequate Protection, filed in connection with Debtor's Emergency Motion to Approve Agreement for Use of Cash Collateral and Adequate Protection between Debtor and Centennial Bank.

Dated:  December 3, 2015.

BIEGING SHAPIRO & BARBER LLP

By:___/s/ *Duncan E. Barber*_____
    Duncan E. Barber, #16768
4582 South Ulster St. Parkway, Suite 1650
Denver, CO  80237
Tel:  (720) 488-0220
Fax:  (720) 488-7711
E-mail: dbarber@bsblawyers.com

*Counsel for Centennial Bank*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 3, 2015, I caused to be served by prepaid first class mail a true and correct copy of the foregoing **NOTICE OF FILING AMENDED AGREEMENT FOR USE OF CASH COLLATERAL AND ADEQUATE PROTECTION** to the following:

Haimark Line, Ltd.
1536 Cole Blvd., Suite 330
Lakewood, CO 80401

Jeffrey S. Brinen
Benjamin H. Sholoss
Kutner Brinen Garber PC
1660 Lincoln, Ste 1850
Denver, CO 80264

John F. Young
Markus Williams Young & Zimmerman LLC
1700 Lincoln, Ste 4550
Denver, CO 80203

Alan Motes
Office of the United States Trustee
Byron G. Rogers Federal Building
1961 Stout Street, Suite 12-200
Denver, Colorado 80294

By: ___/s/ Mary Anne Lenzi_____

403635

2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

In re:                    )
                            )
HAIMARK LINE LTD.      )   Chapter 11
EIN:                   )
                            )   Case No.
     Debtor.         )
                            )

## AMENDED AGREEMENT FOR USE OF CASH COLLATERAL AND ADEQUATE PROTECTION

Pursuant to 11 U.S.C. § 363(c)(2), **HAIMARK LINE LTD.**, a Colorado limited liability company, debtor and debtor-in-possession ("**Debtor**"), and **CENTENNIAL BANK** ("**Bank**"), hereby stipulate and agree:

### RECITALS

A.     On October 30, 2015 (the "**Petition Date**"), Debtor filed its voluntary petition under Chapter 11 of the United States Bankruptcy Code and has retained possession of its assets as debtor-in-possession under §§ 1107 and 1108 of the Bankruptcy Code. No committees have been formed.

B.     Debtor owns and operates a cruise line based out of Lakewood, Colorado. Debtor is subject to the rules and procedures of the Federal Maritime Commission (the "**FMC**").

C.     Debtor is in the process of reorganization. In order to do so while in Chapter 11, Debtor must be able to use a portion of the funds held at Bank to meet certain of its obligations, as discussed below. Without use of such funds, Debtor would be unable to achieve its goals in connection with this bankruptcy filing.

D.     Bank has a perfected first priority security interest in a $2,000,000 certificate of deposit held at Bank, CD Account No. 2001929 (the "**CD**"), as well as rights of set off against Debtor's deposit accounts held at Bank as of the Petition Date in the approximate amount of $80,000.00 (the "**Deposit Account**", and together with the CD, the "**Cash Collateral**"), and since the Petition Date, there have been additional deposits from credit card transactions during the Pre-Petition period. In light of Debtor's obligations under Bankruptcy Code § 363(c)(2) and (e), Debtor has requested that Bank consent to the use of Bank's Cash Collateral (as defined in Bankruptcy Code § 363(a)), as contemplated by Bankruptcy Code § 363(c)(2)(A).

E.     Bank has indicated its willingness to allow Debtor to use some of the Cash Collateral, but only on the specific terms and conditions set forth in this Agreement.

EXHIBIT A

I.    **Current Deposit Requirement**.

     F.    Under applicable FMC rules and regulations, Debtor is required to establish escrow accounts into which certain of its unearned customer deposits and payments are held until such time as those sums are earned.  Debtor maintains certain of its escrow accounts at KeyBank (collectively, the "**KeyBank Escrow Accounts**") and others at Bank (the "**CB Escrow Accounts**" and, collectively with the KeyBank Escrow Accounts, the "**Escrow Accounts**"). Under the terms of the applicable escrow agreements, the funds held in the Escrow Accounts are property of the individual passengers until earned by Debtor.  If a scheduled cruise is cancelled by Debtor in its entirety or if a customer timely exercises his or her right to cancel a trip, then the escrowed funds for that cruise or passenger trip are returned to the applicable passengers. Combined, the funds in the Escrow Accounts and the Cash Collateral exceed the amount subject to refunds and that excess will be eventually refunded to Debtor.

     G.    Funds to be held in escrow are reconciled on a weekly basis and remitted to the applicable Escrow Account.  This process is monitored by the FMC.  Debtor's licensure with the FMC to operate as a passenger cruise line is conditioned on maintaining the Escrow Accounts by remitting the funds as passengers book and pay for trips.

     H.    The amount of $209,231.00 is currently due to be deposited in the KeyBank Escrow Accounts (the "**Current KeyBank Deposit Requirement**").  The amount of $90,000.00 is currently due to be deposited in the CB Escrow Accounts (the "**Current CB Deposit Requirement**", and together with the Current KeyBank Deposit Requirement, the "**Current Deposit Requirement**")

     I.    Debtor has requested Bank's consent to use $299,231.00 of Bank's Cash Collateral to fund the Current Deposit Requirement.

     J.    Debtor has requested that Bank also consent to use of the Cash Collateral to fund future deposit requirements (the "**Future Deposit Requirements**"), if any, that become due.

II.    **Charge-Back Offset Right**.

     K.    Debtor manages its merchant account through a combination of agreements with Bankers' Bank of the West ("**BBOW**") and Bank (the "**Merchant Account**").  This combination of agreements is a routine structure through which Bank manages its credit cards.

     L.    In the event of charge-backs against payments through the Merchant Account (the "**Charge-backs**"), funds are debited from Debtor's Deposit Account and those funds are then remitted to BBOW.

     M.    Since the Petition Date, there have been Charge-backs.  Initially, $39,081.11 in Charge-backs were funded through the prior arrangement of debiting Debtor's Deposit Account at Bank (the "**Initial Charge-backs Claim**").

403057                                                    2

EXHIBIT A

N.      That practice has stopped.   Now Bank funds Charge-backs directly and is accumulating a claim against Debtor (the **"Ongoing Charge-back Claims"** and, together with the Initial Charge-backs Claim, the **"Charge-back Claim"**).

O.      Bank's Charge-back Claim is secured by the CD as well as by Bank's right to offset against the Deposit Account consistent with Bankruptcy Code § 506(a).

P.      Debtor desires the Charge-backs to continue with a minimum of disruption to passengers to assist in preserving its business.

III.   **Cancelled Cruises.**

Q.      As a result of an accident pre-petition and ongoing disputes with the owner of the ship chartered by Debtor, Debtor has cancelled a number of cruises.  As a result, some customers have exercised their Charge-back rights, thus creating the Initial Charge-backs Claim, and it is anticipated that Charge-backs will continue until the escrowed funds are refunded.

R.      Debtor, Bank, KeyBank and the FMC have started the effort to effectuate the refund of escrowed funds.   However, that process will take some time to coordinate and implement among these parties, and, accordingly, it is fully anticipated that additional Charge-backs will be processed before the escrowed funds are disbursed.

S.      Debtor seeks to avoid a double refund to customers that will result if escrowed funds are refunded to a passenger that has exercised his or her Charge-back rights.  Moreover, Debtor wants to process refunds quickly so that it can realize and use the net funds in its operations.   Allowing Bank to exercise its offset rights for Charge-backs will facilitate that result.

T.      Given Bank's Cash Collateral and the escrowed funds, both Debtor and Bank believe that Bank is an over-secured creditor entitled to the rights contained in Bankruptcy Code § 506(b).

U.      Debtor desires to enter into this Agreement for the purpose of providing adequate protection to Bank's interest in the Cash Collateral.

**AGREEMENT**

IN CONSIDERATION OF the foregoing Recitals and the mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Bank and Debtor hereby stipulate and agree as follows:

1.      Bank consents to Debtor's use of the Cash Collateral, but only on the terms set forth herein.  Bank reserves the right to withdraw its consent to such use in the event that the Bankruptcy Court enters an order in connection with the approval or attempted approval of this Agreement which contains any provision to which Bank does not consent.

3

EXHIBIT A

2.      For so long as Debtor remains in compliance with the terms of this Agreement, and the order approving this Agreement (which order shall be acceptable to Bank in its sole discretion), Debtor shall be authorized and entitled to use the Cash Collateral as specified herein.

3.      Bank consents to Debtor's funding the Current Deposit Requirement from the Cash Collateral.

4.      As may be agreed hereafter, Bank consents to Debtor's use of the Cash Collateral to fund costs associated with the Escrow Agreements.

5.      As may be agreed hereafter, Bank consents to Debtor's use of the Cash Collateral to fund Future Deposit Requirements.

6.      Bank is authorized to exercise its right of offset against the Cash Collateral to fund Charge-backs, the payment of fees associated with the Merchant Account and the costs arising in connection with this Agreement.

7.      Funds which are held in the Escrow Accounts and for which Bank has honored Charge-backs shall be disbursed directly to Bank, as may be agreed among Debtor, Bank, KeyBank and the FMC or among Debtor, Bank and the escrow agent of the CB Escrow Accounts, as the case may be.

8.      Debtor's use of the Merchant Account is suspended, pending subsequent agreement of the parties or Court order.

9.      In accordance with Bankruptcy Code § 361(2), only to the extent that Bank's pre-petition liens are valid, perfected and unavoidable, Debtor hereby grants, assigns and pledges to Bank, *nunc pro tunc* to the Petition Date, valid, first priority and automatically perfected post-petition replacement liens and security interests in all property which the Debtor or its estate had as of, or may acquire after, the Petition Date and upon which Bank did not have a perfected lien or security interest (the "**Replacement Collateral**") (with the exception of any avoiding powers or causes of action possessed by the Debtor's estate under 11 U.S.C. §§ 542-552), subject only to statutory tax liens to the extent provided by applicable non-bankruptcy law, in the amount and only to the extent that Debtor's actual post-petition use of the Cash Collateral results in a decrease in the value of the Cash Collateral measured as of the Petition Date.  The liens and security interests granted hereunder as adequate protection shall be automatically valid, perfected and enforceable against the Replacement Collateral as of the Petition Date and thereafter without further filing or recording of any document or instrument or the taking of any further action, including but not limited to the filing of UCC Financing Statements or control agreements. Notwithstanding anything contained herein to the contrary, the replacement liens and other rights granted under this Agreement are to adequately protect Bank's interest in pre-petition Cash Collateral against any diminution in the value of Bank's interest therein measured as of the Petition Date arising from Debtor's post-petition use of the Cash Collateral.  The liens granted herein are provided only to the extent that Debtor's post-petition use of the Cash Collateral results in a decrease in the value of Bank's interest in such property measured as of the Petition

EXHIBIT A

Date. The Replacement Collateral expressly include any funds held in the Escrow Accounts and to which Debtor becomes entitled.

10. Bank shall be entitled to and is hereby granted a super-priority administrative expense claim under § 507(b) of the Bankruptcy Code to the extent that the provision of adequate protection by virtue of the provision of replacement liens and security interests and the funds received by Bank from it exercising its right of setoff are insufficient to compensate for any diminution in the value of Bank's interest in the Cash Collateral measured as of the Petition Date. The replacement liens and security interests of Bank and the proceeds thereof in Replacement Collateral granted to Bank pursuant to this Agreement and any super-priority administrative expense claim awarded or afforded to Bank hereunder shall be subordinate and subject to the fees owed pursuant to 28 U.S.C. § 1930(a)(6). Notwithstanding Bank's super-priority administrative expense claim, Bank shall not be entitled to recover any administrative expense payments made by Debtor in the ordinary course of business or pursuant to court order.

11. Debtor shall execute any and all documents Bank reasonably requests concerning the transaction specified herein, including but not limited to notes, security agreements, and financing statements.

12. Bank shall be given at least 10 days' prior written notice and an opportunity for a hearing prior to the granting to any other person or entity of any lien or security interest in any property in which Bank possesses a security interest which is senior or equal to the liens of Bank. In the event any such equal or senior security interest or lien is granted to any such other person or entity in the same collateral subject to Bank's liens, the proceeds of any loan or extension of credit secured by any such senior or equal security interest or lien shall be applied first in payment to Bank in reduction of indebtedness and obligations owing by Debtor to Bank, unless otherwise ordered by the Court.

13. Debtor shall be obligated to Bank for all reasonable costs and expenses (including, without limitation, attorneys' fees and outside accounting fees) incurred by Bank in connection with (i) the preparation of this Agreement and related documentation; (ii) the preservation and protection of Bank's rights hereunder and under any other such documentation; and (iii) this case, all as is permitted by Bankruptcy Code § 506(b) and the Order approving this Agreement.

14. Debtor shall timely provide to Bank all periodic reports and information, including but not limited to reports regarding Cash Collateral, financial statements, evidence of insurance, debtor-in-possession reports, and all other information reasonably requested by Bank.

15. In the event any other person or entity hereafter seeks an order from the United States Bankruptcy Court pursuant to §§ 361, 362, 363, 364, or 365 of the Bankruptcy Code, Bank shall be given notice thereof and Bank shall have an opportunity to be heard prior to the entry of any such order.

16. Debtor's right to use Cash Collateral shall terminate automatically and without action by any person on the earlier of (a) March 31, 2016, which date may be extended by

403057

5

EXHIBIT A

mutual agreement of Bank and Debtor in writing without the need to obtain further Court Order; or (b) the occurrence of one of the following events:

     a.  Failure to comply with this Agreement or the order approving and authorizing this Agreement, which failure to comply shall remain uncured for five (5) business days after written notice from Bank to Debtor with a copy to the United States Trustee and any committee appointed herein, including the failure to pay in accordance with § 7 hereof;

     b.  Entry of an order under Bankruptcy Code § 1112, including conversion of this case to a case under Chapter 7 or dismissal of this case;

     c.  Entry of an order under Bankruptcy Code § 1104, appointing a Chapter 11 trustee in this case, provided that Bank may in writing elect to continue this Agreement following appointment of a Chapter 11 trustee;

     d. Entry of an order under Bankruptcy Code § 362(d) in favor of any person other than Bank and materially affecting any of the property constituting part or all of the Cash Collateral or materially affecting Bank's liens; and

     e. Entry of an order under Bankruptcy Code § 364 granting any person a lien on any assets of the estate equal to or senior to Bank's liens, without Bank's express prior written consent or Court Order.

     f.    Upon the occurrence of a default as set forth hereinabove, Bank shall provide notice of such default to Debtor and any Committee. Debtor shall have a period of five (5) business days from mailing of the notice of such default to cure or request a hearing before the Court to determine whether a default has indeed occurred. If Debtor does not request a hearing or cure the asserted default within the stated five (5) business days, Debtor's right under this Agreement to use the Cash Collateral subject to Bank's security interest shall terminate (unless Debtor has otherwise obtained an Order authorizing use of Cash Collateral).

    17.    Nothing contained herein shall preclude Bank or Debtor from making appropriate requests of this Court for such other or further relief as shall from time to time be necessary for adequate protection of Bank's interest, including its security interests in the Cash Collateral and Replacement Collateral. Bank's agreement to the provisions herein shall not constitute an admission by Bank that Debtor should continue operation of its business or that there is a reasonable likelihood of Debtor's successful reorganization. The automatic stay provided by § 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed vacated or modified as necessary to implement the provisions of this Agreement, but this provision shall not mean nor be interpreted to mean that Bank shall be entitled to foreclose on the Cash Collateral or Replacement Collateral without first obtaining an order under Bankruptcy Code § 362(d) with an opportunity for Debtor and any Committee to respond.

    18.    This Agreement shall be binding upon and inure to the benefit of Bank, Debtor, and any Committee and their respective successors and assigns, including any trustee

EXHIBIT A

subsequently appointed in this case or any conversion of this case under the United States Bankruptcy Code to Chapter 7.

19.     Debtor shall give notice and an opportunity for hearing to all creditors and parties in interest entitled to notice in accordance with Bankruptcy Rule 4001(d) of the execution of this Agreement and Motion seeking approval thereof.

20.     Debtor shall seek approval of this Agreement and authorization to enter and perform the terms hereof. Debtor shall seek approval *nunc pro tunc* to the Petition Date.

21.     This Agreement may be executed in any number of counterparts, and may be executed in original or facsimile transmission signatures. All such counterparts, taken together, shall constitute a single agreement.

22.     This Agreement shall be governed by Colorado law except to the extent otherwise governed by Bankruptcy law

23.     Any notice or report required to be sent or furnished under this Agreement shall be in writing and either via email or transmitted by United States Mail, first-class postage pre-paid, addressed as follows:

      a.   If to Debtor:

        Haimark Line, Ltd.
        ATTN: Marcus Leskover
        1536 Cole Boulevard, Suite 330
        Lakewood, CO 80401
        Email:

        With a copy to:

        Jeff Brinen, Esq.
        Kutner Brinen Garber, P.C.
        1660 Lincoln Street, Suite 1850
        Denver, Colorado 80264
        Email: jsb@kutnerlaw.com

EXHIBIT A

    b.  If to Bank:

        Centennial Bank
        116 Lincoln Ave.
        ATTN: Kenneth Trausch
        P.O. Box 6520
        Breckenridge, Colorado 80424
        Email: ktrausch@centennialbanking.com

        With a copy to:

        Duncan Barber, Esq.
        Bieging Shapiro & Barber LLP
        4582 S. Ulster Street Parkway, Suite 1650
        Denver, CO 80237
        Email: dbarber@bsblawyers.com

DATED this 3rd day of December, ~~2014~~. 2015.

**Accepted and Agreed:**

**HAIMARK LINE LTD.**                    **CENTENNIAL BANK**

By: _____          By: _____
    Name: Marcus Leskovar                    Name: Kenneth Trausch
    Title: Managing Partner                    Title: Market President

EXHIBIT A

**EXHIBIT B**

**EXHIBIT B**

1        UNITED STATES BANKRUPTCY COURT
           FOR THE DISTRICT OF COLORADO
2

      Bankruptcy Judge Joseph G. Rosania, Jr.
3

Case No. 16-19885-JGR
4  Involuntary Chapter 7 Bankruptcy
    _____

5

RULE 2004 EXAMINATION OF:   SARAH LAMOND
6                    December 8, 2016
    _____

7

In re:
8

HAIMARK, LTD.,
9

Debtor.
10  _____

11        PURSUANT TO NOTICE AND SUBPOENA, the
Rule 2004 Examination of SARAH LAMOND was taken on
12  behalf of the Petitioning Creditors, Vantage Travel
Service, Inc., Abercrombie & Kent USA, LLC, and ICE
13  Support Ltd. at 2000 South Colorado Boulevard, Tower
2, Suite 700, Denver, Colorado 80222, on December 8,
14  2016, at 2:35 p.m., before Sherry Wallin, Certified
Realtime Reporter, Registered Merit Reporter and
15  Notary Public within Colorado.

16

17

18

19

20

21

22  **H+G**

23

24  Hunter + Geist, Inc.

25
303.832.5966    1900 Grant Street, Suite 1025    ■ www.huntergeist.com
800.525.8490    Denver, CO 80203    ■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**1**

```
           UNITED STATES BANKRUPTCY COURT
              FOR THE DISTRICT OF COLORADO

        Bankruptcy Judge Joseph G. Rosania, Jr.

Case No. 16-19885-JGR
Involuntary Chapter 7 Bankruptcy
_____

RULE 2004 EXAMINATION OF:  SARAH LAMOND
                     December 8, 2016
_____

In re:

HAIMARK, LTD.,

Debtor.
_____
          PURSUANT TO NOTICE AND SUBPOENA, the
Rule 2004 Examination of SARAH LAMOND was taken on
behalf of the Petitioning Creditors, Vantage Travel
Service, Inc., Abercrombie & Kent USA, LLC, and ICE
Support Ltd. at 2000 South Colorado Boulevard, Tower
2, Suite 700, Denver, Colorado 80222, on December 8,
2016, at 2:35 p.m., before Sherry Wallin, Certified
Realtime Reporter, Registered Merit Reporter and
Notary Public within Colorado.
```

**2**

```
            A P P E A R A N C E S

For the Petitioning Creditors Vantage Travel Service,
Inc., Abercrombie & Kent USA, LLC, and ICE Support
Ltd.:

          NEAL K. DUNNING, ESQ.
          Brown, Berardini, Dunning & Walker P.C.
          2000 South Colorado Boulevard
          Suite 700
          Denver, Colorado 80222

For the Creditor Centennial Bank:
          CHRISTOPHER J. HEAPHEY, ESQ.
          Holland & Hart LLP
          555 17th Street
          Suite 3200
          P.O. Box 8749
          Denver, Colorado 80201-8749

For the Creditors Scenic Tours Pty Ltd. and Evergreen
Tours:

          ADRIAN P. CASTRO, ESQ.
          Fairfield and Woods P.C.
          1801 California Street
          Suite 2600
          Denver, Colorado 80202-2645
```

**3**

```
                    I N D E X

EXAMINATION OF SARAH LAMOND:              PAGE
December 8, 2016


By Mr. Dunning                              4
```

**4**

1    WHEREUPON, the following proceedings
2  were taken pursuant to the Federal Rules of Civil
3  Procedure.
4       *    *    *    *    *
5         SARAH LAMOND,
6  having been first duly sworn to state the whole truth,
7  testified as follows:
8         (Deponent's reply to oath:  Yep.)
9         EXAMINATION
10  BY MR. DUNNING:
11    Q.  Sarah, can you state your name and spell
12  your last name for the record, please.
13    A.  Sarah Lamond, S-a-r-a-h L-a-m-o-n-d.
14    Q.  Okay.  And where do you live?
15    A.  45 South Sherman Street, Denver,
16  Colorado.
17    Q.  Okay.  Telephone number?
18    A.  970-389-5263.
19    Q.  Okay.  Have an e-mail address?
20    A.  Do I have to give it to you?
21    Q.  Well, I'd like you to.  I'm not going
22  to --
23    A.  LamondSA78@Gmail.
24    Q.  Okay.  And how are you currently
25  employed?

SARAH LAMOND - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

**5**

1    A.  I'm an accountant.
2    Q.  Okay.  And how long have you been an
3 accountant?
4    A.  With the current employer?
5    Q.  No, just overall.
6    A.  Two years.
7    Q.  Ever had your deposition taken before?
8    A.  Nope.
9    Q.  Okay.  So let me tell you, just a little
10 bit, what's going on.  So this concerns a bankruptcy
11 for Haimark Ltd.  We filed an involuntary bankruptcy
12 against Haimark Ltd., oh, a few months back, and in
13 part, the judge has entered an order requiring me, on
14 behalf of my clients, to fill out the bankruptcy
15 paperwork because the people at Haimark either haven't
16 or won't do it, okay?  And so I've basically dug
17 through bankruptcy pleadings and come up with names.
18    A.  Okay.
19    Q.  Yours was in there.  So to the extent
20 that you know the answers to some of the questions,
21 just answer them, and if you don't --
22    A.  Sure.
23    Q.  -- just tell me that.  And that's kind
24 of how we're going to go.  If you don't understand my
25 question, let me know.  And we'll try not to talk on

---

**6**

1 top of each other and get this through so we can get
2 out of here, okay?
3    A.  Okay.
4    Q.  All right.  What position did you have
5 at Haimark when you worked there?
6    A.  I was an accounting intern for a little
7 bit, and then I moved up to, like, a staff accountant.
8    Q.  Did you work for any particular Haimark
9 entity or -- for example, I'm aware that there is
10 Haimark Line --
11    A.  All three.
12    Q.  Okay.  So what are the three entities?
13    A.  There is Haimark Line, Haimark Ltd., and
14 Haimark S.A.
15    Q.  Okay.  And at the end, what -- at the
16 end of your employment there, what was your position
17 at Haimark?
18    A.  Staff accountant.
19    Q.  Staff accountant?  Okay.  And how long
20 were you there?  You might have said, but. . .
21    A.  I guess maybe a little over a year, year
22 and a half.
23    Q.  Okay.  And what were your
24 responsibilities as a staff accountant?
25    A.  Basic operational accounting:  AR, AP,

---

**7**

1 sometimes bank reconciliations, wiring.  Nothing -- I
2 wasn't really -- I never put together, like, financial
3 statements or anything.  I was just basically
4 operational accounting.
5    Q.  Okay.  Did you have a particular boss
6 that you reported to?
7    A.  No.  I mean, I just, like -- it was
8 everybody.  Marcus, Lisa.
9    Q.  And by "Marcus," you mean Marcus
10 Leskovar?
11    A.  And then Amy after Lisa left.
12    Q.  Okay.  And what's Lisa's last name?
13    A.  Larue.
14    Q.  Larue?  Do you know where she is these
15 days?
16    A.  She's in Breckenridge.
17    Q.  Okay.  Is that where she lives or works
18 or both or --
19    A.  Both.
20    Q.  All right.  And who's Amy?
21    A.  She was the controller that they hired
22 after Lisa left.
23    Q.  Okay.  Do you know when Haimark Ltd. was
24 formed?
25    A.  I don't know.  Maybe 2012?  I believe.

---

**8**

1 Maybe '12.
2    Q.  And what particular line of business was
3 Haimark Ltd. involved in?
4    A.  Luxury cruise vacations, I would call
5 it.
6    Q.  Okay.  And was it for any particular
7 geographic location or --
8    A.  Yeah.  It was international.
9    Q.  Okay.  What about Haimark S.A., what
10 was --
11    A.  Strictly South America.
12    Q.  Okay.  What about Haimark Line?
13    A.  Strictly one ship in the United States.
14    Q.  What was the name of that ship?
15    A.  Oh, shoot.  I just forgot.  I can't
16 remember.
17    Q.  Is that the Laurent?
18    A.  Oh, and the Saint Laurent, yeah.
19    Q.  The Saint Laurent?
20    A.  The Saint Laurent, yeah.
21    Q.  So the Saint Laurent was with S.A.?
22    A.  No.
23    Q.  No.  Haimark --
24    A.  Line.
25    Q.  -- Line, okay.  And what happened to the

---

2 (Pages 5 to 8)

SARAH LAMOND - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

**9**

1  Saint Laurent?  Is it still in operation, or do you
2  know?
3       A.  No.  It was -- well, in the beginning of
4  its -- like its second or third voyage, it hit a lock,
5  and then it was grounded for op -- like to get fixed,
6  and then it never sailed again.  And it ended up in
7  Florida, I believe.  I think that's where it ended up.
8       Q.  Okay.  Did one of the Haimark entities
9  still own it when it ended up in Florida, or do you
10  know?
11       A.  I think that it was a battle between the
12  shipowner and then Haimark.
13       Q.  And was Haimark --
14       A.  But I don't know who actually had
15  possession of the boat when I left.
16       Q.  Okay.  And was Haimark an owner of the
17  ship or --
18       A.  No.
19       Q.  Were they just leasing it or. . .
20       A.  I don't know the exact -- how that
21  worked, but there was -- so it was -- I guess it was
22  sort of a lease, but we were in -- Haimark, I think,
23  built it or renovated it, and then there was still a
24  shipowner that contracted out the staff and, like, all
25  the fuel and all of that stuff.  So there was somebody

---

**10**

1  else involved in it as well.
2       Q.  Okay.
3       A.  I think they were FleetPro, that was
4  FleetPro.
5       Q.  So let's go back to Haimark Ltd.
6       A.  Um-hum.
7       Q.  You said it was international --
8       A.  Um-hum.
9       Q.  -- travel, right?
10       A.  Um-hum.
11       Q.  So what function in the international
12  travel business did Haimark perform?  I mean, was it
13  to get -- hook up customers with -- or clients with
14  particular trips, or what did they --
15       A.  No.  They provided river cruise trips.
16       Q.  And did they provide them to individuals
17  or to wholesalers?  How did that work?
18       A.  Both.
19       Q.  Both?  Okay.
20       A.  Mostly through travel agencies, I would
21  say.
22       Q.  All right.  And did travel agents or
23  other wholesalers of travel products, did they pay
24  deposits --
25       A.  Um-hum.

---

**11**

1       Q.  -- to Haimark?
2       A.  Yeah.
3       Q.  Okay.  And walk me through what would
4  happen if a deposit came in to reserve a trip or a
5  cruise.
6       A.  It was received against the invoice,
7  they were -- there was a series of deposits that were
8  paid, and then final payments were made after
9  departure as charges were incurred.  Yeah.  Revenue
10  was never actually recognized until the date of
11  departure.
12       Q.  Okay.  And what would happen with those
13  deposits?  Would they be deposited in a particular
14  spot or an account or what?
15       A.  Yeah, they got deposited into the bank.
16  I mean, wires came into one bank, checks went into a
17  different bank.
18       Q.  And what banks was Haimark using at the
19  time?
20       A.  All the wires were done through PNC.
21  Most -- the majority of -- yeah, the majority of money
22  came through via wire.  Some came through via check.
23  And if -- that was -- yeah.  It was both, actually,
24  both bank accounts.
25       Q.  And wires and checks went to PNC or just

---

**12**

1  the wires?
2       A.  Yep.  Yep.
3       Q.  And did you have any involvement with
4  the funds?
5       A.  As in physically depositing them?
6       Q.  Anything.
7       A.  Yeah.  We had a check reader, so I would
8  deposit the checks into the check reader for PNC.
9       Q.  All right.  Then would you make the book
10  entries for --
11       A.  Um-hum.
12       Q.  -- the credit?
13       A.  Yeah.  I would receive it against the
14  invoices.
15       Q.  When was your last day working for
16  Haimark?
17       A.  I want to say the first week of April
18  maybe.
19       Q.  2016?
20       A.  Yeah.
21       Q.  Okay.  And were the three Haimark
22  entities that we talked about earlier, were they all
23  in operations at that time?
24       A.  Well, Haimark Line hadn't been in
25  operation since -- like actually carrying passengers,

---

**SARAH LAMOND - 12/8/2016**
**In Re:  Haimark, Ltd (Debtor)**

---

**13**

1  and then it filed for Chapter 11 bankruptcy in maybe
2  February?  I'm sorry.  I can't remember.
3      Q.  That's okay.  We can figure that out.
4      A.  Okay.
5      Q.  But we're just --
6      A.  Yeah.
7      Q.  -- going with what your recollection is
8  at this particular point, so. . . Okay.  So you were
9  there working for Haimark after Haimark Line had filed
10 bankruptcy is what your recollection is.
11     A.  Yeah.  Haimark Line, yeah.
12     Q.  Haimark Line.  And what was Haimark Ltd.
13 involved in at the time that you left in April of
14 2016?  Was it still operating?
15     A.  Well, yeah.  It operated, and then,
16 like, within a couple days it stopped operating.  So
17 there wasn't like -- it was a pretty immediate
18 shutoff.
19     Q.  Okay.  And when was that immediate
20 shutoff, as best as you recall?
21     A.  I think it was the first or second week
22 of April.
23     Q.  Okay.  And you were still there at the
24 time, working?
25     A.  In the building?  Yeah.  Yeah.

---

**14**

1      Q.  Employed.
2      A.  Yeah.
3      Q.  Okay.  So how did you -- how did your
4  employment end?  Did you quit?  Were you laid off?
5      A.  No, I was asked to leave by Vert
6  Capital.
7      Q.  Anybody in particular at Vert?
8      A.  I forget his name.  He was a consultant
9  on behalf of Vert.  I forget his name.  I'm sorry.
10     Q.  That's okay.  Because I have names here
11 that we'll go through in a little bit --
12     A.  Okay.
13     Q.  -- and might say, ah, that's the guy.
14 Or not.  Or not.
15     A.  Okay.
16     Q.  So tell me how that worked.  Guy from
17 Vert came in and did what?
18     A.  It was drawn out over maybe a month or
19 so.  He would pop in, ask us to adjust -- or to, like,
20 produce financial statements, then he would leave, and
21 then he'd come back.  And the way that it actually
22 ended was he just asked -- he wasn't even there.  He
23 just asked Marcus to tell us all that Haimark was
24 done.
25     Q.  So you gathered your stuff and left, I

---

**15**

1  take it.
2      A.  That's it.
3      Q.  Okay.  All right.  What office did you
4  work out of?
5      A.  I worked out of the Denver office up in
6  the Denver West complex.
7      Q.  Is that the Cole Boulevard?
8      A.  Yeah, Cole Boulevard.  I think it was
9  1536 Cole Boulevard.
10     Q.  Is that the only office you worked at?
11     A.  It was the only office they had.
12     Q.  Okay.
13     A.  Well, for -- in Colorado.  They had
14 Chicago offices, but I never worked there.
15     Q.  Okay.  In your -- do you have possession
16 of any Haimark documents of any kind?
17     A.  No.
18     Q.  So when you left, you pretty much just
19 took your personal items?
20     A.  Yeah.
21     Q.  And no Haimark items?
22     A.  No.  No.
23     Q.  Okay.  Did you -- tell me about the
24 computers.  What kind of computer system did they
25 have?

---

**16**

1      A.  Well, we worked on -- the physical
2  computer itself was a Macintosh, but I worked on a
3  remote desktop into QuickBooks, and that was basically
4  all I used.
5      Q.  Okay.  Because of your accounting
6  functions?
7      A.  Um-hum.  Um-hum.
8      Q.  Okay.  Did the computers have passwords?
9      A.  Um-hum.
10     Q.  Do you remember what your password was?
11     A.  Nope.
12     Q.  Were they tied in to anything like a
13 person's initials or Social Security number or --
14     A.  No, I feel like they were all just
15 issued to us.  Anything that had to do with QuickBooks
16 was issued to us.  And I didn't have a password to my
17 QuickBooks login.  I didn't set one.
18     Q.  So you could just basically turn on your
19 machine, sit down --
20     A.  Yeah, you could get in if it was there.
21     THE REPORTER:  Wait.  I'm sorry.  I need
22 one at a time.
23     Q.  (BY MR. DUNNING)  My bad.  Go ahead.
24 You go ahead.
25     A.  Yeah, if you -- if my computer was on,

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

SARAH LAMOND - 12/8/2016
In Re: Haimark, Ltd (Debtor)

---

17

you could log in to QuickBooks.

Q. Okay. And who gave you the computer passwords?

A. I think initially when all my computers were set up it was set up by a guy who was, like, kind of doing IT a little bit. His name was Luis. I don't remember his last name.

Q. Was there a process for finding out an employee's passwords or do you know if passwords were stored in a particular place, or do you have any information on that?

A. No. Passwords were not stored in any particular place. If I ever needed to get my -- I didn't have -- I didn't really have a password for anything. So when my computer turned on, it turned on. When I logged in to QuickBooks, it turned on.

There were passwords for, like, the bank accounts and stuff, but I don't remember what those are.

Q. Other than PNC Bank, what other banks?

A. Centennial.

Q. And what kind of business did Haimark have with Centennial Bank? Did they make deposits with them, did they --

A. Um-hum.

---

18

Q. Did wires go through them?

A. No, no wires really. They try -- they did most of the wiring through PNC because they supported international wiring functions, and that wasn't supported through the type of account -- or I don't know if Centennial supported it at all, but it wasn't part of the account that they had with them. So. . .

Q. Was Haimark's operating account with Centennial?

A. It was both.

Q. So it kept money in both banks?

A. Yep.

Q. So you worked on payables --

A. Um-hum.

Q. -- and paid bills?

A. Um-hum.

Q. Were you the only person in your department who did that?

A. No. No.

Q. Who else did you work with?

A. I worked with Lisa Larue and Yvette Castillo, and then later on a woman named Deb, but I forget her last name too, and Amy. It was all sort of -- there wasn't really any specific department.

---

19

There was nobody specifically assigned to AP, specifically assigned to AR. We attempted to move in that direction, but the company never got to that point. So. . .

Q. So you did a little bit of both?

A. Yeah. Yeah. Those of us who were in the accounting department, we were all just operational accounting at the staff level.

Q. Did you have the need to contact any officers, directors, employees at PNC Bank? Did you ever have any personal contact with anybody at the bank?

A. Yeah, I had contacts every now and again if wires couldn't go through or if there was any issues with wiring, but nothing that wasn't -- nothing beyond the scope of operational functions.

Q. And did you have a particular person at PNC Bank that you would talk with, or was it just whoever picked up the phone in the wire department?

A. Picked up the phone, exactly.

Q. What about Centennial Bank, was there any particular person at Centennial Bank that you may have had --

A. Janet. I was in contact with Janet quite a bit.

---

20

Q. And do you remember Janet's last name?

A. Sorry. I always just called her Janet.

Q. Okay. And what kind of matters would you talk to Janet about at Centennial Bank?

A. Same thing. If there was any issues with -- any banking issues that arose, if there were any issues with deposits or any -- nothing beyond, like, the operational scope.

Q. Did you ever work with any escrow agents?

A. Oh, yes. That was through Key Bank.

Q. Okay. So tell me how escrow agents were involved with the Haimark businesses.

A. So Haimark Line, because they departed from U.S. cities, had to put all -- had to hold all customer deposits and moneys in an escrow account. And so anytime there was a departure on Haimark Line or any moneys that were received for Haimark Line, those moneys went into the escrow account through Key Bank, and Key Bank would make the transfer to Federal Maritime Commission.

Q. So just walk me through it a little bit slower. Say I'm a customer --

A. Um-hum.

Q. -- and I'm going to book a cruise or

---

5 (Pages 17 to 20)

SARAH LAMOND - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

21

1  trip, or something like that, with Haimark, and I'm
2  going to pay by wire.  If I did that, my wire
3  probably -- would go through PNC probably first,
4  right?
5      A.  Except for now if we're talking about
6  Haimark Line, those wires actually came into
7  Centennial Bank.
8      Q.  Okay.
9      A.  Haimark Line had its full operational
10 account through Centennial Bank.
11     Q.  Okay.  But let's talk about Haimark Ltd.
12     A.  Okay.
13     Q.  So if we're talking Haimark Ltd. --
14     A.  Well, you talked about escrow accounts.
15 So the escrow accounts that I dealt with were only
16 associated with Haimark Line.
17     Q.  Okay.  Well, that's good to know.  So no
18 escrow accounts with Haimark Ltd.?
19     A.  No.
20     Q.  And that's because of what?
21     A.  I don't think they had any.  Well,
22 that's not true.  There were a few clients that had
23 escrow accounts that they would transfer -- after the
24 departure, those moneys would transfer into the
25 Haimark operating account.

---

22

1      Q.  And under what circumstances would there
2  be a Haimark Ltd. customer whose funds would transfer
3  into an escrow account?
4      A.  Per the request of the customer.
5      Q.  So if the funds weren't going through an
6  escrow account, were they just being held at either
7  PNC Bank or Centennial Bank?
8      A.  Um-hum.  Yeah.
9      Q.  And then once the invoice had either --
10 been completed, the funds would just be applied to the
11 invoice or what?
12     A.  Well, funds were applied to the invoice
13 as received.
14     Q.  Okay.
15     A.  Invoices were never paid in full.
16 Invoices were paid in deposit stages.
17     Q.  And was there a typical stage -- number
18 of stages that an invoice would have?  Four, five?
19     A.  Yeah.  I mean, there was maybe two,
20 maybe three, sometimes four.  Sometimes there was an
21 in -- usually always an initial deposit, and then
22 depending on the cruise, sometimes it would be 90 days
23 out and then 60 days out and then 30 days out and then
24 a final final payment after charges had been incurred,
25 onboard charges had been incurred.

---

23

1      Q.  Okay.  So back -- again, if I was the
2  traveler and I had booked a trip through Haimark Ltd.,
3  I would be given an option to pay my bill in three or
4  four different phases, or stages, as it were.
5      A.  Um-hum.
6      Q.  And I would wire the funds probably
7  through PNC Bank.  And when it would come into
8  Haimark, it would get applied to my invoice so that I
9  would owe less, and then another time increment would
10 come by and I'd have to make another payment --
11     A.  Yep.
12     Q.  -- to stay on my trip, correct?
13     A.  Yep.  Individuals didn't necessarily
14 have those types of payment arrangements, though.
15 There would be a deposit and then a final payment.
16 The staged payments, the deposits, mostly came with
17 full charters.
18     Q.  And Key Bank was the only escrow agent
19 that you worked with, and that was always on Haimark
20 Line matters.
21     A.  Correct.
22     Q.  What about attorneys, were there any
23 attorneys that you ever worked with in relation to
24 your function at Haimark?
25     A.  I don't think so.  Not me directly, no.

---

24

1      Q.  Were there any other accountants for
2  Haimark other than the names you've -- of people
3  you've identified earlier?
4      A.  Yes.  So it was myself, Lisa, and then
5  Amy, and then Yvette and Mimi and Deb.
6      Q.  Do you have a last name for Mimi?
7      A.  I don't know how to say it.  It starts
8  with an E.  Sorry.
9      Q.  Okay.  What about Deb?
10     A.  I don't know her last name.  She was
11 only there for maybe five or six weeks.  And Mimi was
12 only there for maybe four months.
13     Q.  Who prepared taxes for Haimark, do you
14 know?
15     A.  Lisa Larue.
16     Q.  You know, I've seen her name spelled a
17 couple of different ways.  Is it L-a-r-u-e --
18     A.  Um-hum.
19     Q.  -- or is it -- okay.  I think somebody
20 gave it a French spelling that was a little different,
21 and I thought, okay, that's different.
22     And was Lisa there most of the time that
23 you were employed there?
24     A.  She left in December of '15.
25     Q.  Why did she leave?  If you know.

---

6 (Pages 21 to 24)

SARAH LAMOND - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

25

1     A.  She left for personal reasons.  She --
2 she has her own business, and she was ready to get
3 back to that.
4     Q.  And she is the one you said went to
5 Breckenridge earlier, I think, right?
6     A.  She lives there.
7     Q.  Did she live there at the time?
8     A.  She's always lived there, yeah.
9     Q.  Okay.  Are there any other employees of
10 Haimark whose names and positions you recall?
11     A.  Do I remember everybody who worked
12 there?
13     Q.  Yeah.  Do you?
14     A.  Yeah.
15     Q.  Okay.  Why don't you rattle off some
16 names and what they did.
17     A.  They hired a revenue manager in maybe
18 January or December, and his name was Wayne.  The
19 president was Hans.  That was pretty much the Denver
20 office.  Josh was in the Denver office.
21     Q.  Back to Hans, is that Hans Rood?
22     A.  Um-hum.
23     Q.  Okay.  Go ahead.
24     A.  Stella came on board in, like, the
25 beginning of the year as well.  And then there was the

---

26

1 Chicago office too.
2     Q.  Did you know people at the Chicago
3 office?
4     A.  Um-hum.
5     Q.  Okay.  Who do you recall at the Chicago
6 office and what they did?
7     A.  There was Luis, Jesse, Tom.  They're the
8 ones that I dealt with.
9     Q.  Did you ever deal with Bob Henry?
10     A.  Oh, yeah, Bob.  But he wasn't an
11 employee of Haimark.
12     Q.  Was he an independent --
13     A.  Um-hum.
14     Q.  -- CPA or something?
15     A.  Um-hum.  Yeah.
16     Q.  And what did Bob do for the company?
17     A.  He came in after Lisa left and tried to
18 basically organize financials so that they would be
19 presentable to outside parties because they were a
20 little difficult to read if you were an outside party.
21     Q.  Okay.  So was he kind of doing this for
22 Vert, you think, or --
23     A.  No, no.  He did it for Haimark.  I
24 believe he was associated with Hans.  I think that's
25 where the connection was.

---

27

1     Q.  Do you have any information or know how
2 I would get information about the income for Haimark
3 Ltd. for the years 2013, '14, '15 and '16?
4     A.  Beyond the tax returns?
5     Q.  Yes.
6     A.  The only way you would be able to do
7 that is to get into the QuickBooks file.  I mean, the
8 tax returns were all generated from the QuickBooks
9 file, though, so. . .
10     Q.  Do you still keep in touch with anybody
11 from Haimark these days?
12     A.  I don't keep in touch with anybody
13 except for Lisa every now and again.
14     Q.  And as you indicated, she hasn't been
15 there for just about a year, right?
16     A.  Yeah, exactly.
17     Q.  So nobody who's currently working at
18 Haimark, at least as far as you know.  You don't keep
19 in contact with anybody who's currently there?
20     A.  No.
21     Q.  I may have asked you this, but was it
22 Lisa who prepared the tax returns?  Is that what you
23 said?
24     A.  Yeah.  So she didn't file 2015, but she
25 filed '13 and '14.

---

28

1     Q.  And do you think she has copies of
2 Haimark tax returns to this date, or do you know?
3     A.  I don't think she would have copies of
4 Haimark's, no.  I know that she did the taxes for the
5 managing partner -- for one of the managing partners,
6 for Marcus, so she might have his individual taxes,
7 but. . .
8     Q.  Was she friends with Marcus?
9     A.  Yeah.  Yeah.
10     Q.  He's coming at 3:30, just so you know.
11     A.  Okay.
12     Q.  I don't know if that's an issue for you,
13 but. . .
14     A.  No.  It's fine.
15     Q.  Supposed to be anyway.  Account payable
16 records, where would I find those if I was searching
17 for account payable records, again on QuickBooks?
18     A.  Yeah.  I mean, there were all those -- I
19 don't know where all the paperwork ended up, but there
20 were copies of everything, physical copies of
21 everything, filed by entity and by vendor.
22     Q.  And who was the last person working on
23 QuickBooks when you left that you're aware of at
24 Haimark?
25     A.  Probably myself or Amy.  I don't know.

---

7 (Pages 25 to 28)

SARAH LAMOND - 12/8/2016
In Re: Haimark, Ltd (Debtor)

---

29

1    Either one -- one of us.
2        Q.  How long --
3        A.  Maybe Mimi.  I mean, we all finished
4    right at the exact same time.  So. . .
5        Q.  So Amy and Mimi left when you left?
6        A.  Yeah.
7        Q.  General ledgers showing payments to
8    third parties, those would be, again, in the
9    QuickBooks probably?
10       A.  Um-hum.  Yeah.
11       Q.  And you have none of this stuff
12   yourself, right?
13       A.  No, I don't have access to it.
14       Q.  Okay.  Same with accounts receivables?
15       A.  Yeah, it's all in there.
16       Q.  Okay.  Are you aware of any litigation
17   that Haimark was involved in in 2016?
18       A.  Ltd.?
19       Q.  Yes.
20       A.  No.
21       Q.  So that doesn't mean that there wasn't
22   any.  You just aren't aware of any.  Or you're pretty
23   sure there wasn't any.
24       A.  I mean -- yeah, not that I know of.
25       Q.  I take it some of the other entities

---

30

1    might have been involved in litigation?
2        A.  Well, yeah, Haimark Line was in
3    litigation with --
4        Q.  The boat?
5        A.  -- the shipowner, yeah.
6        Q.  Aware of any repossessions or
7    garnishments that occurred for Haimark Ltd. during
8    2015?
9        A.  No.
10       Q.  Were there ever any receiverships that
11   were invoked or put in place concerning Haimark Ltd.?
12       A.  No.
13       Q.  And the only thing that you know of that
14   came in that kind of changed the structure was when
15   Vert Capital came in, correct?
16       A.  Exactly.  Yeah.
17       Q.  All right.  So nobody from a court
18   proceeding or anything like that that came in with a
19   court order that took control of the assets of the
20   company?
21       A.  No.  No, no.  No.
22       Q.  Even though the other entity, Haimark
23   Line, was in bankruptcy, so -- and you were aware of
24   that, correct?
25       A.  Yeah.  Yeah.

---

31

1        Q.  But nothing similar to that as relates
2    to Haimark Ltd.?
3        A.  No.  Well, so in the last, like, week or
4    so they had a bankruptcy attorney come in with this
5    paperwork --
6        Q.  Yeah.
7        A.  -- that you provided to us, but nothing
8    came of it.
9        Q.  Okay.
10       A.  We all left after that.  So. . .
11       Q.  Do you remember who the bankruptcy
12   lawyer was?
13       A.  I don't remember names.  Sorry.  I
14   remember what he looks like.  Pardon?
15       Q.  Jeff Brinen?
16       A.  No.  Jeff was --
17       Q.  Marcus's lawyer.
18       A.  Marcus's lawyer, yeah.
19       Q.  Steve Abelman?
20       A.  I don't know.
21       Q.  What did he look like?
22       A.  He was an older gentleman, taller.
23       Q.  That wouldn't be Steve, so okay.  What
24   about an attorney by the name of Dan Wolf from Vail,
25   did you ever have any interaction with him?

---

32

1        A.  I never had any interaction with him.  I
2    do know his name though.  Yeah.
3        Q.  But you're not sure you've met him?
4        A.  Definitely have never met him, no.
5        Q.  Did Haimark Ltd. lose any property
6    because of theft that you're aware of?
7        A.  No.
8        Q.  And obviously all these questions are
9    just based on what you know.
10       A.  Yeah.  Yeah.
11       Q.  You're not supposed to make up
12   anything --
13       A.  Yeah, no.
14       Q.  -- or guess or infer something.  Just
15   based on your knowledge.
16       A.  Yep.  No.
17       Q.  Were there transfers of any assets of
18   Haimark Ltd. outside of the ordinary course of
19   business, as far as you know?
20       A.  They didn't have any assets.  Some
21   desks, office furniture and some computers, but other
22   than that, they didn't really have any fixed assets,
23   no.
24       Q.  Right.  And then cash deposits that were
25   paid on -- applied to invoices, that's about all they

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

SARAH LAMOND - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

33

1   had.
2       A.   Right, yeah.
3       Q.   They had bank accounts.
4       A.   Yeah, exactly.
5       Q.   And you don't know anything of, like,
6   transfers of money from bank accounts?
7       A.   No.  After -- like --
8       Q.   While you were there.
9       A.   Like intercompany transfers?
10      Q.   Yeah, why don't you tell me about that,
11  if you know anything about intercompany transfers.
12      A.   Yeah.  I mean, there were times when
13  there would be bills paid on behalf of S.A. by Ltd. or
14  vice versa, and those sit on the balance sheet as due
15  to, due from accounts.
16      Q.   Okay.  And why would that be, just one
17  was short cash when the other one had it or what?
18      A.   Yeah.  Sometimes there was an inability
19  to wire for S.A., so we would have to use money from
20  Ltd. to wire on behalf of S.A., and then S.A. would
21  owe Ltd. money for that.
22      Q.   So if there was a need for a wire from
23  one entity, give me an example of why there would be a
24  need for a wire.  What -- why would money need to be
25  wired out?

---

34

1       A.   To pay the shipbuilders.
2       Q.   Okay.  Is that the only one, or is that
3   just the best one that comes to mind?
4       A.   No.  I mean, there were international
5   vendors, too, that we would have to pay if they -- I
6   mean, the ships were in foreign countries.  So we'd
7   have to pay vendors in foreign countries with wire
8   transfers.
9       Q.   So the vendors would be, what, people
10  who provided food on the ships or. . .
11      A.   No, that was mostly provided by the
12  shipowner -- or the shipbuilders.  But, I mean, if
13  there were pre and post activities, so hotels,
14  transfers, that kind of stuff.
15      Q.   Okay.
16      A.   Tour guides.
17      Q.   So the pre and post transfers, is that
18  for customers that those wires would have to be made
19  or for employees or for -- who would be getting
20  those -- who would be benefitting from those funds
21  being wired?
22      A.   The vendors.
23      Q.   The vendors.
24      A.   Yeah.
25      Q.   Okay.

---

35

1       A.   There were employees who worked on the
2   ships who were paid by wire as well.  So there was
3   chefs and sort of like activity managers, and those
4   were international employees, and then their salaries
5   were wired into their respective international bank
6   accounts.
7       Q.   How often would you say that one of the
8   Haimark entities had to cover for the other one
9   because of a shortage of cash in one or the other?
10      A.   I mean, most of the operating cash was
11  flowing through Ltd., so I'd say it happened.
12      Q.   At least once a month, once every month,
13  probably, or. . .
14      A.   Yeah.  Yeah.
15      Q.   Was there a particular time of the month
16  when that would happen, like a time when --
17      A.   No.
18      Q.   -- Ltd. would be short cash or --
19      A.   No.
20      Q.   Just kind of depended, huh?
21      A.   Yeah.  Yeah.  I mean, there were slow
22  seasons.
23      Q.   Okay.  And which ones were the slow
24  seasons?
25      A.   In the summertime there's not a whole

---

36

1   lot going on in Ltd. at all.  There's actually no --
2   there were no departures in the summertime.
3       Q.   So was one of your and the other
4   accounting folks' functions to keep a pretty close eye
5   on the cash to make sure that --
6       A.   Cash flow?
7       Q.   Yeah.
8       A.   Yeah.  Yeah.  Lisa prepared cash flow
9   statements.  And so did Bob Henry, too, actually.
10      Q.   On a daily basis or --
11      A.   No.
12      Q.   How often?
13      A.   Only ad hoc whenever somebody asked for
14  it.
15      Q.   Were those funds that were advanced by
16  one Haimark entity to the benefit of the other, were
17  they ever repaid, replenished?
18      A.   No.
19      Q.   No?  Would an accounting entry be made
20  to account for them?
21      A.   Yeah.  They're sitting on the balance
22  sheet as due to, due from accounts.  Yeah.
23      Q.   Almost like another receivable or
24  payable, correct?
25      A.   Well, no.  It's a liability.

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

SARAH LAMOND - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

37

Q. Okay. When you left, do you remember roughly what the liability would have been to Haimark Ltd. from either of these other entities?

A. I have no idea. I'm sorry. I don't remember.

Q. Not even a rough guess?

A. No. I wouldn't feel comfortable giving a guess.

Q. Okay. And when we were talking about these wires, was there kind of a rough average of the dollar amount that these wires would be, or it would be just all across the board?

A. No. Completely all across the board. I mean, the larger dollar-value amounts obviously went to the shipbuilders. Smaller dollar values went to operational vendors.

Q. Are you aware of any loans that were made to insiders of Haimark Ltd.?

A. No. Like with loans to employees or something?

Q. Well, anybody, say, like who had maybe an ownership interest or anything like that of Haimark Ltd.

A. Well --

Q. Or maybe I should ask you if you even

---

38

knew who owned Haimark Ltd. Do you know who the owners of Haimark Ltd. were?

A. Yeah, it was Marcus and Tom and Hai.

Q. Do you know if --

A. And then Chi maybe. Chi, I think Chi had some percentage in it as well.

Q. Are you aware of any loans to any of those people by Haimark Ltd.?

A. I think both Marcus and Tom had loans.

Q. Where they received funds from those entities?

A. I think so, yeah. I mean, they were sitting on the balance sheet. So, yeah. Yeah.

Q. Okay. All right. And, again, when you left, you were told to just leave, so you don't --

A. Yeah.

Q. -- have copies of any of that stuff, right?

A. Oh, gosh, no. No. And I don't actually know if they were -- I never personally saw any source documentation for those loans. All I saw was the value sitting on the financials. So. . .

Q. Okay. So whether they were real or not, who knows, right?

A. Well, I mean, you would expect to see a

---

39

source doc for something like that, but, yeah.

Q. Yeah. Okay. No, I understand. Are you aware of any bank accounts that were closed while you worked for Haimark?

A. So Centennial was suspended. The Haimark Line account was suspended while I was working there. And so was Ltd., actually, at the end, too, I believe. I just don't know the timing. I'm sorry, I don't remember the timing.

Q. But I could ask somebody at Centennial for that, right?

A. Oh, yeah. Yeah.

Q. What about that PNC account, did it --

A. The PNC was operating up until the day that I left because we were -- we maybe were paid through the PNC account at the end. We were always paid through Centennial. That's where payroll was from. I don't know, at the end maybe -- I didn't do payroll. So. . . I don't know. But I'm pretty sure at the end that must have come from the PNC Bank account because that was the only operating account.

Q. But you did get paid up to the end of when you worked for Haimark?

A. Yeah. Yeah.

Q. Do you know if there were safety deposit

---

40

boxes?

A. No.

(Telephone ringing.)

Q. I don't know what that was. Probably somebody telling me somebody walked in the door.

A. Marcus is here.

Q. Okay. Are you aware of any setoffs that were made in any accounts or any --

A. And by "setoff" you mean?

Q. Oh, instead of -- instead of somebody, say, making a credit on a -- making a payment on an invoice, they were actually given an unearned credit or anything like that, just -- not a good example, but I just --

A. Why would you receive an unearned credit if you make a payment --

Q. Well, just if there was funny business going on in the books. That's all I'm trying to ask you.

A. No. No.

Q. Do you know if Haimark Ltd. or any of the principals of Haimark Ltd. held property for another person?

A. I don't --

Q. I mean, you said they --

---

10 (Pages 37 to 40)

SARAH LAMOND - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

41

1    A.  -- think so.
2    Q.  -- really didn't have any property,
3  right?
4    A.  No, yeah.
5    Q.  Okay.  Other than those payments to
6  vendors that sometimes came from different entities,
7  were there any other times when money went back and
8  forth between the different Haimark entities, other
9  than those circumstances you gave us?
10    A.  No.  Yeah, that was it.
11    Q.  Does -- some of these are going to seem
12  kind of silly, but. . .
13    A.  That's okay.
14    Q.  Haimark Ltd., did it own any real
15  estate?
16    A.  Not that I'm aware of.
17    Q.  Okay.
18    A.  No.
19    Q.  And the cash that it had would have
20  either been in Centennial Bank or PNC Bank, correct?
21    A.  Correct.
22    Q.  No other bank accounts that you're aware
23  of at any time while you were working there besides
24  those two institutions, correct?
25    A.  For Ltd.?

---

42

1    Q.  For Ltd., yeah.
2    A.  No.
3    Q.  Because we do have the escrows with Key
4  Bank for --
5    A.  Exactly.
6    Q.  -- a different entity, but not --
7    A.  Exactly.
8    THE REPORTER:  Wait.  One at a time.
9    MR. DUNNING:  Thank you.
10    Q.  (BY MR. DUNNING)  She has to remind me
11  sometimes to be good, you know.  That's okay.
12    What type of furniture, fixtures and
13  equipment did Haimark Line have?
14    A.  Standard office equipment.  Tables,
15  desks, chairs.  Computers.  Printer.
16    Q.  Okay.  How many people worked for
17  Haimark Ltd. at any one time at the Cole Boulevard
18  location?
19    A.  Well, at the Cole Boulevard location it
20  started off as one, two, three, four, five of us, and
21  then it grew to six, and then seven, and then eight,
22  and then nine, and then ten, and then eleven.  I think
23  there was eleven at the end.
24    Q.  Okay.  So there were tables, desks,
25  chairs, computers for eleven people, give or take?

---

43

1    A.  Yeah.
2    Q.  And were all those items still at the
3  location when you left?
4    A.  Yeah.
5    Q.  Did Ltd. own any artwork?  Of any value.
6    A.  I don't think so, no.
7    Q.  What about insurance policies?
8    A.  I don't know.
9    Q.  Probably didn't have any stocks or bonds
10  or anything like that, right?
11    A.  No.  No.
12    Q.  When you left, did it -- did Ltd. hold
13  any accounts receivables?
14    A.  Yeah.  There was still receivables out
15  there.
16    Q.  Like who would -- who would they have
17  receivables from?  Customers, clients that had booked
18  cruises?
19    A.  Yep.  Yep.
20    Q.  Roughly, idea as to --
21    A.  Oh, I don't know, I'm sorry.
22    Q.  -- the dollar amount?
23    A.  I don't remember.
24    Q.  And certainly if they were still
25  operating, they had payables as well, correct?

---

44

1    A.  Yeah.  Oh, yeah.
2    Q.  Did Ltd. have a piece of the Saint
3  Laurent?
4    A.  No.  Well, I believe there was -- I
5  believe that Line owed Ltd. close to $700,000.
6    Q.  And what was that for?
7    A.  I don't know.  A lot of this came
8  about -- I don't know.  I don't know.  I didn't really
9  have anything to do with it, so. . .  But I do
10  remember there being about $700,000 that Ltd. owed
11  Line -- or sorry, vice versa, that Line owed Ltd.,
12  yeah.
13    And, I mean, if you could get ahold of
14  the financials, you'd see all that.  It's all in
15  there.
16    Q.  Right.  Well, I wish you would have
17  taken some when you walked out the door, but. . .
18    A.  Yeah.  I'm trying to think how we did --
19  no, I am trying to think now.  We did have binders.
20  Each of the accountants -- the new controller that
21  came in was trying to do monthly closes obviously,
22  and -- because that had never happened before, and
23  she -- we had binders, but I never -- I don't have
24  mine.  I didn't take -- never took it home or
25  anything.  It was sitting in the office.  So I don't

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

SARAH LAMOND - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

45

1  know who would have possession of that now.  Probably
2  Vert.
3        **Q.  Think Lisa is a good contact for**
4  **something like that maybe, possibly?**
5        A.  Anything up until -- to get actual
6  physical copies, no.  I mean, we don't have access to
7  the file any -- to the QuickBooks file anymore.
8  So. . .
9        **Q.  And was she there when those binders**
10  **were --**
11        A.  No.  She left in December, and those
12  started -- I think we did it for February and March
13  and that was it.
14        **Q.  Okay.  Did Ltd. have any patents or**
15  **copyrights that you're aware of?**
16        A.  No.
17        **Q.  And, again, I know you're kind of just**
18  **thinking of what was on the books.**
19        A.  Yeah.  I'm just trying to look at the
20  balance sheet right now.
21        **Q.  Yeah.  Yeah.  Didn't own any vehicles,**
22  **autos, trucks, trailers?**
23        A.  So there was a vehicle lease, and I
24  believe that that was under -- it was under Marcus's
25  name, but it was for Tom Markwell.  But when the lease

---

46

1  was up, the car went away, so. . .  The car went back
2  to the dealer.
3        **Q.  In this type of business, there really**
4  **isn't inventory, really, per se, is there?**
5        A.  No, no inventory.
6        **Q.  Do you know who kept the tax returns?**
7  **Would they have probably been on site or --**
8        A.  They were on site, yeah.
9        **Q.  Do you recall any secured creditors**
10  **besides maybe Centennial Bank, for example?**
11        A.  No.
12        **Q.  Any leases that Ltd. held?  Did they**
13  **hold any leases?**
14        A.  Well, so I don't know if you'd consider
15  that a lease, but those payments to the shipowners
16  were -- I mean, it was like a hypothetical lease, but
17  it didn't sit on the balance sheet as a lease.
18  So. . .
19        **Q.  What did it sit on the balance sheet as,**
20  **just as a liability?**
21        A.  No.  It didn't at all.
22        **Q.  Why is that, do you think?**
23        A.  Well, actually maybe -- maybe it did.
24  So. . . I'm sorry.  I don't remember.  They've got
25  it -- all I know is we made payments when they asked,

---

47

1  when the shipowners asked for them.
2        **Q.  Do you know if Ltd. was current on its**
3  **tax obligations at the time you left?**
4        A.  I don't know.
5        **Q.  Wasn't your job, right?**
6        A.  No.  Sorry.  I didn't do the tax
7  returns.
8        **Q.  Yeah.  Okay.**
9        A.  And I don't know if they ever got filed
10  for 2015, so. . .
11        **Q.  Did the books show money that Marcus**
12  **Leskovar owed to Ltd.?**
13        A.  Um-hum.
14        **Q.  Do you remember how much that was?**
15        A.  I don't.
16        **Q.  How about -- close to a million?  Just**
17  **under a million?  Does that sound about right?**
18        A.  No.
19        **Q.  Like 950,000 maybe?**
20        A.  No.
21        **Q.  Don't think so?  Okay.  All right.  But**
22  **there was something on the books and records that**
23  **showed --**
24        A.  Yeah.  Maybe, like, 2- or 300,000.
25        **Q.  Do you know Richard Burkemper?**

---

48

1        A.  Oh, yeah.  Dick, yeah.
2        **Q.  Okay.  What did he do?**
3        A.  He was -- I guess he was an owner as
4  well in the company, but he was sort of like a -- he
5  wasn't a silent partner.  He was involved a little bit
6  in sort of the sales and marketing maybe, but I didn't
7  really have very much involvement with him.  I only
8  met him maybe once or twice.
9        **Q.  After Vert came in, which prior owners**
10  **were still owners?  Marcus?**
11        A.  Yeah.  Well, so Tom left the company,
12  but I don't know, when he left, if his ownership
13  change -- I don't know.  I don't know if he
14  relinquished ownership when he left.  I feel like he
15  might have stayed on as an owner as well when he left
16  the company.
17        **Q.  Do you have any contact with Richard or**
18  **Tom these days?**
19        A.  No.  No.
20        **Q.  Just Lisa, right?**
21        A.  Yeah.
22        **Q.  Okay.  Same with -- I'm probably saying**
23  **this wrong -- is it Giang, Giang Hoang Hai?  Is**
24  **that --**
25        A.  Hai.  I never had any contact with Hai,

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

SARAH LAMOND - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

49

but yeah.
    Q.  Steven Dobbins?
    A.  I've never -- I met him once, but he was out of the company.
    Q.  What about --
    A.  Actually, I'm sorry.  You just triggered something with me.  You asked about litigation with Ltd.?  I think Steve Dobbins was involved with litigation with Ltd., but I don't know for sure.
    Q.  Over maybe his ownership interest or something?
    A.  No.  He wanted to get paid commissions, but I think they were withholding -- Ltd. was withholding the commissions because he was trying to get paid commissions on departures that didn't make a profit.
    Q.  Oh.
    A.  So. . .
    Q.  What about Paul Abramowitz?
    A.  That's the guy from Vert.  Thank you.
    Q.  What do you recall about him?  He's the guy who basically told you -- or told Marcus to tell you it was time to go?
    A.  Yep.
    Q.  You never met him?

---

50

    A.  I did meet him multiple times.
    Q.  Did he ever have you make entries or changes in the books?
    A.  Nope.
    Q.  Did he ever request copies of the books from you?
    A.  Yeah.  He's the -- he was the representative for Vert Capital.
    Q.  What about Adam Levin?
    A.  I met him very briefly.  I think he might own Vert Capital.
    Q.  Michael Pope?
    A.  Never met him.
    Q.  Steven Weis?
    A.  Nope.
    Q.  Ever heard of an entity called VC2 Capital?
    A.  Yeah.  They're associated with Vert. And I -- the only reason I know their name is because they were in the media about -- when Haimark Line -- when they came over and took over, there was a blurb in the media about VC2 Capital taking over Haimark Line.
    Q.  So did Haimark Line actually take over Haimark Ltd.'s business or anything, or no?

---

51

    A.  No.  They filed for Chapter 11 bankruptcy; they couldn't operate.
    Q.  Okay.  And Ltd. continued in operation at least while you were there.
    A.  But not on behalf of Line.
    Q.  On its own behalf.
    A.  Yes.
    Q.  And the only moneys that you're aware of that kind of went back and forth was at the times when vendors needed to be paid and there wasn't sufficient cash to do that.
    A.  Yeah.  Yeah.
    Q.  So sometimes it would go from Line to Ltd. and sometimes from Ltd. to Line or --
    A.  Yes.
    Q.  -- S.A. or something like that?
    A.  Yes.
    Q.  Ever heard of Haimark Affinity Travel?
    A.  Yeah.  I don't -- I never did anything with HAT, though.
    Q.  Haimark Cruise Line?
    A.  Haimark Affinity Travel was -- I don't know if it actually was its own entity or not, but it was basically they -- it was, like, a marketing tool, and they were going to appeal just to alumni groups,

---

52

and that's what was going to go through that.
    Q.  Okay.  What about --
    A.  And I'm sorry.  I didn't --
    Q.  That's okay.  Haimark Cruise Line was the other one I asked about.  Don't know it?
    A.  No.
    Q.  What about Lotus Cruises, do you know who they are?
    A.  Yeah.  They're a shipbuilder.
    Q.  Okay.  Did they ever take over --
    A.  For the Mekong Navigator.  And I believe that's Chi.
    Q.  So is that somebody that Haimark would get involved with to complete some of the cruises or sub out the cruises or what?
    A.  They owned the Mekong Navigator, and we paid payments to them.  They are the shipbuilder.
    Q.  Okay.
    A.  And they also oversaw all of the operations from, like, staffing.  Like they were the on -- they were in -- the on-the-ground company who dealt with -- yeah.
    Q.  So when you were trying to explain to me the difference between the vendors that some of these funds would go to and contrasting it with the services

---

13 (Pages 49 to 52)

SARAH LAMOND - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

53

1  that the shipbuilder would -- or shipowner would
2  provide, it's Lotus that you were talking about?
3      Q.  For one of the boats.
4      Q.  What about Paukan Cruises?
5      A.  Yeah, that's in Myanmar, a shipbuilder
6  in Myanmar.
7      Q.  Same sort of thing?
8      A.  Exact same thing.
9      Q.  Any others you can think of?
10     A.  Yeah, there's the one in India, too.
11  His name is Raj.  I don't remember what their company
12  is called, though.  And then same thing for South
13  America.
14     Q.  So when you walked out the door, was
15  Ltd. solvent?  Did it have money in the bank?
16     A.  Very little.  Maybe --
17     Q.  Was it able to pay its bills when they
18  became due?
19     A.  No.  No.
20     Q.  That's why sometimes money would have to
21  go back and forth between different entities?
22     A.  Well, no.  The different entities didn't
23  typically pay other entities' bills.
24     Q.  Okay.
25     A.  There were instances, I guess, where

---

54

1  that happened between S.A. and Ltd. but not between
2  Line and Ltd. really.  That $700,000 that Ltd. was
3  owed by Line, I'm not sure what it represented.
4      Q.  Were you there when the Saint Laurent
5  accident case was settled?
6      A.  It was settled?
7      Q.  Well, I don't know.  I'm just -- I think
8  it was.
9      A.  Oh.  No.  I mean, it was ongoing.
10     Q.  So as you sit here today, you kind of
11  have a recollection that maybe Marcus had on the books
12  about a 200- or $250,000 liability?
13     A.  I think so.
14     Q.  What about Tom?
15     A.  Say, like -- I think -- I can't remember
16  which one was more, but they both had liabilities like
17  that.
18     Q.  Any other insiders that were owners that
19  also had liabilities?
20     A.  No.
21     Q.  Bob Henry?
22     A.  No.  He wasn't an owner.  He was just a
23  consultant.
24     Q.  Hans Rood?
25     A.  I don't --

---

55

1      Q.  He was just an employee, right?
2      A.  He was the president, but I don't think
3  he -- he didn't have any -- he didn't owe the company
4  anything, no.
5      Q.  How about Dick Burkemper?
6      A.  No, nothing.
7      Q.  Hai?
8      A.  Not that I know of, no.
9      Q.  When you called me on the phone
10  yesterday, you said that you really didn't have any of
11  the information that would go into those forms that
12  were attached to the subpoena, right?
13     A.  Yeah.
14     Q.  Is that pretty much what you said?
15     A.  Yeah.  I mean, you would need the
16  QuickBooks file to get all of that information.
17     Q.  And you wouldn't know who, for example,
18  would be unsecured creditors of Ltd., right?
19     A.  I mean, there's a lot of them.
20     Q.  Would that be in the QuickBooks?
21     A.  Yep.
22     Q.  And as far as who Ltd. owed money to,
23  that would be in the QuickBooks, right?
24     A.  Um-hum.  Yeah.
25     Q.  Did Vert Capital have access to the

---

56

1  QuickBooks once they took over?
2      A.  They -- Paul might have had a login, but
3  they basically asked us to -- they asked us to put it
4  all in spreadsheets, and the one who compiled those
5  was Amy.
6      Q.  And you and Mimi and Amy left on the
7  same day, right?
8      A.  Mimi might have left a couple days
9  earlier, but -- yeah.
10     Q.  So who was there to provide QuickBooks
11  information after you guys left?
12     A.  Good question.  I don't know.
13     Q.  Maybe no one?
14     A.  Yeah.
15     Q.  And this QuickBooks, is this the kind of
16  QuickBooks that the information kind of disappears
17  after a while or -- if you don't access it?
18     A.  Well, I mean, I don't think it ever
19  disappears.  I think it's sitting on the cloud.  But I
20  don't know -- I don't know how you get access to it if
21  somebody doesn't pay the annual fee.  So I don't know
22  how that happens.
23     Q.  Gotcha.
24     A.  I mean, I'm sure it's out there though.
25         MR. DUNNING:  Did you have a note for

---

14 (Pages 53 to 56)

**SARAH LAMOND - 12/8/2016**
**In Re: Haimark, Ltd (Debtor)**

---

57

1  me?
2        MR. HEAPHEY: No, you did -- you asked
3  it.
4        MR. DUNNING: That's why you crumpled it
5  up?
6        MR. HEAPHEY: Yes.
7        MR. DUNNING: All right. Well, I thank
8  you for coming. Unless you have something you want to
9  volunteer or you have a set of QuickBooks in your bag,
10  I think you can probably go.
11        THE DEPONENT: No, I'm sorry. I don't.
12        MR. DUNNING: I knew you didn't. Okay.
13        THE DEPONENT: I do for my other clients
14  but can't help you out. Sorry.
15        MR. DUNNING: Well, you're done. Okay.
16  But thank you for coming, and at least you know you're
17  done.
18        THE REPORTER: Now, is there signature
19  on this or -- is this a 2004 examination?
20        MR. DUNNING: This is a 2004
21  examination.
22        THE REPORTER: I can't recall, do I need
23  to ask about signature or --
24        MR. DUNNING: Well, you know, it's kind
25  of like a deposition. I guess you could. You want to

---

58

1  do it or you want me to? Go ahead if you want.
2        THE REPORTER: Would you like to read
3  and sign the transcript and check it for inaccuracies?
4  That is your option. You can come to our office and
5  do that or since we have your e-mail --
6        THE DEPONENT: You can send it to me in
7  e-mail.
8        WHEREUPON, the within proceedings were
9  concluded at the approximate hour of 3:37 p.m. on the
10  8th day of December, 2016.
11        *    *    *    *    *

---

59

         I, SARAH LAMOND, do hereby certify that
I have read the above and foregoing deposition and
that the same is a true and accurate transcription of
my testimony, except for attached amendments, if any.
         Amendments attached   (  ) Yes   (  ) No


         _____
         SARAH LAMOND


         The signature above of SARAH LAMOND was
subscribed and sworn to before me in the county of
_____, state of _____,
this _____ day of _____, 2016.


         _____
         Notary Public
         My Commission expires:


Haimark, Ltd., Debtor 12/8/16 (sw)

---

60

                REPORTER'S CERTIFICATE
STATE OF COLORADO        )
                         ) ss.
CITY AND COUNTY OF DENVER )

         I, SHERRY A. WALLIN, Certified Realtime
Reporter, Registered Merit Reporter and Notary Public
ID 19874212873, State of Colorado, do hereby certify
that previous to the commencement of the Rule 2004
examination, the said SARAH LAMOND was duly sworn by
me to testify to the truth in relation to the matters
in controversy between the parties hereto; that the
said deposition was taken in machine shorthand by me
at the time and place aforesaid and was thereafter
reduced to typewritten form; that the foregoing is a
true transcript of the questions asked, testimony
given, and proceedings had.
         I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

         IN WITNESS WHEREOF, I have affixed my
signature this 16th day of December, 2016.

         My commission expires May 14, 2019.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

---

15 (Pages 57 to 60)

60

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER  )


          I, SHERRY A. WALLIN, Certified Realtime
Reporter, Registered Merit Reporter and Notary Public
ID 19874212873, State of Colorado, do hereby certify
that previous to the commencement of the Rule 2004
examination, the said SARAH LAMOND was duly sworn by
me to testify to the truth in relation to the matters
in controversy between the parties hereto; that the
said deposition was taken in machine shorthand by me
at the time and place aforesaid and was thereafter
reduced to typewritten form; that the foregoing is a
true transcript of the questions asked, testimony
given, and proceedings had.

          I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

          IN WITNESS WHEREOF, I have affixed my
signature this 16th day of December, 2016.

          My commission expires May 14, 2019.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.




_____

Sherry A. Wallin
Certified Realtime Reporter
Registered Merit Reporter

SARAH LAMOND - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

## A

**Abelman** 31:19
**Abercrombie** 1:12 2:3
**able** 27:6 53:17
**Abramowitz** 49:19
**access** 29:13 45:6 55:25 56:17,20
**accident** 54:5
**account** 11:14 18:5 18:7,9 20:16,19 21:10,25 22:3,6 28:15,17 36:20 39:6,13,16,21,21
**accountant** 5:1,3 6:7,18,19,24
**accountants** 24:1 44:20
**accounting** 6:6,25 7:4 16:5 19:7,8 36:4,19
**accounts** 11:24 17:18 21:14,15,18 21:23 29:14 33:3 33:6,15 35:6 36:22 39:3 40:8 41:22 43:13
**accurate** 59:3
**activities** 34:13
**activity** 35:3
**actual** 45:5
**ad** 36:13
**Adam** 50:9
**address** 4:19
**adjust** 14:19
**ADRIAN** 2:14
**advanced** 36:15
**Affinity** 51:18,22
**affixed** 60:15
**aforesaid** 60:8
**agencies** 10:20
**agent** 23:18
**agents** 10:22 20:10 20:12
**ah** 14:13

**ahead** 16:23,24 25:23 58:1
**ahold** 44:13
**alumni** 51:25
**amendments** 59:4 59:5
**America** 8:11 53:13
**amount** 37:11 43:22
**amounts** 37:14
**Amy** 7:11,20 18:24 24:5 28:25 29:5 56:5,6
**annual** 56:21
**answer** 5:21
**answers** 5:20
**anybody** 14:7 19:11 27:10,12,19 37:21
**anymore** 45:7
**anytime** 20:17
**anyway** 28:15
**AP** 6:25 19:1
**appeal** 51:25
**applied** 22:10,12 23:8 32:25
**approximate** 58:9
**April** 12:17 13:13 13:22
**AR** 6:25 19:2
**arose** 20:6
**arrangements** 23:14
**artwork** 43:5
**asked** 14:5,22,23 27:21 36:13 46:25 47:1 49:7 52:5 56:3,3 57:2 60:9
**assets** 30:19 32:17 32:20,22
**assigned** 19:1,2
**associated** 21:16 26:24 50:18
**attached** 55:12

59:4,5
**attempted** 19:2
**attorney** 31:4,24
**attorneys** 23:22,23
**autos** 45:22
**average** 37:10
**aware** 6:9 28:23 29:16,22 30:6,23 32:6 37:17 38:7 39:3 40:7 41:16 41:22 45:15 51:8

## B

**back** 5:12 10:5 14:21 23:1 25:3 25:21 41:7 46:1 51:9 53:21
**bad** 16:23
**bag** 57:9
**balance** 33:14 36:21 38:13 45:20 46:17,19
**bank** 2:8 7:1 11:15 11:16,17,24 17:17 17:20,23 19:10,12 19:18,21,22 20:4 20:11,20,20 21:7 21:10 22:7,7 23:7 23:18 33:3,6 35:5 39:3,20 41:20,20 41:22 42:4 46:10 53:15
**banking** 20:6
**bankruptcy** 1:1,2,4 5:10,11,14,17 13:1,10 30:23 31:4,11 51:2
**banks** 11:18 17:20 18:12
**based** 32:9,15
**Basic** 6:25
**basically** 5:16 7:3 16:3,18 26:18 49:22 51:24 56:3
**basis** 36:10

**battle** 9:11
**beginning** 9:3 25:25
**behalf** 1:12 5:14 14:9 33:13,20 51:5,6
**believe** 7:25 9:7 26:24 39:8 44:4,5 45:24 52:11
**benefit** 36:16
**benefitting** 34:20
**Berardini** 2:5
**best** 13:20 34:3
**beyond** 19:16 20:7 27:4
**bill** 23:3
**bills** 18:16 33:13 53:17,23
**binders** 44:19,23 45:9
**bit** 5:10 6:7 14:11 17:6 19:5,25 20:22 48:5
**blurb** 50:21
**board** 25:24 37:12 37:13
**boat** 9:15 30:4
**boats** 53:3
**Bob** 26:9,10,16 36:9 54:21
**bonds** 43:9
**book** 12:9 20:25
**booked** 23:2 43:17
**books** 40:18 45:18 47:11,22 50:3,5 54:11
**boss** 7:5
**Boulevard** 1:13 2:5 15:7,8,9 42:17,19
**Box** 2:11
**boxes** 40:1
**Breckenridge** 7:16 25:5
**briefly** 50:10
**Brinen** 31:15

**Brown** 2:5
**building** 13:25
**built** 9:23
**Burkemper** 47:25 55:5
**business** 8:2 10:12 17:22 25:2 32:19 40:17 46:3 50:25
**businesses** 20:13

## C

**C** 2:1
**California** 2:15
**call** 8:4
**called** 20:2 50:16 53:12 55:9
**Capital** 14:6 30:15 50:8,11,17,22 55:25
**car** 46:1,1
**carrying** 12:25
**case** 1:3 54:5
**cash** 32:24 33:17 35:9,10,18 36:5,6 36:8 41:19 51:11
**Castillo** 18:23
**CASTRO** 2:14
**Centennial** 2:8 17:21,23 18:6,10 19:21,22 20:4 21:7,10 22:7 39:5 39:10,17 41:20 46:10
**certainly** 43:24
**CERTIFICATE** 60:1
**Certified** 1:14 60:4
**certify** 59:1 60:5,11
**chairs** 42:15,25
**change** 48:13
**changed** 30:14
**changes** 50:3
**Chapter** 1:4 13:1 51:1
**charges** 11:9 22:24

22:25
**charters** 23:17
**check** 11:22 12:7,8
  58:3
**checks** 11:16,25
  12:8
**chefs** 35:3
**Chi** 38:5,5,5 52:12
**Chicago** 15:14 26:1
  26:2,5
**CHRISTOPHER**
  2:9
**circumstances** 22:1
  41:9
**cities** 20:15
**CITY** 60:3
**Civil** 4:2
**clients** 5:14 10:13
  21:22 43:17 57:13
**close** 36:4 44:5
  47:16
**closed** 39:4
**closes** 44:21
**cloud** 56:19
**Cole** 15:7,8,9 42:17
  42:19
**Colorado** 1:1,13,13
  1:15 2:5,6,11,16
  4:16 15:13 60:2,5
**come** 5:17 14:21
  23:7,10 31:4
  39:20 58:4
**comes** 34:3
**comfortable** 37:7
**coming** 28:10 57:8
  57:16
**commencement**
  60:6
**commission** 20:21
  59:18 60:18
**commissions** 49:12
  49:14,15
**company** 19:3
  26:16 30:20 48:4
  48:11,16 49:4

52:21 53:11 55:3
**compiled** 56:4
**complete** 52:14
**completed** 22:10
**Completely** 37:13
**complex** 15:6
**computer** 15:24
  16:2,25 17:2,15
**computers** 15:24
  16:8 17:4 32:21
  42:15,25
**concerning** 30:11
**concerns** 5:10
**concluded** 58:9
**connection** 26:25
**consider** 46:14
**consultant** 14:8
  54:23
**contact** 19:9,11,24
  27:19 45:3 48:17
  48:25
**contacts** 19:13
**continued** 51:3
**contracted** 9:24
**contrasting** 52:25
**control** 30:19
**controller** 7:21
  44:20
**controversy** 60:7
**copies** 28:1,3,20,20
  38:17 45:6 50:5
**copyrights** 45:15
**correct** 23:12,21
  30:15,24 36:24
  41:20,21,24 43:25
**counsel** 60:11
**countries** 34:6,7
**county** 59:12 60:3
**couple** 13:16 24:17
  56:8
**course** 32:18
**court** 1:1 30:17,19
**cover** 35:8
**CPA** 26:14
**credit** 12:12 40:11

40:12,15
**Creditor** 2:8
**creditors** 1:12 2:2
  2:13 46:9 55:18
**cruise** 8:4 10:15
  11:5 20:25 22:22
  51:21 52:4
**cruises** 43:18 52:7
  52:14,15 53:4
**crumpled** 57:4
**current** 5:4 47:2
**currently** 4:24
  27:17,19
**customer** 20:16,23
  22:2,4
**customers** 10:13
  34:18 43:17

**D**

**D** 3:1
**daily** 36:10
**Dan** 31:24
**date** 11:10 28:2
**day** 12:15 39:14
  56:7 58:10 59:14
  60:16
**days** 7:15 13:16
  22:22,23,23 27:11
  48:18 56:8
**deal** 26:9
**dealer** 46:2
**dealt** 21:15 26:8
  52:22
**Deb** 18:23 24:5,9
**Debtor** 1:9 59:25
**December** 1:6,13
  3:2 24:24 25:18
  45:11 58:10 60:16
**Definitely** 32:4
**Denver** 1:13 2:6,11
  2:16 4:15 15:5,6
  25:19,20 60:3
**departed** 20:14
**department** 18:19
  18:25 19:7,19

**departure** 11:9,11
  20:17 21:24
**departures** 36:2
  49:15
**depended** 35:20
**depending** 22:22
**DEPONENT** 57:11
  57:13 58:6
**Deponent's** 4:8
**deposit** 11:4 12:8
  22:16,21 23:15
  39:25
**deposited** 11:13,15
**depositing** 12:5
**deposition** 5:7
  57:25 59:2 60:8
**deposits** 10:24 11:7
  11:13 17:23 20:7
  20:16 23:16 32:24
**desks** 32:21 42:15
  42:24
**desktop** 16:3
**Dick** 48:1 55:5
**difference** 52:24
**different** 11:17
  23:4 24:17,20,21
  41:6,8 42:6 53:21
  53:22
**difficult** 26:20
**direction** 19:3
**directly** 23:25
**directors** 19:10
**disappears** 56:16
  56:19
**DISTRICT** 1:1
**Dobbins** 49:2,8
**doc** 39:1
**documentation**
  38:21
**documents** 15:16
**doing** 17:6 26:21
**dollar** 37:11,15
  43:22
**dollar-value** 37:14
**door** 40:5 44:17

53:14
**drawn** 14:18
**due** 33:14,15 36:22
  36:22 53:18
**dug** 5:16
**duly** 4:6 60:6
**Dunning** 2:4,5 3:3
  4:10 16:23 42:9
  42:10 56:25 57:4
  57:7,12,15,20,24

**E**

**E** 2:1,1 3:1 24:8
**e-mail** 4:19 58:5,7
**earlier** 12:22 24:3
  25:5 56:9
**eight** 42:21
**either** 5:15 22:6,9
  29:1 37:3 41:20
**eleven** 42:22,23,25
**employed** 4:25
  14:1 24:23 60:11
**employee** 26:11
  55:1
**employee's** 17:9
**employees** 19:10
  25:9 34:19 35:1,4
  37:19
**employer** 5:4
**employment** 6:16
  14:4
**ended** 9:6,7,9 14:22
  28:19
**entered** 5:13
**entities** 6:12 9:8
  12:22 29:25 35:8
  37:3 38:11 41:6,8
  53:21,22
**entities'** 53:23
**entity** 6:9 28:21
  30:22 33:23 36:16
  42:6 50:16 51:23
**entries** 12:10 50:2
**entry** 36:19
**equipment** 42:13

42:14
escrow 20:9,12,16
  20:19 21:14,15,18
  21:23 22:3,6
  23:18
escrows 42:3
ESQ 2:4,9,14
estate 41:15
Evergreen 2:13
everybody 7:8
  25:11
exact 9:20 29:4
  53:8
exactly 19:20 27:16
  30:16 33:4 42:5,7
examination 1:5,11
  3:2 4:9 57:19,21
  60:6
example 6:9 33:23
  40:13 46:10 55:17
expect 38:25
expires 59:18 60:18
explain 52:23
extent 5:19
eye 36:4

F

Fairfield 2:15
far 27:18 32:19
  55:22
February 13:2
  45:12
Federal 4:2 20:20
fee 56:21
feel 16:14 37:7
  48:14
figure 13:3
file 27:7,9,24 45:7,7
  55:16
filed 5:11 13:1,9
  27:25 28:21 47:9
  51:1
fill 5:14
final 11:8 22:24,24
  23:15

financial 7:2 14:20
financials 26:18
  38:22 44:14
find 28:16
finding 17:8
fine 28:14
finished 29:3
first 4:6 12:17
  13:21 21:3
five 22:18 24:11
  42:20
fixed 9:5 32:22
fixtures 42:12
FleetPro 10:3,4
Florida 9:7,9
flow 36:6,8
flowing 35:11
folks' 36:4
following 4:1
follows 4:7
food 34:10
foregoing 59:2 60:9
foreign 34:6,7
forget 14:8,9 18:24
forgot 8:15
form 60:9
formed 7:24
forms 55:11
forth 41:8 51:9
  53:21
four 22:18,20 23:4
  24:12 42:20
French 24:20
friends 28:8
fuel 9:25
full 21:9 22:15
  23:17
function 10:11
  23:24
functions 16:6 18:4
  19:16 36:4
funds 12:4 22:2,5
  22:10,12 23:6
  34:20 36:15 38:10
  52:25

funny 40:17
furniture 32:21
  42:12
further 60:11

G

G 1:2
garnishments 30:7
gathered 14:25
General 29:7
generated 27:8
gentleman 31:22
geographic 8:7
getting 34:19
Giang 48:23,23
give 4:20 33:23
  42:25
given 23:3 40:12
  60:10
giving 37:7
go 5:24 10:5 14:11
  16:23,24 18:1
  19:14 21:3 25:23
  49:23 51:13 52:1
  52:25 53:21 55:11
  57:10 58:1
going 4:21 5:10,24
  13:7 20:25 21:2
  22:5 36:1 40:18
  41:11 51:25 52:1
good 21:17 40:13
  42:11 45:3 56:12
gosh 38:19
Gotcha 56:23
grew 42:21
grounded 9:5
groups 51:25
guess 6:21 9:21
  32:14 37:6,8 48:3
  53:25 57:25
guides 34:16
guy 14:13,16 17:5
  49:20,22
guys 56:11

H

Hai 38:3 48:23,25
  48:25 55:7
Haimark 1:8 5:11
  5:12,15 6:5,8,10
  6:13,13,14,17
  7:23 8:3,9,12,23
  9:8,12,13,16,22
  10:5,12 11:1,18
  12:16,21,24 13:9
  13:9,11,12,12
  14:23 15:16,21
  17:22 20:13,14,17
  20:18 21:1,6,9,11
  21:13,16,18,25
  22:2 23:2,8,19,24
  24:2,13 25:10
  26:11,23 27:2,11
  27:18 28:2,24
  29:17 30:2,7,11
  30:22 31:2 32:5
  32:18 35:8 36:16
  37:2,18,22 38:1,2
  38:8 39:4,6,23
  40:21,22 41:8,14
  42:13,17 50:20,22
  50:24,25 51:18,21
  51:22 52:4,13
  59:25
Haimark's 18:9
  28:4
half 6:22
Hans 25:19,21,21
  26:24 54:24
happen 11:4,12
  35:16
happened 8:25
  35:11 44:22 54:1
happens 56:22
Hart 2:9
HAT 51:20
HEAPHEY 2:9
  57:2,6
heard 50:16 51:18
held 22:6 40:22

46:12
help 57:14
Henry 26:9 36:9
  54:21
hereto 60:7
hired 7:21 25:17
hit 9:4
Hoang 48:23
hoc 36:13
hold 20:15 43:12
  46:13
Holland 2:9
home 44:24
hook 10:13
hotels 34:13
hour 58:9
huh 35:20
hypothetical 46:16

I

ICE 1:12 2:3
ID 60:5
idea 37:4 43:20
identified 24:3
immediate 13:17
  13:19
inability 33:18
inaccuracies 58:3
income 27:2
increment 23:9
incurred 11:9
  22:24,25
independent 26:12
India 53:10
indicated 27:14
individual 28:6
individuals 10:16
  23:13
infer 32:14
information 17:11
  27:1,2 55:11,16
  56:11,16
initial 22:21
initially 17:4
initials 16:13

SARAH LAMOND - 12/8/2016
In Re: Haimark, Ltd (Debtor)

Page 64

**insiders** 37:18
54:18
**instances** 53:25
**institutions** 41:24
**insurance** 43:7
**interaction** 31:25
32:1
**intercompany** 33:9
33:11
**interest** 37:22
49:10
**interested** 60:12
**intern** 6:6
**international** 8:8
10:7,11 18:4 34:4
35:4,5
**inventory** 46:4,5
**invoice** 11:6 22:9
22:11,12,18 23:8
40:12
**invoices** 12:14
22:15,16 32:25
**invoked** 30:11
**involuntary** 1:4
5:11
**involved** 8:3 10:1
13:13 20:13 29:17
30:1 48:5 49:8
52:14
**involvement** 12:3
48:7
**issue** 28:12
**issued** 16:15,16
**issues** 19:15 20:5,6
20:7
**items** 15:19,21 43:2

**J**

**J** 2:9
**Janet** 19:24,24 20:2
20:4
**Janet's** 20:1
**January** 25:18
**Jeff** 31:15,16
**Jesse** 26:7

**job** 47:5
**Joseph** 1:2
**Josh** 25:20
**Jr** 1:2
**judge** 1:2 5:13

**K**

**K** 2:4
**keep** 27:10,12,18
36:4
**Kent** 1:12 2:3
**kept** 18:12 46:6
**Key** 20:11,19,20
23:18 42:3
**kind** 5:23 15:16,24
17:5,22 20:3
26:21 30:14 34:14
35:20 37:10 41:12
45:17 51:9 54:10
56:15,16 57:24
**knew** 38:1 57:12
**know** 5:20,25 7:14
7:23,25 9:2,10,14
9:20 17:9 18:6
21:17 24:7,10,14
24:16,25 26:2
27:1,18 28:2,4,10
28:12,19,25 29:24
30:13 31:20 32:2
32:9,19 33:5,11
38:1,4,20 39:8,18
39:19,25 40:4,21
42:11 43:8,21
44:7,8,8 45:1,17
46:6,14,25 47:2,4
47:9,25 48:12,13
48:13 49:9 50:19
51:23 52:5,7 54:7
55:8,17 56:12,20
56:20,21 57:16,24
**knowledge** 32:15
**knows** 38:24

**L**

**L-a-m-o-n-d** 4:13

**L-a-r-u-e** 24:17
**laid** 14:4
**Lamond** 1:5,11 3:2
4:5,13 59:1,8,11
60:6
**LamondSA78@...**
4:23
**larger** 37:14
**Larue** 7:13,14
18:22 24:15
**Laurent** 8:17,18,19
8:20,21 9:1 44:3
54:4
**lawyer** 31:12,17,18
**lease** 9:22 45:23,25
46:15,16,17
**leases** 46:12,13
**leasing** 9:19
**leave** 14:5,20 24:25
38:15
**ledgers** 29:7
**left** 7:11,22 9:15
13:13 14:25 15:18
24:24 25:1 26:17
28:23 29:5,5
31:10 37:1 38:15
39:15 43:3,12
45:11 47:3 48:11
48:12,14,15 56:6
56:8,11
**Leskovar** 7:10
47:12
**let's** 10:5 21:11
**level** 19:8
**Levin** 50:9
**liabilities** 54:16,19
**liability** 36:25 37:2
46:20 54:12
**line** 6:10,13 8:2,12
8:24,25 12:24
13:9,11,12 20:14
20:17,18 21:6,9
21:16 23:20 30:2
30:23 39:6 42:13
44:5,11,11 50:20

50:23,24 51:5,13
51:14,21 52:4
54:2,3
**Lisa** 7:8,11,22
18:22 24:4,15,22
26:17 27:13,22
36:8 45:3 48:20
**Lisa's** 7:12
**litigation** 29:16
30:1,3 49:7,9
60:13
**little** 5:9 6:6,21
14:11 17:6 19:5
20:22 24:20 26:20
48:5 53:16
**live** 4:14 25:7
**lived** 25:8
**lives** 7:17 25:6
**LLC** 1:12 2:3
**LLP** 2:9
**loans** 37:17,19 38:7
38:9,21
**location** 8:7 42:18
42:19 43:3
**lock** 9:4
**log** 17:1
**logged** 17:16
**login** 16:17 56:2
**long** 5:2 6:19 29:2
**look** 31:21 45:19
**looks** 31:14
**lose** 32:5
**lot** 36:1 44:7 55:19
**Lotus** 52:7 53:2
**Ltd.'s** 50:25
**Luis** 17:6 26:7
**Luxury** 8:4

**M**

**machine** 16:19
60:8
**Macintosh** 16:2
**majority** 11:21,21
**making** 40:11,11
**manager** 25:17

**managers** 35:3
**managing** 28:5,5
**March** 45:12
**Marcus** 7:8,9,9
14:23 28:6,8 38:3
38:9 40:6 47:11
48:10 49:22 54:11
**Marcus's** 31:17,18
45:24
**Maritime** 20:21
**marketing** 48:6
51:24
**Markwell** 45:25
**matters** 20:3 23:20
60:7
**mean** 7:7,9 10:12
11:16 22:19 27:7
28:18 29:3,21,24
33:12 34:4,6,12
35:10,21 37:14
38:12,25 40:9,25
44:13 45:6 46:16
54:9 55:15,19
56:18,24
**media** 50:20,22
**meet** 50:1
**Mekong** 52:11,16
**Merit** 1:14 60:5
**met** 32:3,4 48:8
49:3,25 50:10,13
**Michael** 50:12
**million** 47:16,17
**Mimi** 24:5,6,11
29:3,5 56:6,8
**mind** 34:3
**mine** 44:24
**money** 11:21 18:12
33:6,19,21,24
41:7 47:11 53:15
53:20 55:22
**moneys** 20:16,18
20:19 21:24 51:8
**month** 14:18 35:12
35:12,15
**monthly** 44:21

**months** 5:12 24:12
**move** 19:2
**moved** 6:7
**multiple** 50:1
**Myanmar** 53:5,6

**N**

**N** 2:1 3:1
**name** 4:11,12 7:12
  8:14 14:8,9 17:6,7
  18:24 20:1 24:6
  24:10,16 25:18
  31:24 32:2 45:25
  50:19 53:11
**named** 18:23
**names** 5:17 14:10
  24:2 25:10,16
  31:13
**Navigator** 52:11,16
**NEAL** 2:4
**necessarily** 23:13
**need** 16:21 19:9
  33:22,24,24 55:15
  57:22
**needed** 17:13 51:10
**never** 7:2 9:6 11:10
  15:14 19:3 22:15
  32:1,4 38:20
  44:22,23,24 48:25
  49:3,25 50:13
  51:19
**new** 44:20
**nine** 42:22
**Nope** 5:8 16:11
  50:4,15
**Notary** 1:15 59:17
  60:5
**note** 56:25
**NOTICE** 1:11
**number** 4:17 16:13
  22:17

**O**

**oath** 4:8
**obligations** 47:3

**obviously** 32:8
  37:14 44:21
**occurred** 30:7
**office** 15:3,5,10,11
  25:20,20 26:1,3,6
  32:21 42:14 44:25
  58:4
**officers** 19:10
**offices** 15:14
**oh** 5:12 8:15,18
  20:11 26:10 38:19
  39:12 40:10 43:21
  44:1 48:1 49:17
  54:9
**okay** 4:14,17,19,24
  5:2,9,16,18 6:2,3
  6:12,15,19,23 7:5
  7:12,17,23 8:6,9
  8:12,25 9:8,16
  10:2,19 11:3,12
  12:21 13:3,4,8,19
  13:23 14:3,10,12
  14:15 15:3,12,15
  15:23 16:5,8 17:2
  20:3,12 21:8,11
  21:12,17 22:14
  23:1 24:9,19,21
  25:9,15,23 26:5
  26:21 28:11 29:14
  29:16 31:9,23
  33:16 34:2,15,25
  35:23 37:1,9
  38:14,23 39:2
  40:7 41:5,13,17
  42:11,16,24 45:14
  47:8,21 48:2,22
  51:3 52:2,4,10,18
  53:24 57:12,15
**older** 31:22
**on-the-ground**
  52:21
**onboard** 22:25
**once** 22:9 35:12,12
  48:8 49:3 56:1
**ones** 26:8 35:23

**ongoing** 54:9
**op** 9:5
**operate** 51:2
**operated** 13:15
**operating** 13:14,16
  18:9 21:25 35:10
  39:14,21 43:25
**operation** 9:1
  12:25 51:3
**operational** 6:25
  7:4 19:8,16 20:8
  21:9 37:16
**operations** 12:23
  52:20
**option** 23:3 58:4
**order** 5:13 30:19
**ordinary** 32:18
**organize** 26:18
**outcome** 60:12
**outside** 26:19,20
  32:18
**overall** 5:5
**oversaw** 52:19
**owe** 23:9 33:21
  55:3
**owed** 44:5,10,11
  47:12 54:3 55:22
**owned** 38:1 52:16
**owner** 9:16 48:3,15
  54:22
**owners** 38:2 48:9
  48:10 54:18
**ownership** 37:22
  48:12,14 49:10

**P**

**P** 2:1,1,14
**P.C** 2:5,15
**p.m** 1:14 58:9
**P.O** 2:11
**PAGE** 3:2
**paid** 11:8 18:16
  22:15,16 32:25
  33:13 35:2 39:15
  39:17,22 49:12,15

  51:10 52:17
**paperwork** 5:15
  28:19 31:5
**Pardon** 31:14
**part** 5:13 18:7
**particular** 6:8 7:5
  8:2,6 10:14 11:13
  13:8 14:7 17:10
  17:13 19:17,22
  35:15
**parties** 26:19 29:8
  60:7,11
**partner** 28:5 48:5
**partners** 28:5
**party** 26:20
**passengers** 12:25
**password** 16:10,16
  17:14
**passwords** 16:8
  17:3,9,9,12,17
**patents** 45:14
**Paukan** 53:4
**Paul** 49:19 56:2
**pay** 10:23 21:2 23:3
  34:1,5,7 53:17,23
  56:21
**payable** 28:15,17
  36:24
**payables** 18:14
  43:25
**payment** 22:24
  23:10,14,15 40:11
  40:16
**payments** 11:8
  23:16 29:7 41:5
  46:15,25 52:17
**payroll** 39:17,19
**people** 5:15 24:2
  26:2 34:9 38:8
  42:16,25
**percentage** 38:6
**perform** 10:12
**person** 18:18 19:17
  19:22 28:22 40:23
**person's** 16:13

**personal** 15:19
  19:11 25:1
**personally** 38:20
**Petitioning** 1:12
  2:2
**phases** 23:4
**phone** 19:19,20
  55:9
**physical** 16:1 28:20
  45:6
**physically** 12:5
**picked** 19:19,20
**piece** 44:2
**place** 17:10,13
  30:11 60:8
**pleadings** 5:17
**please** 4:12
**PNC** 11:20,25 12:8
  17:20 18:3 19:10
  19:18 21:3 22:7
  23:7 39:13,14,16
  39:20 41:20
**point** 13:8 19:4
**policies** 43:7
**pop** 14:19
**Pope** 50:12
**position** 6:4,16
**positions** 25:10
**possession** 9:15
  15:15 45:1
**possibly** 45:4
**post** 34:13,17
**pre** 34:13,17
**prepared** 24:13
  27:22 36:8
**presentable** 26:19
**president** 25:19
  55:2
**pretty** 13:17 15:18
  25:19 29:22 36:4
  39:19 55:14
**previous** 60:6
**principals** 40:22
**Printer** 42:15
**prior** 48:9

**probably** 21:3,3 23:6 28:25 29:9 35:13 40:4 43:9 45:1 46:7 48:22 57:10
**Procedure** 4:3
**proceeding** 30:18
**proceedings** 4:1 58:8 60:10
**process** 17:8
**produce** 14:20
**products** 10:23
**profit** 49:16
**property** 32:5 40:22 41:2
**provide** 10:16 53:2 56:10
**provided** 10:15 31:7 34:10,11
**Pty** 2:13
**Public** 1:15 59:17 60:5
**pursuant** 1:11 4:2
**put** 7:2 20:15 30:11 56:3

**Q**

**question** 5:25 56:12
**questions** 5:20 32:8 60:9
**QuickBooks** 16:3 16:15,17 17:1,16 27:7,8 28:17,23 29:9 45:7 55:16 55:20,23 56:1,10 56:15,16 57:9
**quit** 14:4
**quite** 19:25

**R**

**R** 2:1
**Raj** 53:11
**rattle** 25:15
**read** 26:20 58:2

59:2
**reader** 12:7,8
**Reading** 60:21,23 60:25
**ready** 25:2
**real** 38:23 41:14
**really** 7:2 17:14 18:2,25 32:22 41:2 44:8 46:3,4 48:7 54:2 55:10
**Realtime** 1:14 60:4
**reason** 50:19
**reasons** 25:1
**recall** 13:20 25:10 26:5 46:9 49:21 57:22
**receivable** 36:23
**receivables** 29:14 43:13,14,17
**receive** 12:13 40:15
**received** 11:6 20:18 22:13 38:10
**receiverships** 30:10
**recognized** 11:10
**recollection** 13:7 13:10 54:11
**reconciliations** 7:1
**record** 4:12
**records** 28:16,17 47:22
**reduced** 60:9
**Registered** 1:14 60:5
**related** 60:11
**relates** 31:1
**relation** 23:23 60:7
**relinquished** 48:14
**remember** 8:16 13:2 16:10 17:7 17:18 20:1 25:11 31:11,13,14 37:1 37:5 39:9 43:23 44:10 46:24 47:14 53:11 54:15
**remind** 42:10

**remote** 16:3
**renovated** 9:23
**repaid** 36:17
**replenished** 36:17
**reply** 4:8
**reported** 7:6
**Reporter** 1:14,14 16:21 42:8 57:18 57:22 58:2 60:5,5
**REPORTER'S** 60:1
**repossessions** 30:6
**representative** 50:8
**represented** 54:3
**request** 22:4 50:5
**requested** 60:21
**required** 60:25
**requiring** 5:13
**reserve** 11:4
**respective** 35:5
**responsibilities** 6:24
**returns** 27:4,8,22 28:2 46:6 47:7
**revenue** 11:9 25:17
**Richard** 47:25 48:17
**right** 6:4 7:20 10:9 10:22 12:9 15:3 21:4 25:5 27:15 29:4,12 30:17 32:24 33:2 38:14 38:18,24 39:11 41:3 43:10 44:16 45:20 47:5,17,21 48:20 55:1,12,18 55:23 56:7 57:7
**ringing** 40:3
**river** 10:15
**Rood** 25:21 54:24
**Rosania** 1:2
**rough** 37:6,10
**roughly** 37:2 43:20
**Rule** 1:5,11 60:6
**Rules** 4:2

**S**

**S** 2:1
**S-a-r-a-h** 4:13
**S.A** 6:14 8:9,21 33:13,19,20,20 51:16 54:1
**safety** 39:25
**sailed** 9:6
**Saint** 8:18,19,20,21 9:1 44:2 54:4
**salaries** 35:4
**sales** 48:6
**Sarah** 1:5,11 3:2 4:5,11,13 59:1,8 59:11 60:6
**saw** 38:20,21
**saying** 48:22
**Scenic** 2:13
**scope** 19:16 20:8
**se** 46:4
**searching** 28:16
**seasons** 35:22,24
**second** 9:4 13:21
**secured** 46:9
**Security** 16:13
**see** 38:25 44:14
**seen** 24:16
**send** 58:6
**series** 11:7
**Service** 1:12 2:2
**services** 52:25
**set** 16:17 17:5,5 57:9
**setoff** 40:9
**setoffs** 40:7
**settled** 54:5,6
**seven** 42:21
**sheet** 33:14 36:22 38:13 45:20 46:17 46:19
**Sherman** 4:15
**Sherry** 1:14 60:4
**ship** 8:13,14 9:17
**shipbuilder** 52:9 52:17 53:1,5

**shipbuilders** 34:1 34:12 37:15
**shipowner** 9:12,24 30:5 34:12 53:1
**shipowners** 46:15 47:1
**ships** 34:6,10 35:2
**shoot** 8:15
**short** 33:17 35:18
**shortage** 35:9
**shorthand** 60:8
**show** 47:11
**showed** 47:23
**showing** 29:7
**shutoff** 13:18,20
**sign** 58:3
**signature** 57:18,23 59:11 60:16
**Signing** 60:21,23 60:25
**silent** 48:5
**silly** 41:12
**similar** 31:1
**sit** 16:19 33:14 46:17,19 54:10
**site** 46:7,8
**sitting** 36:21 38:13 38:22 44:25 56:19
**six** 24:11 42:21
**slow** 35:21,23
**slower** 20:23
**Smaller** 37:15
**Social** 16:13
**solvent** 53:15
**somebody** 9:25 24:19 36:13 39:10 40:5,5,10 52:13 56:21
**sorry** 13:2 14:9 16:21 20:2 24:8 31:13 37:4 39:8 43:21 44:11 46:24 47:6 49:6 52:3 57:11,14
**sort** 9:22 18:24

SARAH LAMOND - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

35:3 48:4,6 53:7
**sound** 47:17
**source** 38:20 39:1
**South** 1:13 2:5 4:15
    8:11 53:12
**specific** 18:25
**specifically** 19:1,2
**spell** 4:11
**spelled** 24:16
**spelling** 24:20
**spot** 11:14
**spreadsheets** 56:4
**ss** 60:2
**staff** 6:7,18,19,24
    9:24 19:8
**staffing** 52:20
**stage** 22:17
**staged** 23:16
**stages** 22:16,18
    23:4
**Standard** 42:14
**started** 42:20 45:12
**starts** 24:7
**state** 4:6,11 59:13
    60:2,5
**statements** 7:3
    14:20 36:9
**States** 1:1 8:13
**stay** 23:12
**stayed** 48:15
**Stella** 25:24
**Steve** 31:19,23 49:8
**Steven** 49:2 50:14
**stocks** 43:9
**stopped** 13:16
**stored** 17:10,12
**Street** 2:10,15 4:15
**Strictly** 8:11,13
**structure** 30:14
**stuff** 9:25 14:25
    17:18 29:11 34:14
    38:17
**sub** 52:15
**subpoena** 1:11
    55:12

**subscribed** 59:12
**sufficient** 51:10
**Suite** 1:13 2:6,10
    2:16
**summertime** 35:25
    36:2
**Support** 1:13 2:3
**supported** 18:4,5,6
**supposed** 28:15
    32:11
**sure** 5:22 29:23
    32:3 36:5 39:19
    49:9 54:3 56:24
**suspended** 39:5,6
**sw** 59:25
**sworn** 4:6 59:12
    60:6
**system** 15:24

**T**

**tables** 42:14,24
**take** 15:1 29:25
    42:25 44:24 50:24
    52:10
**taken** 1:11 4:2 5:7
    44:17 60:8
**talk** 5:25 19:18
    20:4 21:11
**talked** 12:22 21:14
**talking** 21:5,13
    37:9 53:2
**taller** 31:22
**tax** 27:4,8,22 28:2
    46:6 47:3,6
**taxes** 24:13 28:4,6
**Telephone** 4:17
    40:3
**tell** 5:9,23 14:16,23
    15:23 20:12 33:10
    49:22
**telling** 40:5
**ten** 42:22
**testified** 4:7
**testify** 60:7
**testimony** 59:4

60:9
**thank** 42:9 49:20
    57:7,16
**theft** 32:6
**thing** 20:5 30:13
    53:7,8,12
**think** 9:7,11,22
    10:3 13:21 15:8
    17:4 21:21 23:25
    24:19 25:5 26:22
    26:24 28:1,3 38:5
    38:9,12 41:1
    42:22 43:6 44:18
    44:19 45:3,12
    46:22 47:21 49:8
    49:13 50:10 53:9
    54:7,13,15 55:2
    56:18,19 57:10
**thinking** 45:18
**third** 9:4 29:8
**thought** 24:21
**three** 6:11,12 12:21
    22:20 23:3 42:20
**tied** 16:12
**time** 11:19 12:23
    13:13,24 16:22
    23:9 24:22 25:7
    29:4 35:15,16
    41:23 42:8,17
    47:3 49:23 60:8
**times** 33:12 41:7
    50:1 51:9
**timing** 39:8,9
**today** 54:10
**told** 38:15 49:22,22
**Tom** 26:7 38:3,9
    45:25 48:11,18
    54:14
**tool** 51:24
**top** 6:1
**touch** 27:10,12
**Tour** 34:16
**Tours** 2:13,13
**Tower** 1:13
**trailers** 45:22

**transcript** 58:3
    60:9
**transcription** 59:3
**transfer** 20:20
    21:23,24 22:2
**transfers** 32:17
    33:6,9,11 34:8,14
    34:17
**travel** 1:12 2:2 10:9
    10:12,20,22,23
    51:18,22
**traveler** 23:2
**tried** 26:17
**triggered** 49:6
**trip** 11:4 21:1 23:2
    23:12
**trips** 10:14,15
**trucks** 45:22
**true** 21:22 59:3
    60:9
**truth** 4:6 60:7
**try** 5:25 18:2
**trying** 40:18 44:18
    44:19,21 45:19
    49:14 52:23
**turn** 16:18
**turned** 17:15,15,16
**twice** 48:8
**two** 5:6 22:19 41:24
    42:20
**type** 18:5 42:12
    46:3
**types** 23:14
**typewritten** 60:9
**typical** 22:17
**typically** 53:23

**U**

**U.S** 20:15
**Um-hum** 10:6,8,10
    10:25 12:11 16:7
    16:7,9 17:25
    18:15,17 20:24
    22:8 23:5 24:18
    25:22 26:4,13,15

29:10 47:13 55:24
**understand** 5:24
    39:2
**unearned** 40:12,15
**United** 1:1 8:13
**unsecured** 55:18
**USA** 1:12 2:3
**use** 33:19
**usually** 22:21

**V**

**vacations** 8:4
**Vail** 31:24
**value** 38:22 43:5
**values** 37:15
**Vantage** 1:12 2:2
**VC2** 50:16,22
**vehicle** 45:23
**vehicles** 45:21
**vendor** 28:21
**vendors** 34:5,7,9
    34:22,23 37:16
    41:6 51:10 52:24
**versa** 33:14 44:11
**Vert** 14:5,7,9,17
    26:22 30:15 45:2
    48:9 49:20 50:8
    50:11,18 55:25
**vice** 33:14 44:11
**volunteer** 57:9
**voyage** 9:4

**W**

**Wait** 16:21 42:8
**waived** 60:23
**walk** 11:3 20:22
**walked** 40:5 44:17
    53:14
**Walker** 2:5
**Wallin** 1:14 60:4
**want** 12:17 57:8,25
    58:1,1
**wanted** 49:12
**wasn't** 7:2 13:17
    14:22 18:5,7,25

SARAH LAMOND - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

Page 68

| | | | |
|---|---|---|---|
| 19:15 26:10 29:21 29:23 47:5 48:5 51:10 54:22 | 16:1,2 18:14,22 23:19,23 25:11 35:1 39:4,23 42:16 | **year** 6:21,21 25:25 27:15 | **2600** 2:16 |
| **way** 14:21 27:6 | **working** 12:15 13:9 | **years** 5:6 27:3 | **3** |
| **Wayne** 25:18 | 13:24 27:17 28:22 | **Yep** 4:8 12:2,2 | **3:30** 28:10 |
| **ways** 24:17 | 39:6 41:23 | 18:13 23:11,13 | **3:37** 58:9 |
| **we'll** 5:25 14:11 | **works** 7:17 | 32:16 43:19,19 | **30** 22:23 |
| **we're** 5:24 13:5 | **wouldn't** 31:23 | 49:24 55:21 | **300,000** 47:24 |
| 21:5,13 | 37:7 55:17 | **yesterday** 55:10 | **3200** 2:10 |
| **week** 12:17 13:21 | **wrong** 48:23 | **Yvette** 18:22 24:5 | |
| 31:3 | | | **4** |
| **weeks** 24:11 | **X** | **Z** | **4** 3:3 |
| **Weis** 50:14 | **X** 3:1 60:21 | | **45** 4:15 |
| **went** 11:16,25 | | **0** | |
| 20:19 25:4 37:14 | **Y** | | **5** |
| 37:15 41:7 46:1,1 | **yeah** 8:8,18,20 11:2 | **1** | **555** 2:10 |
| 51:9 | 11:9,15,21,23 | **11** 13:1 51:1 | |
| **weren't** 22:5 | 12:7,13,20 13:6 | **12** 8:1 | **6** |
| **West** 15:6 | 13:11,11,15,25,25 | **12/8/16** 59:25 | **60** 22:23 |
| **WHEREOF** 60:15 | 14:2 15:8,20 | **13** 27:25 | |
| **wholesalers** 10:17 | 16:20,25 19:6,6 | **14** 27:3,25 60:18 | **7** |
| 10:23 | 19:13 22:8,19 | **15** 24:24 27:3 | **7** 1:4 |
| **wire** 11:22 19:19 | 25:8,13,14 26:10 | **1536** 15:9 | **700** 1:13 2:6 |
| 21:2,2 23:6 33:19 | 26:15 27:16,24 | **16** 27:3 | **700,000** 44:5,10 |
| 33:20,22,24 34:7 | 28:9,9,18 29:6,10 | **16-19885-JGR** 1:3 | 54:2 |
| 35:2 | 29:15,24 30:2,5 | **16th** 60:16 | |
| **wired** 33:25 34:21 | 30:16,25,25 31:6 | **17th** 2:10 | **8** |
| 35:5 | 31:18 32:2,10,10 | **1801** 2:15 | **8** 1:6,13 3:2 |
| **wires** 11:16,20,25 | 32:13 33:2,4,10 | **19874212873** 60:5 | **80201-8749** 2:11 |
| 12:1 18:1,2 19:14 | 33:12,18 34:24 | | **80202-2645** 2:16 |
| 21:6 34:18 37:10 | 35:14,14,21,21 | **2** | **80222** 1:13 2:6 |
| 37:11 | 36:7,8,8,21,22 | **2** 1:13 | **8749** 2:11 |
| **wiring** 7:1 18:3,4 | 38:3,12,13,13,16 | **2-** 47:24 | **8th** 58:10 |
| 19:15 | 39:1,2,12,12,24 | **2:35** 1:14 | |
| **wish** 44:16 | 39:24 41:4,10 | **200-** 54:12 | **9** |
| **withholding** 49:13 | 42:1 43:1,4,14 | **2000** 1:13 2:5 | **90** 22:22 |
| 49:14 | 44:1,1,12,18 | **2004** 1:5,11 57:19 | **950,000** 47:19 |
| **WITNESS** 60:15 | 45:19,21,21 46:8 | 57:20 60:6 | **970-389-5263** 4:18 |
| **Wolf** 31:24 | 47:8,24 48:1,1,11 | **2012** 7:25 | |
| **woman** 18:23 | 48:21 49:1 50:7 | **2013** 27:3 | |
| **Woods** 2:15 | 50:18 51:12,12,19 | **2015** 27:24 30:8 | |
| **work** 6:8 10:17 | 52:9,22 53:5,10 | 47:10 | |
| 15:4 18:21 20:9 | 55:13,15,24 56:9 | **2016** 1:6,14 3:2 | |
| **worked** 6:5 9:21 | 56:14 | 12:19 13:14 29:17 | |
| 14:16 15:5,10,14 | | 58:10 59:14 60:16 | |
| | | **2019** 60:18 | |
| | | **250,000** 54:12 | |

1                    UNITED STATES BANKRUPTCY COURT
                     FOR THE DISTRICT OF COLORADO
2
            Bankruptcy Judge Joseph G. Rosania, Jr.
3
     Case No. 16-19885-JGR
4    Involuntary Chapter 7 Bankruptcy
     _____
5
     RULE 2004 EXAMINATION OF:   MARCUS LESKOVAR
6                                December 8, 2016
     _____
7
     In re:
8
     HAIMARK, LTD.,
9
     Debtor.
10   _____

11              PURSUANT TO NOTICE, the Rule 2004
     Examination of MARCUS LESKOVAR was taken on behalf of
12   the Petitioning Creditors, Vantage Travel Service,
     Inc., Abercrombie & Kent USA, LLC, and ICE Support
13   Ltd. at 2000 South Colorado Boulevard, Tower 2, Suite
     700, Denver, Colorado 80222, on December 8, 2016, at
14   3:45 p.m., before Sherry Wallin, Certified Realtime
     Reporter, Registered Merit Reporter and Notary Public
15   within Colorado.

16

17

18

19

20

21

22   **H+G**

23

24   Hunter+Geist, Inc.

25

303.832.5966        1900 Grant Street, Suite 1025    ▪ www.huntergeist.com
800.525.8490        Denver, CO 80203                 ▪ scheduling@huntergeist.com

Your Partner in Making the Record

**1**

```
            UNITED STATES BANKRUPTCY COURT
             FOR THE DISTRICT OF COLORADO

        Bankruptcy Judge Joseph G. Rosania, Jr.

Case No. 16-19885-JGR
Involuntary Chapter 7 Bankruptcy
_____

RULE 2004 EXAMINATION OF:  MARCUS LESKOVAR
                     December 8, 2016
_____

In re:

HAIMARK, LTD.,

Debtor.

_____
            PURSUANT TO NOTICE, the Rule 2004
Examination of MARCUS LESKOVAR was taken on behalf of
the Petitioning Creditors, Vantage Travel Service,
Inc., Abercrombie & Kent USA, LLC, and ICE Support
Ltd. at 2000 South Colorado Boulevard, Tower 2, Suite
700, Denver, Colorado 80222, on December 8, 2016, at
3:45 p.m., before Sherry Wallin, Certified Realtime
Reporter, Registered Merit Reporter and Notary Public
within Colorado.
```

**2**

```
            A P P E A R A N C E S
For the Petitioning Creditors Vantage Travel Service,
Inc., Abercrombie & Kent USA, LLC, and ICE Support
Ltd.:

            NEAL K. DUNNING, ESQ.
            Brown, Berardini, Dunning & Walker P.C.
            2000 South Colorado Boulevard
            Suite 700
            Denver, Colorado 80222

For the Creditor Centennial Bank:

            CHRISTOPHER J. HEAPHEY, ESQ.
            Holland & Hart LLP
            555 17th Street
            Suite 3200
            P.O. Box 8749
            Denver, Colorado 80201-8749

For the Creditors Scenic Tours Pty Ltd. and Evergreen
Tours:

            ADRIAN A. CASTRO, ESQ.
            Fairfield and Woods P.C.
            1801 California Street
            Suite 2600
            Denver, Colorado 80202-2645

For the Deponent:

            JEFFREY S. BRINEN, ESQ.
            Kutner Brinen, P.C.
            1660 Lincoln Street
            Suite 1850
            Denver, Colorado 80264
```

**3**

```
                  I N D E X
EXAMINATION OF MARCUS LESKOVAR:            PAGE
December 8, 2016


By Mr. Dunning                               4
```

**4**

1  WHEREUPON, the following proceedings
2  were taken pursuant to the Federal Rules of Civil
3  Procedure.
4  *   *   *   *   *
5  MARCUS LESKOVAR,
6  having been first duly sworn to state the whole truth,
7  testified as follows:
8  (Deponent's reply to oath:  Yes.)
9  EXAMINATION
10  BY MR. DUNNING:
11  Q.  Mr. Leskovar, can you state your name
12  and spell your last name for the record, please.
13  A.  It's Marcus Leskovar.  Last name is
14  L-e-s-k-o-v-a-r.
15  Q.  And your address?
16  A.  My residential address is 1403 Belford
17  court in Evergreen, Colorado 80439.
18  Q.  How long have you lived there?
19  A.  For two years.
20  Q.  Okay.  Telephone number?
21  A.  970-485-0735.
22  Q.  And do you have an e-mail address?
23  A.  It's Marcus, M-a-r-c-u-s, dot, last name
24  Leskovar, at Gmail.com.
25  Q.  And how are you currently employed?

1 (Pages 1 to 4)

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

**5**

A.  I'm employed by Amadeus River Cruises.

Q.  **And how long have you been employed by them?**

A.  Employed by them since May of this year.

Q.  **Okay.  Ever had your deposition taken before?**

A.  Yes.

Q.  **She'll tell you that I'm bad about not talking on top of people.  So when you're answering, I might ask you a question at the same time, and then she'll give me the look and I'll try to stop, but let's try to avoid that, okay?**

A.  All right.

Q.  **My primary purpose is to get more information about Haimark Ltd.'s involuntary bankruptcy, because in part I'm charged with trying to fill out the information on the petitions and schedules, okay?  I'm going to have some questions that are beyond that.**

A.  Um-hum.

Q.  **But that's the primary purpose for this deposition.**

A.  Um-hum.

Q.  **I've already talked to your counsel, who said that, you know, you'll help to the extent you**

**6**

can, but you probably don't know all of the information.  And so we'll just kind of have to take it step by step and see what you know and what you don't, all right?

A.  Um-hum.

Q.  **If you have any questions based on my questions, or if you can't understand it or if I don't articulate it very well, let me know --**

A.  Um-hum.

Q.  **-- and I'll rephrase it, okay?**

A.  Um-hum.

Q.  **When did you first become affiliated with Haimark?**

A.  I was one of the founders of the company, so we founded the company in June of 2012. Let me just see if that's correct.  We were in business four years?  '16, '12.  Yeah, 2012.

Q.  **Who are the other founders besides yourself?**

A.  There was Tom Markwell was one of my business partners; and Hai, Hai Giang, he is a Vietnamese national; and then there were additional owners that were brought on over the course of the years.

Q.  **Okay.  So those were the first three?**

**7**

A.  Um-hum.

Q.  **You and the other two?**

A.  Um-hum.

Q.  **Okay.  All right.  Now, there are several Haimark entities, correct?**

A.  Yes.

Q.  **Okay.  We know that there's Haimark Line?**

A.  Um-hum.

Q.  **Which is in Chapter 11 bankruptcy --**

A.  Yes, correct.

Q.  **-- currently.**

A.  Yep.  I guess.  I mean, I don't know if they still are, so I'm assuming that, but I don't know that for a fact.

Q.  **Okay.  And then we know that there's Haimark Ltd., correct?**

A.  Yes, um-hum.

Q.  **And then there's Haimark S.A., correct?**

A.  Yes.

Q.  **Are there any others?**

A.  There is Haimark Affinity, which was a brand that was created but never really took off.  So it's an in -- that was an incorporated company, but it didn't have any bank accounts.  It didn't have any

**8**

business really.

Q.  **And why were there three entities?  Did they specialize in different things or what?**

A.  The entities were -- the idea of the company was to operate cruise ships.  And so if you are in the cruise industry, it is standard, as your client knows, Vantage, to separate companies in case of a casualty, which we suffered with Haimark Line. So that's the primary reason to separate those companies legally.

Q.  **So what specialty, as it were, did Haimark Line have?**

A.  Haimark Line?

Q.  **Yeah.**

A.  Haimark Line had a cruise ship -- had a cruise ship chartered, an oceangoing cruise ship, and was the first cruise line to go into Cuba, as a matter of fact, had licenses for Cuba and was poised to be the first cruise ship, the first cruise line, to go into Cuba.

So that was the specialty of that -- of that venture.  So it was Cuba cruises in the winter -- or in the fall, winter into spring, and then in the summer, Great Lakes cruises.

Q.  **Okay.  And what was the specialty, as it**

2 (Pages 5 to 8)

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

9

were, of just Haimark Ltd.?
    A.  Haimark Ltd. basically was a tour operator that facilitated and brokered cruises on Southeast Asian rivers.  So there was the Mekong, the Irrawaddy, the Ganges -- and the Ganges.
    Q.  And S.A., what about Haimark S.A.?
    A.  They did the same thing in South America on the Amazon River.
    Q.  What positions at Haimark Ltd. did you hold?
    A.  I was a managing partner together with the other two, so there was three managing partners.  Every managing partner had a certain focus in the business.  My focus was finance and procurement.
    Q.  And what were the focuses of the other --
    A.  Sorry.  Let me backtrack.
    Q.  Yeah.
    A.  So I held this position until Haimark was acquired by Vert Capital.  When it was acquired by Vert Capital, I became COO until I was terminated.
    Q.  Okay.  And when were you terminated?
    A.  I was terminated on April 30 -- I have my diary here from this year.  I was terminated on Friday, April 29th.

10

    Q.  Okay.  And why were you terminated, if you know?
    A.  The termination was because the owner at the time decided to cease business operations and not fund money into the business, and so therefore everyone was terminated.
        There was two termination waves.  There was a termination wave on April 15, by which the majority of employees at the time were terminated, and then two weeks later, on this day, April 29, the skeleton team that was left over was terminated, and the premises was abandoned.
    Q.  So are any of these Haimark entities currently operating at this time?
    A.  I couldn't tell you that.
    Q.  Okay.  What about on April 29th of 2016, were any of them operating at that time?
    A.  We had -- well, we had -- we were operating.  There were a lot of passengers that were on the road that were traveling.  There was a lot of business operations that were going on.  That was made clear to the owner that you cannot, for several -- for ethical reasons, cannot terminate a company like that because you had -- we had, you know, groups of people, elderly travelers from Germany, from the U.S., that

11

were trying to go on a river cruise in Southeast Asia and Myanmar.  I don't know if you've ever been to those countries, but if you don't have a place to go and if you're stranded there, it is an ordeal.  It's not something that you can do.
        We had people that ended up in various embassies.  There was people that were in the U.S. embassy, we had people that were in the German, the Austrian embassy seeking shelter.
        The owner knew that, and we told him that this is not a hot dog stand where when you run out of hot dogs you cut the line.  These are people that are out on the road, they're depending on us, and you have to wind up the business in a proper course.
        It's important for several reasons.  And they acknowledged that and told me to -- you know, if I don't like what they do, told me to sue them, two days before they shut down the business.
    Q.  Okay.  Did you sue them?
    A.  No.  I don't have the means to sue them.
    Q.  Did your job description ever change during the time you were employed by Haimark?
    A.  Well, yes, it did, in one specific effect.  That, you know, before the company was acquired, I was, together with our company president,

12

very much involved in making decisions when it comes to financial -- financial decisions.
        Once Vert entered at the beginning of this year, that was taken -- that was taken off my job description.  So financial decisions were done through Vert and via Vert, and they were -- they took very much charge in the cash management and in how funds were administrated, disbursed and handled with.
    Q.  So before Vert came in, who did you report to, just yourself and your other co-owners or. . .
    A.  Yeah.  We had a company president, Hans Rood, that the owners of -- the ownership at that time brought in because the company or the company's crew with that oceangoing business, that was a specialty, really, that I didn't have very much exposure before.  So we brought in a company president that, according to my employment contract, that I would report to and I did report to.
    Q.  Okay.  And did that change after Vert took over?
    A.  That really didn't change.  The problem was when Vert came in, they rewrote employment contracts.  I accepted my employment contract.  Hans Rood did not accept his employment contract and then

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

13

was removed from the company in March.
    Q.  Okay.  So you were there longer than Hans is what you're saying.
    A.  By a few weeks, but that's correct, yes.
    Q.  After Hans left, who did you report to?
    A.  I reported to Adam Levin and Paul Abramowitz.
    Q.  And they're both principals of Vert, correct?
    A.  Well, Adam Levin is, yes.  And Adam Levin brought in Mr. Abramowitz, and I, in various occasion, tried to get an engagement letter or a formal declaration of Mr. Abramowitz's capacity, which I never received.  But Mr. Abramowitz did most of the dealings, made most of the decisions, and had most -- and had a lot of interaction with people within the company and out of the company and gave -- and interacted the most with me and then gave me direction when it came to financial issues, contractual issues, how to deal with clients.  So that was probably most interaction I had with him.
    Q.  Okay.  Now, you gave us some answers, and I'm going to ask you just, probably, little pieces of kind of the same questions you've already answered.
    A.  Um-hum.

---

14

    Q.  But just bear with me, okay?
    A.  Um-hum.  Yeah.
    Q.  When was Haimark Ltd. formed, do you know?
    A.  Haimark Ltd. was formed in June of 2012.
    Q.  Okay.  And you indicated basically what its specialty was.
    A.  Um-hum.
    Q.  Can you just kind of give us that again?
    A.  Sure.  So the idea of Haimark, and I'll give you, like -- if I can give you -- count me off, I'll give you -- because otherwise I'm not going to stop talking because, you know, there's a lot to it.
    Q.  I'll have her kick you, okay?  How about that?
    A.  So initially the company was started to provide land services for American tour operators in Southeast Asia.  So what that means is if you are a cruise line that operates river cruises or that has outgoing business into exotic countries or Southeast Asian countries, you would provide ground services.  That's called a destination management company.
        So that was how the company started.  We had good customers at the beginning, two very large customers, that we operated it for.  And those

---

15

customers were interested in new river cruise ships, in a new -- in a new type of cruise ship that was not available at the time in Southeast Asia.
        So I come from that industry, I've spent the majority of my professional life in that industry, and so I had a lot of contacts and I had a lot of knowledge, and so we said, well, what we could do is we could try to find owners, investors for these cruise ships, and we can operate them, sell them and market them.
        And we have the clients, you know.  I had a lot of contacts in Southeast Asia.  So that was the involve -- this is how this business evolved, really, a few months after we started out very successfully with the ground services.
        So we went to certain contacts I had in Southeast Asia and presented them with the idea.  Some of them were shipowners, but they were offshore shipowners.  They operated oil platforms in the South China Sea and offshore boats, very wealthy companies and individuals that I knew for a long time.  It's a great idea, you know.  We'd like to do that.  It's a very -- it's a low barrier of entry for them with 3 or $4 million to build a ship and a very high reward eventually.  So they like -- they were on board.

---

16

        So we started building ships and we started to, as with your client, Vantage, and Abercrombie & Kent, then to sell space on board those vessels to clients such as your client.
        And it was a very successful business.  And so we started it, we grew it.  We started on the Mekong River, then we went on the Irrawaddy and Myanmar.  We were the first company who started river cruising in India on the Ganges, a very successful venture, and eventually we branched out into ocean cruising with Haimark Line, with the oceangoing ship.  We mentioned that before.
    Q.  And that's the Saint Laurent?
    A.  That's the Saint Laurent, yes.
    Q.  I knew I wouldn't pronounce it right, but, yeah.
    A.  That's okay.
    Q.  Well, you know, I grew up in Nebraska, and we just don't say words like that, so that's just how that is.
        So it was Haimark Ltd. that was still in operations when you left that Vert basically stopped operations kind of midstream, as it were?
    A.  Yeah, they walked away from it basically, or they had us walk away from it.  I don't

---

4 (Pages 13 to 16)

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

17

know what they did with the company, but they had us walk away from it.  And I don't think they had the means and the knowledge to know how to wind down this company, and I told them that.

Q.  Is there a specific date when operations stopped that you're aware of or --

A.  Basically -- here's what happened, so -- timelinewise.

Q.  Yeah.

A.  If you would like that.

Q.  No, I would.  I would like that.  So just, if you could, take us through the timeline.

A.  I brought my. . . So we had -- the understanding with Vert was that they would inject money into the company.  There was obviously that -- once we had -- after we had the accident with the Saint Laurent, there was a lot of money that Haimark Ltd., as the operating company and is providing the shared services for this company, injected in this company.  And so this really -- all the operation was done by Haimark Ltd. as the operating company and as the provider of shared services for all other companies.  The other companies were legal entities, but the operation, the employment and everything, was with Haimark Ltd.

18

So the understanding with Vert, and Vert acquired all companies in one transaction in very much the same fashion, is that they would come in and they would inject money into the company in order to -- in order to make -- to take back what we've lost with the Saint Laurent.  But on the other hand side, there was very high earnings potential with the Saint Laurent, with the hold business, and that's why they came in, obviously, to buy.

So initially they started charging the company for their management services and not -- and not injecting money into the company.  So Mr. Abramowitz showed up for two days just to bill the company, then after his departure, for between 15 and $20,000 as a consulting fee, which I thought was, you know, given the services that he rendered, which weren't adequate for any reason for anything, was very high.

And we complained about this.  We said, Well, this is -- this was not the agreement that we had.  You are, as a matter of fact, draining the company and steering, and you -- your commandeering it and steering it in the wrong direction worries us, is not going to go well.

And Vert then also, you know, other than

19

trying to be in charge or being in charge with the financials and disbursement of funds, then took it upon itself to insert themselves into client meetings.

I know there was a meeting that -- we had phone meetings with all of the clients where Mr. Abramowitz was on the phone and Mr. Levin was partially on the phone.  Most of the times he couldn't make the phone calls, but then Mr. Abramowitz came in and talked to clients.  And then there was also meetings that were held by Mr. Abramowitz and/or Mr. Levin together with clients without me present, so even without my knowledge.  I know that there was meetings with some of your clients that I was not privy, and I don't know what was talked about, but they happened.

So they took, ultimately, control of the company, they took control of client relationships, client communications, and communicated in a way that -- again, I don't know what they communicated, but that happened.  So that happened in the months of February and March.

In April the situation, because of not -- money not being injected, and as a matter of fact, taken out for management services that apparently were rendered, I had conversations with

20

both Mr. Abramowitz and Mr. Levin, said, We -- You have to stop commandeering this company when it comes to disbursement of payments and contract negotiations, and you have to step back and say what you said you were going to do, and that is injecting money, as was agreed upon, in order to stabilize the company and in order to carry on.

And that argument fell on deaf ears.  That wasn't done.  I don't think they ever took me serious in that regard.  And then we had a final -- I had a final call with Mr. Levin on Wednesday, April 13, where I said, You have to -- it is -- now is the time, you have to inject money in or stop taking money out, because we have several passengers that are on the road that are scheduled to go that aren't -- that are in Southeast Asia.  We have to continue -- we have to continue.  Going to have the company collapse if you don't do anything.

And he told me to -- basically, that's when he told me to go sue him and hung up on me.  Then I called him again, and I said, Well, then you have to come out here, you and Paul have to come out here.  We have to figure something out.  Because we cannot continue.  There is no money to pay payroll, there is no money to pay vendors.

5 (Pages 17 to 20)

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

21

1    You have an active company that has a
2  lot of people on the road, people that are traveling.
3  You have -- you have -- you can't just tell me to sue
4  you.  It's not going to do anything.
5    So he said, Okay, fine.  Great.  We will
6  be out on Thursday and we'll meet you.  So that's the
7  day after.  So on Thursday, I got a call from
8  Mr. Abramowitz -- actually, no.
9    **Q.  We're talking Thursday the what?**
10   A.  The 14th.
11   **Q.  14th?  Okay, go ahead.**
12   A.  So on the 14th, no one showed up.  I got
13 a call in the evening on the 14th from Mr. Abramowitz
14 and say, Okay, well, we want to have breakfast with
15 you on Friday morning, that's the 15th of April, and
16 we will talk about things.
17   So he had me come to his hotel in
18 Lakewood to meet with him, 8:00, 9:00 in the morning,
19 which I did.  And so Mr. Abramowitz was there.
20 Mr. Levin was busy, and -- I was told, and didn't have
21 time to show up.
22   So what we did that day is we had
23 breakfast, and I reiterated the urgency that the
24 company was in in my conversation with Mr. Abramowitz,
25 and so he said, Okay, fine, but let's go to the

---

22

1  attorney.  So he had a meeting scheduled at Brown --
2  at Brownstein, I think, is the bankruptcy attorney of
3  Haimark Line, and he wanted me to drive him there.
4    So we -- I drove him there.  Then on my
5  way to the attorney I got into a car accident, which
6  Mr. Abramowitz then left the car, went to the attorney
7  anyway, and let me -- had me deal with the police,
8  with people that I hit that day.
9    Then I finally caught up to him at the
10 end of the meeting, and then he said, Okay.  Well,
11 fine.  You're going to go back to your office and
12 you're going to get rid of everyone.
13   And so I said, What do you mean?  So
14 he's like, Well, we're going to shut the company down.
15 And so I -- I asked him to come with me and -- you
16 know, it would be nice if someone from the ownership
17 would actually be there.  This was all people that
18 worked with the company and for the company for years,
19 that had vested interest in the company, and you can't
20 just be not -- I mean, it was against my
21 recommendation just to, you know, throw everyone out.
22   But he didn't -- there was no discussion
23 with him.  He wanted to go back to the airport and
24 catch his flight because he had a dinner party that
25 night, and he said, So that's what you do.  You go

---

23

1  back and you retain two or three people as a skeleton
2  crew.  Everyone goes.  And that's what we did.  On the
3  15th of April.  So we fired everyone.  There was a
4  skeleton crew that was left, it was like three people,
5  that was supposed to wind the business up.
6    The next day, on Saturday, I had to go
7  to Europe because of a family emergency, which both
8  Levin and Abramowitz knew.  So I was gone for a week.
9  And during that week Abramowitz hired a bankruptcy
10 attorney, Joel Laufer, that came in, I guess, during
11 that week I was absent to file a bankruptcy for
12 Haimark Ltd.
13   So he met with Abramowitz, and I guess
14 Abramowitz retained him.  And as far as my
15 understanding was, it was Laufer's -- he was charged,
16 then, with filing bankruptcy for Haimark Ltd.
17   And so when I came back, I came back at
18 the end of that week, it was the -- I think the 22nd.
19 I was told that Laufer was here, he's been retained,
20 he's handling everything, and we had five days to
21 clean out our offices.  And that's what we did.
22   So my last day was on Friday the 29th.
23 Mr. Levin never called me again, never answered any of
24 my e-mails.  I documented everything in e-mails to him
25 saying that, Okay.  Well, apparently, you know, our

---

24

1  understanding from Paul is that everyone's going to be
2  terminated, we're going to abandon the premises.  You
3  know, if you need anything, we're still here for five
4  days.  And never heard anything back from them.  And
5  then we abandoned the premises on Friday, April 29.
6    **Q.  Why did Laufer not file the bankruptcy,**
7  **do you know?**
8    A.  Laufer was -- I -- that's a good
9  question.  Well, Laufer, I think, was provided, during
10 that week I was not present, with documents in order
11 to file.
12   I guess Laufer had several questions
13 regarding these documents in order to file them and
14 prepare them correctly, and Vert Capital decided to --
15 eventually, because I saw e-mails from him with
16 questions, decided to not -- not let him file.  Why
17 they did that, I can only speculate.
18   **Q.  Do you know if Vert gave Laufer the**
19 **information that he needed to file?**
20   A.  I don't know that.  I wasn't there that
21 week.  It was also my recommendation to -- it was my
22 recommendation, first of all, to wind down the
23 business properly, to -- instead of paying
24 Mr. Abramowitz a 15,000-a-day fee, to maybe keep the
25 skeleton staff for another week, deal with our

---

6 (Pages 21 to 24)

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

25

1  customers and deal with clients that are on the road,
2  and to properly file the bankruptcy documents.  So
3  that recommendation wasn't taken.
4        The other recommendation I had is to
5  wait until I'm back, please, so I can -- I can --
6  because Mr. Abramowitz had absolutely no idea of the
7  company operations, to wait with the attorney until
8  I'm back so I can, you know, insert myself and help
9  answering questions and point people in the right
10 direction.  That was ignored, too.
11       So it was all done when I had to deal
12 with a family emergency and had absolutely no time to
13 be on the phone with anyone.  Not that anyone called
14 me for questions anyway.  So they just wound it down
15 themselves and dismissed people, terminated them, and
16 as far as I know, abandoned the premises.
17       **Q.  Each of these Haimark entities we've**
18 **talked about have a separate corporate existence and a**
19 **separate tax ID number, correct?**
20       A.  Um-hum.  Yes.
21       **Q.  I think we were eventually able to get**
22 **the tax ID number from Haimark Ltd. from one of my**
23 **clients, but have you seen the paperwork that was**
24 **filed in this case to date?  There's not much.**
25       A.  No.  I -- no, I did not.  I was made

26

1  aware that the company was -- well, what I knew is --
2  so Joel Laufer reached out to me and to the Vert
3  people when the case was filed to get someone in order
4  to help him putting together documents and to continue
5  what he tried to do since April, to understand
6  documents in order to prepare them to file for
7  bankruptcy.
8        And so he reached out to everyone.  I
9  told Joel before that, I have no authority anymore.
10 I'm not -- employee that was terminated.  I didn't
11 have any information with me.  I didn't take anything.
12 I didn't take anything out of the office.  So I'm not
13 able to help him with that, nor do I have the
14 authority.  So I told him that.
15       He sent several e-mails further to Paul
16 Abramowitz and the other Vert guys, copying me,
17 telling them that he needs their response, he needs
18 their decisions, their guidance, their response.
19       As far as I saw, unless they didn't copy
20 me on the response, he never got a response from them,
21 and which, in turn, he then terminated his services
22 and prorated his retainer and sent the rest -- I don't
23 know where he sent the rest, but that's what I --
24 that's what I know.
25       **Q.  And what time period are we talking**

27

1  about?  We still in April at this point?
2        A.  No, no.  That was in October, when the
3  involuntary bankruptcy was filed, yeah.  I'm sorry,
4  yeah.
5        **Q.  All right.**
6        A.  Yeah.  Because you asked me if I know
7  about the bankruptcy file.
8        **Q.  No, no.  That's fine.  And was the only**
9  **business office location the one on Cole Boulevard in**
10 **Lakewood?**
11       A.  Yes.  We had two offices.  We had an
12 office in Chicago -- we had three offices, initially.
13 We had an office in Chicago; we had an office in
14 Yangon, Myanmar; and we had the office in Colorado.
15 The office in Myanmar was consolidated at the end of
16 two years ago.  The office in Chicago was
17 consolidated, then, with the office in Denver about
18 one year ago, a little bit -- well, actually in
19 October of 2015.
20       **Q.  Okay.  When you left in April of 2016,**
21 **was Haimark Ltd. able to pay its bills?**
22       A.  We did.  We paid bills, we negotiated
23 payments in order to -- you know, some we paid
24 partially, but we still had liquidity, yes.
25       **Q.  And as you left the office at the end of**

28

1  April 2016, were there any funds still in the bank
2  accounts of Haimark?
3        A.  They were really mainly drained.  The
4  problem is -- well, we had two issues.  So to answer
5  your question first, they were mainly drained.  There
6  were several thousand dollars in various bank
7  accounts, but they were -- but otherwise available
8  cash was drained.
9        They were drained by Vert, and that's
10 where the urgency came in to Vert about stop draining.
11 You have to add money, as you said, because otherwise
12 we cannot continue working.  So by the time everyone
13 left, we were almost drained of funds.
14       However, there were surplus funds that
15 were held by Centennial Bank as collateral for credit
16 card charges.  There were over a million dollars, and
17 overprotection by several hundred thousand dollars,
18 which they knew, but those were funds that were --
19 maybe they're still held by your client, but they were
20 held by Centennial.  So those were funds that were not
21 available to us, and Vert Capital was dealing with
22 that.
23       **Q.  Okay.  And whose funds were those?  Were**
24 **those Haimark Ltd.?**
25       A.  Those were commingled funds really.

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

29

```
 1    Those were funds that -- so Haimark Ltd., talking
 2    about the commingling, Haimark Ltd. was the operating
 3    company.  So everyone, all the employees, all the
 4    business operation was Haimark Ltd.  So we had -- you
 5    know, that was the employer.  That was where -- what
 6    ran the company.  Everything was legal entities.  So
 7    that was -- the holding company was the company who
 8    provided logistical services to all other companies
 9    and shared services.  And so as providing shared
10    services, this company also injected money into
11    Haimark Line after the casualty.  So there was
12    $700,000 that were injected.
13          But the funds that Centennial was
14    holding were commingled.  They were commingled funds
15    between Haimark Ltd. and Haimark Line.  We said, Well,
16    for Haimark Line, you know, you -- ultimately,
17    Centennial was overprotected by $700,000, but -- you
18    know, that was money that was there, too, but that
19    wasn't available to us.
20          Q.  But Vert didn't care.  They took it
21    whether it was Haimark Line's or Haimark Ltd.'s,
22    right?
23          A.  Vert didn't -- in my opinion, it is my
24    opinion, I think Vert never cared to really understand
25    the business model in detail.
```

---

30

```
 1          Q.  They were just grabbing funds from
 2    wherever, right?
 3          A.  They were interested in -- yes.  They
 4    were interested in cash and how this cash could be
 5    eventually transferred and taken and restructured, and
 6    that was -- as far as I understand, that was very much
 7    their main interest.
 8          Q.  And Vert's basically, what, a venture
 9    capitalist company, I mean, would you say, or. . .
10          A.  Vert is -- well, that's also interesting
11    question.  Vert -- they presented themselves as a
12    venture capital company.  So they presented themselves
13    as a small boutique firm that specializes in
14    distressed companies.
15          And actually, they found us.  We --
16    right after the casualty of the Saint Laurent, we were
17    looking for a company to either partner with us or to
18    acquire us or partially acquire us, because it's like
19    an airplane crash.
20          We had 40 severely injured people on
21    there that was -- you know, you can imagine the mass
22    casualty on U.S. territory is -- is draining.  It's
23    hard on any company but especially on a new company.
24          So we knew -- we started looking for
25    partners, for investors, for partners, anyone we could
```

---

31

```
 1    find.  One of the first investors that came forward
 2    was one of your clients, Vantage, and it was the
 3    second attempt to actually acquire Haimark.  That
 4    didn't pan out.  We looked at -- Anschutz was very
 5    interested, and then they eventually, unfortunately,
 6    backed away.
 7          And in the whole -- in this whole due
 8    diligence in order to try to find good partners to go
 9    into and to grow into the future, Vert contacted us.
10    There was an article about our business and our
11    predicament in the front page of the financial section
12    of USA Today which Vert caught or read, and then they
13    approached us and vigorously pursued us, flew out here
14    in private jets.
15          And I remember the first -- their first
16    appearance was very dramatic.  And their boutique firm
17    and their specialties are, you know, to turn companies
18    like us around.  And at this point, really, we were
19    only looking for 3 to $5 million.  That's all we
20    needed in order to turn the complete company around.
21          That was a company at that time that
22    produced about 20,000 passengers, and in this industry
23    that's not a bad number, with a very, you know, short-
24    to midterm turnaround time, all documented, very
25    feasible.  And they're like, Oh, yeah, we have 250
```

---

32

```
 1    million cash 3 to 5 million is nothing, blah, blah,
 2    blah.  That's how they presented themselves.
 3          And so we thought, okay, well, this --
 4    you know, this seems to be in -- they say, Oh, yeah,
 5    they talk to you, you know, other companies that looked at
 6    us, and they claimed to know Mr. Anschutz personally
 7    and he recommended this and that.  And so they made it
 8    seem -- they -- I don't know.  That's how they
 9    presented themselves.
10          And so we knew from them that they were
11    a private equity company.  Apparently, as they told
12    us, the majority of money comes from families -- or
13    from their family that has a $250 million fund, and
14    they're apparently very successful.
15          I was at their offices several times in
16    Los Angeles -- they have an office on Pico
17    Boulevard -- because I wanted to do my due diligence
18    on behalf of the company, the owners, and our clients.
19    And so they had -- they had a little -- they had a
20    little office in Los Angeles with about ten people.
21    They seemed -- they seemed to have a legit office
22    operation there.
23          But then we saw a lot of other entities
24    on our closing paperwork.  So in February we had the
25    closing documents signed, so there was a closing book
```

---

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

33

1 of maybe 300, 350 pages of various documents that
2 named other companies.  There was a company called
3 Wolverine Funding, there was a company called V2C
4 Capital, there was a company -- there was two
5 companies that they founded, a Haimark Holdings,
6 another Haimark Holdings.  And so these documents were
7 orchestrated between these various entities with Adam
8 Levin and his business partner always as CEO or
9 chairman or what have you.
10     Q.  So there was a closing?
11     A.  There was a closing, yes.
12     Q.  When?
13     A.  There was a closing at the end of
14 February, before we went to Asia actually.  So the
15 closing was administrated by a New York law firm on
16 their side.  I forgot the name.  It was a prominent
17 New York law firm.  We checked them out.  They were
18 legit apparently.
19     Q.  Like Kutner Brinen or something like
20 that -- oh, no, no.  That's the --
21     A.  It wasn't Kutner Brinen, but it was a --
22     Q.  I just have to tease Jeff every once in
23 a while because we're kind of friends, so I have to do
24 that.  Make sure he was awake.  And he was awake.
25     A.  So it was a New York law firm, and then

---

34

1 we were represented by our attorney, Dan Wolf, is a
2 business transaction lawyer who did it on our side.
3     And there was a closing.  So the closing
4 documents, just for the record, were signed by us,
5 transmitted to the company -- to the law firm in New
6 York to put together the closing book, and the
7 closing -- a copy of the closing book went to Dan
8 Wolf, but I never got a countersigned closing book.
9     But Dan Wolf confirmed that as the
10 company secretary and the registered agent he had
11 received a closing book, and he -- he has a copy of
12 that.  So it was indeed signed and executed.
13     Q.  And was one of the documents this equity
14 exchange agreement?
15     A.  Um-hum.
16     Q.  Is that one of the documents?
17     A.  Yes.  Apparently all documents that I've
18 signed and Hans signed on behalf of the companies were
19 countersigned, executed, and included in the closing
20 Bible.
21     Only one side note.  One of the
22 documents that I signed, my employment contract, then
23 was falsified, that was -- they took certain terms out
24 and falsified them, and they put -- reproduced my
25 signature on a document that I actually have not

---

35

1 signed.
2     Q.  Okay.  And was there a -- so what were
3 they doing?  Were they lending you money or were they
4 buying your company?
5     A.  So it was a -- it was an exchange.  So
6 the -- it was very complicated, the setup, and I'm --
7 forgive me, but I'm not a private equity financial
8 guru.  I'm not --
9     Q.  Trust me.  The simpler you can say it,
10 the better, for all of us.
11     A.  I'm a cruise guy, and so I think in
12 cabins and passengers and, you know, passenger
13 comfort.  But apparently, as far as I can reconstruct
14 these documents, and, you know, I had them explained
15 to me by Dan and other people, so it was an exchange
16 document where basically the owners of the Haimark
17 companies exchanged a hundred percent of their
18 ownership in a highly diluted ownership in a holding
19 company.
20     So that means I gave up all of my equity
21 in the Haimark companies and in return I got, I don't
22 know, half a percent or percent at the end of the day,
23 of a Haimark holding company that was formed.
24     And that was -- and they had different
25 shares.  They had Class A, B and C shares.  So the

---

36

1 ownership was then -- my ownership was a Class B
2 share, and once they inject money, then it would be
3 transferred into a Class C share.  I mean, they'd
4 dilute it again, in a nutshell.  So that's how this
5 should have worked.
6     And so, yeah.  So the ownership was
7 exchanged, and then the new owners would then, through
8 certain investment companies, those companies that
9 showed up, like Wolverine, V2C, God knows, would then
10 inject up to this, you know, 3 and 2 million, the
11 total of 5, into various companies as they saw fit,
12 because we didn't need them all at once really, in
13 order to stabilize the companies and grow them and --
14 so that was -- in a nutshell, that was the deal.
15     Q.  Did they ever inject those funds?
16     A.  No.  As a matter of fact, as I -- you
17 know, right after -- right after the closing, we were
18 presented with invoices.  So we were presented with --
19 it was the agreement that both sides will take care of
20 their attorneys fees, and we took care of Dan Wolf's
21 attorneys fees, and they were supposed to take care of
22 their attorneys fees.
23     So right after the closing we got all
24 their attorney fees, which were very expensive, and we
25 got -- you know, we got the management invoices from

---

9 (Pages 33 to 36)

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

37

1   Mr. Abramowitz, you know, tallying about -- for a lot
2   of money, two days, $15,000, you know, I mean, plus
3   travel expenses, you know.  I think it's fairly high.
4   But -- so that's what we got.  But there was nothing
5   else that came back.
6          There was no money injected, although
7   that was -- that was the agreement, that they're --
8   you know, at their discretion, they will put money in
9   according to the loan documents that were signed in
10  this deal.  And without that, we would have never
11  signed it because there wouldn't have been any reason
12  to sign anything.
13      Q.  So you never got any money out of this
14  deal?
15      A.  No.
16      Q.  And none of your other partners did
17  either?
18      A.  No.
19      Q.  So --
20      A.  I paid -- paid travel on my personal
21  credit card for those guys to take them to Southeast
22  Asia, which never got reimbursed.  That's what I got
23  out of that.
24      Q.  Okay.  You saw Sarah leaving as you were
25  coming, more or less.

---

38

1       A.  Um-hum.
2       Q.  And she told us that for the most part,
3   books and records were kept in a QuickBooks system,
4   correct?
5       A.  Um-hum.  Yeah, correct.
6       Q.  When you left in April of 2016, where
7   were those QuickBooks located at that time, as best
8   you know?
9       A.  We had -- so our QuickBooks version was
10  a QuickBooks Enterprise.  So that is a hosted -- a
11  hosted application.  So it's a cloud application
12  basically.
13      Q.  Yes.
14      A.  And so that's what we had.  We had
15  QuickBooks Enterprise, a hosted QuickBooks Enterprise
16  version, and there were two computers that ran it.
17  There was my -- you could, because it was cloud-based,
18  you could sign on to this -- to the system from
19  anywhere.  But when we left, we had -- Mr. Abramowitz
20  had access to that, obviously, on behalf of Vert, I
21  had a copy of that software on my office computer in
22  the office in Lakewood that I left behind, didn't take
23  anything, and there was an accounting computer in the
24  accounting office that had -- that had that software
25  on there, too.

---

39

1          And then Sarah had that on her laptop,
2   but -- at the time she left, but I think there was a
3   company computer that she left behind, I think.
4       Q.  So she didn't take that laptop with her?
5       A.  I don't think she took any of that.  I
6   don't think she took anything with her.
7       Q.  Were there hard copies of any of these
8   QuickBook records?
9       A.  There was a -- yes.  There was a backup
10  that we put on an HD drive that was shipped to Vert
11  Capital, to that office on Pico Boulevard in Los
12  Angeles.
13      Q.  Okay.  But no paper copies anywhere else
14  that you are aware of?
15      A.  There were paper copies in the office,
16  yes.  There were paper copies.  Yeah, I don't know --
17  you know, I mean, not the whole system was on paper
18  copy, but there was -- you know, there was regular
19  accounting files in the office, as you would have, I
20  mean, as a regular course of business, that were kept.
21         There was a full backup at per -- per
22  April maybe shipped to Vert, and the rest was on the
23  computers that were in the office.  And, again, no one
24  took anything.  They were left behind for the owner.
25      Q.  Do you know what happened to those

---

40

1   computers?
2       A.  I don't.
3       Q.  Okay.  Do you have any paper copies of
4   any records yourself?
5       A.  I don't.  I -- again, I was told to just
6   leave, you know, and leave everything behind, and I
7   definitely didn't want to take anything that wasn't
8   mine at that point.  So, no, I don't have any copies.
9       Q.  If anybody would have paper copies --
10      A.  Um-hum.
11      Q.  -- who would be your best guess as to
12  who that might be?
13      A.  I really don't know.
14      Q.  Lisa?
15      A.  The question -- no, Lisa did not,
16  because Lisa left on her own accord about exactly a
17  year ago.  We tried -- had her personal reasons and
18  she left.  And I know, I was there until last day, she
19  didn't use anything -- she didn't take anything, any
20  paper copies.
21      Q.  What about the guy who came in after
22  her?
23      A.  That was -- we hired a CFO after Lisa
24  left, Amy -- Amy Steines, and Ms. Steines, to the best
25  of my knowledge, didn't take anything either.

---

10 (Pages 37 to 40)

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

41

Q.  And did she leave the company right around the same time Sarah did?

A.  Yes.

Q.  So a couple weeks before you did?

A.  Yeah, but they all -- they all worked with me until about the end of April.  So that was -- she was -- that was part of the skeleton team.

Q.  Oh, yeah, I was going to ask you, who was the skeleton team?

A.  So it was Amy, Sarah, myself and a gentleman named Josh Youngerman, and -- that was the skeleton team.

Q.  What about Bob Henry?

A.  Bob Henry was an accountant that worked with -- especially with your client, Vantage, in order to, you know, go through the due diligence, but he left -- he stopped working for Haimark in about February, because he did not get along with the new ownership.  Not a lot of people did.

Q.  Did he have access to books and records of Haimark though?

A.  He at that time had access to the cloud-based QuickBooks.  But I don't know -- I don't think that he maintained that.  I think that after he resigned as an independent contractor, I don't know if

---

42

he maintained it.  I don't think so.  Because we only had a certain amount of licenses, and we tried to make sure that we get the license back or the use of it back in order not to buy additional licenses.

Q.  And you think those licenses have expired; is that what you think?

A.  I don't know.  I don't know if they would -- if they are not paid on a monthly basis, they expire.

Q.  So the QuickBooks, though, would function for both Haimark Line and Haimark Ltd. and Haimark S.A.?

A.  Um-hum.

Q.  They'd all be together, correct?

A.  Um-hum.  They were different companies in the QuickBooks -- in the Enterprise, sorry.  You can set up different companies in there.

Q.  Right.

A.  And so they should be -- yeah, they should be together.

Q.  Okay.  Who did the tax returns?

A.  The tax returns for 2015 was done by a company on the East Coast.  I forgot the name.  But it was a -- it was a tax company who did that.  We provided the records, and then they did the tax

---

43

returns.

It was another thing that we asked Vert Capital to say -- we said, Well, you know, we got to file tax returns, because initially they were very, very concerned about controlling anything financial.  And so I approached Mr. Abramowitz.  I'm like, Well, you're a CPA.  Are you going to file the tax returns?  Who do you want to file the tax returns?  Oh, I really don't care about that.  I said, Well, you know, we -- we are operating a business, you know, there is a certain deadline by which you have to file.  We got to file.

Well, I'm not going to worry about that.  I said, Well, I do, you know, I'm -- we got to do it right.  So he never got back to me, so I took it upon myself to find a tax company who can do it, and I did, and it was Bernstein, Bernstein, S and H or something.  They did the tax returns for the companies.

Q.  Okay.  So --

A.  And then I signed them, because no one else wanted to step forward to sign anything.  So, you know, in order to have a proper year end for 2015, I found the tax company, the tax firm, and then they filed it, and I signed the tax returns for 2015.

Q.  Do you have copies of the tax returns?

---

44

A.  I don't.  I did not -- actually -- no.  I don't have paper copies of that, no.  I can -- there is just the tax company who filed it, you know, they probably have return -- or they probably have copies of returns maybe.  But I don't have any.

Q.  And you said their name was Bernstein?

A.  Bernstein, um-hum.

Q.  On the East Coast?

A.  Um-hum.

Q.  Little more specific, like New York or Philly or --

A.  You know, I -- I don't.  I don't want to give you false information.  They're a -- I can --

Q.  If it comes to you, would you tell Mr. Brinen --

A.  Yes.

Q.  -- and maybe he could pass that on to me?

A.  Um-hum.

Q.  Maybe they're so big I can just Google them, I don't know.

A.  I don't think they are that big.

Q.  All right.  So when you left, you had no paperwork from the company, and all the computer systems were still onsite?

---

11 (Pages 41 to 44)

**MARCUS LESKOVAR - 12/8/2016**
**In Re:  Haimark, Ltd (Debtor)**

---

45

1  A.  Yes.
2  Q.  And you have no idea what happened to
3  them, if anything?
4  A.  No.  As I said, we abandoned the
5  premises at that point.
6  Q.  Okay.  So you were still with Haimark
7  when Haimark Line went into a Chapter 11, correct?
8  A.  Yes.
9  Q.  Okay.  And in that bankruptcy, did
10 anybody come in and preserve computer records that
11 were in existence at that particular time?  Like did
12 the counsel for Haimark lines --
13 A.  The Haimark Line bankruptcy happened in
14 October of 2015.  That was a Chapter 11.  And, again,
15 everything was preserved in that Haimark office.  So
16 we had -- of course we had proper backup, and we had
17 documentation.  That was a federally regulated
18 business.  It was regulated by the Federal Maritime
19 Commission.  And so we had the oversight of a federal
20 regulator that made sure that we were -- you know,
21 moneys were in escrow, in the FMC escrow.
22       It was a very complicated procedure with
23 them, but we had a federal oversight that demanded
24 that certain records are kept in a certain way,
25 reported in a certain way.  Certain moneys are then

---

46

1  refunded to passengers that were escrowed according to
2  the rules and regulations of the FMC.  And so we
3  abided by all of them.
4  Q.  Okay.  I think what I'm really also
5  wanting to know is, is did Haimark Ltd. records kind
6  of go along with the Haimark Line?  I mean, are
7  they -- could they be there with the Haimark Line
8  counsel or something like that?
9  A.  Well, as far as I remember,
10 Mr. Abramowitz had shipped the records for Haimark
11 Line offsite.  And as far as I -- as far as I know,
12 Mr. Abramowitz is now the chief restructuring officer
13 for Haimark Line.  So as far as I know, he took
14 records in order to administrate the Chapter 11 for
15 Haimark Line.
16 Q.  But who else would have copies of
17 Haimark Line records besides Abramowitz?  Let's just
18 say --
19 A.  Haimark Line or Ltd.?
20 Q.  I'm talking about Line first, then I'm
21 going to say Ltd. next, just because I'm hoping they
22 kind of follow each other.  And I could be wrong,
23 but. . .
24 A.  Okay.  Haimark Line, any copies were
25 left in the office.  There was the questions what to

---

47

1  do with -- what to do with the office.  I mean, you
2  can't just walk out of your office and never return.
3  I mean, it's -- but that's exactly what they did.
4  They told us to leave.  They didn't give us specific
5  instruct -- they didn't give us any instructions what
6  to do with accounting documents, with anything in
7  there, with the payables, anything.  It was just --
8  you know, Mr. Levin was too busy to answer any of
9  these questions always.
10       Mr. Abramowitz really eventually
11 declared himself only interested in Haimark Line, and
12 that was it.  So he had -- he had the documents
13 pertaining to Haimark Line shipped offsite.  I think
14 he has an office in L.A., too, and that they were
15 shipped there.  I think Josh Youngerman did that.  And
16 everything else was left in that office, and then
17 everyone walked out of there and that was it.
18 Q.  Okay.
19 A.  It was very -- I know it's hard to
20 believe, I mean.  It's very unusual to do it that way.
21 Q.  Do these -- do financial records have to
22 get filed with that Maritime Commission that you were
23 talking about?
24 A.  The FMC requires a passenger
25 recomputation certificate filed on a monthly basis.

---

48

1  So how that works is that if you, as a cruise line,
2  accept payments from passengers that depart from a
3  U.S. territory, those moneys have to be safeguarded in
4  an FMC escrow account.  So that means if you buy from
5  me, as a cruise line, a cruise, and that cruise leaves
6  from Miami, for example, then under federal
7  regulations that money has to go into an escrow
8  account.
9        And once that money is earned, so that
10 means you've taken your cruise and you're off the ship
11 and you've actually consumed the trip, then that money
12 can be re-called from that escrow account in what's
13 called an FMC recomputation certificate.  But until
14 that point, everything is in there.
15       And if a casualty occurs, if there is an
16 unclarity on cruises if they can be delivered or not,
17 or if it's in limbo, then it stays in the escrow
18 account, and then the FMC will work with the cruise
19 line or with the representative to see about refunds.
20 Q.  And as was explained to us earlier,
21 that's not the case with Haimark Ltd.
22 A.  Haimark Ltd. was not under federal
23 oversight because it never operated on U.S. territory.
24 Q.  Okay.  To access the documents, say,
25 like a profit and loss statement, balance sheet, those

---

**Hunter + Geist, Inc.**
**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**

**MARCUS LESKOVAR - 12/8/2016**
**In Re:  Haimark, Ltd (Debtor)**

---

49

1  sorts of things, on the QuickBooks, you'd have to have
2  a password, correct?
3      A.  You'd have to have a password, and you
4  have to assume that the service was paid up and is
5  still available.
6      Q.  Right.  Okay.  And you had a password?
7      A.  I had a password in my computer, yes,
8  that I had at work.  I had a user account, like a
9  regular -- you know, regular online user.
10     Q.  So if anybody has copies of these
11  QuickBooks, it might be Abramowitz or possibly the
12  bankruptcy lawyer in the Haimark Line bankruptcy but
13  nobody else?
14     A.  Haimark Line?  Haimark Line or Haimark
15  Ltd., right?  You're talking about Ltd.?
16     Q.  Well, I know I keep going back and
17  forth.
18     A.  Haimark Line is -- so Mr. Abramowitz, as
19  far as I understand, Mr. Abramowitz is administrating
20  the Chapter 11 for Haimark Line.  So ideally
21  Mr. Abramowitz should have all records when it comes
22  to financial records, I'm guessing.
23     Q.  Right.
24     A.  I'm just thinking that he may have that.
25     Q.  And I'm just trying to figure out if

---

50

1  there's somebody besides Abramowitz that I can go
2  through to get these records.
3      A.  To Line?
4      Q.  Well, let's say Line, but I know we'll
5  eventually have to get back to Ltd. because we're
6  going to talk about Ltd.
7      A.  Yeah, yeah, yeah.  I'm with you.  For
8  Ltd., I don't know who has them.  I mean, it has --
9  again, there was a hard -- there was a drive, a
10  computer drive, that was sent to Vert Capital with a
11  backup for the accounting records for the QuickBooks
12  file.  And everything else, the paper backups,
13  computers that had access to -- or that were
14  subscribed to this online service for QuickBooks were
15  left in the office in Lakewood.
16         And apparently, you know, I don't know,
17  the owner may have come in and taken care of that,
18  cleaned it up, maybe not.  I don't know.  It was -- as
19  far as I know, and -- as far as I know, it was just
20  abandoned and left there and then never dealt with
21  again.
22     Q.  Okay.  We were told earlier that the two
23  main banks involved in financial transactions were
24  Centennial Bank and PNC Bank.  Is that correct?
25     A.  Yes, um-hum.

---

51

1      Q.  No other banks that you can think of?
2      A.  There was an account with Key Bank.  The
3  Key Bank -- actually, Centennial did not qualify for
4  the FMC account because it is a state-chartered bank.
5  That doesn't qualify under federal guidelines.
6         So we had to switch to a different bank
7  and started the relationship with Key Bank for the
8  FMC -- for the FMC escrow.  So we had accounts with
9  Key Bank, too.
10     Q.  And was Key Bank the only escrow
11  agent --
12     A.  Yes.
13     Q.  -- as it were?
14     A.  And they did -- you're correct.  They
15  were the escrow agent, too, because their escrow
16  department handled the escrow.
17     Q.  What other attorneys were there that
18  worked with Haimark, in particular Haimark Ltd.?
19  Besides Dan Wolf that you've mentioned, anybody else?
20     A.  On behalf of Haimark Ltd.?
21     Q.  Yes.
22     A.  That was Dan Wolf.
23     Q.  What about accountants?
24     A.  We had -- we had an accounting team of
25  five people.  So we had Lisa Larue, who left about a

---

52

1  year ago.  Then we had a new CFO after her, Amy
2  Steines.  And then we had Sarah that joined the
3  company initially as a temp person in 2014 and then
4  got more and more involved and really was, at the end,
5  most -- the go-to person for me for anything.  And
6  then there were two more -- two additional clerks for
7  receivables and payables that worked there.
8      Q.  And before the Bernstein firm prepared
9  the taxes, who did the taxes the years before?
10     A.  Lisa Larue.  Like '13 and '14 was Lisa
11  Larue prepared those tax returns.  But those -- all
12  the tax returns, all the tax returns were in the
13  office.  They were -- there's a file, there's a tax
14  return file, with all the documents in there for all
15  years in that Haimark office.
16     Q.  How many employees were there for
17  Haimark Ltd.?
18     A.  About a year ago there were 35, and then
19  we started consolidating the office in Chicago, and
20  after that consolidation we had about 18 to 20.  And
21  then we -- you know, starting when Vert came on, we
22  just -- you know, it went less and less because either
23  people left or they laid people off.  That's -- if
24  that gives you an indication.
25     Q.  Do you know what the income for Haimark

---

13 (Pages 49 to 52)

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

53

1   Ltd. was in 2013?
2       A.  '13?
3       Q.  Yeah.
4       A.  I couldn't tell you the exact number.
5   It was a loss, but I couldn't tell you what that
6   exactly was.
7       Q.  Okay.  Can you -- can you give me an
8   estimate?
9       A.  I can't.  I'm sorry.
10      Q.  Seven-figure loss?
11      A.  No.  No.  Smaller.
12      Q.  Okay.  Six-figure loss?
13      A.  Yeah.  But, again, I can't -- I don't
14  recall.  I don't recall the exact number.
15      Q.  Probably more than a hundred thousand
16  but less than a million is what you're thinking?
17      A.  Is what I'm thinking.  I can't -- again,
18  without having access to the records, because there
19  were different companies, and it was -- I can't tell
20  you exactly.
21      Q.  Okay.  Same question, but 2014.
22      A.  Same question -- same answer.
23      Q.  Kind of the same range?  Was it a loss,
24  do you think?
25      A.  It was a loss, yes.

---

54

1       Q.  Okay.  And more than a hundred thousand
2   dollars but less than a million?
3       A.  Yes.
4       Q.  Okay.  What about 2015?
5       A.  2015 there were -- all companies lost
6   money, and that was because of Haimark Line.  That's
7   where we had to find a partner, a company that comes
8   in to -- you know, to inject money.
9           So altogether at that point, if you look
10  at '15, so altogether, there was an accumulated loss
11  of about $3.5 million within all the companies.
12      Q.  And who knows about 2016, right?  You
13  left in April, so. . .
14      A.  I don't know.  They could have injected
15  money finally and sit on $10 million in assets.  I
16  don't know.
17      Q.  They didn't do that, though, right?
18      A.  I don't know.  I don't know.  I --
19  again, I left in April, and after that I don't know
20  what happened.  I'm under the understanding, though,
21  that they had follow-up conversations and dealings
22  with Haimark Line, and there was a big settlement with
23  the shipowner, and they had follow-up conversations.
24  I don't know -- they had follow-up conversations with,
25  I know, your client and some other clients about

---

55

1   certain settlements, but I'm not privy to the detail
2   of those conversations.
3       Q.  Okay.  So the Saint Laurent matter did
4   get settled; is that right?
5       A.  Yes.
6       Q.  But you don't know the details?
7       A.  No, I just know that it got handled.  It
8   got handled with a large amount of money.  Several
9   million, it was -- I was told, but I don't have any
10  evidence of that.
11      Q.  And how much of that came back Haimark's
12  direction, you don't know.
13      A.  I don't think anything came back to
14  Haimark Ltd.'s direction.  I think it went into
15  Haimark Line, and that's where Mr. Abramowitz sits and
16  administrates funds.
17      Q.  So just clarify for me a little bit,
18  because we've talked about it just a smidge.  The
19  boat, the ship --
20      A.  Um-hum.
21      Q.  -- the Saint Laurent, had dealings with
22  Haimark Line, correct?
23      A.  Um-hum, yes.
24      Q.  Okay.  So that's why it was a liability
25  for Haimark Line when it got in the accident or the

---

56

1   catastrophe, whatever you want to call it --
2       A.  Allision.
3       Q.  The collision?
4       A.  Allision, that's the term.
5       Q.  Okay.  But it didn't -- it didn't affect
6   Haimark Ltd. because it was a separate entity; is that
7   correct?
8       A.  Well, it did.  It did.  And it did on --
9   it did on numerous occasions.  First of all, it had an
10  effect on the brand.  So we were a new carrier, and
11  the news of the accident, of the mass casualty, and
12  that many severely injured people immediately went
13  into the press.
14          We were actually number-one news,
15  unfortunately, for three days straight at CNN.  We
16  were on TV, we were on global TV.  We were everywhere.
17  And so we -- especially our clients and our larger
18  clients shied away.  They're like, Wow, it's a new
19  carrier, and they're unsafe.  A new airline, you know,
20  they crash into a mountain, 40 people die, well, you
21  know, may not want to do business with them because
22  maybe they just haven't figured out their safety yet.
23  So that had --
24      Q.  Nobody died, though, right?
25      A.  Nobody died, but 40 severely injured

---

14 (Pages 53 to 56)

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

**57**

1  people, you know, and a class action together with
2  that, that will do some damage.
3  **Q.  No, I know.  I just wanted to be clear**
4  **though.**
5  A.  Not just -- just to give you -- I think
6  it's important to understand the magnitude of an
7  accident like that.  We blocked the Eisenhower lock,
8  which is the main entryway into the Great Lakes, for
9  almost a week.  That cost the company $27,000 an hour.
10  The ship was out of commission for three
11  months in the high season.  That was a loss of about
12  100,000 a day on top of it.
13  We were a start-up company who didn't
14  have any big investors, who didn't have anything
15  behind them, just a few guys that came from the
16  industry and a lot of clients that believed in the
17  product.
18  That completely totaled us.  There is
19  no -- there is most likely no coming back even for a
20  midsize company with a good history.  You can't
21  survive that.  And it was brought onto us.  And what
22  happened is really, and I think it's important to
23  understand, is that wasn't our fault.  It wasn't our
24  safety, but what we did as Haimark Line, we chartered
25  the vessel from a shipowner.

---

**58**

1  The shipowner is a Danish company called
2  Clipper, a very prominent shipowner, one of the
3  largest shipowners in the world.  They own 300 large
4  vessels.  So the Saint Laurent, just to put it in
5  perspective, is a 7,000-ton vessel.  It's a vessel
6  that's about 300 feet long and carries up to about
7  maybe 200 people.  It's considered a small ship.
8  But the shipowner owns tankers,
9  supertankers.  They've got tonnage worth billions.
10  They're very wealthy, and a -- they're very wealthy
11  and a very lucrative target if you know what you're
12  doing with them like Vert did.
13  So they put on -- so what we had is a --
14  we had a charter in which the shipowner maintained the
15  nautical service on the ship.  So it's like if I'm an
16  airline, I charter an airline, the captain and the
17  crew comes from the company who charters it to me.  So
18  we just market it and whatever.
19  So the nautical liability on that vessel
20  still legally was with the owner.  So what happened in
21  that accident is that ship crashed into a lock.  And
22  the reason was that the captain on the ship, by the
23  Coast Guard and the NTSB, was declared as unfit, and
24  therefore the ship was declared as sea unworthy.
25  That's about the worst thing that can

---

**59**

1  happen to you.  It's like if you're in a plane crash
2  and the NTSB declares the captain is unfit and
3  therefore, you know, the aircraft is un-airworthy.
4  Horrible.  Can't rate any worse than that.
5  So that was brought upon us because the
6  NTSB records and the records of all investigators that
7  were investigating that accident came to the
8  conclusion, and it was made public.  So that had a
9  tremendous impact on the brand.  Awful.
10  And people didn't necessarily know what
11  our -- you know, what our setup or our arrangements
12  with the ships were.  They just knew that it's the
13  worst safety -- the worst safety rating that you can
14  get.
15  So it was the shipowner's fault.  So
16  immediately after the accident we went to the
17  shipowner, said, You brought it upon us.  You have to
18  make us whole.  And they weren't interested in it.
19  They did know that we had a Cuba
20  license, and we were actually the first cruise line
21  having a Cuba license, which was gold in that
22  industry.  Ship of that size with a Cuba license, you
23  know, 18 months ago, you could sail until there is no
24  tomorrow.
25  And so that's -- so they wanted to stall

---

**60**

1  us, and they wanted to -- I think they wanted to take
2  us down and take the ship and the Cuba license and run
3  it themselves.
4  And that's how it started.  That's when
5  we filed for bankruptcy for the ship and the
6  protection.  We seized -- we had the vessel seized in
7  a maritime action by the Coast Guard.  We kept that
8  vessel as collateral, and that's when -- that's when
9  it went -- that's when the whole -- that was the
10  beginning of the end.
11  **Q.  And sometimes --**
12  A.  I don't know if I answered your
13  question.  I get -- I get -- I'm still, you know,
14  unfortunately, emotionally attached to this.  And so
15  sometimes I stray.  So you have to reign me back in if
16  I --
17  **Q.  And Haimark Ltd., then, sometimes would**
18  **give money to Haimark Line because it was short of**
19  **funds.**
20  A.  That's correct.  I'm sorry.  That was
21  your question.  I didn't answer that.  So correct.
22  So what happens is that -- so what
23  happened is that Haimark Ltd. provided shared
24  services.  So that means everyone, every employee,
25  everything was administered by Haimark Line.  So in

---

15 (Pages 57 to 60)

MARCUS LESKOVAR - 12/8/2016
In Re: Haimark, Ltd (Debtor)

---

61

1  this accident, Haimark Line then helped Haimark Ltd.
2  financially and, you know --
3        MR. HEAPHEY:  Ltd. helped?
4        THE WITNESS:  Line.
5        MR. HEAPHEY:  You said Line helped Ltd.
6     A.  I'm sorry.  Ltd. helped Line.  My fault.
7  So because it -- it paid all the travel expenses, it
8  paid employees, it paid basically all overhead up to
9  almost a million dollars that at that time, when I
10 left, Haimark Line still owed Haimark Ltd.
11    **Q.  (BY MR. DUNNING)  About a million**
12 **dollars or. . .**
13    A.  Close to a million, yeah.
14    **Q.  It was basically for moneys provided by**
15 **Haimark Ltd. because Haimark Line didn't have the**
16 **funds they needed to operate?**
17    A.  Didn't have the funds and didn't have a
18 setup either, didn't employ anyone.  So you can't --
19 obviously, you can't run a cruise line without anyone
20 working at it, you know.  So they covered the --
21 covered the travel expenses, covered the emergency
22 response to the incident, covered all salaries of
23 people that worked there, provided shared services.
24 So that's how that money -- how it comes to be.
25    **Q.  Sarah told us at times there were -- if**

---

62

1  **one Haimark entity needed funding because they had to**
2  **pay, say, vendors or --**
3     A.  Um-hum.
4     **Q.  -- well, let's just say vendors, that it**
5  **was usual and customary to dip into one of the other**
6  **Haimark entities to make those payments.**
7     A.  There were -- yeah, there were internal
8  transfers from one company to the next.  So mainly it
9  was between Haimark Ltd. and Haimark Line.  Yeah,
10 that's correct.
11    **Q.  Okay.**
12    A.  And the companies -- and I mentioned
13 that before, with funds commingled, you know, with
14 this -- with those funds with this money Centennial
15 held or still is holding, that's because of that,
16 because you had moneys -- you know, the companies were
17 legally separated for certain reasons, but as a
18 company they operated very much as one and the same.
19    **Q.  Was Haimark Ltd. involved in any**
20 **litigation?**
21    A.  Haimark Ltd.?
22    **Q.  Ltd.**
23    A.  No.
24    **Q.  Were there ever any repossessions --**
25    A.  No.

---

63

1     **Q.  -- or garnishments against Haimark Ltd.?**
2     A.  No, never.
3     **Q.  Never placed in receivership?**
4     A.  No.
5     **Q.  Were there any losses by theft?**
6     A.  No.  Not documented.  So we had reason
7  to believe that Ms. Larue may have taken some money
8  without authorization, but we didn't really -- we
9  didn't really follow up on it thoroughly because, A,
10 we didn't have the capacity at that time or the
11 manpower at the time.
12         And second, we stayed away from, did not
13 pursue it, because we just were in the middle of -- of
14 this financial transaction, of the ownership
15 transaction, and we didn't want to get into something
16 that may have yielded results that were detrimental to
17 the company.  So there was never proof.
18    **Q.  So at least by the time you left,**
19 **Haimark Ltd. was making payments to vendors to the**
20 **extent it could.**
21    A.  Yes, um-hum.
22    **Q.  But you don't know the specifics of the**
23 **vendors they were paying or how much they were paying,**
24 **right?**
25    A.  No, we were paying -- we were trying to

---

64

1  keep current with the ship payments and with vendor
2  payments.  So up to until I left, I kept -- we tried,
3  to the best of our financial possibilities, to make
4  amends and make arrangements to pay vendors in order
5  to provide services for passengers that we booked and
6  that we had on the road.
7     **Q.  But as to the specifics of which vendors**
8  **you paid and how much and when, you don't know that as**
9  **you sit here today?**
10    A.  I don't remember specifics, no, but that
11 was all recorded in accounting documents, so you
12 can -- you know, you -- yeah.
13    **Q.  Again, I need the QuickBooks, right?**
14    A.  You need the QuickBooks or you need --
15 you need the accounting files that were left behind in
16 that office.  But there was -- obviously, it was all
17 recorded there.
18    **Q.  Or I need to find Mr. Abramowitz, right,**
19 **and get them from him, if he has them?**
20    A.  That would be -- yeah.
21    **Q.  Do you know of any transfers or payment**
22 **of money that was outside the ordinary course of**
23 **business?**
24    A.  Like ordinary course of business,
25 what's --

---

16 (Pages 61 to 64)

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

65

Q.  Well, I mean, I guess to some extent we could say if Haimark Ltd. made payments on Haimark Line's behalf --

A.  Um-hum.

Q.  -- I mean, sometimes --

A.  Well, they didn't make it on Haimark Line's behalf.  I mean, these payments -- so the payments came -- the payments came from the companies that were supposed to make the payments.

So that means if Haimark Line had to make a payment to, I don't know, to a vendor, to a passenger, it came from Haimark Line.  But in order maybe to enable this company to make the payment, there could have been an internal transfer where we would have transferred $5,000 from Haimark Ltd. to Haimark Line in order to enable Haimark Line to make this payment or vice versa.

Q.  Okay.  Were there payments to any insiders, say, as -- somebody such as yourself or Mr. Abramowitz or any other owner of the company?

A.  Well, payments -- all payments have been recorded.  So if that -- doesn't matter what that was.  So if there was a guaranteed payment, or if it was a salary, all of that has been recorded.

The payments to Mr. Abramowitz have been

66

recorded, too, although, as I said before, we had a hard time establishing his capacity.  So he would send an invoice, for example, after two days, for $15,000 from his company, LCG or LCQ Capital.

Again, it was recorded for management services, but in what capacity he acted and what kind of services those exactly were, that was never identified, and after I asked him several times, You need to -- if you're not with Vert, if you're not -- if Vert is not paying you -- because that was -- talking about that, that was a big unknown from the beginning, too.

So Vert brought Abramowitz in, and we were under the impression that that is an expert that either works for Vert or that is paid by Vert, like all the -- like all the lawyers they brought in.

You'd think that if a company that is specialized in distressed companies brings in experts, for lack of better words, then they will take care of those experts when it is clear that this company needs money.  That was my understanding, but -- so then Mr. Abramowitz came, he dealt with us and he gave us direction, just to receive an invoice from Mr. Abramowitz after a certain while for management services.  And that's when I went to Mr. Levin.  I

67

said, But, listen, I thought he works for you.  That's how you -- that's why -- why is he sending me invoices?  Isn't he work -- he's sending me invoices from a different company now.  Well, you got -- you got to take this up with Paul.  And I'm like, Well, you brought him in.  He reports to you.  He works for you.  And so I didn't -- that's -- that wasn't really clear.

And then I went to Mr. Abramowitz, said, Well, you're sending me an invoice, but I thought that you were working for Vert or that that's taken care of by Vert or you're one of Vert's experts.  Now you're sending an invoice, for moneys that we never agreed on, to us.

Q.  Who else besides Abramowitz was sending invoices that you thought should have been part of Vert?

A.  Well, it was Mr. Abramowitz and it was all Vert's attorneys.  So people that worked on the closing, for example, on due diligence, they sent -- Vert sent it all on to us.  And my understanding was that they'd take care of them, and that was the whole -- that was the whole reason to do this deal.

They were -- they deemed themselves as experts or having access to experts in order to turn

68

companies around, and then -- so, yeah, so they sent it all on to us.  And it's all -- again, all of these payments are recorded, obviously.

Q.  Do you owe money to Haimark --

A.  Yes, I have a note that --

Q.  -- Ltd.?

A.  Yes.  There is a note out there.

Q.  How much?

A.  That's about $380,000.  Some of these moneys -- your client obviously knows that some of these moneys, there was a suit against Haimark that I settled personally as an owner in order to keep the settlement amount as low as possible and not have any corporate involvement.

So part of that is that suit, which really should be a company charge, but I took it upon myself in order to help the company with that.  And it's -- again, all of this is documented.

Q.  Okay.  Any of the other prior owners --

A.  There was a -- Tom Markwell has a note, too.  Although those are hundred percent -- it is a hundred percent personal note, so that's not any payments that he made on behalf of the company like I did.  And so there is a note out, too, for him.

Again, those are signed, those are

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

69

1  documented and entered in the accounting.  And they
2  were disclosed to your client when they tried to
3  purchase the company about a year ago.
4      Q.  Okay.  Anybody else besides you and Tom?
5  What about Hai?
6      A.  No, Hai -- no.  He doesn't have a note
7  with the company.
8      Q.  Were any bank accounts closed?
9      A.  No.  I think we didn't -- so, again, you
10 know, everything was abandoned.  Nothing -- I mean, at
11 this point, I didn't have any authority anymore.
12     I offered at several occasions to
13 Mr. Abramowitz and Mr. Levin to take ownership or at
14 least to be added to the bank accounts so they can
15 deal with the banks.  I told them that after my
16 dismissal and after my termination, I consider myself
17 not having any authority anymore.  So I'm not going
18 to -- I'm not going to be able to represent Haimark or
19 act in my former capacity.  But they never took me up
20 on my offer to add them on any bank accounts.
21     I know that Mr. Abramowitz has been
22 trying to seize the accounts of Haimark Line.  I don't
23 know if he -- you know, I don't know what the status
24 is with the funds that are held by Centennial.  So I
25 don't know what happened with those.

---

70

1      Q.  Okay.  So some --
2      A.  But I was contacted by some banks about,
3  you know, the status of the company, and I always
4  referred them back to Vert, and I told them that Vert
5  is the new owner and to please, you know, either
6  contact Mr. Levin, the office in L.A., or
7  Mr. Abramowitz, because they're the people with
8  authority.
9      Q.  And as you sit here today, you believe
10 some of the funds held by Centennial is either from --
11 some of it's from Haimark Line and some of it's owed
12 to Haimark Ltd., correct, or do you know?
13     A.  Say that again.  I didn't follow you.
14     Q.  The funds held by Centennial --
15     A.  Yes.
16     Q.  -- could be funds of both Haimark Line
17 and Haimark Ltd.?
18     A.  Those are commingled funds, yes, and --
19 for the reason I explained.  They were transferred
20 internally, and they're commingled funds.  The
21 companies basically acted as one and the same although
22 they were legally different companies.  But, yes,
23 those funds are commingled.  They are overprotected
24 and commingled.
25     Q.  What about the -- well, let me ask

---

71

1  you --
2      A.  And, sorry, in some of --
3      Q.  No, go ahead.
4      A.  Excuse me for interrupting.
5      Q.  Go ahead.
6      A.  Some of those funds, a lot of those
7  funds, actually, are also commingled with credit card
8  payments.  So, you know, I know with the complaint
9  about the credit card charge, because some of those --
10 I don't know exactly the amount of debt found within
11 that fund comes from credit card payments that came in
12 that's in there.  So it's commingled including credit
13 card charges that were -- that were captured by us and
14 then transferred into this -- into this account, and
15 they're held by Centennial.
16     Q.  What about the Key Bank escrow funds?
17     A.  Um-hum.
18     Q.  Are those -- none of that's Haimark
19 Ltd., though, right?
20     A.  No.  No.
21     Q.  Okay.  Because of the stuff you're
22 complaining about?
23     A.  Yes.  Yeah.  No, that is exclusively
24 Haimark Line.
25     Q.  Haimark Ltd. doesn't own any real

---

72

1  estate?
2      A.  No.
3      Q.  Okay.  And the only cash would be
4  probably what's in Centennial now, I suppose, right?
5      A.  Yeah.  So there's a few thousand dollars
6  on -- when I left, so I don't know what happened in
7  the meantime, there was a few thousand dollars in
8  PNC, there was, you know, the moneys that were in
9  Centennial, and that was really it.
10     There is, of course, computers.  So
11 there is inventory.  There were computers and
12 inventory in the amount of maybe -- last book value
13 was maybe 50, 60,000.  I mean, it was a good-size
14 office with very nice furnishings, very updated and
15 high-end computers and other electronics.  They, you
16 know, had a certain value.
17     Q.  So there is furniture, fixtures,
18 equipment?
19     A.  Yeah.  Yeah.
20     Q.  Art?  Artwork?
21     A.  No.  There is our FMC certificate and
22 the Cuba certificate, but that's about -- it's all
23 worthless now.
24     Q.  Were there any insurance policies?
25     A.  Well, there was a regular business

---

18 (Pages 69 to 72)

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

73

1  insurance.  There was a business insurance, and then
2  there was a charterer's P&I.  So a charterer's P&I is
3  if you -- so P&I is a protection and indemnity club.
4  There is a few P&I providers globally that insure
5  cruise ships, and those are pretty big policies, and
6  so as a charterer, then you can obtain a charterer's
7  P&I.  So we at Haimark Line had a charterer's P&I
8  with Steamship Mutual in London.
9      (Court reporter interruption.)
10     A.  We as Haimark Line had a charterer's P&I
11 policy with Steamship Mutual out of London.
12     Q.  Ltd. didn't own any stock or bonds or
13 annuities or anything like that?
14     A.  No.  No.
15     Q.  Did it have accounts receivable?
16     A.  Yes, it did.  But I -- again, I can't
17 tell you.  I don't remember --
18     Q.  So what type of accounts receivable --
19     A.  -- details, but I'm sure --
20     Q.  My bad.  What type of accounts
21 receivables would it be?  Would it be, like, a
22 customer who was obligated to make payments?
23     A.  Yeah.  So the majority of the business
24 was operated as charter business.  So where we had
25 inventory for a ship for a year, and then our clients,

74

1  such as Vantage, for example, would say, Okay, fine,
2  we are going to buy ten weeks out of that year on that
3  ship for the next three years, and then -- so they
4  had -- they had payment terms where we said, Okay,
5  fine.  You're going to do 10 percent or -- every
6  client was different, but there was a certain -- there
7  was a certain payment plan.
8      You say, Well, you pay 10 percent now
9  and then you pay 20 percent later and then you pay so
10 and so much for this year, so and so much for that
11 year.  So there were payment plans out with
12 Abercrombie & Kent, Vantage, Uniworld, every customer.
13     And on the flip side, there were deposit
14 schedules to the shipowners, because they pretty much
15 required the same thing.  They wanted to have security
16 and say, Okay, you know, we built this for you, making
17 this available for you, so you've got to pay us
18 something, too.
19     So once Vert Capital came into the
20 picture, they started communicating directly to
21 clients and took a very, very aggressive and -- very
22 aggressive route into -- in telling people, well --
23 you know, basically threatening them and blackmailing
24 them, and if they are not cooperating, are just going
25 to file bankruptcy and hold their passengers hostage

75

1  and this and that in order to restructure all kinds of
2  arrangements, against my advice to them.
3      So after them getting involved, a lot of
4  customers said, Okay.  Well, thank you for the
5  lecture, but we don't feel comfortable at all to make
6  any payments anymore, and so we're just going to hold
7  off.
8      And so there were several customers that
9  had payments due that Vert -- you know, really would
10 be accounts receivable, that didn't make them because
11 of Vert Capital's overtures to those customers.
12     MR. DUNNING:  Can we take a short break?
13     (Recess taken, 5:14 p.m. to 5:28 p.m.)
14     Q.  (BY MR. DUNNING)  Just to follow up
15 where we were off the record, how much money do you
16 think Vert got out of the Haimark entities?
17     A.  What they got out of this after, after I
18 left, I don't know, but initially -- so with the
19 settlement of Haimark Line and with liabilities that
20 were still there from Haimark Ltd. to Haimark Line, I
21 don't know what the end result is.
22     What they've gotten out of it before I
23 left was the payments to attorneys that we paid on
24 their behalf and the payments to Paul Abramowitz that
25 was paid not to Vert but to an entity that was

76

1  associated with Paul Abramowitz.
2      And then they got travel benefits out of
3  Haimark that was paid by Haimark in taking them to
4  Southeast Asia and introducing them to our business
5  partners and our product and ships there.
6      Q.  So the deposits that -- well, at the
7  time that you left Haimark, wasn't Haimark holding
8  funds that were on deposit for its customers?
9      A.  Yes.
10     Q.  Okay.  Any rough idea as to how much
11 money it was holding?
12     A.  If you take -- if you take the CD with
13 Centennial that held some of those, because those were
14 commingled funds -- so I don't know what the value was
15 of that.  That was about a million, little bit more
16 than a million.  So probably with the Centennial was a
17 little bit more than a million dollars, a million one,
18 a million two maybe.
19     Q.  Okay.
20     A.  And some of that was not accessible
21 because it was, in this case, for example, held by
22 Centennial, but that's the cash that was there.
23     Q.  Okay.
24     MR. BRINEN:  Did you want to include the
25 Federal Maritime Commission as well?

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

77

1  MR. DUNNING:  Yeah, I kind of wanted to
2 include everything, whether it's Haimark Line, Haimark
3 Ltd., Federal Maritime.
4  A.  Everything, okay.  So all of the escrows
5 and everything.  What was, in the FMC, left?
6 Probably -- maybe altogether -- I don't -- this is an
7 estimate.
8  Q.  (BY MR. DUNNING)  No, I understand, yes.
9  A.  Maybe altogether 2.5 million.  Not all
10 accessible, but. . .
11  MR. BRINEN:  And just so you know, when
12 a passenger charges back -- when a passenger charges
13 back their credit card because the cruise was canceled
14 and their deposit is being held at the FMC, it was
15 impossible for us to get the FMC to send that money
16 back to either Centennial or to the -- or to the
17 debtor, at the time Haimark Line, in order to then
18 provide it to Centennial.  So I don't really know what
19 happened with that.
20  Q.  (BY MR. DUNNING)  And if the FMC isn't
21 involved, then what happens?  If you're a customer and
22 your cruise has been canceled, you just are at the
23 graces of your credit card company to do a chargeback
24 to Haimark in that case?
25  A.  Well, the FMC immediately inserted

---

78

1 themselves as a total oversight once we filed for
2 bankruptcy.  So you really couldn't do anything
3 without the FMC's approval.  Otherwise you would
4 violate federal regulation.
5  Q.  But that's as to Haimark Line?
6  A.  Line, yes.  Yes.
7  Q.  Because that's who was in Chapter 11.
8  A.  Yes.
9  Q.  But any funds that were really Haimark
10 Ltd.'s funds -- I mean, to the extent that they're
11 commingled --
12  A.  Um-hum.
13  Q.  -- then they could still be held.  But
14 were all of the funds commingled, then, between
15 Haimark Line and Haimark Ltd.?
16  A.  Yes.
17  Q.  Okay.  Okay.  All right.  So --
18  A.  To what extent, you know, varies, but
19 they were commingled, period.
20  Q.  So I guess here is the question that I
21 guess I really should be asking:  So any money that
22 really was Haimark Ltd. funds has probably been -- is
23 probably being held in the Haimark Line bankruptcy?
24  A.  A lot of those, yes.
25  Q.  Because no Haimark Ltd. funds were

---

79

1 released by the time you left Haimark, correct?
2  A.  Haimark Line fund -- none of the Haimark
3 Line funds were released.
4  Q.  What about Haimark Ltd.?
5  A.  Haimark Ltd. didn't have funds.  So, for
6 example, so the funds that weren't released from
7 Centennial, for example, had Haimark Ltd. funds in
8 there, so -- with the commingling.
9  Q.  Um-hum.
10  A.  But there were no accounts that were
11 specifically Haimark Ltd. accounts that were not
12 accessible.  And the funds in Haimark Ltd. were pretty
13 much depleted.  That's why the company stopped because
14 Vert Capital didn't follow through with their promise
15 to inject money.  They just took out through
16 Abramowitz.  And so once the -- once the gravy train
17 came to a stop, they're like, Okay.  You're out of
18 funds?  We can't bill them anymore?  Well, let's just
19 abandon it.
20  Q.  Okay.  And so when we're talking about
21 the money going out of Haimark Ltd., it's to pay the
22 Abramowitz invoices, et cetera?
23  A.  Um-hum.  Exactly.
24  Q.  Okay.  Haimark Ltd. didn't own any
25 vehicles, did it?

---

80

1  A.  Haimark Ltd. had a leasing car, but that
2 lease -- that lease was consumed and that car went
3 back, but there is no -- no, it isn't -- a lease that
4 went back, that was all.
5  Q.  And I know you've told us this, because
6 you've told us a lot of things, but as far as where
7 the tax returns for Haimark Ltd. would be located,
8 it's your understanding they're either with
9 Mr. Abramowitz or with Vert?
10  A.  Well, the last time I saw the files,
11 they were in the Haimark office.  That's where those
12 tax returns and -- as everything else, were located
13 when I left in April.
14  Q.  Okay.  Who is the landlord over at the
15 building?
16  A.  The landlord is -- it's Denver West.
17 It's the -- so the office was in the -- so if you know
18 the Colorado Mills there, there's an office park,
19 Denver West office park, and that was the landlord.
20 And it was some investment company, but that -- you
21 know, that was the landlord.  And there is an office
22 there, a CBRE office, that deals with the rental space
23 there.  But that's who the landlord is.  That's where
24 everything was when I left.
25  Q.  You don't think the landlord seized it

---

20 (Pages 77 to 80)

**MARCUS LESKOVAR - 12/8/2016**
**In Re:  Haimark, Ltd (Debtor)**

---

81

1  when it was abandoned, do you?
2      A.  I don't know.  They contacted me,
3  though, a few weeks after it and asked me, you know,
4  what -- if anyone was going to come back or what were
5  we doing, because obviously the rent wasn't being
6  paid.  And I told them, I said, Well -- you know, I
7  told them that there was a new ownership, that the
8  owner is Vert Capital.  I gave them the contact
9  information.  That's -- I gave them the contact
10 information of Mr. Levin, who was my superior at that
11 time, and his cell phone number, and I said, Well, you
12 may want to contact them because I don't know what
13 they want to do.  I don't know if they want to -- you
14 know, I don't know.  You should ask them.
15         And then I got a call a day after from
16 Mr. Levin cursing me out and telling me to not give
17 out his number ever again to anyone.  That was the
18 feedback I got there.  But I don't know what their
19 conversations were, and I don't know what the intent
20 was with the office.
21     Q.  What secured creditors did Haimark Ltd.
22 have besides Centennial Bank?
23     A.  That was really it.  Let me think.  Let
24 me think.
25         There was Centennial, of course, with

---

82

1  the credit card facility.  There was -- that's all I
2  can think -- that's all I can think of at the moment.
3  So that doesn't mean there weren't anyone else, but
4  just thinking about it, that's all I can think of at
5  this moment.
6      Q.  Well, and if you ever, in the middle of
7  the night, wake up and have another answer, you tell
8  Jeff, I'll -- you know, he'll probably -- it's okay if
9  he tells me, right?  Okay.  All right.
10     A.  Yeah.
11     Q.  Other information that comes to mind?
12     A.  Absolutely.
13     Q.  Okay.  Did you guarantee any debt of
14 Haimark Ltd.?
15     A.  No.
16     Q.  Do you know who the creditors of Haimark
17 are?  Besides, I mean, the --
18     A.  It's a long list because you have
19 passengers, obviously, you have clients.  So it's --
20 that would be a substantial list.
21     Q.  And I assume there is some overlap with
22 the Haimark Line creditors as well?
23     A.  Some of the creditors may be one and the
24 same, yes.
25     Q.  But as far as the passengers, maybe not

---

83

1  so much, right?
2      A.  I -- that is hard to say.  I don't think
3  so.  There could -- I don't know.  You know, I don't
4  know.  Could be.  Could be that someone went on a -- I
5  don't think that we would have someone that booked two
6  cruises that they didn't consume, but I don't know,
7  you know.  I don't know.  Unlikely but possible.  I
8  don't know.
9      Q.  Did --
10     A.  That's -- yeah, I don't know.
11     Q.  And to figure out who those creditors
12 would be, we kind of need the QuickBooks to do that?
13     A.  QuickBooks or accounting records.
14 Anything that's -- again, when I left -- well, so
15 these five days before April 29th, that Friday, that
16 last Friday in April, Abramowitz had us basically
17 empty everything and put it in one office to get ready
18 for transport or shipment.
19         So we emptied all the files, went
20 through all files, and emptied them out and put them
21 in bankers boxes for storage because at the time it
22 was the understanding that this office probably is not
23 going to -- they're not going to renew the lease,
24 they're not going to pay the lease, and so you can't
25 just -- can't just walk out with all of that stuff.  I

---

84

1  mean, there is personal information in there, there is
2  passenger information in there, there is -- you should
3  store it somewhere.  Plus, we were under the
4  impression it would file for bankruptcy eventually
5  anyway.
6          So we packed it all up and so, you know,
7  everything's -- everything when we left was packed up
8  in an office.  Computers were there.  All the
9  inventory was there.  And Abramowitz had Haimark Line
10 files shipped out to his office, but the Haimark Ltd.
11 files were in that office ready to -- for someone to
12 properly store them.
13     Q.  And you think Joel Laufer got copies of
14 those?
15     A.  He has -- I don't know what he got.  He
16 was there, and he was there when I was not there, so I
17 don't know --
18     Q.  He's moving into this suite tomorrow.
19     A.  Oh, really?
20     Q.  Yeah.  So I probably have a hell of a
21 conflict.
22         MR. BRINEN:  I believe that I was copied
23 on an e-mail from him.  It was an e-mail expressing
24 frustration that he didn't have the material he
25 needed.

---

21 (Pages 81 to 84)

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

85

1      MR. DUNNING:  That sounds like Joel,
2  yeah.  And as responsive as they've been in this
3  action, I mean, why would I think otherwise?
4      A.  Yeah, I don't know exactly what he -- I
5  don't know what Abramowitz told him.  I don't know
6  exactly what he was provided.  I know that he was in
7  the office.  I never met Joel Laufer.  I had one or
8  two telephone calls with him.  But my suggestion was
9  to -- let's just wait until I'm back, and I will find
10  all of this and we keep the accountants here so it's
11  done properly, and that never happened.
12      And then what I did after I left, I --
13  on my own accord, I tried to mitigate.  I contacted
14  all our clients, like -- you know, like your clients,
15  and said, Well, listen, here, this is awful, but
16  here's what we had.  This is the -- this is the net
17  rates we had, this is what you surcharged, so here is
18  your information.
19      I put the vendors and the clients
20  together in order to mitigate.  Because all these
21  people that I knew for a long time in Southeast Asia,
22  they were -- they were -- you know, a lot of that
23  stuff is done with trust.  You know, they trust you.
24  They're like, Okay.  Well, we know you.  We trust you.
25  We build this ship and make it available.

86

1      So I came back in the end and tried to
2  mitigate and put people together.  Went to Vantage,
3  said this is our partner here, this is our partner
4  there.  This is what the margin was.  This is the net
5  rate.  So if you take that and if you -- if you pay
6  the net rates, you should be whole in two or three
7  years, depending on your volume.
8      And then on the other hand side, I went
9  to the shipowners and said, Well, here is the clients
10  we had, and you charge them our rates, you still get
11  the business, you still have the boats there, you
12  know, you're not going to have any major harm after --
13  other than a few cancellations.  And I put people
14  together on my own accord, because Vert never did
15  anything.
16      I couldn't do this with the -- with the
17  individual travelers, but knowing that the majority
18  was charters and companies, that's all I could do.
19      Q.  (BY MR. DUNNING)  Do you know if Ltd.
20  owes any tax -- taxes, do you know?
21      A.  No.  It doesn't.  As of April 29th, did
22  not owe any taxes.  Neither did Haimark Line.  All
23  it -- again, up to -- up to the point Vert came in and
24  consumed the deal in February, those companies were
25  run perfectly clean.

87

1      There was no tax that wasn't paid.
2  There wasn't any -- there wasn't laws that were broke.
3  You asked about lawsuits.  They were perfectly fine
4  and reputable companies.
5      Q.  What kind of business are you doing at
6  Amadeus these days?  I mean, same sort of thing?
7      A.  Amadeus is a European shipowner.  They
8  own 14 cruise ships, and I work there.  I got a job as
9  a -- you know, to do sales and marketing.
10      Q.  Okay.  So you're not doing exactly the
11  same kind of work you did at Haimark, or you are?
12      A.  No.
13      Q.  No?
14      A.  I am not at that level there.  I'm doing
15  sales and marketing for international markets, so I
16  sit in the airplane all week and fly all over the
17  place trying to get people to buy river cruises.
18      Q.  People like Vantage and others or
19  charters or --
20      A.  Vantage would be a competitor.  It would
21  be a conflict of interest.
22      Q.  Okay.  All right.  Just trying to figure
23  it out.  When's the last time you spoke with Lisa
24  Larue?
25      A.  A year ago.

88

1      Q.  Okay.  When she left?
2      A.  A year ago in January.  Yeah, January.
3      Q.  Okay.  What about Hans Rood?
4      A.  Hans Rood I saw in London at the World
5  Travel Market in October.
6      Q.  Okay.  And he's not affiliated with --
7  because he left Haimark before you did, right?
8      A.  Yeah.  Two or three weeks maybe.
9      Q.  Okay.  What about Richard Burkemper?
10      A.  I talked to Dick three weeks ago, maybe
11  four weeks ago.  He checked in, how things were.  I
12  gave him updates that there was an involuntary
13  Chapter 7.
14      Q.  Does he owe money to Haimark Ltd.?
15      A.  No.
16      Q.  Okay.  Well, you know, I haven't seen
17  any books and records, so I don't know.
18      A.  Right.  No, I know.  No.  I mean, he got
19  guaranteed payments, and he -- you know, he provided
20  services for them.  But, no, I mean, he did -- no,
21  it's. . . Not that I know of.
22      Q.  But Tom Markwell does owe money?
23      A.  Yes, there is a note that's -- for Tom
24  Markwell.
25      Q.  How much did you say it was?  I forgot.

22 (Pages 85 to 88)

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

89

1     A.  300, maybe -- about 350,000, maybe 340.
2     **Q.  Right around the same as yours?**
3     A.  Little lower.
4     **Q.  Okay.  And you told us that Hai doesn't**
5  **owe any money?**
6     A.  No.
7     **Q.  When did you last talk to Markwell?**
8     A.  A year -- well, 14 months ago.
9     **Q.  Oh, okay.**
10    A.  Yeah.
11    **Q.  What about Hai, when did you last speak**
12 **with him?**
13    A.  Seven months ago.  At about the time
14 when we closed down the office.
15    **Q.  Okay.**
16    A.  And we had some -- we had follow-up
17 conversation several weeks after that because I worked
18 together with him and through him in order to
19 facilitate some of those, you know, mitigation
20 efforts.
21    **Q.  What about -- when did you last speak to**
22 **Steven Dobbins?**
23    A.  I saw him at the World Travel Market,
24 too, but I didn't talk to him.  Last time I spoke to
25 him was in April -- in April of last year is when we

---

90

1  spoke, I think.  Yeah, that was the last time.
2     So the reason was that Joel Laufer
3  wanted me to have him sign off on the bankruptcy
4  because he was one of the owners of the company, and
5  so that's why, you know, they -- I asked Vert to call
6  him, as the owner.  And they didn't want to, and then
7  Joel said, Well, can you contact him.  And I did, and
8  I had a conversation with him, which I documented to
9  Joel, in regards that Steven Dobbins wouldn't object
10 to a bankruptcy filing and everything was clear to --
11 basically to file a bankruptcy, and then Vert decided
12 against it.
13    **Q.  Does he still own part of Ltd.?**
14    A.  Steven Dobbins?  He -- yeah, he -- he
15 does because -- I mean, I don't know legally if he
16 does, but my understanding is that he does because he
17 never signed the document with Vert, the exchange
18 agreement.  I don't think -- I may be wrong with that,
19 I don't know.
20    **Q.  Okay.**
21    A.  But there was a conflict -- there was
22 some -- they had -- they talked to each other and
23 there was certain things not clear.  But I don't know
24 if he ever did or not, so I don't know.
25    **Q.  Okay.  What about Dan Wolf, do you still**

---

91

1  talk to him or --
2     A.  Yeah, we had a conversation a few weeks
3  ago on a personal level.
4     **Q.  Okay.  Because he's still practicing,**
5  **right?**
6     A.  Yeah.
7     **Q.  Yeah, okay.  I just haven't seen him for**
8  **several years, so I didn't know.**
9     A.  No, no.  He is.  I think.
10    **Q.  Bob Henry?**
11    A.  Yeah.  I talk to Bob Henry frequently.
12    **Q.  What does he do now?**
13    A.  He's an independent CPA.
14    **Q.  Is he local, around here, or --**
15    A.  He's in Florida.
16    **Q.  Oh, okay.  All right.  He didn't own any**
17 **of --**
18    A.  No.
19    **Q.  -- Haimark?  Okay.**
20    A.  He was -- he was an independent
21 contractor that came in and helped with accounting
22 from time to time.
23    **Q.  So who else at Vert did you deal with**
24 **besides -- well, I guess Abramowitz, we're not sure if**
25 **he was really with Vert, but we had Levin?**

---

92

1     A.  So Vert -- there were two Vert guys.
2  There was Adam Levin and his partner --
3     **Q.  Pope?**
4     A.  Yes, Pope.
5     **Q.  Michael Pope?**
6     A.  Yes.  So I met Michael Pope on a few
7  occasions, although Michael Pope always tried to keep
8  a certain distance, but I met him a few times, and we
9  talked about that -- obviously, once we were aware of
10 everything, but it was -- it seemed to me that it was
11 mostly Adam Levin's deal.  But Pope was definitely
12 involved, obviously, shows up on documents, random
13 signatures and everything.
14    **Q.  Were there payments that ever went**
15 **directly to Adam Levin or Michael Pope or to Vert?**
16    A.  No.
17    **Q.  So --**
18    A.  Not that -- I shouldn't say that.  I
19 didn't -- not as long as I was there.
20    **Q.  Okay.  But there were payments to**
21 **Abramowitz through those invoices?**
22    A.  Yes.
23    **Q.  Okay.**
24    A.  And there were other fringe benefits
25 supplied to Vert like, you know, the travel in

---

23 (Pages 89 to 92)

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

---

93

1  Southeast Asia and whatever.
2      Q.  And is one of the attorneys from the
3  East Coast, was that Steven Weis or "Vice"?
4      A.  Yes, exactly.  That was the
5  transactional attorney, um-hum.
6      Q.  Okay.
7      A.  Steven, and I think his son or whatever,
8  there was two Weises, but Steven was the senior.
9      Q.  Okay.  What about Haimark Cruise Line,
10 what's that, do you know?  Was that another kind of
11 name that kind of came up when Haimark Affinity Travel
12 came up?
13     A.  Yeah.  So I think there's two more
14 companies that were incorporated, but they were --
15 were never active.  So there was no accounts, there
16 was no activity.  There was just a -- we didn't do
17 anything with them basically.
18     Q.  How does Haimark S.A. fit into --
19 especially, let's say, the funds that Centennial's
20 holding.  Are any of those funds Haimark S.A.'s?
21     A.  Well, again, they're all -- at the end
22 of the day, all of these entities, all of these
23 operating entities are somehow commingled, you know.
24         So could you -- could there be an -- in
25 this specific amount that you're holding, could there

---

94

1  be, you know, a certain portion of Haimark S.A. in
2  there?  Likely.  How much it exactly is, I don't know.
3      Q.  Okay.  So it could be.
4      A.  Could be, yes.
5      Q.  Were there escrow agents for any Haimark
6  Ltd. business?
7      A.  Yes.  There was one escrow agent that we
8  used in Breckenridge, Mike Connelly, and he was the
9  escrow agent for all of our escrow accounts outside of
10 the federal mandated accounts, because he didn't
11 qualify for that.
12     Q.  So tell me how that worked, then, with
13 Connelly.  How did that work?
14     A.  So we had, for example -- of the escrow
15 accounts.  So we had an escrow account with
16 Centennial, and -- for certain customers.  So we had a
17 customer that says, Okay, fine, very much to the -- to
18 the mechanism I explained before where we had someone
19 that, you know, wanted us to guarantee space one or
20 two years before, and we required payment, and that
21 specific customer would say, Okay, fine.  I'll pay,
22 but I want this in an escrow account because -- you
23 know, we started with that because the ships weren't
24 built, you know.  I mean, it's easy to sell you a ship
25 in Burma.  You know, you've never been there, and God

---

95

1  knows, you know, you don't know if they built that or
2  not, right?
3          So you say, Okay, fine.  I like the
4  business idea and I'll pay money, but it's going to --
5  I need to see the money in escrow.  So what we did is
6  we started -- and we did this at the beginning
7  especially, trying to promote it and then also, you
8  know, create those escrow accounts to offer to people
9  in order to be -- you know, to be -- to have a viable
10 proposition.
11         So we had -- we worked with -- I went to
12 Centennial and said, Well, we want to do escrow
13 accounts.  Can you help us with that?  They're like,
14 Well, no.  We don't want to get involved in that.  We
15 don't have an escrow agency -- an escrow agent, we
16 don't have a legal department, blah, blah, blah, but
17 we -- we work with Mike Connelly on that and, you
18 know, he can be the escrow agent.
19         I said, Well, if you are comfortable
20 with him, I don't care.  It's got to be a third party
21 and ideally should be an attorney.  So we did.  So we
22 had an escrow agent and an escrow agreement.  So
23 those -- those were three-party agreements on each
24 escrow account that were signed by us, by the escrow
25 agent, and by the customer.

---

96

1          So those were three-party agreements,
2  and then we had, with that, a -- an account, and
3  that's how those escrow accounts came about.
4      Q.  Are there still funds in escrow at
5  Willis & Connelly?
6      A.  No, I don't think so.  I think -- I
7  think all the escrow accounts were dealt with and they
8  were disbursed, and they were -- unless I'm mistaken.
9  I don't think so.
10     Q.  Okay.  What's Lotus Cruises?
11     A.  Lotus Cruises is a vendor.  So that's
12 one of the companies that built a ship for us.  Also
13 that's a -- in that case, that's a shipowner that owns
14 a ship in -- on the Mekong, the Mekong Navigator.
15     Q.  Okay.
16     A.  It's a 1,600-ton vessel, has about 64
17 passenger capacity.  It was the first vessel that we
18 started building with them.
19     Q.  Are they still in business today?
20     A.  Yes.  The owner actually owns oil
21 platforms in the South China Sea.  It's a very, very
22 wealthy and influential Vietnamese family, the Binon
23 (phonetic) family.
24     Q.  And so, what, have they just hooked up
25 with a different travel agent at this point?

---

24 (Pages 93 to 96)

**MARCUS LESKOVAR - 12/8/2016**
**In Re:  Haimark, Ltd (Debtor)**

---

97

A.  Independently wealthy.  I mean, they're worth billions.  But they can -- they have what I -- you know, how I explained before, I contacted all of these families, all of these owners, right after April in order to mitigate.  So I -- you know, I introduced them to Vantage, I introduced them to Abercrombie & Kent, to all of our large other clients, so that's how they're operating now.  They are indirectly with existing clients that we had at that time.

So they are still dealing with Vantage, with Vantage enjoying a -- for example, just as an example, a net rate that we had, therefore achieving savings, and hopefully making up some of the losses they had, and the shipowner is still getting their business and the passengers, this time directly from this tour operator, for example.

So they are still all operating, and I'm in touch with these companies from time to time because it's a very, very small industry.  Those companies are very large, they're very influential, so they're in every big conference and trade shows, the same trade shows I have to go for my job, and so I meet and talk to these people from time to time.

Q.  So the arrangement's continuing but Haimark's just out of --

---

98

A.  Exactly.

Q.  The middleman's gone, is what you're saying.

A.  Exactly.  The middleman's gone, and there is direct arrangements that I helped initiate in a mitigation effort with former Haimark clients that now became the clients of the shipowner, with the difference that the middleman is gone, and the margin that the middleman made goes to the benefit of, in most times, our clients that had a loss.  So they are making up the loss, and once they make that up, it's a win for them.

Q.  And is Paukan Cruises kind of the same thing?  I'm sure it's --

A.  Paukan Cruises is a company that is a company in Myanmar, and they -- that company has operated, or is operating the -- two ships on the Irrawaddy, the Avalon -- the Avalon Myanmar and the Irrawaddy Explorer, and same arrangements there.

I just met them again at the World Travel Market in London, too, so I know that they have the same arrangements, that they continue to operate directly.

MR. DUNNING:  I think that's all I've got.

---

99

MR. HEAPHEY:  I have nothing.

MR. CASTRO:  No questions.

MR. BRINEN:  I don't have any questions.

WHEREUPON, the within proceedings were concluded at the approximate hour of 5:57 p.m. on the 8th day of December, 2016.

*   *   *   *   *

---

100

I, MARCUS LESKOVAR, do hereby certify that I have read the above and foregoing Rule 2004 Examination and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.

Amendments attached   (  ) Yes   (  ) No

_____
MARCUS LESKOVAR


The signature above of MARCUS LESKOVAR was subscribed and sworn to before me in the county of _____, state of _____, this _____ day of _____, 2016.


_____
Notary Public
My Commission expires:


Haimark, Ltd., Debtor 12/8/16 (sw)

---

**MARCUS LESKOVAR - 12/8/2016**
**In Re:  Haimark, Ltd (Debtor)**

101

```
                    REPORTER'S CERTIFICATE
STATE OF COLORADO        )
                         )  ss.
CITY AND COUNTY OF DENVER )

          I, SHERRY A. WALLIN, Certified Realtime
Reporter, Registered Merit Reporter and Notary Public
ID 19874212873, State of Colorado, do hereby certify
that previous to the commencement of the Rule 2004
examination, the said MARCUS LESKOVAR was duly sworn
by me to testify to the truth in relation to the
matters in controversy between the parties hereto;
that the said deposition was taken in machine
shorthand by me at the time and place aforesaid and
was thereafter reduced to typewritten form; that the
foregoing is a true transcript of the questions asked,
testimony given, and proceedings had.
          I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

          IN WITNESS WHEREOF, I have affixed my
signature this 16th day of December, 2016.

          My commission expires May 14, 2019.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.
```

26 (Page 101)

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                          )  ss.
CITY AND COUNTY OF DENVER )


        I, SHERRY A. WALLIN, Certified Realtime
Reporter, Registered Merit Reporter and Notary Public
ID 19874212873, State of Colorado, do hereby certify
that previous to the commencement of the Rule 2004
examination, the said MARCUS LESKOVAR was duly sworn
by me to testify to the truth in relation to the
matters in controversy between the parties hereto;
that the said deposition was taken in machine
shorthand by me at the time and place aforesaid and
was thereafter reduced to typewritten form; that the
foregoing is a true transcript of the questions asked,
testimony given, and proceedings had.

        I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

        IN WITNESS WHEREOF, I have affixed my
signature this 16th day of December, 2016.

        My commission expires May 14, 2019.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.




_____
Sherry A. Wallin
Certified Realtime Reporter
Registered Merit Reporter

**A**

abandon 24:2
79:19
abandoned 10:12
24:5 25:16 45:4
50:20 69:10 81:1
Abercrombie 1:12
2:2 16:3 74:12
97:6
abided 46:3
able 25:21 26:13
27:21 69:18
Abramowitz 13:7
13:11,14 18:13
19:6,8,10 20:1
21:8,13,19,24
22:6 23:8,9,13,14
24:24 25:6 26:16
37:1 38:19 43:6
46:10,12,17 47:10
49:11,18,19,21
50:1 55:15 64:18
65:20,25 66:13,22
66:24 67:9,15,18
69:13,21 70:7
75:24 76:1 79:16
79:22 80:9 83:16
84:9 85:5 91:24
92:21
Abramowitz's
13:13
absent 23:11
absolutely 25:6,12
82:12
accept 12:25 48:2
accepted 12:24
access 38:20 41:20
41:22 48:24 50:13
53:18 67:25
accessible 76:20
77:10 79:12
accident 17:16 22:5
55:25 56:11 57:7
58:21 59:7,16
61:1

accord 40:16 85:13
86:14
account 48:4,8,12
48:18 49:8 51:2,4
71:14 94:15,22
95:24 96:2
accountant 41:14
accountants 51:23
85:10
accounting 38:23
38:24 39:19 47:6
50:11 51:24 64:11
64:15 69:1 83:13
91:21
accounts 7:25 28:2
28:7 51:8 69:8,14
69:20,22 73:15,18
73:20 75:10 79:10
79:11 93:15 94:9
94:10,15 95:8,13
96:3,7
accumulated 54:10
accurate 100:3
achieving 97:12
acknowledged
11:16
acquire 30:18,18
31:3
acquired 9:20,20
11:25 18:2
act 69:19
acted 66:6 70:21
action 57:1 60:7
85:3
active 21:1 93:15
activity 93:16
Adam 13:6,10,10
33:7 92:2,11,15
add 28:11 69:20
added 69:14
additional 6:22
42:4 52:6
address 4:15,16,22
adequate 18:17
administered 60:25

administrate 46:14
administrated 12:8
33:15
administrates
55:16
administrating
49:19
ADRIAN 2:14
advice 75:2
affect 56:5
affiliated 6:12 88:6
Affinity 7:22 93:11
affixed 101:15
aforesaid 101:8
agency 95:15
agent 34:10 51:11
51:15 94:7,9
95:15,18,22,25
96:25
agents 94:5
aggressive 74:21
74:22
ago 27:16,18 40:17
52:1,18 59:23
69:3 87:25 88:2
88:10,11 89:8,13
91:3
agreed 20:6 67:13
agreement 18:20
34:14 36:19 37:7
90:18 95:22
agreements 95:23
96:1
ahead 21:11 71:3,5
aircraft 59:3
airline 56:19 58:16
58:16
airplane 30:19
87:16
airport 22:23
Allision 56:2,4
altogether 54:9,10
77:6,9
Amadeus 5:1 87:6
87:7

Amazon 9:8
amendments 100:5
100:6
amends 64:4
America 9:7
American 14:17
amount 42:2 55:8
68:13 71:10 72:12
93:25
Amy 40:24,24
41:10 52:1
and/or 19:10
Angeles 32:16,20
39:12
annuities 73:13
Anschutz 31:4 32:6
answer 28:4 47:8
53:22 60:21 82:7
answered 13:24
23:23 60:12
answering 5:9 25:9
answers 13:22
anybody 40:9
45:10 49:10 51:19
69:4
anymore 26:9
69:11,17 75:6
79:18
anyway 22:7 25:14
84:5
apparently 19:25
23:25 32:11,14
33:18 34:17 35:13
50:16
appearance 31:16
application 38:11
38:11
approached 31:13
43:6
approval 78:3
approximate 99:5
April 9:23,25 10:8
10:10,16 19:22
20:12 21:15 23:3
24:5 26:5 27:1,20

28:1 38:6 39:22
41:6 54:13,19
80:13 83:15,16
86:21 89:25,25
97:4
argument 20:8
arrangement's
97:24
arrangements
59:11 64:4 75:2
98:5,19,22
Art 72:20
article 31:10
articulate 6:8
Artwork 72:20
Asia 11:1 14:18
15:3,12,17 20:16
33:14 37:22 76:4
85:21 93:1
Asian 9:4 14:21
asked 22:15 27:6
43:2 66:8 81:3
87:3 90:5 101:9
asking 78:21
assets 54:15
associated 76:1
assume 49:4 82:21
assuming 7:14
attached 60:14
100:4,6
attempt 31:3
attorney 22:1,2,5,6
23:10 25:7 34:1
36:24 93:5 95:21
attorneys 36:20,21
36:22 51:17 67:19
75:23 93:2
Austrian 11:9
authority 26:9,14
69:11,17 70:8
authorization 63:8
available 15:3 28:7
28:21 29:19 49:5
74:17 85:25
Avalon 98:18,18

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

avoid 5:12
awake 33:24,24
aware 17:6 26:1
  39:14 92:9
awful 59:9 85:15

**B**

B 35:25 36:1
back 18:5 20:4
  22:11,23 23:1,17
  23:17 24:4 25:5,8
  37:5 42:3,4 43:15
  49:16 50:5 55:11
  55:13 57:19 60:15
  70:4 77:12,13,16
  80:3,4 81:4 85:9
  86:1
backed 31:6
backtrack 9:17
backup 39:9,21
  45:16 50:11
backups 50:12
bad 5:8 31:23
  73:20
balance 48:25
bank 2:7 7:25 28:1
  28:6,15 50:24,24
  51:2,3,4,6,7,9,10
  69:8,14,20 71:16
  81:22
bankers 83:21
bankruptcy 1:1,2,4
  5:16 7:10 22:2
  23:9,11,16 24:6
  25:2 26:7 27:3,7
  45:9,13 49:12,12
  60:5 74:25 78:2
  78:23 84:4 90:3
  90:10,11
banks 50:23 51:1
  69:15 70:2
barrier 15:23
based 6:6
basically 9:2 14:6
  16:22,25 17:7

20:19 30:8 35:16
  38:12 61:8,14
  70:21 74:23 83:16
  90:11 93:17
basis 42:8 47:25
bear 14:1
beginning 12:3
  14:24 60:10 66:12
  95:6
behalf 1:11 32:18
  34:18 38:20 51:20
  65:3,7 68:23
  75:24
Belford 4:16
believe 47:20 63:7
  70:9 84:22
believed 57:16
benefit 98:9
benefits 76:2 92:24
Berardini 2:4
Bernstein 43:17,17
  44:6,7 52:8
best 38:7 40:11,24
  64:3
better 35:10 66:19
beyond 5:19
Bible 34:20
big 44:20,22 54:22
  57:14 66:11 73:5
  97:21
bill 18:13 79:18
billions 58:9 97:2
bills 27:21,22
Binon 96:22
bit 27:18 55:17
  76:15,17
blackmailing 74:23
blah 32:1,1,2 95:16
  95:16,16
blocked 57:7
board 15:25 16:3
boat 55:19
boats 15:20 86:11
Bob 41:13,14 91:10
  91:11

bonds 73:12
book 32:25 34:6,7
  34:8,11 72:12
booked 64:5 83:5
books 38:3 41:20
  88:17
Boulevard 1:13 2:5
  27:9 32:17 39:11
boutique 30:13
  31:16
Box 2:10
boxes 83:21
branched 16:10
brand 7:23 56:10
  59:9
break 75:12
breakfast 21:14,23
Breckenridge 94:8
Brinen 2:18,19
  33:19,21 44:15
  76:24 77:11 84:22
  99:3
brings 66:18
broke 87:2
brokered 9:3
brought 6:23 12:14
  12:17 13:11 17:13
  57:21 59:5,17
  66:13,16 67:6
Brown 2:4 22:1
Brownstein 22:2
build 15:24 85:25
building 16:1 80:15
  96:18
built 74:16 94:24
  95:1 96:12
Burkemper 88:9
Burma 94:25
business 6:17,21
  8:1 9:14 10:4,5,21
  11:14,18 12:15
  14:20 15:13 16:5
  18:8 23:5 24:23
  27:9 29:4,25
  31:10 33:8 34:2

39:20 43:10 45:18
  56:21 64:23,24
  72:25 73:1,23,24
  76:4 86:11 87:5
  94:6 95:4 96:19
  97:15
busy 21:20 47:8
buy 18:9 42:4 48:4
  74:2 87:17
buying 35:4

**C**

C 2:1 35:25 36:3
cabins 35:12
California 2:15
call 20:11 21:7,13
  56:1 81:15 90:5
called 14:22 20:21
  23:23 25:13 33:2
  33:3 48:13 58:1
calls 19:8 85:8
canceled 77:13,22
cancellations 86:13
capacity 13:13
  63:10 66:2,6
  69:19 96:17
capital 9:20,21
  24:14 28:21 30:12
  33:4 39:11 43:3
  50:10 66:4 74:19
  79:14 81:8
Capital's 75:11
capitalist 30:9
captain 58:16,22
  59:2
captured 71:13
car 22:5,6 80:1,2
card 28:16 37:21
  71:7,9,11,13
  77:13,23 82:1
care 29:20 36:19,20
  36:21 43:9 50:17
  66:19 67:11,22
  95:20
cared 29:24

carrier 56:10,19
carries 58:6
carry 20:7
case 1:3 8:7 25:24
  26:3 48:21 76:21
  77:24 96:13
cash 12:7 28:8 30:4
  30:4 32:1 72:3
  76:22
CASTRO 2:14
  99:2
casualty 8:8 29:11
  30:16,22 48:15
  56:11
catastrophe 56:1
catch 22:24
caught 22:9 31:12
CBRE 80:22
CD 76:12
cease 10:4
cell 81:11
Centennial 2:7
  28:15,20 29:13,17
  50:24 51:3 62:14
  69:24 70:10,14
  71:15 72:4,9
  76:13,16,22 77:16
  77:18 79:7 81:22
  81:25 94:16 95:12
Centennial's 93:19
CEO 33:8
certain 9:13 15:16
  34:23 36:8 42:2
  43:11 45:24,24,25
  45:25 55:1 62:17
  66:24 72:16 74:6
  74:7 90:23 92:8
  94:1,16
certificate 47:25
  48:13 72:21,22
  101:1
Certified 1:14
  101:4
certify 100:1 101:5
  101:11

cetera 79:22
CFO 40:23 52:1
chairman 33:9
change 11:21 12:20
   12:22
Chapter 1:4 7:10
   45:7,14 46:14
   49:20 78:7 88:13
charge 12:7 19:1,1
   68:16 71:9 86:10
chargeback 77:23
charged 5:16 23:15
charges 28:16
   71:13 77:12,12
charging 18:10
charter 58:14,16
   73:24
chartered 8:16
   57:24
charterer 73:6
charterer's 73:2,2
   73:6,7,10
charters 58:17
   86:18 87:19
checked 33:17
   88:11
Chicago 27:12,13
   27:16 52:19
chief 46:12
China 15:20 96:21
CHRISTOPHER
   2:8
CITY 101:3
Civil 4:2
claimed 32:6
clarify 55:17
class 35:25 36:1,3
   57:1
clean 23:21 86:25
cleaned 50:18
clear 10:22 57:3
   66:20 67:8 90:10
   90:23
clerks 52:6
client 8:7 16:2,4

19:3,17,18 28:19
   41:15 54:25 68:10
   69:2 74:6
clients 13:20 15:11
   16:4 19:5,9,11,13
   25:1,23 31:2
   32:18 54:25 56:17
   56:18 57:16 73:25
   74:21 82:19 85:14
   85:14,19 86:9
   97:7,9 98:6,7,10
Clipper 58:2
Close 61:13
closed 69:8 89:14
closing 32:24,25,25
   33:10,11,13,15
   34:3,3,6,7,7,8,11
   34:19 36:17,23
   67:20
cloud 38:11
cloud-based 38:17
   41:23
club 73:3
CNN 56:15
co-owners 12:10
Coast 42:23 44:8
   58:23 60:7 93:3
Cole 27:9
collapse 20:17
collateral 28:15
   60:8
collision 56:3
Colorado 1:1,13,13
   1:15 2:5,6,11,16
   2:20 4:17 27:14
   80:18 101:2,5
come 15:4 18:3
   20:22,22 21:17
   22:15 45:10 50:17
   81:4
comes 12:1 20:2
   32:12 44:14 49:21
   54:7 58:17 61:24
   71:11 82:11
comfort 35:13

comfortable 75:5
   95:19
coming 37:25
   57:19
commandeering
   18:22 20:2
commencement
   101:6
commingled 28:25
   29:14,14 62:13
   70:18,20,23,24
   71:7,12 76:14
   78:11,14,19 93:23
commingling 29:2
   79:8
commission 45:19
   47:22 57:10 76:25
   100:20 101:18
communicated
   19:18,19
communicating
   74:20
communications
   19:18
companies 8:7,10
   15:20 17:23,23
   18:2 29:8 30:14
   31:17 32:5 33:2,5
   34:18 35:17,21
   36:8,8,11,13
   42:15,17 43:18
   53:19 54:5,11
   62:12,16 65:8
   66:18 68:1 70:21
   70:22 86:18,24
   87:4 93:14 96:12
   97:18,20
company 6:15,15
   7:24 8:5 10:23
   11:24,25 12:12,14
   12:17 13:1,17,17
   14:16,22,23 16:8
   17:1,4,15,18,19
   17:20,21 18:4,11
   18:12,14,22 19:17

20:2,6,17 21:1,24
   22:14,18,18,19
   25:7 26:1 29:3,6,7
   29:7,10 30:9,12
   30:17,23,23 31:20
   31:21 32:11,18
   33:2,3,4 34:5,10
   35:4,19,23 39:3
   41:1 42:23,24
   43:16,23 44:3,24
   52:3 54:7 57:9,13
   57:20 58:1,17
   62:8,18 63:17
   65:13,20 66:4,17
   66:20 67:4 68:16
   68:17,23 69:3,7
   70:3 77:23 79:13
   80:20 90:4 98:15
   98:16,16
company's 12:14
competitor 87:20
complained 18:19
complaining 71:22
complaint 71:8
complete 31:20
completely 57:18
complicated 35:6
   45:22
computer 38:21,23
   39:3 44:24 45:10
   49:7 50:10
computers 38:16
   39:23 40:1 50:13
   72:10,11,15 84:8
concerned 43:5
concluded 99:5
conclusion 59:8
conference 97:21
confirmed 34:9
conflict 84:21
   87:21 90:21
Connelly 94:8,13
   95:17 96:5
consider 69:16
considered 58:7

consolidated 27:15
   27:17
consolidating
   52:19
consolidation
   52:20
consulting 18:15
consume 83:6
consumed 48:11
   80:2 86:24
contact 70:6 81:8,9
   81:12 90:7
contacted 31:9
   70:2 81:2 85:13
   97:3
contacts 15:6,12,16
continue 20:16,17
   20:24 26:4 28:12
   98:22
continuing 97:24
contract 12:18,24
   12:25 20:3 34:22
contractor 41:25
   91:21
contracts 12:24
contractual 13:19
control 19:16,17
controlling 43:5
controversy 101:7
conversation 21:24
   89:17 90:8 91:2
conversations
   19:25 54:21,23,24
   55:2 81:19
COO 9:21
cooperating 74:24
copied 84:22
copies 39:7,13,15
   39:16 40:3,8,9,20
   43:25 44:2,4
   46:16,24 49:10
   84:13
copy 26:19 34:7,11
   38:21 39:18
copying 26:16

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

**corporate** 25:18
68:14
**correct** 6:16 7:5,11
7:17,19 13:4,9
25:19 38:4,5
42:14 45:7 49:2
50:24 51:14 55:22
56:7 60:20,21
62:10 70:12 79:1
**correctly** 24:14
**cost** 57:9
**counsel** 5:24 45:12
46:8 101:11
**count** 14:11
**countersigned** 34:8
34:19
**countries** 11:3
14:20,21
**county** 100:14
101:3
**couple** 41:4
**course** 6:23 11:14
39:20 45:16 64:22
64:24 72:10 81:25
**court** 1:1 4:17 73:9
**covered** 61:20,21
61:21,22
**CPA** 43:7 91:13
**crash** 30:19 56:20
59:1
**crashed** 58:21
**create** 95:8
**created** 7:23
**credit** 28:15 37:21
71:7,9,11,12
77:13,23 82:1
**Creditor** 2:7
**creditors** 1:12 2:2
2:12 81:21 82:16
82:22,23 83:11
**crew** 12:14 23:2,4
58:17
**cruise** 8:5,6,15,16
8:16,17,19,19
11:1 14:19 15:1,2

15:9 35:11 48:1,5
48:5,5,10,18
59:20 61:19 73:5
77:13,22 87:8
93:9
**cruises** 5:1 8:22,24
9:3 14:19 48:16
83:6 87:17 96:10
96:11 98:13,15
**cruising** 16:9,11
**Cuba** 8:17,18,20,22
59:19,21,22 60:2
72:22
**current** 64:1
**currently** 4:25 7:12
10:14
**cursing** 81:16
**customary** 62:5
**customer** 73:22
74:12 77:21 94:17
94:21 95:25
**customers** 14:24,25
15:1 25:1 75:4,8
75:11 76:8 94:16
**cut** 11:12

**D**

**D** 3:1
**damage** 57:2
**Dan** 34:1,7,9 35:15
36:20 51:19,22
90:25
**Danish** 58:1
**date** 17:5 25:24
**day** 10:10 21:7,22
22:8 23:6,22
35:22 40:18 57:12
81:15 93:22 99:6
100:16 101:16
**days** 11:18 18:13
23:20 24:4 37:2
56:15 66:3 83:15
87:6
**deadline** 43:11
**deaf** 20:8

**deal** 13:20 22:7
24:25 25:1,11
36:14 37:10,14
67:23 69:15 86:24
91:23 92:11
**dealing** 28:21
97:10
**dealings** 13:15
54:21 55:21
**deals** 80:22
**dealt** 50:20 66:22
96:7
**debt** 71:10 82:13
**debtor** 1:9 77:17
100:25
**December** 1:6,13
3:2 99:6 101:16
**decided** 10:4 24:14
24:16 90:11
**decisions** 12:1,2,5
13:15 26:18
**declaration** 13:13
**declared** 47:11
58:23,24
**declares** 59:2
**deemed** 67:24
**definitely** 40:7
92:11
**delivered** 48:16
**demanded** 45:23
**Denver** 1:13 2:6,11
2:16,20 27:17
80:16,19 101:3
**depart** 48:2
**department** 51:16
95:16
**departure** 18:14
**depending** 11:13
86:7
**depleted** 79:13
**Deponent** 2:17
**Deponent's** 4:8
**deposit** 74:13 76:8
77:14
**deposition** 5:5,22

101:8
**deposits** 76:6
**description** 11:21
12:5
**destination** 14:22
**detail** 29:25 55:1
**details** 55:6 73:19
**detrimental** 63:16
**diary** 9:24
**Dick** 88:10
**die** 56:20
**died** 56:24,25
**difference** 98:8
**different** 8:3 35:24
42:15,17 51:6
53:19 67:4 70:22
74:6 96:25
**diligence** 31:8
32:17 41:16 67:20
**dilute** 36:4
**diluted** 35:18
**dinner** 22:24
**dip** 62:5
**direct** 98:5
**direction** 13:18
18:23 25:10 55:12
55:14 66:23
**directly** 74:20
92:15 97:15 98:23
**disbursed** 12:8
96:8
**disbursement** 19:2
20:3
**disclosed** 69:2
**discretion** 37:8
**discussion** 22:22
**dismissal** 69:16
**dismissed** 25:15
**distance** 92:8
**distressed** 30:14
66:18
**DISTRICT** 1:1
**Dobbins** 89:22 90:9
90:14
**document** 34:25

35:16 90:17
**documentation**
45:17
**documented** 23:24
31:24 63:6 68:18
69:1 90:8
**documents** 24:10
24:13 25:2 26:4,6
32:25 33:1,6 34:4
34:13,16,17,22
35:14 37:9 47:6
47:12 48:24 52:14
64:11 92:12
**dog** 11:11
**dogs** 11:12
**doing** 35:3 58:12
81:5 87:5,10,14
**dollars** 28:6,16,17
54:2 61:9,12 72:5
72:7 76:17
**dot** 4:23
**drained** 28:3,5,8,9
28:13
**draining** 18:21
28:10 30:22
**dramatic** 31:16
**drive** 22:3 39:10
50:9,10
**drove** 22:4
**due** 31:7 32:17
41:16 67:20 75:9
**duly** 4:6 101:6
**Dunning** 2:4,4 3:3
4:10 61:11 75:12
75:14 77:1,8,20
85:1 86:19 98:24

**E**

**E** 2:1,1 3:1
**e-mail** 4:22 84:23
84:23
**e-mails** 23:24,24
24:15 26:15
**earlier** 48:20 50:22
**earned** 48:9

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

**earnings** 18:7
**ears** 20:8
**East** 42:23 44:8 93:3
**easy** 94:24
**effect** 11:24 56:10
**effort** 98:6
**efforts** 89:20
**Eisenhower** 57:7
**either** 30:17 37:17 40:25 52:22 61:18 66:15 70:5,10 77:16 80:8
**elderly** 10:25
**electronics** 72:15
**embassies** 11:7
**embassy** 11:8,9
**emergency** 23:7 25:12 61:21
**emotionally** 60:14
**employ** 61:18
**employed** 4:25 5:1 5:2,4 11:22 101:11
**employee** 26:10 60:24
**employees** 10:9 29:3 52:16 61:8
**employer** 29:5
**employment** 12:18 12:23,24,25 17:24 34:22
**emptied** 83:19,20
**empty** 83:17
**enable** 65:13,16
**ended** 11:6
**engagement** 13:12
**enjoying** 97:11
**entered** 12:3 69:1
**Enterprise** 38:10 38:15,15 42:16
**entities** 7:5 8:2,4 10:13 17:23 25:17 29:6 32:23 33:7 62:6 75:16 93:22

93:23
**entity** 56:6 62:1 75:25
**entry** 15:23
**entryway** 57:8
**equipment** 72:18
**equity** 32:11 34:13 35:7,20
**escrow** 45:21,21 48:4,7,12,17 51:8 51:10,15,15,16 71:16 94:5,7,9,9 94:14,15,22 95:5 95:8,12,15,15,18 95:22,22,24,24 96:3,4,7
**escrowed** 46:1
**escrows** 77:4
**especially** 30:23 41:15 56:17 93:19 95:7
**ESQ** 2:4,8,14,18
**establishing** 66:2
**estate** 72:1
**estimate** 53:8 77:7
**et** 79:22
**ethical** 10:23
**Europe** 23:7
**European** 87:7
**evening** 21:13
**eventually** 15:25 16:10 24:15 25:21 30:5 31:5 47:10 50:5 84:4
**Evergreen** 2:12 4:17
**everyone's** 24:1
**everything's** 84:7
**evidence** 55:10
**evolved** 15:13
**exact** 53:4,14
**exactly** 40:16 47:3 53:6,20 66:7 71:10 79:23 85:4 85:6 87:10 93:4

94:2 98:1,4
**examination** 1:5,11 3:2 4:9 100:3 101:6
**example** 48:6 66:3 67:20 74:1 76:21 79:6,7 94:14 97:11,12,16
**exchange** 34:14 35:5,15 90:17
**exchanged** 35:17 36:7
**exclusively** 71:23
**Excuse** 71:4
**executed** 34:12,19
**existence** 25:18 45:11
**existing** 97:9
**exotic** 14:20
**expenses** 37:3 61:7 61:21
**expensive** 36:24
**expert** 66:14
**experts** 66:18,20 67:12,25,25
**expire** 42:9
**expired** 42:6
**expires** 100:20 101:18
**explained** 35:14 48:20 70:19 94:18 97:3
**Explorer** 98:19
**exposure** 12:16
**expressing** 84:23
**extent** 5:25 63:20 65:1 78:10,18

_____

**F**

**facilitate** 89:19
**facilitated** 9:3
**facility** 82:1
**fact** 7:15 8:18 18:21 19:24 36:16
**Fairfield** 2:14

**fairly** 37:3
**fall** 8:23
**false** 44:13
**falsified** 34:23,24
**families** 32:12 97:4
**family** 23:7 25:12 32:13 96:22,23
**far** 23:14 25:16 26:19 30:6 35:13 46:9,11,11,13 49:19 50:19,19 80:6 82:25
**fashion** 18:3
**fault** 57:23 59:15 61:6
**feasible** 31:25
**February** 19:21 32:24 33:14 41:18 86:24
**federal** 4:2 45:18 45:19,23 48:6,22 51:5 76:25 77:3 78:4 94:10
**federally** 45:17
**fee** 18:15 24:24
**feedback** 81:18
**feel** 75:5
**fees** 36:20,21,22,24
**feet** 58:6
**fell** 20:8
**figure** 20:23 49:25 83:11 87:22
**figured** 56:22
**file** 23:11 24:6,11 24:13,16,19 25:2 26:6 27:7 43:4,7,8 43:11,12 50:12 52:13,14 74:25 84:4 90:11
**filed** 25:24 26:3 27:3 43:24 44:3 47:22,25 60:5 78:1
**files** 39:19 64:15 80:10 83:19,20

84:10,11
**filing** 23:16 90:10
**fill** 5:17
**final** 20:10,11
**finally** 22:9 54:15
**finance** 9:14
**financial** 12:2,2,5 13:19 31:11 35:7 43:5 47:21 49:22 50:23 63:14 64:3
**financially** 61:2
**financials** 19:2
**find** 15:8 31:1,8 43:16 54:7 64:18 85:9
**fine** 21:5,25 22:11 27:8 74:1,5 87:3 94:17,21 95:3
**fired** 23:3
**firm** 30:13 31:16 33:15,17,25 34:5 43:23 52:8
**first** 4:6 6:12,25 8:17,19,19 16:8 24:22 28:5 31:1 31:15,15 46:20 56:9 59:20 96:17
**fit** 36:11 93:18
**five** 23:20 24:3 51:25 83:15
**fixtures** 72:17
**flew** 31:13
**flight** 22:24
**flip** 74:13
**Florida** 91:15
**fly** 87:16
**FMC** 45:21 46:2 47:24 48:4,13,18 51:4,8,8 72:21 77:5,14,15,20,25
**FMC's** 78:3
**focus** 9:13,14
**focuses** 9:15
**follow** 46:22 63:9 70:13 75:14 79:14

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

follow-up 54:21,23
  54:24 89:16
following 4:1
follows 4:7
foregoing 100:2
  101:9
forgive 35:7
forgot 33:16 42:23
  88:25
form 101:9
formal 13:13
formed 14:3,5
  35:23
former 69:19 98:6
forth 49:17
forward 31:1 43:21
found 30:15 43:23
  71:10
founded 6:15 33:5
founders 6:14,18
four 6:17 88:11
frequently 91:11
Friday 9:25 21:15
  23:22 24:5 83:15
  83:16
friends 33:23
fringe 92:24
front 31:11
frustration 84:24
full 39:21
function 42:11
fund 10:5 32:13
  71:11 79:2
funding 33:3 62:1
funds 12:7 19:2
  28:1,13,14,18,20
  28:23,25 29:1,13
  29:14 30:1 36:15
  55:16 60:19 61:16
  61:17 62:13,14
  69:24 70:10,14,16
  70:18,20,23 71:6
  71:7,16 76:8,14
  78:9,10,14,22,25
  79:3,5,6,7,12,18

93:19,20 96:4
furnishings 72:14
furniture 72:17
further 26:15
  101:11
future 31:9

## G

G 1:2
Ganges 9:5,5 16:9
garnishments 63:1
gentleman 41:11
German 11:8
Germany 10:25
getting 75:3 97:14
Giang 6:21
give 5:11 14:9,11
  14:11,12 44:13
  47:4,5 53:7 57:5
  60:18 81:16
given 18:16 101:10
gives 52:24
global 56:16
globally 73:4
Gmail.com 4:24
go 8:17,19 11:1,3
  18:24 20:15,20
  21:11,25 22:11,23
  22:25 23:6 31:8
  41:16 46:6 48:7
  50:1 71:3,5 97:22
go-to 52:5
God 36:9 94:25
goes 23:2 98:9
going 5:18 10:21
  13:23 14:12 18:24
  20:5,17 21:4
  22:11,12,14 24:1
  24:2 41:8 43:7,13
  46:21 49:16 50:6
  69:17,18 74:2,5
  74:24 75:6 79:21
  81:4 83:23,23,24
  86:12 95:4
gold 59:21

good 14:24 24:8
  31:8 57:20
good-size 72:13
Google 44:20
gotten 75:22
grabbing 30:1
graces 77:23
gravy 79:16
great 8:24 15:22
  21:5 57:8
grew 16:6,18
ground 14:21
  15:15
groups 10:24
grow 31:9 36:13
guarantee 82:13
  94:19
guaranteed 65:23
  88:19
Guard 58:23 60:7
guess 7:13 23:10,13
  24:12 40:11 65:1
  78:20,21 91:24
guessing 49:22
guidance 26:18
guidelines 51:5
guru 35:8
guy 35:11 40:21
guys 26:16 37:21
  57:15 92:1

## H

H 43:17
Hai 6:21,21 69:5,6
  89:4,11
Haimark 1:8 5:15
  6:13 7:5,7,17,19
  7:22 8:8,12,13,15
  9:1,2,6,9,19 10:13
  11:22 14:3,5,10
  16:11,21 17:17,21
  17:25 22:3 23:12
  23:16 25:17,22
  27:21 28:2,24
  29:1,2,4,11,15,15

29:16,21,21 31:3
  33:5,6 35:16,21
  35:23 41:17,21
  42:11,11,12 45:6
  45:7,12,13,15
  46:5,6,7,10,13,15
  46:17,19,24 47:11
  47:13 48:21,22
  49:12,14,14,14,18
  49:20 51:18,18,20
  52:15,17,25 54:6
  54:22 55:14,15,22
  55:25 56:6 57:24
  60:17,18,23,25
  61:1,1,10,10,15
  61:15 62:1,6,9,9
  62:19,21 63:1,19
  65:2,2,6,10,12,15
  65:16,16 68:4,11
  69:18,22 70:11,12
  70:16,17 71:18,24
  71:25 73:7,10
  75:16,19,20,20
  76:3,3,7,7 77:2,2
  77:17,24 78:5,9
  78:15,15,22,23,25
  79:1,2,2,4,5,7,11
  79:12,21,24 80:1
  80:7,11 81:21
  82:14,16,22 84:9
  84:10 86:22 87:11
  88:7,14 91:19
  93:9,11,18,20
  94:1,5 98:6
  100:25
Haimark's 55:11
  97:25
half 35:22
hand 18:6 86:8
handled 12:8 51:16
  55:7,8
handling 23:20
Hans 12:12,24 13:3
  13:5 34:18 88:3,4
happen 59:1

happened 17:7
  19:15,20,20 39:25
  45:2,13 54:20
  57:22 58:20 60:23
  69:25 72:6 77:19
  85:11
happens 60:22
  77:21
hard 30:23 39:7
  47:19 50:9 66:2
  83:2
harm 86:12
Hart 2:9
HD 39:10
he'll 82:8
HEAPHEY 2:8
  61:3,5 99:1
heard 24:4
held 9:19 19:10
  28:15,19,20 62:15
  69:24 70:10,14
  71:15 76:13,21
  77:14 78:13,23
hell 84:20
help 5:25 25:8 26:4
  26:13 68:17 95:13
helped 61:1,3,5,6
  91:21 98:5
Henry 41:13,14
  91:10,11
hereto 101:7
high 15:24 18:7,18
  37:3 57:11
high-end 72:15
highly 35:18
hired 23:9 40:23
history 57:20
hit 22:8
hold 9:10 18:8
  74:25 75:6
holding 29:7,14
  35:18,23 62:15
  76:7,11 93:20,25
Holdings 33:5,6
Holland 2:9

**hooked** 96:24
**hopefully** 97:13
**hoping** 46:21
**Horrible** 59:4
**hostage** 74:25
**hosted** 38:10,11,15
**hot** 11:11,12
**hotel** 21:17
**hour** 57:9 99:5
**hundred** 28:17
  35:17 53:15 54:1
  68:21,22
**hung** 20:20

**I**

**ICE** 1:12 2:2
**ID** 25:19,22 101:5
**idea** 8:4 14:10
  15:17,22 25:6
  45:2 76:10 95:4
**ideally** 49:20 95:21
**identified** 66:8
**ignored** 25:10
**imagine** 30:21
**immediately** 56:12
  59:16 77:25
**impact** 59:9
**important** 11:15
  57:6,22
**impossible** 77:15
**impression** 66:14
  84:4
**incident** 61:22
**include** 76:24 77:2
**included** 34:19
**including** 71:12
**income** 52:25
**incorporated** 7:24
  93:14
**indemnity** 73:3
**independent** 41:25
  91:13,20
**Independently**
  97:1
**India** 16:9

**indicated** 14:6
**indication** 52:24
**indirectly** 97:8
**individual** 86:17
**individuals** 15:21
**industry** 8:6 15:4,5
  31:22 57:16 59:22
  97:19
**influential** 96:22
  97:20
**information** 5:15
  5:17 6:2 24:19
  26:11 44:13 81:9
  81:10 82:11 84:1
  84:2 85:18
**initially** 14:16
  18:10 27:12 43:4
  52:3 75:18
**initiate** 98:5
**inject** 17:14 18:4
  20:13 36:2,10,15
  54:8 79:15
**injected** 17:19
  19:23 29:10,12
  37:6 54:14
**injecting** 18:12
  20:5
**injured** 30:20
  56:12,25
**insert** 19:3 25:8
**inserted** 77:25
**insiders** 65:19
**instruct** 47:5
**instructions** 47:5
**insurance** 72:24
  73:1,1
**insure** 73:4
**intent** 81:19
**interacted** 13:18
**interaction** 13:16
  13:21
**interest** 22:19 30:7
  87:21
**interested** 15:1
  30:3,4 31:5 47:11

59:18 101:12
**interesting** 30:10
**internal** 62:7 65:14
**internally** 70:20
**international** 87:15
**interrupting** 71:4
**interruption** 73:9
**introduced** 97:5,6
**introducing** 76:4
**inventory** 72:11,12
  73:25 84:9
**investigating** 59:7
**investigators** 59:6
**investment** 36:8
  80:20
**investors** 15:8
  30:25 31:1 57:14
**invoice** 66:3,23
  67:10,13
**invoices** 36:18,25
  67:3,3,16 79:22
  92:21
**involuntary** 1:4
  5:15 27:3 88:12
**involve** 15:13
**involved** 12:1
  50:23 52:4 62:19
  75:3 77:21 92:12
  95:14
**involvement** 68:14
**Irrawaddy** 9:5 16:7
  98:18,19
**issues** 13:19,19
  28:4

**J**

**J** 2:8
**January** 88:2,2
**Jeff** 33:22 82:8
**JEFFREY** 2:18
**jets** 31:14
**job** 11:21 12:4 87:8
  97:22
**Joel** 23:10 26:2,9
  84:13 85:1,7 90:2

90:7,9
**joined** 52:2
**Joseph** 1:2
**Josh** 41:11 47:15
**Jr** 1:2
**Judge** 1:2
**June** 6:15 14:5

**K**

**K** 2:4
**keep** 24:24 49:16
  64:1 68:12 85:10
  92:7
**Kent** 1:12 2:2 16:3
  74:12 97:7
**kept** 38:3 39:20
  45:24 60:7 64:2
**Key** 51:2,3,7,9,10
  71:16
**kick** 14:14
**kind** 6:2 13:24 14:9
  16:23 33:23 46:5
  46:22 53:23 66:6
  77:1 83:12 87:5
  87:11 93:10,11
  98:13
**kinds** 75:1
**knew** 11:10 15:21
  16:15 23:8 26:1
  28:18 30:24 32:10
  59:12 85:21
**know** 5:25 6:1,3,8
  7:7,13,14,16 10:2
  10:24 11:2,16,24
  14:4,13 15:11,22
  16:18 17:1,3
  18:16,25 19:4,12
  19:14,19 22:16,21
  23:25 24:3,7,18
  24:20 25:8,16
  26:23,24 27:6,23
  29:5,16,18 30:21
  31:17,23 32:4,5,6
  32:8 35:12,14,22
  36:10,17,25 37:1

37:2,3,8 38:8
  39:16,17,18,25
  40:6,13,18 41:16
  41:23,25 42:7,7
  43:3,9,10,14,22
  44:3,12,21 45:20
  46:5,11,13 47:8
  47:19 49:9,16
  50:4,8,16,16,18
  50:19,19 52:21,22
  52:25 54:8,14,16
  54:18,18,19,24,25
  55:6,7,12 56:19
  56:21 57:1,3
  58:11 59:3,10,11
  59:19,23 60:12,13
  61:2,20 62:13,16
  63:22 64:8,12,21
  65:11 69:10,21,23
  69:23,23,25 70:3
  70:5,12 71:8,8,10
  72:6,8,16 74:16
  74:23 75:9,18,21
  76:14 77:11,18
  78:18 80:5,17,21
  81:2,3,6,12,13,14
  81:14,18,19 82:8
  82:16 83:3,3,4,6,7
  83:7,8,10 84:6,15
  84:17 85:4,5,5,6
  85:14,22,23,24
  86:12,19,20 87:9
  88:16,17,18,19,21
  89:19 90:5,15,19
  90:23,24 91:8
  92:25 93:10,23
  94:1,2,19,23,24
  94:25 95:1,1,8,9
  95:18 97:3,5
  98:21
**knowing** 86:17
**knowledge** 15:7
  17:3 19:12 40:25
**knows** 8:7 36:9
  54:12 68:10 95:1

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

Page 109

**Kutner** 2:19 33:19 33:21

**L**

**L-e-s-k-o-v-a-r** 4:14
**L.A** 47:14 70:6
**lack** 66:19
**laid** 52:23
**Lakes** 8:24 57:8
**Lakewood** 21:18 27:10 38:22 50:15
**land** 14:17
**landlord** 80:14,16 80:19,21,23,25
**laptop** 39:1,4
**large** 14:24 55:8 58:3 97:7,20
**larger** 56:17
**largest** 58:3
**Larue** 51:25 52:10 52:11 63:7 87:24
**Laufer** 23:10,19 24:6,8,9,12,18 26:2 84:13 85:7 90:2
**Laufer's** 23:15
**Laurent** 16:13,14 17:17 18:6,7 30:16 55:3,21 58:4
**law** 33:15,17,25 34:5
**laws** 87:2
**lawsuits** 87:3
**lawyer** 34:2 49:12
**lawyers** 66:16
**LCG** 66:4
**LCQ** 66:4
**lease** 80:2,2,3 83:23 83:24
**leasing** 80:1
**leave** 40:6,6 41:1 47:4
**leaves** 48:5

**leaving** 37:24
**lecture** 75:5
**left** 10:11 13:5 16:22 22:6 23:4 27:20,25 28:13 38:6,19,22 39:2,3 39:24 40:16,18,24 41:17 44:23 46:25 47:16 50:15,20 51:25 52:23 54:13 54:19 61:10 63:18 64:2,15 72:6 75:18,23 76:7 77:5 79:1 80:13 80:24 83:14 84:7 85:12 88:1,7
**legal** 17:23 29:6 95:16
**legally** 8:10 58:20 62:17 70:22 90:15
**legit** 32:21 33:18
**lending** 35:3
**Leskovar** 1:5,11 3:2 4:5,11,13,24 100:1,9,13 101:6
**let's** 5:12 21:25 46:17 50:4 62:4 79:18 85:9 93:19
**letter** 13:12
**level** 87:14 91:3
**Levin** 13:6,10,11 19:6,11 20:1,11 21:20 23:8,23 33:8 47:8 66:25 69:13 70:6 81:10 81:16 91:25 92:2 92:15
**Levin's** 92:11
**liabilities** 75:19
**liability** 55:24 58:19
**license** 42:3 59:20 59:21,22 60:2
**licenses** 8:18 42:2,4 42:5

**life** 15:5
**limbo** 48:17
**Lincoln** 2:19
**line** 7:8 8:8,12,13 8:15,17,19 11:12 14:19 16:11 22:3 29:11,15,16 42:11 45:7,13 46:6,7,11 46:13,15,17,19,20 46:24 47:11,13 48:1,5,19 49:12 49:14,14,18,20 50:3,4 54:6,22 55:15,22,25 57:24 59:20 60:18,25 61:1,4,5,6,10,15 61:19 62:9 65:10 65:12,16,16 69:22 70:11,16 71:24 73:7,10 75:19,20 77:2,17 78:5,6,15 78:23 79:2,3 82:22 84:9 86:22 93:9
**Line's** 29:21 65:3,7
**lines** 45:12
**liquidity** 27:24
**Lisa** 40:14,15,16,23 51:25 52:10,10 87:23
**list** 82:18,20
**listen** 67:1 85:15
**litigation** 62:20 101:13
**little** 13:23 27:18 32:19,20 44:10 55:17 76:15,17 89:3
**lived** 4:18
**LLC** 1:12 2:2
**LLP** 2:9
**loan** 37:9
**local** 91:14
**located** 38:7 80:7 80:12

**location** 27:9
**lock** 57:7 58:21
**logistical** 29:8
**London** 73:8,11 88:4 98:21
**long** 4:18 5:2 15:21 58:6 82:18 85:21 92:19
**longer** 13:2
**look** 5:11 54:9
**looked** 31:4 32:5
**looking** 30:17,24 31:19
**Los** 32:16,20 39:11
**loss** 48:25 53:5,10 53:12,23,25 54:10 57:11 98:10,11
**losses** 63:5 97:13
**lost** 18:5 54:5
**lot** 10:19,20 13:16 14:13 15:6,6,12 17:17 21:2 32:23 37:1 41:19 57:16 71:6 75:3 78:24 80:6 85:22
**Lotus** 96:10,11
**low** 15:23 68:13
**lower** 89:3
**Ltd.'s** 5:15 29:21 55:14 78:10
**lucrative** 58:11

**M**

**M-a-r-c-u-s** 4:23
**machine** 101:8
**magnitude** 57:6
**main** 30:7 50:23 57:8
**maintained** 41:24 42:1 58:14
**major** 86:12
**majority** 10:9 15:5 32:12 73:23 86:17
**making** 12:1 63:19 74:16 97:13 98:11

**management** 12:7 14:22 18:11 19:24 36:25 66:5,24
**managing** 9:11,12 9:13
**mandated** 94:10
**manpower** 63:11
**March** 13:1 19:21
**Marcus** 1:5,11 3:2 4:5,13,23 100:1,9 100:13 101:6
**margin** 86:4 98:8
**maritime** 45:18 47:22 60:7 76:25 77:3
**market** 15:10 58:18 88:5 89:23 98:21
**marketing** 87:9,15
**markets** 87:15
**Markwell** 6:20 68:20 88:22,24 89:7
**mass** 30:21 56:11
**material** 84:24
**matter** 8:17 18:21 19:23 36:16 55:3 65:22
**matters** 101:7
**mean** 7:13 22:13,20 30:9 36:3 37:2 39:17,20 46:6 47:1,3,20 50:8 65:1,5,7 69:10 72:13 78:10 82:3 82:17 84:1 85:3 87:6 88:18,20 90:15 94:24 97:1
**means** 11:20 14:18 17:3 35:20 48:4 48:10 60:24 65:10
**mechanism** 94:18
**meet** 21:6,18 97:23
**meeting** 19:4 22:1 22:10

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

meetings 19:3,5,10
19:13
Mekong 9:4 16:7
96:14,14
mentioned 16:12
51:19 62:12
Merit 1:14 101:5
met 23:13 85:7
92:6,8 98:20
Miami 48:6
Michael 92:5,6,7
92:15
middle 63:13 82:6
middleman 98:8,9
middleman's 98:2
98:4
midsize 57:20
midstream 16:23
midterm 31:24
Mike 94:8 95:17
million 15:24 28:16
31:19 32:1,1,13
36:10 53:16 54:2
54:11,15 55:9
61:9,11,13 76:15
76:16,17,17,18
77:9
Mills 80:18
mind 82:11
mine 40:8
mistaken 96:8
mitigate 85:13,20
86:2 97:5
mitigation 89:19
98:6
model 29:25
moment 82:2,5
money 10:5 17:15
17:17 18:4,12
19:23 20:5,13,14
20:24,25 28:11
29:10,18 32:12
35:3 36:2 37:2,6,8
37:13 48:7,9,11
54:6,8,15 55:8

60:18 61:24 62:14
63:7 64:22 66:21
68:4 75:15 76:11
77:15 78:21 79:15
79:21 88:14,22
89:5 95:4,5
moneys 45:21,25
48:3 61:14 62:16
67:13 68:10,11
72:8
monthly 42:8 47:25
months 15:14
19:20 57:11 59:23
89:8,13
morning 21:15,18
mountain 56:20
moving 84:18
Mutual 73:8,11
Myanmar 11:2
16:8 27:14,15
98:16,18
_____
                N
N 2:1 3:1
name 4:11,12,13,23
33:16 42:23 44:6
93:11
named 33:2 41:11
national 6:22
nautical 58:15,19
Navigator 96:14
NEAL 2:4
Nebraska 16:18
necessarily 59:10
need 24:3 36:12
64:13,14,14,15,18
66:9 83:12 95:5
needed 24:19 31:20
61:16 62:1 84:25
needs 26:17,17
66:20
negotiated 27:22
negotiations 20:3
Neither 86:22
net 85:16 86:4,6

97:12
never 7:23 13:14
23:23,23 24:4
26:20 29:24 34:8
37:10,13,22 43:15
47:2 48:23 50:20
63:2,3,17 66:7
67:13 69:19 85:7
85:11 86:14 90:17
93:15 94:25
new 15:1,2,2 30:23
33:15,17,25 34:5
36:7 41:18 44:10
52:1 56:10,18,19
70:5 81:7
news 56:11,14
nice 22:16 72:14
night 22:25 82:7
Notary 1:14 100:19
101:5
note 34:21 68:5,7
68:20,22,24 69:6
88:23
NOTICE 1:11
NTSB 58:23 59:2,6
number 4:20 25:19
25:22 31:23 53:4
53:14 81:11,17
number-one 56:14
numerous 56:9
nutshell 36:4,14
_____
                O
oath 4:8
object 90:9
obligated 73:22
obtain 73:6
obviously 17:15
18:9 38:20 61:19
64:16 68:3,10
81:5 82:19 92:9
92:12
occasion 13:12
occasions 56:9
69:12 92:7

occurs 48:15
ocean 16:10
oceangoing 8:16
12:15 16:11
October 27:2,19
45:14 88:5
offer 69:20 95:8
offered 69:12
office 22:11 26:12
27:9,12,13,13,14
27:15,16,17,25
32:16,20,21 38:21
38:22,24 39:11,15
39:19,23 45:15
46:25 47:1,2,14
47:16 50:15 52:13
52:15,19 64:16
70:6 72:14 80:11
80:17,18,19,21,22
81:20 83:17,22
84:8,10,11 85:7
89:14
officer 46:12
offices 23:21 27:11
27:12 32:15
offshore 15:18,20
offsite 46:11 47:13
oh 31:25 32:4 33:20
41:8 43:8 84:19
89:9 91:16
oil 15:19 96:20
okay 4:20 5:5,12,18
6:10,25 7:4,7,16
8:25 9:22 10:1,16
11:19 12:20 13:2
13:22 14:1,6,14
16:17 21:5,11,14
21:25 22:10 23:25
27:20 28:23 32:3
35:2 37:24 39:13
40:3 42:21 43:19
45:6,9 46:4,24
47:18 48:24 49:6
50:22 53:7,12,21
54:1,4 55:3,24

56:5 62:11 65:18
68:19 69:4 70:1
71:21 72:3 74:1,4
74:16 75:4 76:10
76:19,23 77:4
78:17,17 79:17,20
79:24 80:14 82:8
82:9,13 85:24
87:10,22 88:1,3,6
88:9,16 89:4,9,15
90:20,25 91:4,7
91:16,19 92:20,23
93:6,9 94:3,17,21
95:3 96:10,15
once 12:3 17:16
33:22 36:2,12
48:9 74:19 78:1
79:16,16 92:9
98:11
online 49:9 50:14
onsite 44:25
operate 8:5 15:9
61:16 98:22
operated 14:25
15:19 48:23 62:18
73:24 98:17
operates 14:19
operating 10:14,17
10:19 17:18,21
29:2 43:10 93:23
97:8,17 98:17
operation 17:20,24
29:4 32:22
operations 10:4,21
16:22,23 17:5
25:7
operator 9:3 97:16
operators 14:17
opinion 29:23,24
orchestrated 33:7
ordeal 11:4
order 18:4,5 20:6,7
24:10,13 26:3,6
27:23 31:8,20
36:13 41:15 42:4

MARCUS LESKOVAR - 12/8/2016
In Re: Haimark, Ltd (Debtor)

43:22 46:14 64:4
65:12,16 67:25
68:12,17 75:1
77:17 85:20 89:18
95:9 97:5
**ordinary** 64:22,24
**outcome** 101:12
**outgoing** 14:20
**outside** 64:22 94:9
**overhead** 61:8
**overlap** 82:21
**overprotected**
29:17 70:23
**overprotection**
28:17
**oversight** 45:19,23
48:23 78:1
**overtures** 75:11
**owe** 68:4 86:22
88:14,22 89:5
**owed** 61:10 70:11
**owes** 86:20
**owner** 10:3,22
11:10 39:24 50:17
58:20 65:20 68:12
70:5 81:8 90:6
96:20
**owners** 6:23 12:13
15:8 32:18 35:16
36:7 68:19 90:4
97:4
**ownership** 12:13
22:16 35:18,18
36:1,1,6 41:19
63:14 69:13 81:7
**owns** 58:8 96:13,20

**P**

**P** 2:1,1,14
**P&I** 73:2,2,3,4,7,7
73:10
**P.C** 2:4,14,19
**p.m** 1:14 75:13,13
99:5
**P.O** 2:10

**packed** 84:6,7
**page** 3:2 31:11
**pages** 33:1
**paid** 27:22,23
37:20,20 42:8
49:4 61:7,8,8 64:8
66:15 75:23,25
76:3 81:6 87:1
**pan** 31:4
**paper** 39:13,15,16
39:17 40:3,9,20
44:2 50:12
**paperwork** 25:23
32:24 44:24
**park** 80:18,19
**part** 5:16 38:2 41:7
67:16 68:15 90:13
**partially** 19:7
27:24 30:18
**particular** 45:11
51:18
**parties** 101:7,11
**partner** 9:11,13
30:17 33:8 54:7
86:3,3 92:2
**partners** 6:21 9:12
30:25,25 31:8
37:16 76:5
**party** 22:24 95:20
**pass** 44:17
**passenger** 35:12
47:24 65:12 77:12
77:12 84:2 96:17
**passengers** 10:19
20:14 31:22 35:12
46:1 48:2 64:5
74:25 82:19,25
97:15
**password** 49:2,3,6
49:7
**Paukan** 98:13,15
**Paul** 13:6 20:22
24:1 26:15 67:5
75:24 76:1
**pay** 20:24,25 27:21

62:2 64:4 74:8,9,9
74:17 79:21 83:24
86:5 94:21 95:4
**payables** 47:7 52:7
**paying** 24:23 63:23
63:23,25 66:10
**payment** 64:21
65:11,13,17,23
74:4,7,11 94:20
**payments** 20:3
27:23 48:2 62:6
63:19 64:1,2 65:2
65:7,8,8,9,18,21
65:21,25 68:3,23
71:8,11 73:22
75:6,9,23,24
88:19 92:14,20
**payroll** 20:24
**people** 5:9 10:24
11:6,7,8,12 13:16
21:2,2 22:8,17
23:1,4 25:9,15
26:3 30:20 32:20
35:15 41:19 51:25
52:23,23 56:12,20
57:1 58:7 59:10
61:23 67:19 70:7
74:22 85:21 86:2
86:13 87:17,18
95:8 97:23
**percent** 35:17,22
35:22 68:21,22
74:5,8,9
**perfectly** 86:25
87:3
**period** 26:25 78:19
**person** 52:3,5
**personal** 37:20
40:17 68:22 84:1
91:3
**personally** 32:6
68:12
**perspective** 58:5
**pertaining** 47:13
**Petitioning** 1:12

2:2
**petitions** 5:17
**Philly** 44:11
**phone** 19:5,6,7,8
25:13 81:11
**phonetic** 96:23
**Pico** 32:16 39:11
**picture** 74:20
**pieces** 13:23
**place** 11:3 87:17
101:8
**placed** 63:3
**plan** 74:7
**plane** 59:1
**plans** 74:11
**platforms** 15:19
96:21
**please** 4:12 25:5
70:5
**plus** 37:2 84:3
**PNC** 50:24 72:8
**point** 25:9 27:1
31:18 40:8 45:5
48:14 54:9 69:11
86:23 96:25
**poised** 8:18
**police** 22:7
**policies** 72:24 73:5
**policy** 73:11
**Pope** 92:3,4,5,6,7
92:11,15
**portion** 94:1
**position** 9:19
**positions** 9:9
**possibilities** 64:3
**possible** 68:13 83:7
**possibly** 49:11
**potential** 18:7
**practicing** 91:4
**predicament** 31:11
**premises** 10:12
24:2,5 25:16 45:5
**prepare** 24:14 26:6
**prepared** 52:8,11
**present** 19:11

24:10
**presented** 15:17
30:11,12 32:2,9
36:18,18
**preserve** 45:10
**preserved** 45:15
**president** 11:25
12:12,17
**press** 56:13
**pretty** 73:5 74:14
79:12
**previous** 101:6
**primary** 5:14,21
8:9
**principals** 13:8
**prior** 68:19
**private** 31:14 32:11
35:7
**privy** 19:14 55:1
**probably** 6:1 13:20
13:23 44:4,4
53:15 72:4 76:16
77:6 78:22,23
82:8 83:22 84:20
**problem** 12:22
28:4
**procedure** 4:3
45:22
**proceedings** 4:1
99:4 101:10
**procurement** 9:14
**produced** 31:22
**product** 57:17 76:5
**professional** 15:5
**profit** 48:25
**prominent** 33:16
58:2
**promise** 79:14
**promote** 95:7
**pronounce** 16:15
**proof** 63:17
**proper** 11:14 43:22
45:16
**properly** 24:23
25:2 84:12 85:11

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

proposition 95:10
prorated 26:22
protection 60:6
　73:3
provide 14:17,21
　64:5 77:18
provided 24:9 29:8
　42:25 60:23 61:14
　61:23 85:6 88:19
provider 17:22
providers 73:4
providing 17:18
　29:9
Pty 2:12
public 1:14 59:8
　100:19 101:5
purchase 69:3
purpose 5:14,21
pursuant 1:11 4:2
pursue 63:13
pursued 31:13
put 34:6,24 37:8
　39:10 58:4,13
　83:17,20 85:19
　86:2,13
putting 26:4

**Q**

qualify 51:3,5
　94:11
question 5:10 24:9
　28:5 30:11 40:15
　53:21,22 60:13,21
　78:20
questions 5:18 6:6
　6:7 13:24 24:12
　24:16 25:9,14
　46:25 47:9 99:2,3
　101:9
QuickBook 39:8
QuickBooks 38:3,7
　38:9,10,15,15
　41:23 42:10,16
　49:1,11 50:11,14
　64:13,14 83:12,13

**R**

R 2:1
ran 29:6 38:16
random 92:12
range 53:23
rate 59:4 86:5
　97:12
rates 85:17 86:6,10
rating 59:13
re-called 48:12
reached 26:2,8
read 31:12 100:2
Reading 101:21,23
　101:25
ready 83:17 84:11
real 71:25
really 7:23 8:1
　12:16,22 15:14
　17:20 28:3,25
　29:24 31:18 36:12
　40:13 43:8 46:4
　47:10 52:4 57:22
　63:8,9 67:7 68:16
　72:9 75:9 77:18
　78:2,9,21,22
　81:23 84:19 91:25
Realtime 1:14
　101:4
reason 8:9 18:17
　37:11 58:22 63:6
　67:23 70:19 90:2
reasons 10:23
　11:15 40:17 62:17
recall 53:14,14
receivable 73:15,18
　75:10
receivables 52:7
　73:21
receive 66:23
received 13:14
　34:11
receivership 63:3
Recess 75:13
recommendation
　22:21 24:21,22

25:3,4
recommended 32:7
recomputation
　47:25 48:13
reconstruct 35:13
record 4:12 34:4
　75:15
recorded 64:11,17
　65:22,24 66:1,5
　68:3
records 38:3 39:8
　40:4 41:20 42:25
　45:10,24 46:5,10
　46:14,17 47:21
　49:21,22 50:2,11
　53:18 59:6,6
　83:13 88:17
reduced 101:9
referred 70:4
refunded 46:1
refunds 48:19
regard 20:10
regarding 24:13
regards 90:9
registered 1:14
　34:10 101:5
regular 39:18,20
　49:9,9 72:25
regulated 45:17,18
regulation 78:4
regulations 46:2
　48:7
regulator 45:20
reign 60:15
reimbursed 37:22
reiterated 21:23
related 101:11
relation 101:7
relationship 51:7
relationships 19:17
released 79:1,3,6
remember 31:15
　46:9 64:10 73:17
removed 13:1
rendered 18:16

19:25
renew 83:23
rent 81:5
rental 80:22
rephrase 6:10
reply 4:8
report 12:10,18,19
　13:5
reported 13:6
　45:25
reporter 1:14,14
　73:9 101:5,5
**REPORTER'S**
　101:1
reports 67:6
repossessions
　62:24
represent 69:18
representative
　48:19
represented 34:1
reproduced 34:24
reputable 87:4
requested 101:21
required 74:15
　94:20 101:25
requires 47:24
residential 4:16
resigned 41:25
response 26:17,18
　26:20,20 61:22
responsive 85:2
rest 26:22,23 39:22
restructure 75:1
restructured 30:5
restructuring
　46:12
result 75:21
results 63:16
retain 23:1
retained 23:14,19
retainer 26:22
return 35:21 44:4
　47:2 52:14
returns 42:21,22

43:1,4,7,8,18,24
　43:25 44:5 52:11
　52:12,12 80:7,12
reward 15:24
rewrote 12:23
Richard 88:9
rid 22:12
right 5:13 6:4 7:4
　16:15 25:9 27:5
　29:22 30:2,16
　36:17,17,23 41:1
　42:18 43:15 44:23
　49:6,15,23 54:12
　54:17 55:4 56:24
　63:24 64:13,18
　71:19 72:4 78:17
　82:9,9 83:1 87:22
　88:7,18 89:2 91:5
　91:16 95:2 97:4
river 5:1 9:8 11:1
　14:19 15:1 16:7,8
　87:17
rivers 9:4
road 10:20 11:13
　20:15 21:2 25:1
　64:6
Rood 12:13,25 88:3
　88:4
Rosania 1:2
rough 76:10
route 74:22
Rule 1:5,11 100:2
　101:6
rules 4:2 46:2
run 11:11 60:2
　61:19 86:25

**S**

S 2:1,18 43:17
S.A 7:19 9:6,6
　42:12 93:18 94:1
S.A.'s 93:20
safeguarded 48:3
safety 56:22 57:24
　59:13,13

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

**sail** 59:23
**Saint** 16:13,14
  17:17 18:6,7
  30:16 55:3,21
  58:4
**salaries** 61:22
**salary** 65:24
**sales** 87:9,15
**Sarah** 37:24 39:1
  41:2,10 52:2
  61:25
**Saturday** 23:6
**savings** 97:13
**saw** 24:15 26:19
  32:23 36:11 37:24
  80:10 88:4 89:23
**saying** 13:3 23:25
  98:3
**says** 94:17
**Scenic** 2:12
**scheduled** 20:15
  22:1
**schedules** 5:18
  74:14
**sea** 15:20 58:24
  96:21
**season** 57:11
**second** 31:3 63:12
**secretary** 34:10
**section** 31:11
**secured** 81:21
**security** 74:15
**see** 6:3,16 48:19
  95:5
**seeking** 11:9
**seen** 25:23 88:16
  91:7
**seize** 69:22
**seized** 60:6,6 80:25
**sell** 15:9 16:3 94:24
**send** 66:2 77:15
**sending** 67:2,3,10
  67:13,15
**senior** 93:8
**sent** 26:15,22,23

50:10 67:20,21
  68:1
**separate** 8:7,9
  25:18,19 56:6
**separated** 62:17
**serious** 20:10
**service** 1:12 2:2
  49:4 50:14 58:15
**services** 14:17,21
  15:15 17:19,22
  18:11,16 19:24
  26:21 29:8,9,10
  60:24 61:23 64:5
  66:6,7,25 88:20
**set** 42:17
**settled** 55:4 68:12
**settlement** 54:22
  68:13 75:19
**settlements** 55:1
**setup** 35:6 59:11
  61:18
**Seven** 89:13
**Seven-figure** 53:10
**severely** 30:20
  56:12,25
**share** 36:2,3
**shared** 17:19,22
  29:9,9 60:23
  61:23
**shares** 35:25,25
**she'll** 5:8,11
**sheet** 48:25
**shelter** 11:9
**Sherry** 1:14 101:4
**shied** 56:18
**ship** 8:15,16,16,19
  15:2,24 16:11
  48:10 55:19 57:10
  58:7,15,21,22,24
  59:22 60:2,5 64:1
  73:25 74:3 85:25
  94:24 96:12,14
**shipment** 83:18
**shipowner** 54:23
  57:25 58:1,2,8,14

59:17 87:7 96:13
  97:14 98:7
**shipowner's** 59:15
**shipowners** 15:18
  15:19 58:3 74:14
  86:9
**shipped** 39:10,22
  46:10 47:13,15
  84:10
**ships** 8:5 15:1,9
  16:1 59:12 73:5
  76:5 87:8 94:23
  98:17
**short** 60:18 75:12
**short-** 31:23
**shorthand** 101:8
**show** 21:21
**showed** 18:13
  21:12 36:9
**shows** 92:12 97:21
  97:22
**shut** 11:18 22:14
**side** 18:6 33:16
  34:2,21 74:13
  86:8
**sides** 36:19
**sign** 37:12 38:18
  43:21 90:3
**signature** 34:25
  100:13 101:16
**signatures** 92:13
**signed** 32:25 34:4
  34:12,18,18,22
  35:1 37:9,11
  43:20,24 68:25
  90:17 95:24
**Signing** 101:21,23
  101:25
**simpler** 35:9
**sit** 54:15 64:9 70:9
  87:16
**sits** 55:15
**situation** 19:22
**Six-figure** 53:12
**size** 59:22

**skeleton** 10:11 23:1
  23:4 24:25 41:7,9
  41:12
**small** 30:13 58:7
  97:19
**Smaller** 53:11
**smidge** 55:18
**software** 38:21,24
**somebody** 50:1
  65:19
**son** 93:7
**sorry** 9:17 27:3
  42:16 53:9 60:20
  61:6 71:2
**sort** 87:6
**sorts** 49:1
**sounds** 85:1
**South** 1:13 2:5 9:7
  15:19 96:21
**Southeast** 9:4 11:1
  14:18,20 15:3,12
  15:17 20:16 37:21
  76:4 85:21 93:1
**space** 16:3 80:22
  94:19
**speak** 89:11,21
**specialize** 8:3
**specialized** 66:18
**specializes** 30:13
**specialties** 31:17
**specialty** 8:11,21
  8:25 12:15 14:7
**specific** 11:23 17:5
  44:10 47:4 93:25
  94:21
**specifically** 79:11
**specifics** 63:22 64:7
  64:10
**speculate** 24:17
**spell** 4:12
**spent** 15:4
**spoke** 87:23 89:24
  90:1
**spring** 8:23
**ss** 101:2

**stabilize** 20:6 36:13
**staff** 24:25
**stall** 59:25
**stand** 11:11
**standard** 8:6
**start-up** 57:13
**started** 14:16,23
  15:14 16:1,2,6,6,8
  18:10 30:24 51:7
  52:19 60:4 74:20
  94:23 95:6 96:18
**starting** 52:21
**state** 4:6,11 100:15
  101:2,5
**state-chartered**
  51:4
**statement** 48:25
**STATES** 1:1
**status** 69:23 70:3
**stayed** 63:12
**stays** 48:17
**Steamship** 73:8,11
**steering** 18:22,23
**Steines** 40:24,24
  52:2
**step** 6:3,3 20:4
  43:21
**Steven** 89:22 90:9
  90:14 93:3,7,8
**stock** 73:12
**stop** 5:11 14:13
  20:2,13 28:10
  79:17
**stopped** 16:22 17:6
  41:17 79:13
**storage** 83:21
**store** 84:3,12
**straight** 56:15
**stranded** 11:4
**stray** 60:15
**Street** 2:9,15,19
**stuff** 71:21 83:25
  85:23
**subscribed** 50:14
  100:14

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

Page 114

**substantial** 82:20
**successful** 16:5,9
  32:14
**successfully** 15:15
**sue** 11:17,19,20
  20:20 21:3
**suffered** 8:8
**suggestion** 85:8
**suit** 68:11,15
**suite** 1:13 2:5,10,15
  2:20 84:18
**summer** 8:24
**superior** 81:10
**supertankers** 58:9
**supplied** 92:25
**Support** 1:12 2:2
**suppose** 72:4
**supposed** 23:5
  36:21 65:9
**surcharged** 85:17
**sure** 14:10 33:24
  42:3 45:20 73:19
  91:24 98:14
**surplus** 28:14
**survive** 57:21
**sw** 100:25
**switch** 51:6
**sworn** 4:6 100:14
  101:6
**system** 38:3,18
  39:17
**systems** 44:25

― T ―
**take** 6:2 17:12 18:5
  26:11,12 36:19,21
  37:21 38:22 39:4
  40:7,19,25 60:1,2
  66:19 67:5,22
  69:13 75:12 76:12
  76:12 86:5
**taken** 1:11 4:2 5:5
  12:4,4 19:24 25:3
  30:5 48:10 50:17
  63:7 67:11 75:13

101:8
**talk** 21:16 32:5
  50:6 89:7,24 91:1
  91:11 97:23
**talked** 5:24 19:9,14
  25:18 55:18 88:10
  90:22 92:9
**talking** 5:9 14:13
  21:9 26:25 29:1
  46:20 47:23 49:15
  66:11 79:20
**tallying** 37:1
**tankers** 58:8
**target** 58:11
**tax** 25:19,22 42:21
  42:22,24,25 43:4
  43:7,8,16,18,23
  43:23,24,25 44:3
  52:11,12,12,13
  80:7,12 86:20
  87:1
**taxes** 52:9,9 86:20
  86:22
**team** 10:11 41:7,9
  41:12 51:24
**tease** 33:22
**telephone** 4:20
  85:8
**tell** 5:8 10:15 21:3
  44:14 53:4,5,19
  73:17 82:7 94:12
**telling** 26:17 74:22
  81:16
**tells** 82:9
**temp** 52:3
**ten** 32:20 74:2
**term** 56:4
**terminate** 10:23
**terminated** 9:21,22
  9:23,24 10:1,6,9
  10:11 24:2 25:15
  26:10,21
**termination** 10:3,7
  10:8 69:16
**terms** 34:23 74:4

**territory** 30:22
  48:3,23
**testified** 4:7
**testify** 101:7
**testimony** 100:4
  101:10
**thank** 75:4
**theft** 63:5
**they'd** 36:3 42:14
  67:22
**thing** 9:7 43:2
  58:25 74:15 87:6
  98:14
**things** 8:3 21:16
  49:1 80:6 88:11
  90:23
**think** 17:2 20:9
  22:2 23:18 24:9
  25:21 29:24 35:11
  37:3 39:2,3,5,6
  41:24,24 42:1,5,6
  44:22 46:4 47:13
  47:15 51:1 53:24
  55:13,14 57:5,22
  60:1 66:17 69:9
  75:16 80:25 81:23
  81:24 82:2,2,4
  83:2,5 84:13 85:3
  90:1,18 91:9 93:7
  93:13 96:6,6,7,9
  98:24
**thinking** 49:24
  53:16,17 82:4
**third** 95:20
**thoroughly** 63:9
**thought** 18:15 32:3
  67:1,10,16
**thousand** 28:6,17
  53:15 54:1 72:5,7
**threatening** 74:23
**three** 6:25 8:2 9:12
  23:1,4 27:12
  56:15 57:10 74:3
  86:6 88:8,10
**three-party** 95:23

96:1
**throw** 22:21
**Thursday** 21:6,7,9
**time** 5:10 10:4,9,14
  10:17 11:22 12:13
  15:3,21 20:13
  21:21 25:12 26:25
  28:12 31:21,24
  38:7 39:2 41:2,22
  45:11 61:9 63:10
  63:11,18 66:2
  76:7 77:17 79:1
  80:10 81:11 83:21
  85:21 87:23 89:13
  89:24 90:1 91:22
  91:22 97:9,15,18
  97:18,23,23 101:8
**timeline** 17:12
**timelinewise** 17:8
**times** 19:7 32:15
  61:25 66:8 92:8
  98:10
**today** 31:12 64:9
  70:9 96:19
**told** 11:10,16,17
  17:4 20:19,20
  21:20 23:19 26:9
  26:14 32:11 38:2
  40:5 47:4 50:22
  55:9 61:25 69:15
  70:4 80:5,6 81:6,7
  85:5 89:4
**Tom** 6:20 68:20
  69:4 88:22,23
**tomorrow** 59:24
  84:18
**tonnage** 58:9
**top** 5:9 57:12
**total** 36:11 78:1
**totaled** 57:18
**touch** 97:18
**tour** 9:2 14:17
  97:16
**Tours** 2:12,13
**Tower** 1:13

**trade** 97:21,22
**train** 79:16
**transaction** 18:2
  34:2 63:14,15
**transactional** 93:5
**transactions** 50:23
**transcript** 101:9
**transcription** 100:4
**transfer** 65:14
**transferred** 30:5
  36:3 65:15 70:19
  71:14
**transfers** 62:8
  64:21
**transmitted** 34:5
**transport** 83:18
**travel** 1:12 2:2 37:3
  37:20 61:7,21
  76:2 88:5 89:23
  92:25 93:11 96:25
  98:21
**travelers** 10:25
  86:17
**traveling** 10:20
  21:2
**tremendous** 59:9
**tried** 13:12 26:5
  40:17 42:2 64:2
  69:2 85:13 86:1
  92:7
**trip** 48:11
**true** 100:3 101:9
**trust** 35:9 85:23,23
  85:24
**truth** 4:6 101:7
**try** 5:11,12 15:8
  31:8
**trying** 5:16 11:1
  19:1 49:25 63:25
  69:22 87:17,22
  95:7
**turn** 26:21 31:17
  31:20 67:25
**turnaround** 31:24
**TV** 56:16,16

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

**two** 4:19 7:2 9:12
10:7,10 11:17
14:24 18:13 23:1
27:11,16 28:4
33:4 37:2 38:16
50:22 52:6,6 66:3
76:18 83:5 85:8
86:6 88:8 92:1
93:8,13 94:20
98:17
**type** 15:2 73:18,20
**typewritten** 101:9

**U**

**U.S** 10:25 11:7
30:22 48:3,23
**ultimately** 19:16
29:16
**um-hum** 5:20,23
6:5,9,11 7:1,3,9
7:18 13:25 14:2,8
25:20 34:15 38:1
38:5 40:10 42:13
42:15 44:7,9,19
50:25 55:20,23
62:3 63:21 65:4
71:17 78:12 79:9
79:23 93:5
**un-airworthy** 59:3
**unclarity** 48:16
**understand** 6:7
26:5 29:24 30:6
49:19 57:6,23
77:8
**understanding**
17:14 18:1 23:15
24:1 54:20 66:21
67:21 80:8 83:22
90:16
**unfit** 58:23 59:2
**unfortunately** 31:5
56:15 60:14
**UNITED** 1:1
**Uniworld** 74:12
**unknown** 66:11

**unsafe** 56:19
**unusual** 47:20
**unworthy** 58:24
**updated** 72:14
**updates** 88:12
**urgency** 21:23
28:10
**USA** 1:12 2:2 31:12
**use** 40:19 42:3
**user** 49:8,9
**usual** 62:5

**V**

**V2C** 33:3 36:9
**value** 72:12,16
76:14
**Vantage** 1:12 2:2
8:7 16:2 31:2
41:15 74:1,12
86:2 87:18,20
97:6,10,11
**varies** 78:18
**various** 11:6 13:11
28:6 33:1,7 36:11
**vehicles** 79:25
**vendor** 64:1 65:11
96:11
**vendors** 20:25 62:2
62:4 63:19,23
64:4,7 85:19
**venture** 8:22 16:10
30:8,12
**versa** 65:17
**version** 38:9,16
**Vert** 9:20,21 12:3,6
12:6,9,20,23 13:8
16:22 17:14 18:1
18:1,25 24:14,18
26:2,16 28:9,10
28:21 29:20,23,24
30:10,11 31:9,12
38:20 39:10,22
43:2 50:10 52:21
58:12 66:9,10,13
66:15,15 67:11,12

67:17,21 70:4,4
74:19 75:9,11,16
75:25 79:14 80:9
81:8 86:14,23
90:5,11,17 91:23
91:25 92:1,1,15
92:25
**Vert's** 30:8 67:12
67:19
**vessel** 57:25 58:5,5
58:19 60:6,8
96:16,17
**vessels** 16:4 58:4
**vested** 22:19
**viable** 95:9
**vice** 65:17 93:3
**Vietnamese** 6:22
96:22
**vigorously** 31:13
**violate** 78:4
**volume** 86:7

**W**

**wait** 25:5,7 85:9
**waived** 101:23
**wake** 82:7
**walk** 16:25 17:2
47:2 83:25
**walked** 16:24 47:17
**Walker** 2:4
**Wallin** 1:14 101:4
**want** 21:14 40:7
43:8 44:12 56:1
56:21 63:15 76:24
81:12,13,13 90:6
94:22 95:12,14
**wanted** 22:3,23
32:17 43:21 57:3
59:25 60:1,1
74:15 77:1 90:3
94:19
**wanting** 46:5
**wasn't** 20:9 24:20
25:3 29:19 33:21
40:7 57:23,23

67:7 76:7 81:5
87:1,2,2
**wave** 10:8
**waves** 10:7
**way** 19:18 22:5
45:24,25 47:20
**we'll** 6:2 21:6 50:4
**we're** 21:9 22:14
24:2,3 33:23 50:5
75:6 79:20 91:24
**we've** 18:5 25:17
55:18
**wealthy** 15:20
58:10,10 96:22
97:1
**Wednesday** 20:11
**week** 23:8,9,11,18
24:10,21,25 57:9
87:16
**weeks** 10:10 13:4
41:4 74:2 81:3
88:8,10,11 89:17
91:2
**Weis** 93:3
**Weises** 93:8
**went** 15:16 16:7
22:6 33:14 34:7
45:7 52:22 55:14
56:12 59:16 60:9
66:25 67:9 80:2,4
83:4,19 86:2,8
92:14 95:11
**weren't** 18:17
59:18 79:6 82:3
94:23
**West** 80:16,19
**When's** 87:23
**WHEREOF**
101:15
**Willis** 96:5
**win** 98:12
**wind** 11:14 17:3
23:5 24:22
**winter** 8:22,23
**WITNESS** 61:4

101:15
**Wolf** 34:1,8,9
51:19,22 90:25
**Wolf's** 36:20
**Wolverine** 33:3
36:9
**Woods** 2:14
**words** 16:19 66:19
**work** 48:18 49:8
67:3 87:8,11
94:13 95:17
**worked** 22:18 36:5
41:5,14 51:18
52:7 61:23 67:19
89:17 94:12 95:11
**working** 28:12
41:17 61:20 67:11
**works** 48:1 66:15
67:1,6
**world** 58:3 88:4
89:23 98:20
**worries** 18:23
**worry** 43:13
**worse** 59:4
**worst** 58:25 59:13
59:13
**worth** 58:9 97:2
**worthless** 72:23
**wouldn't** 16:15
37:11 90:9
**wound** 25:14
**Wow** 56:18
**wrong** 18:23 46:22
90:18

**X**

**X** 3:1 101:21

**Y**

**Yangon** 27:14
**yeah** 6:17 8:14 9:18
12:12 14:2 16:16
16:24 17:9 27:3,4
27:6 31:25 32:4
36:6 38:5 39:16

MARCUS LESKOVAR - 12/8/2016
In Re:  Haimark, Ltd (Debtor)

Page 116

41:5,8 42:19 50:7
50:7,7 53:3,13
61:13 62:7,9
64:12,20 68:1
71:23 72:5,19,19
73:23 77:1 82:10
83:10 84:20 85:2
85:4 88:2,8 89:10
90:1,14 91:2,6,7
91:11 93:13
**year** 5:4 9:24 12:4
27:18 40:17 43:22
52:1,18 69:3
73:25 74:2,10,11
87:25 88:2 89:8
89:25
**years** 4:19 6:17,24
22:18 27:16 52:9
52:15 74:3 86:7
91:8 94:20
**Yep** 7:13
**yielded** 63:16
**York** 33:15,17,25
34:6 44:10
**Youngerman** 41:11
47:15

---
**Z**
---

---
**0**
---

---
**1**
---
**1,600-ton** 96:16
**10** 54:15 74:5,8
**100,000** 57:12
**11** 7:10 45:7,14
46:14 49:20 78:7
**12** 6:17
**12/8/16** 100:25
**13** 20:12 52:10 53:2
**14** 52:10 87:8 89:8
101:18
**1403** 4:16
**14th** 21:10,11,12
21:13

**15** 10:8 18:14 54:10
**15,000** 37:2 66:3
**15,000-a-day** 24:24
**15th** 21:15 23:3
**16** 6:17
**16-19885-JGR** 1:3
**1660** 2:19
**16th** 101:16
**17th** 2:9
**18** 52:20 59:23
**1801** 2:15
**1850** 2:20
**19874212873** 101:5

---
**2**
---
**2** 1:13 36:10
**2.5** 77:9
**20** 52:20 74:9
**20,000** 18:15 31:22
**200** 58:7
**2000** 1:13 2:5
**2004** 1:5,11 100:2
101:6
**2012** 6:15,17 14:5
**2013** 53:1
**2014** 52:3 53:21
**2015** 27:19 42:22
43:22,24 45:14
54:4,5
**2016** 1:6,13 3:2
10:16 27:20 28:1
38:6 54:12 99:6
100:16 101:16
**2019** 101:18
**22nd** 23:18
**250** 31:25 32:13
**2600** 2:15
**27,000** 57:9
**29** 10:10 24:5
**29th** 9:25 10:16
23:22 83:15 86:21

---
**3**
---
**3** 15:23 31:19 32:1
36:10

**3.5** 54:11
**3:45** 1:14
**30** 9:23
**300** 33:1 58:3,6
89:1
**3200** 2:10
**340** 89:1
**35** 52:18
**350** 33:1
**350,000** 89:1
**380,000** 68:9

---
**4**
---
**4** 3:3 15:24
**40** 30:20 56:20,25

---
**5**
---
**5** 31:19 32:1 36:11
**5,000** 65:15
**5:14** 75:13
**5:28** 75:13
**5:57** 99:5
**50** 72:13
**555** 2:9

---
**6**
---
**60,000** 72:13
**64** 96:16

---
**7**
---
**7** 1:4 88:13
**7,000-ton** 58:5
**700** 1:13 2:5
**700,000** 29:12,17

---
**8**
---
**8** 1:6,13 3:2
**8:00** 21:18
**80201-8749** 2:11
**80202-2645** 2:16
**80222** 1:13 2:6
**80264** 2:20
**80439** 4:17
**8749** 2:10
**8th** 99:6

---
**9**
---
**9:00** 21:18
**970-485-0735** 4:21

# EXHIBIT C

# EXHIBIT C

# LINDQUIST

L I N D Q U I S T ✦ V E N N U M

Minneapolis • Denver • Sioux Falls

**John C. Smiley**
(303) 454-0508
JSmiley@lindquist.com
www.lindquist.com

Lindquist & Vennum LLP
600 17th Street
Suite 1800 South
Denver, CO 80202-5441
Phone: (303) 573-5900
Fax: (303) 573-1956

December 20, 2016

*Via Certified Mail and Electronic Mail*

Centennial Bank and Trust
c/o Heartland Financial USA, Inc.
Attention: Carol Dolson
700 Locust St
Dubuque IA 52001
    cdolson@htlf.com

Christopher J. Heaphey, Esq.
Risa Lynn Wolf-Smith, Esq.
Holland & Hart LLP
555 Seventeen th, #3200
P. O. Box 8749
Denver, CO 80201-8749
    cjheaphey@hollandhart.com
    rwolf@hollandhart.com

**Re: Haimark, Ltd.; Bankruptcy Case No. 16-19885-JGR;**

Dear Sir/Madam:

As indicated in my letter dated December 12, 2016 to you, we represent Jeffrey Weinman, the Chapter 7 bankruptcy trustee (the "Trustee"), in the above-referenced case of Haimark, Ltd., currently pending in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court").

The Trustee is aware that Haimark, Ltd. holds accounts with Centennial Bank and Trust ("Centennial). Under Title 11, U.S.C. (the "Bankruptcy Code"), the accounts are property of the bankruptcy estate. *See* 11 U.S.C. § 541. The Bankruptcy Code requires that Centennial account for and deliver any funds held in these accounts to the Trustee. *See* 11 U.S.C. § 542(a). The Trustee hereby instructs Centennial to account for and deliver to the Trustee <u>all</u> funds held for Haimark, Ltd. In addition, please provide copies of all accounting documents related to any and <u>all</u> Haimark, Ltd. accounts at Centennial.

The Trustee has now been informed that on December 8, 2016, Markus Leskovar and Sarah Lamond testified under oath that their respective Rule 2004 examinations that funds of Haimark, Ltd. were comingled with funds of Haimark Line, Ltd., and held in an account under the name of Haimark Line, Ltd. Therefore, the Trustee hereby gives notice that funds held in accounts and certificates of deposit under the name of Haimark Line, Ltd. are the property of Haimark, Ltd. The Trustee does not consent to the release of any funds belonging to Haimark, Ltd. and demands an accounting and surrender of said funds.

Centennial Bank and Trust
Holland & Hart LLP
December 20, 2016
Page 2

Please deliver the funds, information, and documents referenced above to me on or before December 26, 2016.  Please contact me if you have any questions or concerns.  Thank you for your prompt attention in this matter.

Very truly yours,

LINDQUIST & VENNUM LLP

John C. Smiley

JCS/cr


cc:   Jeffrey A. Weinman, Trustee
      Mike S. Richardson, Esq.